## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **HEIN HETTINGA AND ELLEN HETTINGA d/b/a SARAH FARMS,** ) ) ) | |
| **Plaintiffs,** ) | **Civil Action No. 06-1637 (RJL)** |
| ) | |
| **v.** ) | |
| ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Defendant.** ) ) | |

### DEFENDANT'S MOTION TO DISMISS PURSUANT
### TO RULE 12(b)(1) AND RULE 12(b)(6)

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure,

defendant the United States of America respectfully moves this Court to dismiss plaintiffs'

complaint for lack of subject matter jurisdiction and for failure to state a claim for relief.  Points

and authorities supporting defendant's motion are presented in the attached Memorandum in

Support of Defendant's Motion to Dismiss.

Dated: December 6, 2006                    Respectfully submitted,

                                           PETER D. KEISLER
                                           Assistant Attorney General

                                           JEFFREY A. TAYLOR
                                           United States Attorney

                                           JAMES J. GILLIGAN
                                           Assistant Branch Director

                                            /s/ Peter J. Phipps
                                           PETER J. PHIPPS
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           Tel: (202) 616-8482
                                           Fax: (202) 616-8470

peter.phipps@usdoj.gov

<u>Mailing Address:</u>
Post Office Box 883
Washington, D.C.  20044

<u>Courier Address:</u>
20 Massachusetts Ave., N.W.
Washington, D.C.  20001

Attorneys for Defendant

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| HEIN HETTINGA AND ELLEN HETTINGA d/b/a SARAH FARMS, ) ) ) ) | |
| Plaintiffs, ) | Civil Action No. 06-1637 (RJL) |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.     The Federal Regulation of Milk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    II.    The Producer-Handler Exception . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    III.   The February 2006 Amendments to USDA Regulations for Order 131 . . . . . . . . 8

    IV.   The Milk Regulatory Equity Act of 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . 12

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    I.     Plaintiffs' Action Must Be Dismissed Pursuant to Rule 12(b)(1) for Lack of Subject Matter Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        A.   Standard of review for Rule 12(b)(1) dismissal . . . . . . . . . . . . . . . . . . 15

        B.   Plaintiffs fail to allege a cognizable injury-in-fact with respect to subsection (M). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        C.   Plaintiffs do not have standing to challenge subsection (N) because they fail to satisfy the traceability and redressability elements of Article III standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        D.   Plaintiffs' complaint should also be dismissed for lack of jurisdiction because it fails to identify a valid waiver of sovereign immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        E.   The Court lacks jurisdiction over plaintiffs' action because plaintiffs have not exhausted their mandatory administrative remedies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    II.    Plaintiffs' Complaint Does Not State a Cognizable Claim for Relief. . . . . . . . . 24

        A.   Standard of review for a Rule 12(b)(6) motion to dismiss . . . . . . . . . . 25

        B.   Section 2(a) of the MREA is not an unconstitutional bill of attainder. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

1.      Section 2(a) does not satisfy the specificity element of a bill-of-attainder violation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

2.      Section 2(a) of the MREA does not inflict a legislative punishment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

a.      Historical Analysis of Punishment . . . . . . . . . . . . . . . . . 29

b.      Functional Analysis of Punishment . . . . . . . . . . . . . . . . 30

c.      Motivational Analysis of Punishment . . . . . . . . . . . . . . 32

3.      Section 2(a) of the MREA does not legislatively determine plaintiffs' guilt, nor does it deny plaintiffs a right to a judicial trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

C.      The MREA does not violate the Equal Protection Clause. . . . . . . . . . . 39

D.      The MREA does not violate the Due Process Clause. . . . . . . . . . . . . . . 42

E.      Nor does the MREA unconstitutionally foreclose judicial review of USDA regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

## INTRODUCTION

Plaintiffs, Hein and Ellen Hettinga d/b/a Sarah Farms, seek to have this Court strike down as unconstitutional two provisions of the Milk Regulatory Equity Act of 2006, Pub. L. No. 109-215, 120 Stat. 328 (Apr. 11, 2006) (the "MREA"). Plaintiffs' complaint targets section 2(a) of the MREA, specifically subsections (M) and (N), which place volume limits on the applicability of the so-called "producer-handler exception." The exception itself exempts certain entities that produce their own milk and handle their own milk products from making payments into federally-regulated milk pooling systems, which guarantee dairy farmers a minimum price for their milk. The volume limit on the producer-handler exception ensures that the largest entities in the dairy industry are not exempted from making such pool payments. Specifically, under subsection (M), the producer-handler exception does not apply to entities (i) whose monthly fluid milk dispositions exceed three million pounds and (ii) who sell milk from a federally regulated geographic area into a non-federally regulated area. Subsection (N) applies a similar cap of three million pounds of milk per month to the producer-handler exception for the Arizona geographical region, thus ensuring that any entity whose production exceeds that limit is subject to the applicable federal pooling payment obligations. Plaintiffs complain that these two subsections violate the Bill of Attainder Clause, the Equal Protection Clause, and the Due Process Clause. Not only do these claims lack merit, but also, more basically, the Court does not have subject matter jurisdiction over plaintiffs' action.

Starting with subject matter jurisdiction, there are three reasons why the Court lacks such jurisdiction: (i) plaintiffs lack Article III standing; (ii) plaintiffs have not identified a valid waiver of sovereign immunity; and (iii) plaintiffs have not exhausted their mandatory administrative remedies.

1

First, plaintiffs do not have Article III standing to bring their claims.  By failing to allege that they actually sell milk into a non-federally regulated geographic area, plaintiffs have not alleged that subsection (M) causes them an injury-in-fact sufficient for Article III standing.  See Sierra Club v. Morton, 405 U.S. 727, 735 (1972).  Plaintiffs' challenge to subsection (N) likewise does not satisfy the traceability or the redressability components of Article III standing.  Because the relevant producer-handler exception adopted by regulation, see 71 Fed. Reg. at 9433, Part 3 (to be codified at 7 C.F.R. § 1131.10), independently excludes handlers with monthly milk dispositions in excess of three million pounds, the enactment of subsection (N) does not cause plaintiffs to incur obligations beyond those already imposed in the regulations.  Nor would declaring subsection (N) unconstitutional redress plaintiffs' alleged grievance as the USDA regulations are not challenged here and would not be affected by such a declaration.

Second, to bring suit against the United States, plaintiffs need to identify a valid waiver of sovereign immunity in their complaint.  They do not do so.  None of the jurisdictional bases that plaintiffs state for their suit (28 U.S.C. §§ 1331, 1337, 2201, and 2202) constitutes a waiver of sovereign immunity.  Consequently, their pleading fails to demonstrate a basis for the Court's jurisdiction over their action.

Third, even if plaintiffs were to have the ability to sue the United States here, they have not complied with the mandatory exhaustion requirements.  Because plaintiffs' present action seeks to alter their obligations under federal milk marketing orders, plaintiffs must first exhaust the mandatory administrative remedies by petitioning to the Secretary of Agriculture.  See 7 U.S.C. § 608c(15)(A); United States v. Ruzicka, 329 U.S. 287, 294 (1946); Edaleen Dairy, LLC v. Johanns, -- F.3d -- , 2006 WL 3069187, at *6 (D.C. Cir. Oct. 31, 2006).  Plaintiffs have not done so, and consequently the Court does not have jurisdiction over their action.

2

In addition to the lack of subject matter jurisdiction, plaintiffs' complaint should be dismissed for failure to state a claim for relief.

There is no bill of attainder violation. Section 2(a) of the MREA, which contains subsections (M) and (N), does not satisfy any of the elements of a prohibited bill of attainder. By regulating conduct as opposed to singling out plaintiffs by name or by another irreversible characteristic, section 2(a) does not meet the specificity requirement for a bill of attainder. Nor do the regulatory provisions in section 2(a) constitute a legislative punishment. They are outside of the historical meaning of legislative punishment; they do not function in a retributive manner; and there is no evidence, much less the "clear proof" required, of a legislative intent to punish plaintiffs. Rather, these subsections advance the legitimate non-punitive purposes of achieving regulatory equity and ensuring orderly milk markets. Also fatal to plaintiffs' bill of attainder count are the facts that section 2(a) does not contain a legislative determination of plaintiffs' guilt, and that it does not deny plaintiffs the ability to seek judicial relief.

The MREA also does not violate the Equal Protection Clause. Contrary to plaintiffs' assertions, subsections (M) and (N) are legitimate economic regulations of the milk industry and are fully constitutional. Both subsections exclude high-volume handlers from the producer-handler exception. This is a valid economic regulation. By capping the applicability of the producer-handler exception, the MREA prohibits the barons of the milk industry from using the exception to avoid payments into a pooling system that stabilizes milk markets by guaranteeing producers a uniform minimum price for milk. Thus, the MREA is a rational means of furthering the legitimate government interests in orderly milk markets and regulatory equity.

Nor does the MREA impose a mandatory statutory penalty in violation of the Due Process Clause. Due process does not forbid prospective statutory amendments that adversely

3

affect the operation of a business.  More basically, the MREA does not have a mandatory effect

on plaintiffs since, by altering their conduct and reducing their milk distribution, plaintiffs could

avoid any direct effects of the MREA.  Even if due process protections were triggered here, the

MREA prevails because it survives rationality review.

Finally, the MREA does not unconstitutionally foreclose judicial review of regulations

issued by USDA earlier this year.  Nothing in the MREA stripped plaintiffs of the right to seek

judicial review of those USDA regulations.  Nor did the MREA interfere with pending litigation

that plaintiffs had initiated against the USDA – plaintiffs themselves stipulated to dismiss that

case after losing a motion for a preliminary injunction.  And again, even if a due process or equal

protection interest were implicated, the MREA would still be valid since it passes rationality

review.

For these reasons, explained further below, plaintiffs' complaint should be dismissed for

lack of subject matter jurisdiction and for failure to state a claim for relief.

## STATUTORY AND REGULATORY BACKGROUND

## I.    The Federal Regulation of Milk

Through the Agricultural Marketing Agreement Act of 1937 as amended, see 7 U.S.C.

§ 601 et seq. (the "AMAA"), Congress empowered the Secretary of Agriculture to regulate

persons who handle agricultural commodities, including milk products.  See id. § 608c(1)-(2).

Congress authorized the regulation of such persons, known as "handlers," through agricultural

marketing orders to further several policy objectives, including establishing and maintaining

orderly marketing conditions for agricultural commodities, see id. § 602(1), protecting consumers

of agricultural commodities, see id. § 602(2), as well as avoiding unreasonable fluctuations in

supplies and prices by maintaining an orderly supply of agricultural products throughout the

seasons, see id. § 602(4).

With regard to milk, the AMAA authorizes the Secretary of Agriculture to establish milk marketing orders to regulate different geographic regions of the country.  See id. §§ 608c(1), (5).  This authority includes the ability to guarantee dairy farmers (referred to as "producers") a minimum uniform price for milk sold to handlers, regardless of the milk's ultimate use.  Id. §§ 608c(5)(A)-(C).  Pursuant to the AMAA, the Secretary of Agriculture has issued several milk marketing orders for many geographic regions of the United States, including Order 131, which governs the Arizona geographic region.  See, e.g., 7 C.F.R. §§ 1131.1 -.86 (providing regulations specific to Order 131).

The need for these milk marketing orders stems from two distinct features of the milk market.  First, milk production is seasonally cyclical (cows produce more milk in the spring and summer), while demand for milk is fairly stable throughout the year.  See Zuber v. Allen, 396 U.S. 168, 172-73 (1969); Lamers Dairy Inc. v. USDA, 379 F.3d 466, 469 (7th Cir. 2004); Lehigh Valley Farmers v. Block, 829 F.2d 409, 411 (3d Cir. 1987); Dairylea Coop., Inc. v. Butz, 504 F.2d 80, 84 (2d Cir. 1974).  Because fluid milk has a relatively short shelf-life, farmers compensate for the leaner milk production in the fall and winter months by maintaining larger herds of cows.  See Zuber, 396 U.S. at 173; Lamers Dairy, 379 F.3d at 469.  Those larger herds, which enable the farmers to meet the market demand for milk in the fall and winter months, produce significant surpluses of milk in the spring and summer months, which, in the absence of regulation, would cause milk prices to drop.  See Zuber, 396 U.S. at 173; Lamers Dairy, 379 F.3d at 469; Lehigh Valley, 829 F.2d at 411; Dairylea, 504 F.2d at 84.  Because milk prices would drop in the spring and summer, dairy farmers would have to produce more milk to support themselves, and this greater production would accelerate the decline in the milk price and the

5

disequilibrium that follows.  See Zuber, 396 U.S. at 173; Lamers Dairy, 379 F.3d at 469.  The second distinctive feature of the milk market is that fluid milk commands a higher price than milk of the same quality sold for other uses, such as yogurt, cheese, and butter.  See Zuber, 396 U.S. at 172; Lehigh Valley, 829 F.2d at 411; Dairylea, 504 F.2d at 84.  Because fluid milk is more profitable, the competition between dairy farmers in the absence of regulation would be "ruinous and self-defeating."  See Zuber, 396 U.S. at 180-81; Lehigh Valley, 829 F.2d at 411; Dairylea, 504 F.2d at 84.

As authorized by the AMAA, the milk marketing orders issued by the Secretary of Agriculture seek to stabilize milk markets by guaranteeing producers a uniform minimum price for milk through a pooling process.  Because the value of milk varies according to its end use, the first step in the pooling process is the creation of different classes of milk products based on end use.  See 7 U.S.C. § 608c(5)(A); 7 C.F.R. § 1000.40 (classifying milk by end use); see also Lamers Dairy, 379 F.3d at 469.  For example, milk intended for fluid consumption is categorized as Class I milk, see 7 C.F.R. § 1000.40(a), while milk for yogurt, hard cheese, and butter is denominated as Class II, Class III, and Class IV milk, respectively, see 7 C.F.R. § 1000.40(b)-(d).  A minimum price for milk within each class is then calculated on a monthly basis.  See 7 C.F.R. § 1000.50 (providing for the monthly calculation of class minimum prices); see also Lamers Dairy, 379 F.3d at 469.  Those minimum prices per class are used to determine a weighted average for the overall price of milk by (i) multiplying the total units of milk in each class sold to handlers by the minimum price for that class, (ii) aggregating those class totals; and (iii) dividing the aggregated class totals by the total units of milk sold in all classes.  See Lamers Dairy, 379 F.3d at 469; Lehigh Valley, 829 F.2d at 411; Stew Leonard's v. Glickman, 199 F.R.D. 48, 50 (D. Conn. 2001) (providing a hypothetical example to demonstrate the weighted average

6

calculation); see, e.g., 7 C.F.R. § 1131.61 (setting forth the method of calculating the weighted

average for Order 131). This weighted average provides a uniform minimum price for milk,

which after accounting for other potential factors, such as location within a milk marketing order,

constitutes the "blend price" that producers are entitled to receive from handlers, regardless of

the end use for the milk. See Lamers Dairy, 379 F.3d at 469; see, e.g., 7 C.F.R. § 1131.73

(payments from handlers to producers in Order 131); 7 C.F.R. § 1131.75 (differentials to the

uniform prices in Order 131). Establishing this minimum blend price promotes orderly markets

because it eliminates the incentive for producers to compete with one another by destructively

lowering their prices. See Lamers Dairy, 379 F.3d at 469; Lehigh Valley, 829 F.2d at 411-12;

Schepps Dairy, Inc. v. Bergland, 628 F.2d 11, 15 (D.C. Cir. 1979).

On the handler side, a 'pool' or 'settlement fund' is created to take into account the end

use of milk purchased at the blend price. See 7 C.F.R. § 1000.70 (providing for the settlement

fund). Handlers pay into the settlement fund to the extent that the average end-use value of their

milk products exceeds the blend price. See Lehigh Valley, 829 F.2d at 412; Schepps Dairy,

628 F.2d at 15; see, e.g., 7 C.F.R. § 1131.71 (providing for handler payments into the settlement

fund for Order 131). Likewise, handlers whose average end-use value of their milk products is

below the blend price will receive payments from the settlement fund. See Lehigh Valley,

829 F.2d at 412; Schepps Dairy, 628 F.2d at 15; see, e.g., 7 C.F.R. § 1131.72 (providing for

payments to handlers from the settlement fund for Order 131). The net effect of these payments

between the settlement fund and regulated handlers is that "each handler pays for his milk at the

price he would have paid had it been earmarked at the outset for the use to which it was

ultimately put." Lehigh Valley Coop. Farmers, Inc. v. United States, 370 U.S. 76, 81 (1962); see

also 7 U.S.C. § 608c(5)(C) (requiring that "the total sums paid by each handler shall equal the

value of milk purchased by him at the prices fixed . . ."); Lamers Dairy, 379 F.3d at 470.

## II.    The Producer-Handler Exception

The pooling and pricing systems established by federal milk marketing orders have historically recognized an exception for integrated dairy operations where the same entity is both the producer and the handler of the milk. See Edaleen Dairy, LLC v. Johanns, -- F.3d -- , 2006 WL 3069187, at *1 (D.C. Cir. Oct. 31, 2006). Such an entity is commonly referred to as a "producer-handler." Typically, when a producer-handler operates its entire business – from cow to consumer – without relying on federal minimum price guarantees, it is exempt from the pooling and pricing obligations imposed on other handlers in the federal milk marketing order and thus will not have to make payments into the settlement fund. See id.

Historically, the entities qualifying for this producer-handler exception were small family businesses, and their use of the exception did not disrupt orderly milk market conditions. See id.; Stew Leonard's, 199 F.R.D. at 50. In recent years, however, the allure of the competitive advantage from the producer-handler exception (not having to make payments to the settlement fund) has motivated entities with large-scale dairy operations to exploit the exception. See Edaleen Dairy, 2006 WL 3069187, at *1. In response to those developments, USDA recently amended the producer-handler exception for two milk marketing orders, including Order 131, the Arizona region, where Sarah Farms is located.

## III.    The February 2006 Amendments to USDA Regulations for Order 131

In February 2006, the Secretary of Agriculture redefined the producer-handler exception for Order 131 so that large producer-handlers are no longer exempt from the Order's pooling and pricing requirements. See Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas; Order Amending the Orders, 71 Fed. Reg. 9430 (Feb. 24, 2006). Specifically, under the

8

amended regulatory definition, handlers with in-area monthly milk distributions of over three

million pounds no longer qualify as exempt producer-handlers:

> Producer-handler means a person who operates a dairy farm and a distributing
> plant from which there is route distribution within the marketing area during the
> month not to exceed 3 million pounds and who the market administrator has
> designated a producer-handler after determining that all of the requirements of this
> section have been met.

71 Fed. Reg. at 9433, Part 3 (to be codified at 7 C.F.R. § 1131.10).  By this imposition of a three-

million pound-per-month cap on milk distributions, large producer-handlers in Order 131 are

now subject to the pooling and pricing requirements for handlers in Order 131.  See 71 Fed. Reg.

at 9430.

Before implementing such a rule, USDA issued a proposed rule, heard testimony, and

made findings regarding the need and appropriateness of amending the producer-handler

exception for Order 131.  See *Milk in the Pacific Northwest and Arizona-Las Vegas Marketing*

*Areas; Final Decision on Proposed Amendments to Marketing Agreement and to Orders*, 70 Fed.

Reg. 74166-91 (Dec. 14, 2005).  As a result of that process, USDA concluded that contrary to the

AMAA's goal of achieving orderly milk markets, an uncapped producer-handler exception in the

Arizona region was contributing to significant market instability:

> The record supports finding that producer-handlers with more than 3 million
> pounds of route disposition per month in both the Pacific Northwest and the
> Arizona-Las Vegas marketing areas are the primary source of disruption to the
> orderly marketing of milk.  This disorder is evidenced by significantly inequitable
> minimum prices that handlers pay and reduced blend prices that dairy farmers
> receive under the terms of each area's marketing order.  Accordingly, producer-
> handler status under the Pacific Northwest and the Arizona-Las Vegas orders
> should end when a producer-handler exceeds 3 million pounds per month of in-
> area Class I route disposition.

70 Fed. Reg. at 74185-86; see also id. at 74188 ("This decision finds that disorderly marketing

conditions exist in the Pacific Northwest and the Arizona-Las Vegas marketing areas.").[1]

USDA explained this conclusion in detail, consistently observing that permitting large producer-handlers to avoid the pooling and pricing requirements, gives them a two-fold competitive advantage that leads to market instability.  First, the unregulated producer-handlers obtain a pricing advantage over the regulated handlers because the large producer-handlers do not have to pay into the settlement fund for their sales of highly profitable fluid milk, as do the regulated handlers:

> In general, the difference between the Class I price and the blend price not paid into the producer-settlement fund is the pricing advantage enjoyed by producer-handlers over fully regulated handlers. . . . Since fully regulated handlers do not have the ability to escape payment into the producer-settlement fund of the difference in their use-value of milk and the order's blend price like producer-handlers, regulated handlers competing against large producer-handlers are at a competitive price disadvantage.

70 Fed. Reg. at 74186; see also Edaleen Dairy, 2006 WL 3069187, at *1; Stew Leonard's, 199 F.R.D. at 50.  Second, the large producer-handlers derive a competitive advantage relative to the other milk producers due to these exempted pool payments.  Because the blend price is a weighted average of the milk price in all classes, exempting the large producer-handlers (who have significant volumes of high-value fluid milk sales) from pool payments reduces the blend price that producers are guaranteed to receive.  See Edaleen Dairy, 2006 WL 3069187, at *1;

---

[1] USDA concluded that the evidence before it would have supported a decision to phase out the producer-handler exception at an even lower monthly milk volume – 150,000 pounds – one-twentieth of the current three-million pound cap:

> Review of the intent of the producer-handler provision and the marketing conditions arising from this provision in these orders could warrant finding that the original producer-handler exemption is no longer valid or should be limited to 150,000 pounds per month Class I route disposition limit.  However, the hearing notice for this proceeding constrains such a finding to a level of not less than 3 million pound per month of Class I route dispositions.

70 Fed. Reg. at 74186.

Stew Leonard's, 199 F.R.D. at 50-51.  In Order 131, USDA concluded that each producer loses

thousands of dollars annually as a result of the lowered blend price:

> The record evidence supports concluding that the one large producer-handler
> represents between 12-18 percent of the total Class I sales volume in the Arizona-
> Las Vegas marketing area.  The record evidence supports a conclusion that the
> exemption of this producer-handler has reduced the blend price received by
> pooled producers between $.04 and $.06 cwt per month in the Arizona-Las Vegas
> marketing area.
>
> \* \* \*
>
> For the Arizona-Las Vegas marketing area the record supports concluding that the
> annualized reduction in revenue received by the average pooled producer would
> range between $11,000-$17,000 from the $0.04-$0.06 per cwt impact of large
> producer-handlers on that order's blend price per month for 2003.

70 Fed. Reg. at 74186.

In addition to these findings on the disruptive effects of an uncapped producer-handler

exception, USDA also concluded that a central rationale underlying the producer-handler

exception no longer applies to the large producer-handlers.  A justification for exempting

producer-handlers from the pooling and pricing requirements was that they bore the burden of

disposing of their surplus milk – milk that they processed, but could not sell as fluid milk.  But,

that rationale ceases to exist for large producer-handlers because by not having to pay into the

settlement fund, they can price their milk so that all of it can be sold as highly profitable fluid

milk:

> The record supports concluding that producer-handlers with more than 3 million
> pounds of route disposition per month have gained the ability to no longer bear
> the burden of the surplus disposal of their milk production.  This represents a
> significant development that warrants the need for regulatory action because the
> producer-handler exemption from the pooling and pricing provisions of the orders
> has been rationalized on the basis that producer-handlers bear the entire burden of
> balancing their own production.  A producer-handler not bearing the burden of
> balancing their milk production essentially shifts such burden to the market's
> pooled producers while simultaneously retaining the full value of Class I sales for
> themselves.

11

Id. at 74187.  Thus, USDA found that the competitive advantage from the producer-handler exception is so great that it allows large producer-handlers to avoid the risks traditionally associated with producer-handler status.[2]

In sum, USDA concluded that "large producer-handlers have and use a pricing advantage that cannot be overcome by fully regulated handlers [and that this] advantage increases only as producer-handler size increases."  Id.  Accordingly, USDA reasoned that capping the producer-handler exception at three million pounds of monthly milk disposition would "significantly reduce" these disorderly market conditions in Order 131, and for that reason such a cap was implemented.  See 71 Fed. Reg. at 9433, Part 3 (to be codified at 7 C.F.R. § 1131.10); see also 70 Fed. Reg. at 74188.

**IV.    The Milk Regulatory Equity Act of 2006**

Enacted on April 11, 2006, the MREA amends and supplements the AMAA.  See Pub. L. No. 109-215, 120 Stat 328 (Apr. 11, 2006).  In conjunction with the goals of the AMAA, the

---

[2]  Also, producer-handlers' ability to dispose of surplus milk in non-federally-regulated areas (such as California) without making pool payments (as regulated handlers must) works to exacerbate further the competitive advantage associated with the producer-handler exception because producer-handlers can dispose of their surplus milk outside of the regulated region at prices lower than regulated handlers can match:

> The record evidence, reinforced with subsequent comments, also reveals that producer-handlers in both the Pacific Northwest and the Arizona-Las Vegas marketing areas with route disposition of more than 3 million pounds per month enjoy sales of fluid milk products into unregulated areas such as Alaska and California. . . . This outcome has the compounded disadvantage for regulated handlers and their producer-suppliers because fully regulated handlers must account to the market-wide pool for Class I sales outside of the marketing area at the order's Class I price.  This yields a two-fold advantage to producer-handlers – the ability to eliminate balancing their milk production through Class I sales at the expense of the regulated market and the ability to compete on a consistent basis at prices that fully regulated handlers are unable to meet.

70 Fed. Reg. at 74187.

MREA also sought to ensure regulatory equity.  See id. at 328.  Section 2(a) of the MREA

contains the two provisions that plaintiffs challenge: subsections (M) and (N), which are now

codified at 7 U.S.C. § 608c(5)(M)-(N).

Subsection (M) regulates the sale of fluid milk into geographic regions with state-law

minimum prices for milk (such as California) by handlers located in federally regulated milk

marketing orders (such as Arizona).  In general under subsection (M), milk handlers who import

milk into a region governed by state minimum milk prices "shall be subject to all of the

minimum and uniform price requirements of a Federal milk marketing order . . . applicable to the

county in which the plant of the handler is located . . . ."  7 U.S.C. § 608c(5)(M)(i).  There are

exceptions to this general rule, including one for producer-handlers with monthly "route

dispositions, and sales to other plants, of packaged fluid milk equaling less than 3,000,000

pounds of milk. " 7 U.S.C. § 608c(5)(M)(iv)(II).  Thus, under subsection (M), producer-handlers

with monthly fluid milk disposition of over three million pounds will be subject to the federal

minimum and uniform price requirements for sales of milk into non-federally regulated areas.

Subsection (N) regulates milk handlers in Order 131.  Under subsection (N), handlers

(including producer-handlers) with a monthly disposition of over three million pounds of Class I

milk products from their own farms are subject to the minimum pooling and pricing

requirements.  7 U.S.C. § 608c(5)(N).

### STATEMENT OF THE CASE

Plaintiffs, Hein and Ellen Hettinga d/b/a Sarah Farms, allege that they own, control, and

operate Sarah Farms, which processes and markets milk produced from plaintiffs' own farms.

(Compl. ¶¶ 11-12.)  Plaintiffs further allege that each month Sarah Farms processes and sells

more than three million pounds of its own farm-produced milk in the Arizona milk marketing

13

area, known as Order 131.  (Compl. ¶ 17).  Plaintiffs characterize the Sarah Farms business

operation as qualifying as a producer-handler under the AMAA (Compl. ¶14.), but also

acknowledge that USDA's recent regulatory amendments impose the pooling and pricing

obligations on any producer-handler in Order 131 with monthly milk distribution of over three

million pounds.  (Compl. ¶ 24); see also 71 Fed. Reg. at 9433, Part 3 (to be codified at 7 C.F.R.

§ 1131.10).  Plaintiffs further allege that they are the only producer-handler in Order 131 with

monthly milk sales over three million pounds.  (Compl. ¶ 17.)

       The instant litigation is not the first time that plaintiffs have challenged the producer-

handler exception through litigation.  Earlier this year, plaintiffs challenged the legality of the

USDA's recent regulations in Hettinga v. Johanns, No. 06cv00052 (N.D. Tex.), and sought a

preliminary injunction against their enforcement.  (Compl. ¶ 25.)  The District Court for the

Northern District of Texas denied that motion, see Hettinga v. Johanns, No. 06cv00052, slip. op.

at 4 (N.D. Tex. Mar. 30, 2006) (copy attached as Exhibit 1), and plaintiffs then voluntarily

dismissed their case through stipulation, see id., stipulation of dismissal (May 22, 2006) (copy

attached as Exhibit 2).

       Plaintiffs' current action challenges the constitutionality of the MREA.  Plaintiffs assert

that section 2(a) of the MREA violates the Bill of Attainder Clause by intentionally singling out

plaintiffs for legislative punishment for their past conduct.  (Compl. at ¶¶ 54-57.)  Plaintiffs next

argue that section 2(a) of the MREA denies them equal protection by subjecting them to pooling

and pricing requirements that do not apply to other producer-handlers.  (Compl. ¶ 65.)

According to plaintiffs, the MREA also violates the Due Process Clause "by imposing a

mandatory statutory punishment upon the operation of their business."  (Compl. ¶ 61.)  Plaintiffs

further contend that the enactment of section 2(a) violated their equal protection and due process

rights by denying them judicial review of USDA's February 2006 regulations. (Compl. ¶¶ 60, 65.) On these grounds, plaintiffs pray to have section 2(a) of the MREA declared unconstitutional, and they seek to enjoin permanently the application of the MREA to Sarah Farms. (Compl. at 18, ¶ 1-6.)

## ARGUMENT

### I.    Plaintiffs' Action Must Be Dismissed Pursuant to Rule 12(b)(1) for Lack of Subject Matter Jurisdiction.

The Court does not have subject matter jurisdiction over plaintiffs' action. Plaintiffs' challenges to subsections (M) and (N) do not satisfy the elements of Article III standing. More globally, plaintiffs have not identified a valid waiver of sovereign immunity and therefore cannot proceed with a suit against the United States. In addition, plaintiffs have not complied with the mandatory administrative remedies, thus precluding the Court's jurisdiction over this action. For those reasons, plaintiffs' action must be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).

### A.    Standard of review for Rule 12(b)(1) dismissal

Federal Rule of Civil Procedure 12(b)(1) allows for a preliminary challenge to a court's subject matter jurisdiction over an action. Because federal courts are courts of limited jurisdiction, it is presumed that a plaintiff's action lies outside of that jurisdiction. See Kokkonen v. Guardian Life Ins. Co. of Am., 511 US. 375, 377 (1994); Logan v. Dep't of Veterans Affairs, 257 F. Supp. 2d 149, 153 (D.D.C. 2004). For that reason, a plaintiff bears the burden of demonstrating by a preponderance of the evidence that a court has jurisdiction over the action. See Menkes v. Dep't of Homeland Sec., 402 F. Supp. 2d 204, 207 (D.D.C. 2005). A plaintiff's burden for establishing jurisdiction includes proving the elements of Article III

standing (an injury-in-fact, traceability, and redressability).  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Grassroots Recycling Network, Inc. v. U.S. Envtl. Prot. Agency, 428 F.3d 1109, 1111-12 (D.C. Cir. 2005).  A court's standing inquiry is "especially rigorous when reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  Raines v. Byrd, 521 U.S. 811, 819 (1997).  Where a plaintiff does not establish standing to bring a claim, a court must dismiss that claim for lack of subject matter jurisdiction.  See Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 475-76 (1982) ("Those who do not possess Article III standing may not litigate as suitors in the courts of the United States."); LPA, Inc. v. Chao, 211 F. Supp. 2d 160, 163 (D.D.C. 2002); Bristol-Myers Squibb Co. v. Shalala, 892 F. Supp. 295, 297 (D.D.C. 1995).

> **B.  Plaintiffs fail to allege a cognizable injury-in-fact with respect to subsection (M).**

Plaintiffs have not alleged an injury-in-fact sufficient for Article III standing to challenge subsection (M).  To satisfy the injury-in-fact requirement, the alleged injury must be "distinct and palpable" and not "abstract," "conjectural," or "hypothetical."  Allen v. Wright, 468 U.S. 737, 751 (1984).  Here, plaintiffs have not alleged "distinct and palpable" injuries arising from subsection (M).

Plaintiffs' complaint makes several references to subsection (M), which limits the producer-handler exception in the context of fluid milk sales from federally-regulated regions into state-regulated regions.  See 7 U.S.C. § 608c(5)(M).  But, the complaint omits one critical allegation: that Sarah Farms actually engages in the inter-region milk sales regulated by subsection (M).  Rather, the complaint juxtaposes a description of subsection (M) with an

allegation that plaintiffs sell more than three million pounds of fluid milk a month:

> [T]he bill directly imposed the pricing and pooling requirements of the Arizona-Las Vegas Order on all sales into the California market (which otherwise was not subject to Federal pricing and pooling regulations) by any producer-handler in Arizona that sold more than 3,000,000 pounds of packaged fluid milk per month. Again, there was only one producer-handler in the Arizona-Las Vegas Milk Marketing area that satisfied that criterion, Sarah Farms.

(Compl. ¶ 27.)  Thus, while the complaint alleges that Sarah Farms is the only handler that would be affected by subsection (M), it does not allege that Sarah Farms actually sells any fluid milk in California.

The complaint likewise fails to make that critical allegation – that Sarah Farms sells fluid milk in California – at other times as well.  In paragraph 39, plaintiffs assert that in light of their sales volume, they are subject to subsection (M) for any sales they make in California:

> Subsection (M) thus subjects Sarah Farms to the pricing and pooling requirements of the Arizona-Las Vegas Milk Marketing Order, and its onerous payment obligations, for any sales of milk it makes to California purchasers.

(Compl. ¶ 39.)  These allegations do not allege a "distinct and palpable" injury because they omit any statement that Sarah Farms actually makes any sales of fluid milk in California.  For that reason, any 'injury' that subsection (M) would cause plaintiffs is at most "hypothetical" since it would occur only if Sarah Farms sells fluid milk into California – a fact which plaintiffs have not alleged.

This pleading defect is of constitutional significance and is ultimately fatal for plaintiffs' challenge to subsection (M).  See Lujan, 504 U.S. at 561 (explaining that the elements of Article III standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at

17

the successive stages of the litigation").  It was on this same grounds that the Supreme Court in

Sierra Club v. Morton, 405 U.S. 727 (1972), dismissed the Sierra Club's challenge to the

development of a national forest.  There, the Supreme Court held that the Sierra Club did not

have standing because it "failed to allege that it or its members would be affected in any of their

activities or pastimes by the [proposed] development."  Id. at 735.  Similarly, here, plaintiffs have

not alleged that Sarah Farms actually makes fluid milk sales in California.  Thus, as Sierra Club

makes clear, alleging only a hypothetical injury does not suffice to satisfy the injury-in-fact

requirement for standing to challenge subsection (M).

>        **C.    Plaintiffs do not have standing to challenge subsection (N) because
>               they fail to satisfy the traceability and redressability elements of
>               Article III standing.**

Plaintiffs do not have Article III standing to challenge the constitutionality of

subsection (N) because they cannot satisfy the traceability and redressability requirements.  See

Lujan, 504 U.S. at 560; see also Am. Library Ass'n v. Fed. Communications Comm'n, 401 F.3d

489, 492 (D.C. Cir. 2005) ("It is equally well established that Article III standing is a prerequisite

to federal court jurisdiction, and that [plaintiffs] carry the burden of establishing their standing."

(citations omitted)).  To prove the traceability requirement, plaintiffs must demonstrate a "fairly

traceable" causal connection between the alleged injury and the challenged action, and the injury

must not result from another independent action not before the court.  See Lujan, 504 U.S. at

560.  With regard to redressability, plaintiffs have to show that the requested relief would likely

redress their alleged injury.  See Mountain States Legal Found. v. Glickman, 92 F.3d 1228, 1233

(D.C. Cir. 1996); In re Thornburgh, 869 F.2d 1503, 1511 (D.C. Cir. 1989).  Put simply,

plaintiffs' challenges to subsection (N) do not overcome these preliminary hurdles for Article III

standing because USDA regulations independently exclude plaintiffs from the producer-handler

exception, see 71 Fed. Reg. at 9433, Part 3 (to be codified at 7 C.F.R. § 1131.10) (excluding

handlers with a monthly distribution of over three million pounds from the definition of

"producer-handler").

As explained above, subsection (N) mandates that handlers in Order 131 with monthly

distributions in excess of three million pounds be subject to the Order's minimum price

requirements:

> Notwithstanding any other provision of this section, no handler with distribution
> of Class I milk products in the marketing area described in Order 131 shall be
> exempt during any month from any minimum price requirement established by the
> Secretary under this subsection if the total distribution of Class I products during
> the preceding month of any such handler's own farm production exceeds
> 3,000,000 pounds.

7 U.S.C. § 608c(5)(N).  By subjecting such handlers to the minimum price requirements,

subsection (N) prevents handlers in Order 131 with monthly distribution greater than three

million pounds from qualifying for the producer-handler exemption.

Although plaintiffs' subsection (N) claim is premised on the loss of producer-handler

status and the corresponding obligations to make pool payments, that alleged injury is not caused

by subsection (N), nor would enjoining the enforcement of subsection (N) redress that alleged

injury.  This is so because USDA regulations independently foreclose handlers in Order 131 with

monthly route distribution of over three million pounds, such as plaintiffs, from qualifying as a

producer-handler:

> Producer-handler means a person who operates a dairy farm and a distributing
> plant from which there is route distribution within the marketing area during the
> month not to exceed 3 million pounds . . . .

71 Fed. Reg. at 9433, Part 3 (to be codified at 7 C.F.R. § 1131.10).

Due to this regulation, *which plaintiffs do not challenge in this litigation*, plaintiffs

19

would not qualify for the producer-handler exemption for Order 131.  (<u>See</u> Compl., ¶ 27 (acknowledging that Sarah Farms has monthly sales in excess of three million pounds)); <u>see also</u> 70 Fed. Reg. 74166, 74181 ("The witness, [the founder of Sarah Farms] testified that Sarah Farms' sales exceed 3 million pounds per month . . . ."); <u>id.</u> at 74168 (testimony estimating Sarah Farms' Class I milk sales at approximately 12 million pounds per month).  Thus, plaintiffs' alleged injury is not fairly traceable to subsection (N) since, by virtue of 71 Fed. Reg. at 9433, Part 3 (to be codified at 7 C.F.R. § 1131.10), plaintiffs independently do not qualify for the producer-handler exemption.  Similarly, even a permanent injunction of subsection (N) would not redress plaintiffs' alleged injury because 71 Fed. Reg. at 9433, Part 3 (to be codified at 7 C.F.R. § 1131.10) would independently prohibit plaintiffs from qualifying as a producer-handler as long as their route distribution exceeded three million pounds.  For these reasons, plaintiffs' constitutional challenges to subsection (N) should be dismissed for lack of standing.

    **D.**    **Plaintiffs' complaint should also be dismissed for lack of jurisdiction because it fails to identify a valid waiver of sovereign immunity.**

       To maintain a suit against the United States, there must be a valid waiver of sovereign immunity; plaintiffs' complaint does not identify a valid waiver of sovereign immunity, and must therefore be dismissed.  Under the principle of sovereign immunity, the United States can be sued only where it has expressly consented to such suit by statute.  <u>See</u> <u>Fed. Deposit Ins. Corp. v. Meyer</u>, 510 U.S. 471, 475 (1994); <u>Block v. North Dakota</u>, 461 U.S. 273, 287 (1983); <u>Settles v. U.S. Parole Comm'n</u>, 429 F.3d 1098, 1105 (D.C. Cir. 2005).  Without an applicable statutory waiver of sovereign immunity, a court is without jurisdiction over a suit against the United States.  As the Supreme Court explained, "it is elementary that 'the United States, as a sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any

court define that court's jurisdiction to entertain the suit.'" <u>United States v. Mitchell</u>, 445 U.S. 535, 538 (1980) (ellipses omitted) (quoting <u>United States v. Sherwood</u>, 312 U.S. 584, 586 (1941)); <u>see also</u> <u>Webman v. Fed. Bureau of Prisons</u>, 441 F.3d 1022, 1025 (D.C. Cir. 2006); <u>Auction Co. of Am. v. Fed. Deposit Ins. Corp.</u>, 132 F.3d 746, 752 (D.C. Cir. 1998) (explaining that federal agencies performing federal functions always possess sovereign immunity unless there is a waiver).

Because a waiver of sovereign immunity is a prerequisite to a court's subject matter jurisdiction, it must be pleaded in the complaint. <u>See</u> Fed. R. Civ. P. 8(a) (providing that a pleading must contain "a short and plain statement of the grounds upon which the court's jurisdiction depends . . ."); <u>see also</u> <u>United States v. Bustillos</u>, 31 F.3d 931, 933 (10th Cir. 1994) ("The party seeking to invoke the jurisdiction of a federal court must demonstrate that the case is within the court's jurisdiction."); <u>Beller v. United States</u>, 277 F. Supp. 2d 1164, 1166 (D.N.M. 2003); <u>Barnes v. Farmland Nat'l Beef Packing, Co. L.P.</u>, 169 F. Supp. 2d 1235, 1236 (D. Kan. 2001); <u>Thomas v. St. Luke's Health Sys.</u>, 869 F. Supp. 1413, 1424 (N.D. Iowa 1994) ("Failure to plead federal jurisdiction is fatal."). Moreover, failure to identify a valid waiver of sovereign immunity in a complaint against the United States constitutes a failure to allege subject matter jurisdiction. <u>See</u> <u>Weaver v. United States</u>, 98 F.3d 518, 520 (10th Cir. 1996) ("[Plaintiff's] pleadings offer no grounds for finding an express waiver of immunity over any of the claims in question and, therefore, no proper grounds for jurisdiction in federal court."); <u>see also</u> <u>Castaneda v. U.S. Dep't of Justice</u>, No. 88-390-FR, 1989 WL 11107, at *1 (D. Or. Feb. 6, 1989); <u>cf.</u> <u>Holt v. Davidson</u>, 441 F. Supp. 2d 92, 95 (D.D.C. 2006) ("Sovereign immunity acts as a jurisdictional bar, disallowing courts from adjudicating claims against the government.").

Here, paragraphs 7 through 10 of plaintiffs' complaint identify 28 U.S.C. §§ 1331, 1337,

21

2201, and 2202 as the jurisdictional bases for the lawsuit. Neither those statutes nor any other allegations in the complaint identify an applicable waiver of sovereign immunity. First, 28 U.S.C. § 1331 provides for federal question jurisdiction, but it contains no waiver of sovereign immunity. See Beale v. Blount, 461 F.2d 1133, 1138 (5th Cir. 1972); Royer v. I.N.S., 730 F. Supp. 588, 590 (S.D.N.Y. 1990); B. R. MacKay & Sons, Inc. v. United States, 633 F. Supp. 1290, 1295 (D. Utah 1986); Byrd v. Smith, 693 F. Supp. 1199, 1201 (D.D.C. 1986); Benvenuti v. Dep't of Def., 587 F. Supp. 348, 351 (D.D.C. 1984). Second, 28 U.S.C. § 1337 provides for original jurisdiction in federal courts for claims regarding congressional regulation of commerce, but it likewise does not waive sovereign immunity. See Foreman v. Gen. Motors Corp., 473 F. Supp. 166, 181 (E.D. Mich. 1979) ("[Section 1337] is obviously not a statute providing for waiver of sovereign immunity nor can any such waiver be inferred from its language."); see also Thomas v. Pierce, 662 F. Supp. 519, 524 (D. Kan. 1987). In this same vein, 28 U.S.C. §§ 2201 and 2202, which permit declaratory judgments as well as further necessary and proper relief, do not confer jurisdiction, nor do they contain a waiver of sovereign immunity. See Amalgamated Sugar Co. v. Bergland, 664 F.2d 818, 822 (10th Cir. 1981) ("It is settled that 28 U.S.C. § 2201 does not confer jurisdiction on a federal court where none otherwise exists."); Ballistrieri v. United States, 303 F.2d 617, 619 (7th Cir. 1962) (holding that the Declaratory Judgment Act does not waive sovereign immunity); Transport Robert (1973) Ltee. v. U.S. Immigration & Naturalization Serv., 195 F. Supp. 2d 136, 139 (D.D.C. 2002); Benvenuti, 587 F. Supp. at 351. In short, the statutes identified by plaintiffs in their statement of jurisdiction are not waivers of sovereign immunity. Without such a waiver, the Court has no jurisdiction over plaintiffs' action against the United States.

### E.    The Court lacks jurisdiction over plaintiffs' action because plaintiffs have not exhausted their mandatory administrative remedies.

Even if plaintiffs were to have the ability to sue the United States here, they have not

exhausted their mandatory administrative remedies.  Consequently, their challenges to

subsections (M) and (N) are barred by the exhaustion requirement for challenges to milk

marketing orders and the obligations imposed therewith.

It has long been established that any handler who wishes to seek judicial review of a milk

marketing order or "the obligations imposed in connection therewith" as being "not in

accordance with law," must first exhaust the administrative remedies available through petition

to the Secretary of Agriculture.  The text of the AMAA provides such an administrative remedy:

> Any handler subject to an order may file a written petition with the Secretary of
> Agriculture, stating that any such order or any provision of any such order or any
> obligation imposed in connection therewith is not in accordance with law and
> praying for a modification thereof or to be exempted therefrom.

7 U.S.C. § 608c(15)(A).  Case law has consistently held that the availability of this

administrative remedy creates a mandatory requirement that must be met before a handler may

initiate suit challenging a provision of, or an obligation imposed in connection with, a milk

marketing order.  United States v. Ruzicka, 329 U.S. 287, 294 (1946) ("And so Congress has

provided that the remedy in the first instance must be sought from the Secretary of

Agriculture."); Edaleen Dairy, LLC v. Johanns, -- F.3d -- , 2006 WL 3069187, at *6 (D.C. Cir.

Oct. 31, 2006) ("Consistent with this long line of cases, we hold that the AMAA's administrative

appeal process is a *mandatory* procedure that handlers must follow prior to seeking judicial

review of a milk marketing order."); Hershey Foods Corp. v. Dep't of Agric., 293 F.3d 520, 526-

27 (D.C. Cir. 2002) (upholding dismissal of case where plaintiff did not exhaust the section

15(A) remedies).

Plaintiffs' action is subject to this mandatory exhaustion requirement.  Although plaintiffs base their claims on the assertion that subsections (M) and (N) are unconstitutional, plaintiffs are nonetheless challenging the "obligations imposed in connection" with a milk marketing order brought on by the enactment of subsections (M) and (N), and are thus subject to the exhaustion requirement.  See 7 U.S.C. § 608c(15)(A).  Subsections (M) and (N) operate to ensure that handlers who have monthly milk production of over three million pounds (and who meet the other specific conditions in those subsections) are not exempt under the producer-handler exception from pooling and pricing requirements in the relevant milk marketing order.  See 7 U.S.C. § 608c(5)(M)-(N).  In other words, those handlers who fall outside of the producer-handler exception by virtue of subsections (M) and (N) will be obligated to make pool payments as required by the relevant milk marketing orders.  Consequently, any challenge to the constitutionality of subsections (M) and (N) amounts to a dispute that the obligations imposed in connection with a milk marketing order are not in accordance with law.  Thus, such a challenge is subject to the mandatory exhaustion requirements of section 15(A).

Plaintiffs have not satisfied this mandatory exhaustion requirement because as a matter of allegation (and reality) they have not pursued the administrative remedies available to them to dispute the constitutionality of subsections (M) and (N).  As a result of that failure to exhaust, plaintiffs' complaint must be dismissed for lack of jurisdiction.

## II.    Plaintiffs' Complaint Does Not State a Cognizable Claim for Relief.

Plaintiffs attack the MREA on several constitutional grounds.  Even taking plaintiffs' allegations as true, the MREA is not constitutionally infirm.  Accordingly, even if the Court had jurisdiction to consider plaintiffs' claims, their complaint should still be dismissed for failure to state a claim for relief.

24

A.        **Standard of review for a Rule 12(b)(6) motion to dismiss**

Federal Rule of Civil Procedure 12(b)(6) provides a mechanism for testing the legal

sufficiency of the factual allegations in a plaintiff's complaint.  See Browning v. Clinton,

292 F.3d 235, 242 (D.C. Cir. 2002).  Under this rule, a court treats the complaint's factual

allegations as true and draws all reasonable inferences in plaintiff's favor.  See Harris v. Ladner,

127 F.3d 1121, 1123 (D.C. Cir. 1997); Alexis v. District of Columbia, 44 F. Supp. 2d 331, 336-

37 (D.D.C. 1999).  However, a court "need not accept inferences drawn by [a plaintiff] if such

inferences are unsupported by the facts set out in the complaint."  Kowal v. MCI

Communications Corp., Inc., 16 F.3d 1271, 1275 (D.C. Cir. 1994).  The scope of the court's

evaluation of the sufficiency of the factual allegations is limited to "only the facts alleged in the

complaint, any documents either attached to or incorporated in the complaint and matters of  . . .

judicial notice."  E.E.O.C. v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir.

1997).  Moreover, the Rule 12(b)(6) pleading standard applies only to factual allegations, and

does not apply to "legal conclusions cast in the form of factual allegations."  Kowal, 16 F.3d at

1275.

To survive a motion to dismiss, the complaint "must set forth sufficient information to

suggest that there is some recognized legal theory upon which relief can be granted."  District of

Columbia v. Air Florida, Inc., 750 F.2d 1077, 1078 (D.C. Cir. 1984).  Those allegations must be

"neither vague nor conclusory" and must "cover all the elements that comprise the theory for

relief."  ASA Accugrade, Inc. v. Am. Numismatic Ass'n, 370 F. Supp. 2d 213, 215 (D.D.C.

2005) (quoting Dickson v. Microsoft Corp., 309 F.3d 193, 201-02 (4th Cir. 2002)).  Consistent

with that standard, "[a] court must dismiss a complaint where, even assuming all the factual

allegations are true, the plaintiff has failed to establish a right to relief based upon those facts."

25

Gregg v. Barrett, 771 F.2d 529, 547 (D.C. Cir. 1985); see also Weyrich v. New Republic, Inc., 235 F.3d 617, 623 (D.C. Cir. 2001).

> **B.      Section 2(a) of the MREA is not an unconstitutional bill of attainder.**

Section 2(a) of the MREA, which contains subsections (M) and (N), is not a bill of attainder. The Supreme Court has described the "key features" of a bill of attainder as being "a law that legislatively determines guilt and inflicts punishment upon an individual without the provisions of a judicial trial." Nixon v. Administrator of Gen. Servs., 433 U.S. 425, 468 (1977). Section 2(a) does not satisfy any of those elements. It does not target a sufficiently specific person or group, let alone plaintiffs. It does not inflict a punishment. Nor does it legislatively determine plaintiffs' guilt. Nor does it deny plaintiffs the provisions of a judicial trial. Rather, section 2(a) is a legitimate form of economic regulation in furtherance of orderly and stable milk markets.

> **1.      Section 2(a) does not satisfy the specificity element of a bill-of-attainder violation.**

Section 2(a) does not meet the specificity element for a bill of attainder because it does not apply to plaintiffs either by name or based on an immutable characteristic. Rather, section 2(a) regulates prospective economic conduct that can be altered, and thus does not impermissibly punish persons based on conditions beyond their control.

When legislation limits conduct and does not impose penalties on specific persons by name or based on an irreversible characteristic (such as past conduct), it operates as a general regulation and does not satisfy the specificity prong for a bill-of-attainder violation. As the Supreme Court reasoned in Communist Party of the United States. v. Subversive Activities Control Board, 367 U.S. 1 (1961), in evaluating a bill of attainder challenge to the Subversive

Activities Control Act: "The Act is not a bill of attainder. It attaches not to specified organizations but to described activities in which an organization may or may not engage." Id. at 86. Other courts have similarly concluded that legislation that provides the ability to avoid its effects is not a bill of attainder. See Am. Communications Ass'n, C.I.O. v. Douds, 339 U.S. 382, 414 (1950) (holding that the law at issue was not a bill of attainder because the persons subject to it could by "voluntary alteration" avoid its effect); WMX Techs., Inc. v. Gasconade County, Mo., 105 F.3d 1195, 1202 (8th Cir. 1997); Recreational Devs. of Phoenix, Inc. v. City of Phoenix, 83 F. Supp. 2d 1072, 1098 (D. Ariz. 1999).

That same reasoning bars plaintiffs' challenge here. Section 2(a) describes entities with respect to conduct within their control, i.e., their monthly production of milk, and does not identify any entity specifically by name. Put another way, section 2(a) does not apply specifically to plaintiffs as persons, but rather to their conduct. Because section 2(a) allows plaintiffs to avoid its effects (for instance by lowering their milk production), it is not a bill of attainder.

Plaintiffs are similarly unable to satisfy the specificity prong through the assertion that section 2(a) presently applies only to them. First, the Supreme Court rejected such an argument where, as explained above, a person may alter their conduct to avoid the impact of the legislation:

> Nor is the statute made an act of 'outlawry' or of attainder by the fact that the conduct which it regulates is described with such particularity that, in probability, few organizations will come within the statutory terms. Legislatures may act to curb behavior which they regard as harmful to the public welfare, whether that conduct is found to be engaged in by many persons *or by one*. So long as the incidence of legislation is such that the persons who engage in the regulated conduct, be they many or few, can escape regulation merely by altering their course of their own present activities, there can be no complaint of attainder.

Communist Party, 367 U.S. at 88 (emphasis added).

27

In addition, where legislation is open-ended in its application – as section 2(a) is with its condition of monthly milk disposition of over three million pounds – it does not satisfy the specificity element. For instance, in Nixon v. Administrator of General Services, 433 U.S. 425 (1977), the Supreme Court considered whether the Presidential Recordings and Materials Preservation Act was a bill of attainder. Id. at 471-72. At the time of its writing, the Act applied only to President Nixon's papers, but it was open-ended and would later apply to the papers of future presidents. Id. at 472. Consequently, although the Act then applied only to a "class of one," it was not a bill of attainder because it would later apply to the papers of future presidents. Id. Another federal court similarly explained this principle that legislation applying to an open-ended set of persons does not constitute a bill of attainder:

> [Plaintiff] being the intended target of the Act does not offend the bill of attainder clause; and, in any event, the Act is worded broadly, such that even after the Act operates on [plaintiff] it could potentially operate on other entities, even if as it now stands the Act operates only upon [plaintiff].

Kerr-McGee Chem. Corp. v. Edgar, 837 F. Supp. 927, 936 (N.D. Ill. 1993); see also Cathy's Tap, Inc. v. Vill. of Mapleton, 65 F. Supp. 2d 874, 881-82 (C.D. Ill. 1999). Applying that principle here, because the MREA defines an open-ended set – entities with monthly fluid milk distributions of over three million pounds – it is not a bill of attainder.

## 2. Section 2(a) of the MREA does not inflict a legislative punishment.

Section 2(a) of the MREA is classic regulatory legislation of an economic market; it does not inflict a "punishment." In evaluating whether legislation constitutes a punishment for bill-of-attainder purposes, courts have considered three factors: whether the legislation fits into the historical definition of a punishment (the historical test); whether the legislation acts like a punishment (the functional test); and whether the legislation was motivated by punitive interests

(the motivational test).  See Selective Serv. Sys. v. Minn. Pub. Interest Research Group, 468 U.S.

841, 852 (1984); Foretich v. United States, 351 F.3d 1198, 1218 (D.C. Cir. 2003).  Section 2(a)

does not satisfy any of those tests, and therefore it is not a legislative punishment.

### a.      Historical Analysis of Punishment

By historical standards, section 2(a) does not amount to a punishment.  As the Supreme

Court explained, "Forbidden legislative punishment is not involved merely because the Act

imposes burdensome consequences."  Nixon, 433 U.S. at 472.  The D.C. Circuit further

distinguished the historical sense of punishment from that of regulation by the following

hypothetical:

> For example, it would be patently absurd, we think, for an inorganic chemical
> company to argue that because it must comply with environmental laws specific to
> that industry, Congress has "punished" it in violation of the bill of attainder
> clause.  Leaving aside the nonpunitive purpose of such laws, it is clear that the
> environmental laws perpetually leave open the possibility that the company may
> still manufacture lawful products by simply employing the appropriate pollution
> control techniques or devices.

BellSouth Corp. v. Fed. Communications Comm'n, 162 F.3d 678, 685 (D.C. Cir. 1998).  As this

example underscores, congressional regulation of an industry – even through strict compliance

laws – is not within the historical meaning of a bill of attainder.  Consequently, because

section 2(a) works to regulate the milk industry in the Arizona region, as well as milk sales into

non-federally regulated regions, its provisions are regulations and not punishments.

Moreover, from a historical perspective, where there is a possibility that a statute will not

impose adverse consequences on an entity, then that statute does not satisfy the punishment

element.  See Selective Serv. Sys. v. Minn. Pub. Interest Res. Group, 468 U.S. 841, 853 (1984)

(holding that a statute that leaves open "perpetually the possibility" that its effect can be avoided

does not fall within the historical definition of punishment).  As the Supreme Court explained in

upholding legislation that terminated social security benefits for deported aliens against a bill-of-attainder challenge:

> Where the source of legislative concern can be thought to be the ***activity or status*** from which the individual is barred, the disqualification is not punishment even though it may bear harshly upon one affected. The contrary is the case where the statute in question is evidently aimed at the person or class of persons disqualified.

Fleming v. Nestor, 363 U.S. 603, 614 (1960). Consistent with the Supreme Court's conclusion that legislation which focuses on conduct or status and not on persons specifically is not punishment, section 2(a) focuses on activities and status and not on persons *qua* persons. As explained above, the impact of section (2)(a) can be avoided by any producer-handler simply by not selling over three million pounds of fluid milk a month. Thus, because the consequences of the MREA can be avoided, section 2(a) is inconsistent with the historical definition of legislative punishment.

Finally, where legislation does not censure or condemn a person, then that legislation is likewise not within the historical definition of punishment for bill-of-attainder purposes. See United States v. Brown, 381 U.S. 437, 453-54 (1965); Foretich v. United States, 351 F.3d 1198, 1220 (D.C. Cir. 2003) ("While the prohibition against bills of attainder has evolved far beyond the original context of capital sentences, it continues to focus on legislative enactments that 'set a note of infamy' on the persons to whom the statute applies." (quoting Brown, 381 U.S. at 453-54.)). Section 2(a) does not contain any legislative censure or public reprimand of plaintiffs, and so again it does not fall within the historical meaning of legislative punishment.

### b.    Functional Analysis of Punishment

As a preliminary matter, the functional analysis may be simplified greatly by virtue of plaintiffs' lack of Article III standing. For instance, the fact that plaintiffs do not allege that

Sarah Farms sells milk into California means both that Sarah Farms is not injured by the operation of subsection (M) and that subsection (M) does not function like a punishment with respect to plaintiffs.  Similarly, because 71 Fed. Reg. at 9433, Part 3 (to be codified at 7 C.F.R. § 1131.10) denies plaintiffs the producer-handler exception (due to their monthly distribution of over three million pounds of milk), subsection (N), which would also deny plaintiffs the producer-handler exception, does not operate like a punishment on Sarah Farms.

More broadly, section 2(a) does not punish Sarah Farms; rather it is a constitutionally permissible economic regulation in furtherance of the non-punitive purpose of promoting orderly milk markets and furthering regulatory equity.  See generally N. Am. Co. v. Sec. & Exch. Comm'n, 327 U.S. 686, 706 (1946) ("Once it is established that the evil concerns or affects commerce in more states than one, Congress may act."); SBC Communications, Inc. v. Fed. Communications Comm'n, 154 F.3d 226, 243 (5th Cir. 1998) (concluding that ensuring fair competition is a non-punitive purpose).  The MREA provides a cap on the producer-handler exception when the regulatory justifications for the exception no longer apply, and thus the MREA acts as a regulatory measure, not a punitive decree.

By placing a limit on the production levels of the entities that may qualify for the producer-handler exception, the MREA ensures that the producer-handler exception does not confer a competitive advantage on the largest players in the milk industry at the expense of regulated handlers (who still have to make pool payments) and other producers (who receive a lower guaranteed blend price).  Subsection (M) ensures that such large producer-handlers who sell milk in non-federally regulated areas are responsible for the pool payments.  See 70 Fed. Reg. 74166, 74187.  Eliminating this exception for the largest handlers in the industry reduces the burden on the remaining handlers and promotes market stability and regulatory equity – it is

31

not punitive.  Similarly, subsection (N) addresses disruptive marketing conditions in Order 131,

wherein the exploitation of the producer-handler exception reduced the blend price to the other

producers, causing them a significant loss of revenue.  See Fed. Reg. 74166, 74186.  Capping the

applicability of the producer-handler exception ensures that the magnitude of the blend price

reduction does not significantly disrupt orderly milk marketing.  In short, both subsections (M)

and (N) further the legitimate, non-punitive objectives of promoting market stability and

furthering regulatory equity.

### c.    Motivational Analysis of Punishment

While often examined by courts, the search for punitive legislative motives is rarely

significant and is often wrought with peril.  As the Supreme Court explained:

> We observe initially that only the clearest proof could suffice to establish the
> unconstitutionality of a statute on such a ground [i.e., punitive design].  Judicial
> inquiries into Congressional motives are at best a hazardous matter, and when that
> inquiry seeks to go beyond objective manifestations it becomes a dubious affair
> indeed.  Moreover, the presumption of constitutionality with which this
> enactment, like any other, comes to us forbids us lightly to choose that reading of
> the statute's setting which will invalidate it over one that will save it.

Fleming v. Nestor, 363 U.S. 603, 617 (1960); see also Selective Serv. Sys. v. Minn. Pub. Interest

Research Group, 468 U.S. 841, 856 n.15 (1984) (requiring "unmistakable evidence of punitive

intent" by Congress before a statute may be invalidated on attainder grounds (quoting Fleming,

363 U.S. at 619)).  At the outset, the MREA itself does not express any intention of punishing

plaintiffs.  See Pub. L. No. 109-215, 120 Stat 328, 328  (Apr. 11, 2006) (expressing the purpose

of ensuring regulatory equity).  Moreover, there were no committee reports or floor speeches in

the Senate, and thus acting alone, the only other source of legislative history – floor debates in

the House of Representatives – would hardly suffice to establish such "clearest proof."  See

Navegar, Inc. v. United States, 192 F.3d 1050, 1067 (D.C. Cir. 1999) (concluding that although

appellants "are repeatedly named in the floor debates . . . . these allegations fall well short of the type of evidence required to show a legislative intent to punish").  However, an examination of these floor statements puts the matter to rest: there is no clear proof of a legislative intent to punish.

Although relatively small in number, the statements by the MREA's proponents extinguish any possibility of proving a punitive legislative motive behind the MREA.  Rather, the floor statements indicate that the MREA was enacted to ensure regulatory equity by closing loopholes and to promote orderly milk markets.  These themes are evident in the opening statement by a principal sponsor of the MREA, Representative Goodlatte of Virginia:

> My original interest in this legislation was to address a loophole created in the interface of the Federal Milk Market Order System with individual State milk marketing arrangements.
>
> * * *
>
> Because of this loophole, milk produced in Arizona and sold in California is not subject to any minimum pricing regulations.  This creates an unfair advantage for out-of-state fluid milk producers.
>
> * * *
>
> The solution simply directs the Secretary to apply the minimum pricing regulations of the Federal order system to any covered milk handler if they sell a significant portion of their fluid milk production in States that have established minimum milk pricing regulations.
>
> * * *
>
> While the original intent was to remedy a situation that has caused great concern to the California dairy industry, two additional provisions have been added to this legislation to address concerns elsewhere.
>
> * * *
>
> The two provisions that were added simply exempt Clark County, Nevada from the existing Arizona-Las Vegas Milk Marketing Order and create a 3 million pound-per-month cap on the exemption for producers who process and distribute their own milk within the Arizona-Las Vegas Order.

152 Cong. Rec. H1149, H1150-51 (daily ed. Mar. 28, 2006) (statement of Rep. Goodlatte).  In another speech on the floor, Representative Goodlatte summarized his reasons for supporting the MREA more succinctly:

33

> When one or two companies' success, however, is based on a gap in the regulatory system, I believe we have an obligation to respond . . . . ***This is not about punishing individuals. It is about ensuring a level playing field for competition.***

Id. at H1152 (emphasis added). Thus, the congressional floor statements of a key sponsor of the MREA expressly disavow any punitive intent behind the MREA and instead emphasize the goal of regulatory equity.

The statements of other proponents of the MREA also display a commitment to orderly markets and regulatory equity, without an inclination to punish. For example, Representative Cardoza emphasized an intent to properly regulate the milk market on a going-forward basis, and not to seek retribution or punishment:

> Our dairy industry is extremely regulated and for good reason. Dairy products are both highly perishable and critical to the dietary requirements of Americans. Without a formal process for pricing, pooling and processing, the entire chain of production from producers through consumers is at risk. Dairy policy works because all players, including processors, producers, co-ops, distributors and buyers adhere to the same rules. Rules and regulations keep the dairy markets stable and allow orderly distribution of high-quality milk, cheese and butter products.

> This bill will close a dangerous loophole that allows a few large producer handlers to escape all these carefully crafted Federal and State regulatory requirements. It would require those operations physically located in a Federal order, but shipping entirely into a State order, to comply with the regulations governing dairy policy in the order where the plant is located.

> Do these individuals who are exploiting this loophole want to maintain it? Absolutely. However, due the unique characteristics of a commodity like dairy, it cannot be allowed to continue. The foundation for this legislation is that all dairy organizations should be governed by the same rules. One group should not have an unfair competitive advantage over another.

> The Milk Regulatory Equity Act ensures production and price of milk is fair and equitable.

> This is an extremely important bill for my home State of California, but also for the entire nation. History has shown that things that happen first in California

34

then spread east.

> This loophole has the opportunity to affect every milk marketing order across the country.  Let us stop it now before that happens.  This is a good bill and one that deserves our support.

Id. at H1152 (statement of Rep. Cardoza).  Representative Schmidt of Ohio expressed similar

concern for an equal application of the law with the hope that the MREA would eliminate certain

loopholes then available to large producer-handlers:

> Years ago, the United States Department of Agriculture exempted small producer handler dairy farmers from regulation because they owned and milked their own cows and sold their own products directly to local consumers.  Today, some of these unregulated producer handlers collect U.S. Government subsidies and have grown to be among the largest dairy processors in the country with significant market shares.
>
> This is an unfair advantage, and this exemption can adversely affect the prices other farmers receive.  Consumers also suffer as unregulated producer handlers eliminate competition.  This bill eliminates the loophole that allows now large producer handler operations to be unregulated and requires equal application of the law.  It still allows family producer handlers to be exempted if their product is less than 3 million pounds per month.

Id. at H1152 (statement of Rep. Schmidt).  This emphasis on regulatory equity was echoed in

other floor statements that opposed future large-scale exploitation of the producer-handler

exception, a description which could include plaintiffs.  As Representative Gutknecht of

Minnesota explained:

> This is really an example of where the laws were originally designed to protect small producer-handlers, and here we have a large producer-handler who has found this . . . and he is exploiting this opportunity.
>                                    * * *
> This is a very complicated issue, but I think all of the speakers who have preceded me have said it well, that we have a responsibility to have a Federal milk system that is fair to everybody.  What we have right now is one particular producer who is trying to use the best of both worlds who is situated right on the border; and, frankly, I think we have a responsibility to close that loophole.

Id. at 1153 (statement of Rep. Gutknect).  Representative Nunes also saw far reaching

35

implications of the producer-handler exception if it were not limited: "This has national

implications to let producer-handlers game the system.  This is about gaming the system."  Id. at

1154 (statement of Rep. Nunes).  Representative Costa similarly saw the MREA as a means to

limit the exploitation of the producer-handler exception and promote fairness:

> [The MREA] is about fairness.  Is it fair today in California some of the world's
> most productive dairymen and women are being undercut by a legal loophole
> between Federal and State dairy programs that permits some dairies to skirt all the
> rules?
>
> Is it fair that by exporting these programs, some dairies avoid all regulations,
> enabling them to sell to retailers at well below well-regulated dairies [sic]?
>
> Is it fair that this bill, which has passed the United States Senate with unanimous
> consent with overwhelming, obviously bipartisan support, has had to wait 3 years
> to be considered by the House?
>
> Is it fair that one of the few dairies in this country that opposes this legislation
> claims he is simply using the free market system, while accepting nearly $1
> million a year in Federal dairy support payments?
>
> No, it is not fair.  Your support of S. 2120 will bring fairness back to dairy farms.
> If we are going to ultimately craft an even-handed dairy policy throughout the
> country, and we have competition abroad, we need to take this first step.

Id. at H1152-53 (statement of Rep. Costa).

The floor statements often reflect a knowledge of the dairy operations in Order 131, with

some of those statements reflecting an apparent awareness of Sarah Farms and other facilities that

the Hettingas operate.  See, e.g., id. at H1151 (statement of Rep. Peterson); id. (statement of Rep.

Obey); id. at H1153 (statement of Rep. Costa); id. (statement of Rep. Lewis); id. (statement of

Rep. Nunes).  These references, apparently to the Hettingas, do not demonstrate an intent to

punish plaintiffs for past conduct, as Representative Goodlatte expressly disavows, id. at H1152

(statement of Rep. Goodlatte); rather they seek to implement future regulation.  Moreover, it is not

constitutionally impermissible for Congress to legislate in response to a particular problem.  See

36

Kerr-McGee Chem. Corp. v. Edgar, 837 F. Supp. 927, 936 (N.D. Ill. 1993) ("The legislative

history . . . addresses [plaintiff's] situation, no doubt.  But if legislation were invalid for being

influenced – or even caused – by a particular need or experience then invalidation based on the

bill of attainder clause would be closer to the rule, rather than the rare exception it is meant to

be.").

　　　　In summary, the floor statements in the House of Representative do not suffice for the

"clearest proof" of a legislative intent to punish.  To the contrary, they evidence a concern for

regulatory equity and a desire to close loopholes that disrupt orderly milk markets, again

confirming that section 2(a) is not a bill of attainder.

　　3.　　**Section 2(a) of the MREA does not legislatively determine plaintiffs'
　　　　　guilt, nor does it deny plaintiffs a right to a judicial trial.**

　　　　Also underlying the constitutional prohibition on bills of attainder, see U.S. Const., art. I,

§ 9, cl. 3, is the interest in ensuring the separation of powers between the different branches of

government.  As the D.C. Circuit explained in rejecting a bill-of-attainder challenge:

> Broadly speaking, the Bill of Attainder Clause is a further constitutional iteration
> of the separation of powers logic that structures our government.  Whereas
> Congress may properly legislate to bar persons with certain characteristics from
> specific activities, the task of determining who possesses these characteristics is
> generally assigned to the judiciary.

Siegel v. Lyng, 851 F.2d 412, 416 (D.C. Cir. 1988); see also United States v. Brown, 381 U.S.

437, 454 n. 29 (1965) (explaining that the prohibition against bills of attainder means that "a

legislature can provide that persons possessing certain characteristics must abstain from certain

activities, but must leave to other tribunals the task of deciding who possess those

characteristics").  This separation of powers rationale is the basis for two related elements of the

bill-of-attainder prohibition: (i) that bills of attainder constitute a legislative determination of guilt

and (ii) that they deny a person a right to a judicial trial.  See Nixon v. Administrator of Gen.

Servs., 433 U.S. 425, 468 (1977); United States v. Lovett, 328 U.S. 303, 322-23 (1946)

(Frankfurter, J., concurring) ("All bills of attainder specify the offense for which the attainted

person was deemed guilty and for which punishment was imposed."); Cummings v. Missouri, 71

U.S. 277, 1866 WL 9452, at *32 (1866) ("A bill of attainder is a legislative act which inflicts

punishment without a judicial trial.").  Plaintiffs' challenge to section 2(a) of the MREA does not

satisfy either of these two separation-of-powers elements.

First, because section 2(a) does not contain a legislative determination of plaintiffs' guilt,

it does not constitute a bill of attainder.  See United States v. Brown, 381 U.S. 437, 454 n.29

(1965); Lovett, 328 U.S. at 323 (Frankfurter, J., concurring) ("There was always a declaration of

guilt either of the individual or the class to which he belonged.  The offense might be a pre-

existing crime or an act made punishable ex post facto."); Siegel v. Lyng, 851 F.2d 412, 416 (D.C.

Cir. 1988).  This principle readily applies here, where section 2(a) does not determine whether

plaintiffs actually possess the characteristics at issue, such as monthly fluid milk distribution of

over three million pounds.  Moreover, plaintiffs do not allege, nor can they, that through

section 2(a), the legislature is usurping judicial powers by adjudicating plaintiffs to be guilty of a

crime or civil offense.  Without a pronouncement that Sarah Farms actually possesses such

characteristics, section 2(a) is not a bill of attainder.

Second, section 2(a) is not a bill of attainder because it does not deny plaintiffs the ability

to seek judicial recourse.  See Cummings, 71 U.S. 277, 1866 WL 9452, at *32.  Nothing in

section 2(a) operates to prevent plaintiffs precisely (or persons with fluid milk distribution of over

three million pounds a month) from having recourse to the judiciary.  Without preventing

plaintiffs from judicially challenging its terms, section 2(a) does not amount to a bill of attainder.

38

### C.    The MREA does not violate the Equal Protection Clause.

Plaintiffs also seek to have subsections (M) and (N) declared unconstitutional as violations of the Equal Protection Clause.  Specifically, plaintiffs allege that subsection (M) violates equal protection by "imposing price controls and an obligation to make pool payments on their sales of milk into the California market that Congress has not imposed on any other producer-handler in the Arizona-Las Vegas Milk marketing area."  (Compl., ¶ 65.)   Plaintiffs further claim that subsection (N) violates the equal protection clause by "imposing direct price controls and obligations to make pool payments on them that Congress has not imposed on any other producer-handlers . . . ." (Compl., ¶ 65.)  Essentially, through these challenges plaintiffs argue that the Equal Protection Clause has been violated because subsections (M) and (N) treat plaintiffs differently than other producer-handlers.  This effort fails for two reasons.  First, it is based on a faulty premise (the notion that Sarah Farms qualifies as a producer-handler).  Second, there is a rational basis for treating producer-handlers with monthly distribution of over three million pounds differently – their amount of unregulated distribution disrupts stable and orderly milk marketing.

First, plaintiffs mistakenly compare themselves with producer-handlers.  Plaintiffs ignore the fact that the regulation which determines whether a handler qualifies as a producer-handler in Order 131, 71 Fed. Reg. at 9433, Part 3 (to be codified at 7 C.F.R. § 1131.10), explicitly excludes handlers, such as Sarah Farms, with a monthly milk distribution of over three million pounds.  By not itself qualifying as a producer-handler under this regulatory exception, Sarah Farms has no basis to demand the same treatment as producer-handlers.

Second, even if plaintiffs qualified as a producer-handler, they do not state an equal protection claim because subsections (M) and (N) survive rational basis review.  That standard,

the least invasive form of constitutional scrutiny, governs plaintiffs' equal protection challenge. See generally FCC v. Beach Comm'ns, Inc., 508 U.S. 307, 313 (1993) ("In the areas of social or economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."). Under rationality review, the statute at issue will be "accorded a strong presumption of validity," Heller v. Doe, 509 U.S. 312, 319 (1993), and it will be upheld if "there is a rational relationship between the disparity of treatment and some governmental purpose." Id. at 320.  In undertaking such a challenge, a plaintiff bears a heavy burden of having to negative every conceivable basis which might support the challenged classification.  See Beach Comm'ns, 508 U.S. at 313; Heller, 509 U.S. at 320-21; Lamers Dairy Inc. v. USDA, 379 F.3d 466, 473 (7th Cir. 2004) (explaining that "[g]overnmental action only fails rational basis scrutiny if no sound reason for the action can be hypothesized" and "a circumspect approach is especially appropriate in reviewing a challenge to the federal milk-marketing regime").  Plaintiffs cannot meet such a burden here because subsections (M) and (N) are reasonable means of advancing legitimate government purposes.

Subsections (M) and (N) seek to further the governmental interests of maintaining orderly milk marketing and of promoting regulatory equity.  Courts have consistently recognized the legitimacy of these interests.  See, e.g., Nebbia v. New York, 291 U.S. 502, 521, 537-38 (1934) (denying equal protection and due process challenges to milk pricing regulations which were legitimate exercises of governmental power); Shamrock Farms Co. v. Veneman, 146 F.3d 1177, 1183 (9th Cir. 1998) (holding that the government has a legitimate interest in maintaining "a stable and plentiful supply of wholesome milk"); Country Classic Dairies, Inc. v. Montana, 847 F.2d 593, 596 (9th Cir. 1988) (holding that the health and stabilization of the milk market are

legitimate governmental interests).

Subsections (M) and (N) are also rational means of achieving these legitimate governmental interests.  Subsection (M) promotes orderly markets and regulatory equity by denying the producer-handler exception to large handlers (those with monthly milk distributions of over three million pounds) who would export fluid milk into non-federally regulated regions. Such large handlers would otherwise interfere with regulatory equity and disrupt markets by avoiding pool payments both in their own federal marketing order as well as in the non-federally regulated region into which they sell milk, thus obtaining a competitive advantage over their regulated rivals in two regions.  See 70 Fed. Reg. at 74187.  By preventing such exportation of milk without the corresponding obligation to make pool payments, subsection (M) promotes regulatory equity and orderly markets.  Consequently, plaintiffs cannot meet their burden of establishing that subsection (M) is irrational in every reasonably conceivable instance, and subsection (M) must be upheld as constitutional.

Subsection (N) also works to achieve orderly milk markets and regulatory equity.  By requiring handlers in Order 131 with monthly milk distributions of over three million pounds to make pool payments, subsection (N) eliminates the producer-handler exception for large handlers. As explained above, when large handlers are exempted from the pooling requirements of Order 131, they have a significant competitive advantage over other handlers, and their non-regulated sales dramatically reduce the blend price for producers.  See 70 Fed. Reg. at 74186.  To prevent such destabilizing effects on the milk market, subsection (N) no longer permits any large handler in Order 131 to be exempt from pool payments.  For that reason, subsection (N) is a rational means of promoting an orderly and stable milk market in Order 131.

In short, subsections (M) and (N) survive rational basis review, and plaintiffs' complaint

does not state a claim under the Equal Protection Clause.

**D.    The MREA does not violate the Due Process Clause.**

Plaintiffs also seek to invalidate subsections (M) and (N) on due process grounds, contending that these subsections impose a "mandatory statutory punishment upon the operation of their business."  (Compl., ¶ 61.)  This argument fails for three reasons.

First, plaintiffs do not have a valid legal basis for their assertion.  The Due Process Clause does not forbid prospective statutory amendments that adversely affect the operation of a business.  If it did, then all regulatory legislation that burdened any business would be invalid on due process grounds.  Moreover, even in the more extreme criminal context, "due process is satisfied as long as the law gives fair notice and warning of the punishment to be imposed," Aponte v. Gomez, 993 F.2d 705, 708 (9th Cir. 1993), and the public lawmaking process for subsections (M) and (N) afforded such notice – even though as described above, plaintiffs were not subjected to any form of legislative punishment, merely regulation.

Second, even if its provisions somehow satisfied the Article III standing requirements, subsections (M) and (N) neither are mandatory nor are they a punishment.  As explained above, the MREA does not mandatorily affect plaintiffs – plaintiffs can avoid its affect by altering their business practice.  Also, as explained in the bill-of-attainder analysis, the MREA does not constitute a legislative punishment under any analysis (historical, functional, or motivational).

Third, even if the Due Process Clause was somehow triggered here, the analysis would proceed under rational basis review because there is no basis for heightened scrutiny.  As explained above, the MREA survives rational basis review because the MREA is a rational means of achieving legitimate governmental interests.

42

**E.    Nor does the MREA unconstitutionally foreclose judicial review of USDA regulations.**

Plaintiffs also assert that the enactment of subsections (M) and (N) denied their ability to challenge USDA's regulations, thus constituting an additional violation of equal protection and due process protections.  (Compl., ¶¶ 60, 66.)  These claims fail for three reasons.  First, nothing in subsections (M) or (N) precludes plaintiffs from challenging USDA regulations.  Second, the passage of subsections (M) and (N) did not legally bar plaintiffs' litigation in the Northern District of Texas.  Plaintiffs had already lost a preliminary injunction hearing before the MREA was signed into law, see Hettinga v. Johanns, No 06-cv-00052, slip. op., (N.D. Tex. Mar. 30, 2006) (copy attached as Exhibit 1), and it was plaintiffs – not the Court or the MREA – that dismissed that litigation, and they did so voluntarily.  Id. (stipulation of dismissal) (May 22, 2006) (copy attached as Exhibit 2).  Third, even if there were some actionable constitutional violation, it would be governed by rational basis review, and as explained above, the MREA survives rational basis review.  For these reasons, this count fails to state a claim for relief.

## CONCLUSION

For the foregoing reasons, the Court does not have subject matter jurisdiction over plaintiffs' action, and plaintiffs do not state a claim for relief; consequently, defendant's motion to dismiss should be granted.

Dated: December 6, 2006                    Respectfully submitted,

                                           PETER D. KEISLER
                                           Assistant Attorney General

                                           JEFFREY A. TAYLOR
                                           United States Attorney

                                           JAMES J. GILLIGAN
                                           Assistant Branch Director

                                           ___/s/ Peter J. Phipps_____
                                           PETER J. PHIPPS
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           Tel: (202) 616-8482
                                           Fax: (202) 616-8470
                                           peter.phipps@usdoj.gov

                                           Mailing Address:
                                           Post Office Box 883
                                           Washington, D.C.  20044

                                           Courier Address:
                                           20 Massachusetts Ave., N.W.
                                           Washington, D.C.  20001

                                           Attorneys for Defendant