IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HEIN HETTINGA AND ELLEN HETTINGA d/b/a SARAH FARMS, | Civil Action No.:  06-1637 (RJL) |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

**MOTION OF UNITED DAIRYMEN OF ARIZONA, SHAMROCK FOODS, SHAMROCK FARMS, PARKER FARMS AND DAIRY INSTITUTE OF CALIFORNIA FOR LEAVE TO FILE A BRIEF AMICUS CURIAE IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

United Dairymen of Arizona, Shamrock Foods, Shamrock Farms, Parker Farms and

Dairy Institute of California respectfully move for leave to file a brief as amicus curiae in support

of Secretary Johanns' motion to dismiss in the above-referenced matter.

Movants are Arizona dairy farmers, an Arizona fluid milk processor, and a trade

association of California fluid milk processors and dairy product manufacturers.  The Arizona

fluid milk processor is regulated by the federal milk marketing program set forth in the

Agricultural Marketing Agreement Act of 1937 ("AMAA"), 7 U.S.C. § 601 et seq.  and

accompanying regulations (7 C.F.R. Parts 1000 and 1131) and competes with Sarah Farms in the

Arizona milk market.  The Arizona dairy farmers who seek amici status are all "pool producers"

under the same milk marketing order 131 – that is that while they are not regulated by the Order,

they participate in the statutory and regulatory scheme by and through which these dairy farmers share in the proceeds of the Arizona fluid milk market on a minimum uniform price basis.  The trade association of California processors and manufacturers represents "handlers" under the California state milk order system who sought adoption of the Milk Regulatory Act because the Act provided for equitable treatment of handlers both in state and federal order territories when in competition with each other.  Each of proposed amici has a direct interest in the scope and coverage of the federal milk marketing program in Arizona as amended by the Milk Regulatory Equity Act ("MREA").  Each of the amici supported and indeed actively sought adoption of the MREA.  The changes to the milk marketing system effectuated by the MREA directly impacts each of them.

As entities that produce and process fluid milk, movants have a different perspective and different set of interests than does Congress or the government.  In *Cobell v. Norton*, 246 F. Supp.2d 59 (D.D.C. 2003), this Court allowed an amicus curiae brief from Native American tribes who were not parties to the suit, but could be impacted by the potential remedy in the suit. Movants stand in a similar, albeit stronger, position, as entities that most certainly will be directly affected by the outcome of this lawsuit because an adverse decision will directly and materially impact their farming and processing operations.  *See*  70 Fed. Reg. 74166, 74168 and 74170 (summary of testimony by United Dairymen of Arizona and Shamrock Foods before Secretary of Agriculture in support of USDA Rule that is substantially similar to MREA § (N).) Thus, movants request that this Court grant their motion to file a brief amicus curiae in this matter.

Should the Court grant the instant motion, movants would request permission to file a reply brief if necessary[1] and to be allowed limited participation in the Court's discretion in the oral argument currently set for March 26, 2007.

Counsel for defendant United States of America has consented to the filing of an amicus curiae brief by United Dairymen of Arizona, Shamrock Foods, Shamrock Farms, Parker Farms and Dairy Institute of California.  In a conversation with counsel for plaintiffs on November 22, 2006, counsel indicated that they would neither oppose nor consent to the filing of an amicus curiae brief, deferring their consent or opposition until the brief was completed and filed and presumably reviewed.

Respectfully submitted,

/s/ Charles M. English, Jr.
Charles M. English, Jr.
D.C. Bar No.:  386572
Sara Pikofsky
D.C. Bar No.:  485948
Thelen Reid Brown Raysman & Steiner LLP
701 8th Street NW
Washington, DC  20001
Telephone:   202.508.4000

December 22, 2006

*Attorneys for Amici Curiae*
*United Dairymen of Arizona, et al.*

---

[1] Movants propose that they would file a reply brief if so permitted on the same March 9, 2007 deadline that applies to defendant in this case.

DC #259547 v2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HEIN HETTINGA AND ELLEN
HETTINGA d/b/a SARAH FARMS,
                    Plaintiffs,
        v.
UNITED STATES OF AMERICA,
                    Defendant.

Civil Action No.:  06-1637 (RJL)

**MEMORANDUM OF AMICI CURIAE
IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

Charles M. English, Jr.
D.C. Bar No.:  386572
Sara Pikofsky
D.C. Bar No.:  485948
Thelen Reid Brown Raysman & Steiner LLP
701 8th Street NW
Washington, DC  20001
Telephone:  202.508.4000

*Attorneys for Amici Curiae
United Dairymen of Arizona, et al.*

## TABLE OF CONTENTS

**Page**

BACKGROUND ........................................................................................................... 1

STANDARD OF REVIEW ........................................................................................... 6

DISCUSSION ............................................................................................................... 6

I.   Plaintiff Sarah Farm's challenge is not ripe for review by this Court. ............................... 6

II.  On the merits, Plaintiff fails to state a claim for which relief may be granted. .................. 8

    A.  Plaintiff alleges no facts which support a claim that the MREA violates the equal protection element of the Fifth Amendment. ...................................................... 8

        1.  The MREA acts as an economic regulation. .......................................................... 8

        2.  Congress provided a rational basis for the MREA through floor statements by legislators. ............................................................................................................ 9

        3.  Even in the absence of the legislative history, one can find plausible reasons for the legislation in the pronouncements of the Secretary of Agriculture when he recently promulgated a Final Rule (the "Rule") that in part mirrors the MREA. ................................................................................................................. 11

        4.  Past regulations of the milk industry have met the rational basis test. ................. 12

        5.  Plaintiff fails to allege sufficient facts to withstand a motion to dismiss its equal protection claim. ......................................................................................... 13

        6.  Plaintiff inaccurately implies that it is the only entity affected by the MREA. ..... 15

    B.  The MREA is not Remotely a Bill of Attainder ...................................................... 16

        1.  The MREA applies and can apply to multiple parties and does not satisfy the specificity element of a bill of attainder. ............................................................. 17

        2.  The MREA furthers the nonpunitive goals of the AMAA and is not punishment under the Bill of Attainder Clause of the U.S. Constitution ............. 19

    C.  The passage of the MREA in no way violated Due Process...................................... 22

1.  The Northern District of Texas opinion denying Plaintiff's motion for
    preliminary injunction belies Plaintiff's current contention that the passage
    of the MREA unfairly interfered with its ability to prosecute that suit. .............. 22

2.  Nothing prohibits Congress from changing the law even if it will affect
    pending litigation. ................................................................................................ 24

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*America Commc'ns. Association, CIO v. Douds*, 339 U.S. 382 (1950)..........................................19

*America Dairy of Evansville v. Bergland*, 627 F.2d 1252 (D.C. Cir 1980)......................................8

*American Federation of Government Employees, Local 2782 v. Federal Labor Relations Authority*, 803 F.2d 737 (D.C. Cir 1986)............................................................18

*Board of Governors of Federal Reserve System v. Agnew*, 329 U.S. 441 (1947) ........................20

*Bellsouth Corp. v. FCC*, 162 F.3d 678 (D.C. Cir 1998) ..........................................................20, 22

*\*Benson v. Schofield*, 236 F.2d 719 (D.C. Cir 1956)...................................................................3, 8

*City of N.Y. v. Beretta U.S.A. Corp.*, 401 F.Supp.2d 244 (E.D.N.Y. 2005)..................................24

*\*City of New Orleans v. Dukes*, 427 U.S. 297 (1976) ....................................................................9

*Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Marketing Board*, 462 F.3d 249 (3rd Cir. 2006) ....................................................................................2

*Communist Party of U.S. v. Subversive Activities Control Board*, 367 U.S. 1 (1961) .................22

*Conley v. Gibson*, 355 U.S. 41 (1957) ..........................................................................................7

*Dandridge v. Williams*, 397 U.S. 471 (1970) ..............................................................................15

*De Veau v. Braisted*, 363 U.S. 144 (1960).....................................................................................20

*Dent v. W. Va.*, 129 U.S. 114 (1889) ...........................................................................................20

*\*Edaleen Dairy v. Johanns*, 467 F.3d 778 (D.C. Cir. 2006) ....................................................8, 9

*\*FCC v. Beach Commc'ns Inc.*, 508 U.S. 307 (1993) ...................................................9, 10, 13, 15

*FCC v. National Citizens Committee for Broad.*, 436 U.S. 775 (1978) .......................................20

*Flemming v. Nestor*, 363 U.S. 603 (1960) ...................................................................................19

*Foretich v. U.S.*, 351 F.3d 1198 (D.C. Cir. 2003).........................................................................21

*Hawker v. N.Y.*, 170 U.S. 189 (1898) ...........................................................................................20

*Heller v. Doe*, 509 U.S. 312  (1993) ..............................................................................................15

*\*Hershey Foods v. Department of Agriculture*, 293 F.3d 520 (D.C. Cir. 2002) ............................8

*Kaempe v. Myers*, 367 F.3d 958 (D.C. Cir. 2004) .......................................................7

*Lamers Dairy Inc. v. U.S. Department of Agriculture*, 379 F.3d 466 (7th Cir. 2004)..............12, 13

*Marshall County Health Care Authority v. Shalala*, 988 F.2d 1221 (D.C. Cir. 1993).................16

*\*Pa. v. Wheeling & Belmont Bridge Co*, 59 U.S. 421 (1855) .................................24, 25

*Robertson v. Seattle Audobon Society*, 503 U.S. 429 (1992)........................................25

*SeaRiver Maritime Finance Holdings, Inc. v. Mineta*, 309 F.3d 662 (9th Cir. 2002) .............21, 22

*Selective Serv. System v. Minn. Public Interest  Research Group*, 468 U.S. 841 (1984) ..............18

*\*Shamrock Foods Co. v. Veneman*, 146 F.3d 1177 (9th Cir. 1998) ................................14

*U.S. v. Brown*, 381 U.S. 437  (1965) .............................................................23

*U.S. v. Rock Royal Co-op, Inc.*, 307 U.S. 533 (1939)...............................................18

*U.S. National Bank of Oregon, Petitioner 92-484 v. Independent Insurance Agents of America, Inc.*, 508 U.S. 439 (1993) ................................................................18

*Williamson v. Lee Optical*, 348 U.S. 481 (1955) ..................................................15

## STATUTES, RULES & REGULATIONS

7 C.F.R. § 1131.7 .............................................................................17, 19

7 U.S.C. §§ 601, *et seq*............................................................................2

7 U.S.C. §§ 602 ...................................................................................7

7 U.S.C. § 608c ..............................................................................2, 4, 6, 7

71 Fed.Reg. 25495 ................................................................................16

71 Fed.Reg. 25496 ................................................................................16

33 U.S.C. § 2737..................................................................................21

*Agriculture, Rural Development, Food and Drug Administration and Related Agencies Appropriations Act of 2000,* Pub.L. No. 106-78, Title VII, § 760, 113 Stat. 1135 ............4

*District of Columbia Appropriations Act of 2000,* Pub.L. No. 106-113, Title I............................4

*Federal Agriculture Improvement and Reform Act of* 1996, Pub.L. No. 104-127, 110 Stat. 888 ................................................................................4

*Food Security Act of* 1985, Pub.L. No. 99-198, § 131-133,99 Stat. 1354 .......................................4

*\*Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas; Final Decision on Proposed Amendments to Marketing Agreement and to Orders*, 70 Fed.Reg. 74166..................................................................................................................6, 12

*\*Milk Regulatory Equity Act of 2005,* Pub.L. No.1 09-215, 120 Stat. 328 ........................7, 10, 16

Amici Curiae United Dairymen of Arizona, Shamrock Foods, Shamrock Farms, Parker Farms and Dairy Institute of California, by and through counsel submit the following in support of Defendant's Motion To Dismiss.  Amici Curiae are either producers or handlers in the Arizona – Las Vegas marketing order or a trade association of handlers in California who are affected by the Milk Regulatory Equity Act.  While Amici generally support all of Defendant's arguments, they offer the following additional arguments.

Sarah Farms' complaint suffers from flawed assumptions.  The Milk Regulatory Act of 2005 ("MREA"), especially when read in its entirety, has general application and affects far more business entities than Sarah Farms.  More importantly the claim fails to account for how rule-making, whether by Congress or its delegates, can ever be lawfully enacted.  Under the scenario painted by Sarah Farms in its complaint, no economic regulation could ever be lawful.  For instance, if the Internal Revenue Service identified a class of persons that were not paying any taxes and Congress chose to modify the Internal Revenue Code so as to capture the future taxes on the economics of those persons, Sarah Farms' complaint would make such standard lawmaking unlawful.  But this is contrary to how the real world in Washington, D.C. (and in state legislatures) operates and is flatly contradicted by long-standing principles laid out by the U.S. Supreme Court permitting, in order to protect the public welfare, legislation of conduct "whether that conduct is found to be engaged in by many persons *or one by one. Communist Party of the U.S. v. Subversive Activities Control Bd.,* 367 U.S. 1, 88 (1961).

## BACKGROUND

The Milk Regulatory Equity Act amends The Agricultural Marketing Agreement Act of 1937 ("AMAA").  7 U.S.C. §§ 601, *et seq.*  Through the AMAA, Congress responded to disruptions in agricultural commodity marketing during the Great Depression.  Among other things, this disruption harmed farmers by causing a severe drop in milk prices, primarily through

competition for the more lucrative fluid milk market.  Through the AMAA, Congress, through the United States Department of Agriculture ("USDA" or "the Secretary") initiated the federal program for the regulation of minimum milk prices that milk processors, known as handlers, must pay to dairy farmers, known as producers, and Congress delegated to the Secretary of Agriculture the authority to set minimum milk prices nationwide.  7 U.S.C. § 608c.  *See generally Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 462 F.3d 249, 253-55 (3d Cir. 2006) (most recent in long line of cases discussing history of and need for federal regulation of milk).

The federal program for regulating the price of milk is based in part on the fact that milk is highly perishable.  Milk is also more highly valued by the market when it is sold for fluid consumption than when it is sold as an input into the manufacture of cheese or other dairy products.  These two factors combine to create an unstable marketplace for both dairy farmers and milk processors.  Because milk has a higher value when sold for fluid use, dairy farmers have an incentive to try to sell as much milk as possible for fluid consumption.  This creates the potential for dairy farmers who might otherwise sell to manufacturers of other dairy products to chase the fluid market thereby depressing prices to all dairy farmers through oversupply.  The AMAA and the related federal regulatory program aim to prevent this effect by honoring the long-cherished and repeated conclusions of Congress that without milk marketing orders, dairy farmers would engage in destructive competition for the higher end fluid milk market.  *Benson v. Schofield*, 236 F.2d 719, 720-21 (D.C. Cir. 1956) ("It is common knowledge that the production and marketing of milk are vital and the problems of the industry have long engaged the notice of the Congress, the state legislatures and the courts.").

In order to avoid this destructive competition, the Secretary of Agriculture provides for a multi-step process to implement the AMAA.  The Secretary does so by issuing milk marketing orders when requested by dairy farmers.  Each geographic region has a separate order.  The Secretary first classifies raw milk based on its end use and assigns a price to each classification. While the classifications and prices for all but fluid milk are the same from geographic area to geographic area, the prices for Class I differ from county to county and thus order to order.  Each processor, or purchaser of raw milk, must account to an equalization pool ("producer settlement fund" or "equalization pool") based on the intended end use of the milk purchased.  Thus a processor who utilizes milk for fluid consumption (paying a greater price per hundredweight than the processor who is purchasing milk to manufacture hard cheese) makes payments into the equalization pool which are in turn paid out for the benefit of farmers whose milk is used to produce cheese.  In order to assure that the producers or farmers are not economically disadvantaged by the business of their customers, the Secretary determines a weighted average price for each order for milk based on the amounts paid by the processors.  Each dairy farmer receives this price for every hundredweight he sells regardless of the end use of the milk.  7 U.S.C. § 608c(5)(B)(ii).

Congress routinely, regularly and aggressively acts to preserve and maintain the federal milk order system implemented by the Secretary under the AMAA, demonstrating Congress' continued concern and legislative findings that milk, as an agricultural commodity, still requires special government intervention in order to "assure orderly marketing."  Since 1985 Congress has amended the AMAA dealing with milk marketing  or directed specific action by the Secretary as to the milk order system at least  four  times  in addition to the MREA .  7 U.S.C. §§ 608c  and 7253 ;  see  *Food Security Act of* 1985, Pub. L. No. 99-198, § 131-133,99 Stat. 1354

(1985); *Federal Agriculture Improvement and Reform Act of* 1996, Pub. L. No. 104-127, 110

Stat. 888 (1996); *Agriculture, Rural Development, Food and Drug Administration and Related*

*Agencies Appropriations Act of 2000,* Pub. L. No. 106-78, Title VII, § 760, 113 Stat. 1135

(1999); *District of Columbia Appropriations Act of 2000,* Pub. L. No. 106-113, Title I, Subtitle

D, Ch. 1, § 143, 113 Stat. 1501 (1999).

Large producer-handlers, those entities like Sarah Farms, that serve both as dairy farms

and processing plants, while subject to the regulatory program, have traditionally been largely

exempted from the pooling and pricing system described above for purposes of administrative

convenience. Recent changes by the Secretary of Agriculture in the form of an Order published

in the Federal Register on February 24, 2006, 71 Fed. Reg. 9430-9434, and Congress, through

the MREA, have ended that exemption for producer-handlers in the Western United States

(which has the largest dairy farmers) that exceed a certain production level. The February 22,

2006 Order provides that any producer-handler in the Pacific-Northwest order or Arizona-Las

Vegas order that produces, processes, and markets in the marketing area, more than 3 million

pounds (approximately 330,000 gallons) of milk per month shall not be exempt from the pooling

and pricing requirements. Smaller producer-handlers generally remain able to use the exemption

from pricing and pooling. The USDA Order, or Final Rule has been subject to two legal

challenges and has overcome both. In December 2005, prior to its final publication in the

Federal Register, three large producer-handlers in the Pacific Northwest challenged the Rule in

the District Court for the District of Columbia. The court held that the challenge was not yet ripe

and failed to meet any of the necessary factors to support a preliminary injunction.[2] In March of

2006, Hein and Ellen Hettinga, plaintiffs in this action, brought suit in the Northern District of

---

[2] One of the Pacific Northwest producer-handlers, Edaleen Dairy, appealed the decision to the D.C. Circuit. On
October 31, 2006, the D.C. Circuit issued a decision affirming the lower court's opinion. On December 14, 2006,
Edaleen petitioned for rehearing.

Texas alleging many of the same infirmities as the December challenge.  The court likewise

denied their request for preliminary injunction, essentially adopting the D.C. Court's analysis.

*See* Ex. 1 to Defendant's Motion to Dismiss.  In April 2006, the President signed the MREA.

The MREA substantially mirrors the Rule with respect to producer-handlers in the Arizona-Las

Vegas order.  The MREA also adds a provision requiring certain handlers to be subject to federal

order prices if they sell to other plants in states where handlers must pay uniform minimum

prices for raw milk (e.g. Montana and California).  Both Congress with respect to the MREA and

the Secretary with respect to the Rule based their decisions on the desire to maintain a stable

marketplace for the purchase and sale of milk.

Sarah Farms, through its challenge to the MREA, wishes to upset the long-standing

policy of Congress and the regulatory program.  Sarah Farms is a large scale commercial

producer-handler, larger than many of its regulated processor competitors and its dairy farmer

counterparts.   Sarah Farms is believed to provide 15 to 20 percent of the fluid milk in the

Arizona-Las Vegas Order, 70 Fed. Reg. 74166, 74182 and has monthly route disposition in the

range of 12.1 to 19.1 million pounds.  *Milk in the Pacific Northwest and Arizona-Las Vegas*

*Marketing Areas; Final Decision on Proposed Amendments to Marketing Agreement and to*

*Orders*, 70 Fed. Reg. 74166, 74173 (Dec 14, 2005)  The basic premise of the AMAA and its

regulations is that the benefits of the fluid market will be shared by all dairy farmers through

pooling.  Sarah Farms, however defeats this premise as it has a significant percentage of the fluid

milk market in Arizona[3] without contributing to pooling and uniform prices contemplated by the

statute.  Its actions destroy uniformity.  Uniformity of treatment for both the processors using the

milk and the dairy farmers producing the milk is the fundamental statutory requirement resulting

---

[3] At the outset, Sarah Farms has not alleged that it sells milk in California or that if it did, it would be subject to regulation pursuant to a USDA order issued under MREA section (a)(M) as opposed to (a)(N).

in adjustments in accounts in order to achieve uniform payments as to all handlers including producers acting as handlers.  7 U.S.C. § 608c(5)(C).   For dairy farmers, an increase in contributions to the equalization pool enhances and equalizes their minimum prices.  For operators of fluid milk plants, or handlers, the requirement that all handlers, regardless of whether they are handlers or producer-handlers, participate in the equalization pool, results in a more level playing field.  Amici simply request that the Secretary acting through an Order issued pursuant to Congressional direction be permitted to implement economic regulations he finds necessary to maintain the purpose of the AMAA.

## STANDARD OF REVIEW

Courts must grant motions to dismiss when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 46-47 (1957).  In evaluating a motion to dismiss, the court need not accept inferences drawn by plaintiffs if those inferences are not supported by the facts in the complaint, nor must the court accept as true any factual allegations that contradict matters subject to judicial notice.  *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004).

## DISCUSSION

**I.     Plaintiff Sarah Farm's challenge is not ripe for review by this Court.**

The AMAA very clearly requires that any handler wishing to challenge an order of the Secretary must first file a petition for review with the Secretary of Agriculture.  7 U.S.C. § 608c(15)(A).  The MREA requires that in order to "accomplish the expedited implementation of these amendments, effective on the date of the enactment of this Act, the Secretary of Agriculture shall include in the pool distributing plan provisions of each Federal milk marketing order issued under subparagraph (B) of section 8c(5) . . . a provision that a handler described in subparagraph (M) of such section, . . . will be fully regulated by the order in which the handler's

distributing plant is located." MREA §(d), 109 P. *Milk Regulatory Equity Act of 2005,* Pub. L. No.1 09-215, 120 Stat. 328. PL 109-215 (April 11, 2006). Because the MREA requires an order by the Secretary, any challenge to the validity of the MREA is essentially a challenge to an order of the Secretary. Without this order, the MREA cannot be implemented as to Sarah Farms. In response to the MREA, the Secretary could have terminated the Arizona-Las Vegas Order, essentially rendering the MREA toothless with respect to Sarah Farms. 7 U.S.C. §§ 602(2) and (4); 7 U.S.C. § 608c(16)(A)(i). Instead, the Secretary reissued the order with amendments including renaming the order the "Arizona Milk Marketing Order." *Milk in the Northeast and Other Marketing Areas*, 71 Fed. Reg. 28248, 28249 (May 16, 2006). It is the order and the regulation of Sarah Farms pursuant to the order that Sarah Farms seeks to invalidate.

The D.C. Circuit recently addressed the question of whether a producer-handler must exhaust the administrative remedies required by § 15(A) prior to bringing an action in federal court. *Edaleen Dairy v. Johanns*, 467 F.3d 778 (D.C. Cir. 2006). Edaleen Dairy, the appellant in that case, is a large producer-handler, much like Sarah Farms, that operates in the Pacific Northwest. Edaleen Dairy challenged the Final Decision issued by the Secretary on December 14, 2005 which lifted the exemption for the pricing and pooling requirements with respect to large producer-handlers in the Pacific Northwest and Arizona-Las Vegas marketing orders. Edaleen Dairy argued that § 15(A) governed handlers only and because § 15(A) does not apply to producers and because Edaleen also acts as a producer, Edaleen should be excused from exhausting the administrative remedies mandated by § 15(A).

The *Edaleen* court rejected this argument. The Court first recognized the long-standing precedent in the D.C. Circuit requiring handlers to exhaust their administrative remedies. *Edaleen*, 467 F.3d at 782 (citing *Hershey Foods v. Dep't of Agric,* 293 F.3d 520 (D.C. Cir.

2002), *Am. Dairy of Evansville v. Bergland,* 627 F.2d 1252 (D.C. Cir 1980), and *Benson v. Schofield*, 236 F.2d 719 (D.C. Cir. 1956)). The Court narrowed the issue to the crucial question of whether a producer-handler is bringing suit as a producer or as a handler. *Id.* The Court held that "Edaleen is clearly bringing suit in its capacity as a handler" reasoning that Edaleen's challenge dealt with payment into the equalization pool and as only handlers must pay into the pool, Edaleen must be acting in its handler capacity. *Id.* at 783. Like Edaleen, Sarah Farms challenges the law's requirement that it pay into the equalization pool, an issue unique to handlers. Like Edaleen, Sarah Farms must exhaust its administrative remedies prior to coming to this Court.

Edaleen Dairy also argued that the court could excuse it from the exhaustion requirement. The *Edaleen* court explicitly held that the exhaustion required by the AMAA is mandatory and cannot be excused. *Edaleen*, 467 F.3d at 785. Sarah Farms, likewise, must comply with the required administrative exhaustion before seeking relief from this Court. Due to Sarah Farm's failure to exhaust its administrative remedies, this Court lacks jurisdiction and must dismiss the complaint.

**II.      On the merits, Plaintiff fails to state a claim for which relief may be granted.**

      **A.      Plaintiff alleges no facts which support a claim that the MREA violates the equal protection element of the Fifth Amendment.**

            1.      The MREA acts as an economic regulation.

The equal protection doctrine requires courts to examine certain provisions with heightened scrutiny, including provisions that address race and gender. Courts employ a rational basis standard of review when evaluating legislative provisions that do not impact a protected class. Economic regulations such as the one at issue are entitled only to rational basis review.

*City of New Orleans v. Dukes*, 427 U.S. 297 (1976) (applying rational basis to an ordinance that prohibited certain pushcart vendors from plying their wares in New Orleans' Vieux Carre).

Rational basis grants the legislature wide latitude in implementing the rules and regulations it believes necessary for effective governance. *Id.* at 303. When addressing equal protection challenges, courts have consistently taken the position that "the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *Id.*; *FCC v. Beach Commc'ns Inc.,* 508 U.S. 307, 313 (1993) (holding that equal protection embodied in either 14th Amendment or 5th Amendment "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.") Because the MREA affects neither fundamental rights nor distinguishes treatment based on suspect class, this Court must apply the rational basis test in determining whether the MREA violates equal protection. In fact, the preamble to the MREA itself provides that rational basis stating that it is an act, "to ensure regulatory equity between and among all dairy farmers and handlers for sales of packaged fluid milk in federally regulated marketing areas and into certain non-federally regulated milk marketing areas from federally regulated areas, and for other purposes." *Milk Regulatory Equity Act of 2005,* Pub. L. No.1 09-215, 120 Stat. 328. PL 109-215 (April 11, 2006).

> 2.   Congress provided a rational basis for the MREA through floor statements by legislators.

In determining whether a provision comports with equal protection principles, the courts determine whether a plausible reason for Congressional action exists. *Beach Commc'ns.*, 508 U.S. at 313-14 ("Where there are 'plausible reasons for Congress' action, our inquiry is at an end'."). Because Congress is not required to provide reasons for enacting statutes, in applying rational basis, the court may discern any plausible reason for the legislation. *Beach Commc'ns.,*

508 U.S. at 315. With respect to the MREA, however, Congress provided a plausible valid reason for enacting the legislation.

During the floor session prior to the passage of the MREA in the House, a number of Congressmen commented on the purposes of the MREA. Representative Cardoza perhaps summed it up best with his statement that "the foundation of this legislation is that all dairy organizations should be governed by the same rules. One group should not have an unfair competitive advantage over another. The Milk Regulatory Equity Act ensures production and price of milk is fair and equitable." 152 *CON. REC* 1150, 1152 (March 28,2006).

Representative Goodlatte also endorsed that reasoning, explaining that "the Secretary of Agriculture protects dairy producers from predatory pricing by setting a minimum price that must be paid by processors who distribute fluid milk within a Federal Milk Marketing Order Area." *Id.* at 1150. With respect to the need for the provision codified in section (M),[4] Representative Goodlatte added that "[b]ecause of this loophole, milk produced in Arizona and sold in California is not subject to any minimum pricing regulations. This creates an unfair advantage for out-of-state fluid milk processors." *Id.* Rep. Goodlatte also commented that the current practice of an Arizona plant selling to California without paying either the California or Federal minimum price "is disrupting the marketplace and undermining the goal of fairness that the regulatory system should encourage." *Id.* at 1151. Sarah Farms offers no reason why the stated reasons of Congress do not provide a rational explanation for the MREA.

---

[4] Section (M) requires that certain handlers to be subject to federal order prices if they sell to other plaints in states where handlers must pay minimum prices for raw milk.

3.    Even in the absence of the legislative history, one can find plausible reasons for the legislation in the pronouncements of the Secretary of Agriculture when he recently promulgated a Final Rule (the "Rule") that in part mirrors the MREA.

The *Edaleen* Court concisely summarized the Secretary's rationale in implementing the Rule that eliminated the producer-handler exemption in Arizona-Las Vegas and the Pacific Northwest. The Court explained that "The decision to eliminate the exemption for large producer-handlers was based upon evidence of 'disorderly marketing conditions' - - namely, that the large producer-handlers were obtaining a 'competitive sales advantage' over fully-regulated handlers, and were causing a 'measurabl[e] and significant' decrease in the blend price being paid to regulated producers." *Edaleen*, at 781. This exclusion of large producer-handlers from the pooling system leads to two undesired effects: large producer-handlers can control a large market share because they can sell at lower prices as they don't have the fixed costs of the settlement fund; and the amount of money in the settlement fund to be distributed to producers dwindles. *Id.* at 780. While Plaintiff may not agree that these findings provide support for the MREA, it fails to allege any basis to conclude that the Secretary or Congress acted irrationally.

The Secretary also provided extensive explanations for the necessity of the Rule. The Secretary, in the findings included in the Rule, explicitly acknowledges that the combination of the changing retail landscape and the growth of certain producer-handlers has resulted in a situation where the large producer-handlers are not bearing the burden of their own surplus milk. *Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas*, 70 Fed. Reg. 74166 (Dec 14, 2005). Shifts in marketing conditions or market structure lead to disorderly marketing, evidenced by lower blend prices paid to dairy farmers shipping to regulated handlers. *Id.* at 74,186. The producer-handlers are significantly larger in these two orders and while they are solely responsible for their production and processing facilities, they are not assuming the entire

burden of balancing their production with their fluid milk requirements. *Id.* The Secretary therefore found "that the burden of balancing has been essentially shifted to the market's pooled participants." *Id.* at 74,187. Like the Rule, the MREA aims to even out that burden among all milk processors. Based on the AMAA's purpose, this goal is clearly rational.

    4.    <u>Past regulations of the milk industry have met the rational basis test</u>.

In *Lamers Dairy Inc. v. U.S. Dep't of Agric.,* 379 F.3d 466 (7th Cir. 2004), Lamers challenged the Secretary's order permitting cheese manufacturers to opt out from regulated Class III pricing under certain circumstances. Lamers alleged that the order violated equal protection because it, as a Class I handler, like Sarah Farms, could never opt out of the regulations. The Court held that the Secretary's order did not offend equal protection. In so holding the *Lamers* court recognized that "The Secretary also is charged with establishing and maintaining orderly marketing conditions so as to ensure an orderly flow of supply and thereby prevent unreasonably fluctuating prices. In order to achieve these legitimate marketing objectives, it is *conceivably rational* for the Secretary to treat Class I and Class III handlers differently with respect to pooling requirements." *Lamers*, 379 F.3d at 473. (emphasis supplied). Similarly, it is conceivably rational that Congress would treat large producer-handlers differently than small producer-handlers in order to attain the same objective of an orderly market.

In *Lamers*, the court discussed the effects of the order on competition in the marketplace, the same issue that forms the crux of the rationale behind the MREA. *Lamers* recognized that the Secretary's order gave Class III processors a competitive advantage by allowing them to de-pool when they believed it beneficial to do so. *Lamers*, 379 F.3d at 475. The court confirmed that economic harm to one group does not constitute an equal protection violation, allowing that "the Class III pooling exemption is economically harmful to Lamers and other Class I handlers (as well as to producers committed to dealing with them) who must suffer the effects of Class III

de-pooling. That harm, however, does not rise to the level of 'invidious discrimination'." *Id.* at 475-76. Plaintiff in the instant case complains essentially of the same type of "unfair" economic harm, in that it is losing the competitive advantage it had over similarly sized milk processors. Although the MREA may impose financial consequences on Plaintiff, like the Secretary's order in *Lamers*, it does not violate equal protection.

> 5. <u>Plaintiff fails to allege sufficient facts to withstand a motion to dismiss its equal protection claim</u>.

Because the court grants a strong presumption of validity to statutes imposing economic regulations, "those attacking the rationality of a legislative classification have the burden 'to negative every conceivable basis which might support it'." *Beach Commc'ns.*, 508 U.S. at 314, 315. Plaintiff completely fails to allege any facts that would undermine the rationality of the MREA and therefore cannot withstand the government's motion to dismiss.

The Ninth Circuit previously addressed a challenge to the constitutionality of a provision of California law governing milk production and sale. *Shamrock Foods Co. v. Veneman*, 146 F.3d 1177 (9th Cir. 1998). Plaintiff in that case, an Arizona milk processor, alleged that California's milk-related laws violated due process and equal protection. Applying rational basis, the court explained that "[b]ecause California's interests in enacting the milk laws and regulations are legitimate, Shamrock must allege facts in the complaint to show that those laws and regulations are arbitrary or not rationally related to the state's goals in order to withstand the state's motion to dismiss." *Shamrock Foods*, 146 F.3d at 1183. The Court concluded that, "[t]here is nothing in the complaint that so much as suggests that the milk laws are either arbitrary or unrelated to the state's efforts to ensure a plentiful supply of healthy milk for its citizens. It is insufficient to assert that the milk laws establish discriminatory classifications; the

complaint must allege facts to demonstrate that the classifications are arbitrary or that they are not rationally related to legitimate state interests." *Id.*

The reasoning of the Ninth Circuit affirming dismissal of the case applies equally to Plaintiff's complaint in the instant case. The complaint alleges that Sarah Farms has been unfairly singled out, but the rationale behind the unfairness is nothing more than the fact that Sarah Farms perceives itself to be the only entity affected by the legislation. As the *Shamrock Foods* court held, alleged discriminatory classifications do not suffice to overcome rational basis. *Id.* Sarah Farms never alleges that the MREA is arbitrary nor does it allege that the MREA is unrelated to legitimate state interests. Like the complaint in the *Shamrock Foods* case, Sarah Farms' complaint should be dismissed for failing to state a claim upon which relief can be granted.

Despite Plaintiff's wishes, the equal protection doctrine does not require that every entity be treated completely equally. *Dandridge v. Williams*, 397 U.S. 471, 485 (1970) (a classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality.) "The law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson v. Lee Optical*, 348 U.S. 481, 483 (1955). Congress believed that the exclusion of large producer-handlers from the regulated milk marketing system resulted in the "evil" of an imbalanced, unstable market and has devised a method by which to correct this "evil". Rational basis requires only that the court determine whether there is a plausible basis for the legislation and nothing more. *Heller v. Doe*, 509 U.S. 312, 324 (1993) ("A statutory classification fails rational-basis review only when it 'rests on grounds wholly irrelevant to the achievement of the

State's objective'." ).  Court do not focus on whether all entities that "should" or "could" be included are regulated by the legislation.  *Beach Commc'ns. Inc.*, 508 U.S. at 315-16 (explaining that "Defining the class of persons subject to a regulatory requirement – much like classifying government beneficiaries—'inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some point is a matter for legislative, rather than judicial consideration'.")   No part of the equal protection doctrine focuses on the number of entities affected by the legislation.  Plaintiff's apparent claim that the MREA violates equal protection because it singles out Plaintiff for regulation is completely unsupported by the law. This Court should dismiss Count 3 of the complaint for failure to state a claim.

6.   <u>Plaintiff inaccurately implies that it is the only entity affected by the MREA</u>.

In addition to subjecting producer-handlers with distribution of over three million pounds per month to the same pricing and pooling regulations as other milk handlers, the MREA changes the rules for fluid milk processors located in Clark County, Nevada.  Pursuant to the terms of the MREA, the Secretary of Agriculture amended all milk marketing orders by publication in the Federal Register on May 1, 2006.  MREA § (O); 71 Fed. Reg. 25495.   In discussing the changes required by the MREA, the Federal Register states, "The Milk Regulatory Equity Act of 2005 specifically amends section 608c(11) of the AMAA by removing the following: 'The price of milk paid by a handler at a plant operating in Clark County, Nevada shall not be subject to any order under this section.'  This removal of the Clark County exemption results in handlers located in Clark County, Nevada, now being subject to Federal order minimum prices for their route sales in a Federal order marketing area."  71 Fed. Reg.

15

25496.[5]  Thus the MREA operates to bring into the federal pricing and pooling system both

Sarah Farms and any handlers in the Clark County, Nevada area selling packaged fluid milk into

Arizona in competition with Plaintiff, neither of which were previously subject to the minimum

pricing and pooling provisions of the Order.   The MREA, read in its entirety, has far-reaching

consequences intended to:

> ensure regulatory equity between and among all dairy farmers and
> handlers for sales of packaged fluid milk in federally regulated
> milk marketing areas and into certain non-federally regulated milk
> marketing areas from federally regulated areas. . .

Preamble to *Milk Regulatory Equity Act of 2005,* Pub. L. No.1 09-215, 120 Stat. 328. PL

109-215 (April 11, 2006)

Prior to the MREA, both Sarah Farms and Las Vegas - based processors were exempt from

federal order pricing and pooling for any sales in Arizona.  The MREA simply reverses that

course of action as to at least those entities.[6]  Any representation to the contrary is false,

misleading and contrary to the law as written and implemented by the Secretary.  Plaintiff's

claims of unequal treatment clearly lack support in both the MREA and the implementing

regulations and the Court should therefore dismiss their equal protection claim.

## B.    The MREA is not Remotely a Bill of Attainder

Economic regulation of future business conduct that may be avoided by altering the

course of business activity and that is or may be applicable to a number of non-named entities

cannot and does not constitute a bill of attainder.  The MREA is a classic example of legislation

that is not a bill of attainder for each of the foregoing reasons. A bill of attainder is a special

---

[5] The D.C. Circuit has held that "as matters of public record, statements of the Federal Register can be examined on 12(b)(6) review." *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n. 6 (D.C. Cir. 1993).

[6] Beyond this Motion to Dismiss, it is relevant that to the best of Amici's knowledge, information and belief, the federal regulatory treatment of as many as 9 handlers (other than Sarah Farms) was altered by the MREA.  And as discussed by the Government in its Motion to Dismiss, Sarah Farms' regulatory treatment actually remained the same under the April 1 implemented Final Rule and the May 1 implemented MREA.  It is simply untrue that Sarah Farms was singled out in any way by this legislation.

legislative action inflicting punishment upon a person. Black's Law Dictionary 176 (8th ed.

1969). There is no moral approbation or taint to subjecting fluid milk processors like, but not

limited to, Sarah Farms, to the economic pricing and pooling provisions of a federal milk

marketing order in months after enactment of the MREA.[7] Leaving aside the fact that Sarah

Farms would be regulated under the Final Rule even if this Court were to find that the MREA is

unlawful, Sarah Farms may avoid regulation under this provision by altering its business

conduct. Finally, the MREA (taken as a whole and not parsing individual provisions) can and

does alter the regulatory treatment of other fluid milk processors. Taken to its logical

conclusion, Sarah Farms' complaint would undercut, if not eliminate, the federal milk order

system entirely. If the regulation of Sarah Farms (and others) under MREA is an unlawful bill of

attainder, then the AMAA must inevitably also be unlawful because it also applies in Arizona

(and other orders ) to a limited number of known entities subject to business regulation of future

conduct. But the United States Supreme Court, together with all of the other courts that have

reviewed this program over the 70 plus years of its existence have found precisely otherwise.

*U.S. v. Rock Royal Co-op, Inc.*, 307 U.S. 533 (1939) (and its numerous progeny).

       1.      <u>The MREA applies and can apply to multiple parties and does not satisfy the specificity element of a bill of attainder</u>.

Sarah Farms would have this Court parse the MREA in order to assert (as oppose to

prove) that it was singled out by the MREA. First, and most obviously, Sarah Farms is not

named anywhere in the MREA. Second, as discussed in the equal protection argument above,

---

[7]      Without repeating the Government's arguments regarding standing and redressability, Amici note that Sarah Farms' admission by way of filing the Texas lawsuit in March 2006 regarding its regulation under the Final Rule proves that it is not Section 2(a)(M) with which it is concerned, but rather Section 2(a)(N). Under federal milk marketing order rules, a plant, such as Sarah Farms, becomes fully regulated once it has 25% of its route sales in a federal order. 7 C.F.R. § 1131.7(a). The MREA § 2(a)(M)(ii)(III) expressly exempts subparagraph (M) coverage as to any plant (handler) already subject to regulation by a federal milk marketing order. Thus, Sarah Farms cannot (and indeed did not) assert that it is or may be subject to regulation under subparagraph (M). Amici will thus, in this memorandum, focus on the implications of subparagraph (N) and reserves the right to comment on subparagraph (M) if and when an entity entitled to assert a claim under that paragraph actually does so.

Sarah Farms simply is not even for motion to dismiss purposes able to assert that the MREA affects only it because Section (b) clearly results in the same rules for minimum pricing and pooling regulation applying to Las Vegas, Nevada (Clark County) based plants that sell packaged fluid milk into Arizona.[8]  For motion to dismiss purposes, we are limited to that universe of known regulated entities under the Arizona order as a result of the MREA.  But the universe of who may become or who may avoid regulation under the Arizona order under this provision is non-specific and "not immutable."  *Selective Serv. Sys. v. Minn. Pub. Interest Research Group,* 468 U.S. 841, 853 (1984); *Am. Commc'ns. Ass'n, CIO v. Douds,* 339 U.S. 382, 414 (1950).

Sarah Farms could alter its business activity such that it no longer fit the administrative definition of a producer-handler (e.g. it could purchase raw milk from other sources or simply fail to provide the Secretary's local federal agent (known as the Market Administrator) with the required information to maintain producer-handler status).  Sarah Farms could reduce its milk marketings to under 3 million pounds in a given month.  Sarah Farms could sell all of its milk in Mexico or non-federally regulated Nevada (thus not meeting the definition of an Arizona federal order plant under 7 C.F.R. § 1131.7(a)).  In each of these cases, Sarah Farms would no longer be subject to regulation because of the Final Rule or the MREA; instead Sarah Farms would either be regulated under different provisions of the pre-2006 Arizona order (if it gave up its producer-handler status) or simply not be regulated at all.   The MREA regulates future conduct and is thus not a bill of attainder.  *Flemming v. Nestor,* 363 U.S. 603, 613-614 (1960) (upholding

---

[8] In analyzing the MREA, the court must look to the statute as a whole, not simply to one part as Plaintiff suggests. *U.S. Nat'l Bank of Oregon, Petitioner 92-484 v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (holding that "over and over we have stressed that 'in expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy'."); *American Fed'n of Gov't Employees, Local 2782 v. Federal Labor Relations Auth.*, 803 F.2d 737,740 (D.C. Cir. 1986) ("It is a generally accepted precept of interpretation that statutes or regulations are to read as a whole, with 'each part or section . . . construed in connection with every other part or section'.")

termination of Social Security benefits of deported aliens as not constituting punishment for past conduct).

It is for these additional reasons, that Amici agree with the Government's argument regarding the specificity element found on pages 26-28 of its memorandum. The MREA establishes an open-ended set of fluid milk processors whose future regulatory status can change (more federally regulated, less federally regulated or not federally regulated) based upon a number of fluid circumstances.

> 2. The MREA furthers the nonpunitive goals of the AMAA and is not punishment under the Bill of Attainder Clause of the U.S. Constitution.

While the MREA's alleged impacts on Sarah Farms do not amount to an actual line of business restriction, as opposed to limited economic regulation, lines of business restrictions have been found routinely by the United States Supreme Court to be lawful without ever suggesting that they can constitute punishment, or constitute a potential unlawful bill of attainder. *See, e.g. FCC v. National Citizens Comm. for Broad.,* 436 U.S. 775 (1978) (upholding ban for cross ownership of broadcast licensee and newspaper in the same market); *Bd. of Governors of Fed. Reserve Sys. v. Agnew*, 329 U.S. 441 (1947) (upholding rule preventing employees of securities firms from simultaneously working for Federal Reserve System banks). The D.C. Circuit applied those cases in *Bellsouth Corp. v. FCC*, 162 F.3d 678, 686 (D.C. Cir. 1998) in finding that the Telecommunications Act of 1996 was not a bill attainder. (upholding for the second time the constitutionality of the Telecommunications Act of 1996 despite repeated challenge that the Bell Operating Companies were singled out by name for business restrictions).

The court in *Bellsouth* also adopted with approval the Supreme Court's oft-cited conclusion "that burdensome regulation simply cannot be equated with punishment." *Id.* at 687 c*iting De Veau v. Braisted,* 363 U.S. 144, 160 (1960) and *Hawker v. N.Y.*, 170 U.S. 189 (1898).

Without conceding that the MREA might impose "burdensome" regulation, Amici note that Sarah Farms does not and cannot allege more than burdensome regulation as the basis for its complaint.  Congress, the Secretary, and the courts have routinely and regularly found that federal milk order regulation remains necessary both to protect dairy farmers and consumers, and in order to maintain a fresh and wholesome supply of milk for the United States.  *See generally* Background Section infra.  Thus, maintaining the system through appropriate regulation of entities that might otherwise disrupt it is a "reasonable means" of ensuring the program's survival. *Dent v. W. Va.,* 129 U.S. 114 (1889) (upholding educational and certification requirements for those practicing medicine).

In addition to the Government's memorandum, one additional case bears examination by this Court.  In *SeaRiver Mar. Fin. Holdings, Inc. v. Mineta,* 309 F.3d 662 (9th Cir. 2002) the Court upheld pollution control legislation that barred vessels from the Prince William Sound, Alaska, if after March 23, 1989, the vessel had released more than one million gallons of oil in the marine environment.[9]  The "Exxon-Valdez" case is relevant on its facts, was decided by a court governing the federal jurisdiction (Arizona) where this case could have been brought, and was relied upon by the D.C. Circuit in the unfortunate case of *Foretich v. U.S.,* 351 F.3d 1198, 1218 (D.C. Cir. 2003) (finding an unlawful bill of attainder in Congressional action singling out specific persons, making judicial judgments in legislation and otherwise casting moral and invidious approbation on specific individuals).[10]

---

[9]      The lead defendant in that case was the Secretary, U.S. Department of Transportation even though USDOT did not on the face of the case adopt any "offending" regulations as were adopted under the MREA by the Secretary. Of course, Sarah Farms here did not choose to sue the Secretary, perhaps in an effort to avoid the inevitable § 15(A) standing argument.

[10]      For those native to the District of Columbia, the notorious 20-year *Foretich* saga only proves that when facts are uniquely bad enough (legislation named for person benefited at expense of ex-husband, legislative "findings" contrary to court decisions on the merits, moral judgments that affected fundamental rights regarding child-rearing and visitation, and impacts on future jobs as a result of moral findings of fact due to alleged past

In mid-1990, Congress passed and the President on August 18 signed the Oil Pollution

Act.  Among other terms, the Oil Pollution Act contained a provision banning from the navigable

waters of the Prince William Sound, Alaska, any tank vessel that had spilled more than

1,000,000 gallons of oil into the marine environment after March 22, 1989.  33 U.S.C. § 2737.

The Exxon Valdez oil spill occurred on March 23, 1989.  The *SeaRiver* court found the requisite

specificity element, notwithstanding the open future nature of the regulation, because of the

specific date of March 22 chosen by Congress – clearly past conduct. *SeaRiver*, 309 F.3d at 670-

673.   Nonetheless, the court concluded that the Oil Pollution Act did *not* inflict punishment on

SeaRiver because it did not meet the historical meaning of legislative punishment, it furthered

non-punitive legislative purposes, it lacked clear legislative intent to punish, and Sea River could

not prove that there were less burdensome alternatives.  In this four part test, the D.C. Circuit has

concluded that the second factor – the so-called functional test – is the most important.

*Bellsouth*, 162 F.3d at 684.   The MREA functions to revise the AMAA and thus is economic

regulation, restoring equitable treatment to the Western United States.  Thus, the MREA has a

non-punitive rational purpose.

Only the clearest proof suffices to establish the unconstitutionality of a statute as a bill of

attainder. *Communist Party of U.S. v. Subversive Activities Control Bd.*, 367 U.S. 1, 83 (1961).

Neither SeaRiver nor Sarah Farms can meet this burden. Unlike SeaRiver, Sarah Farms has no

way of showing that future regulation is based upon its past conduct.  The Exxon Valdez court

found legitimate regulatory goals and Congressional focus on prospective risks to overcome any

indicia (on the surface the legislation appears to be quite clearly based upon past conduct) of

punishment – the key being that under the functional test and with the "clear evidence" rule

---

conduct), a court may find an unlawful bill of attainder.  The case, while a painful read, is instructive here because
nothing alleged or that can be alleged by Sarah Farms is in the same universe as the facts of *Foretich.*

applicable, *any* non-punitive reason for the legislation suffices to defeat a bill of attainder claim. This is because, much like the equal protection analysis, discussed above, the court may rely on any legitimate concern that Congress may have had. *SeaRiver*, 309 F.3d at 675. And the fact that Congress even knew (assuming that it did) that Sarah Farms would (assuming that the Final Rule didn't already impose it) have an additional cost imposed on it by the legislation "does not translate into a suggestion that Congress's intent was to punish" rather than to further the equitable regulatory goals of the AMAA. *Id.* at 674.

The facts and history of the Exxon Valdez are far more suggestive of a bill of attainder than Sarah Farms has alleged or can possibly muster. If that provision of the Oil Pollution Act does not operate as an unlawful bill of attainder, Sarah Farms far weaker claim against the MREA must perforce fail. "By banning bills of attainder, the Framers of the Constitution sought to guard against such dangers by limiting legislatures *to the task of rule-making*." *U.S. v. Brown*, 381 U.S. 437, 446 (1965). In passing the MREA and in USDA's implementation of the MREA, that is precisely what the U.S. government did – general, lawful rule-making.

### C.    The passage of the MREA in no way violated Due Process.

1.    The Northern District of Texas opinion denying Plaintiff's motion for preliminary injunction belies Plaintiff's current contention that the passage of the MREA unfairly interfered with its ability to prosecute that suit.

Plaintiff contends that "Section 2(a) of the MREA denied Plaintiff due process of law by foreclosing its ability to obtain effective judicial review of the Department of Agriculture's Final Rule in the Johanns litigation in the United States District Court for the Northern District of Texas." Comp. at 60. Plaintiff seems to base this contention on two pieces of information: first that counsel for the government notified the court of the passage of the MREA prior to oral argument on the Johanns matter; and second, that "in its decision denying the motion for a

preliminary injunction, the District Court noted that the passage of the Act effectively mooted plaintiffs' legal challenge to the validity of the Department of Agriculture rule."  Comp. at 46.

Plaintiff's assertion regarding the court's consideration of the passage of the MREA fails to tell the whole story.[11]  In fact, the <u>Johanns</u> court denied the Hettinga's request for preliminary injunction on the merits finding that plaintiffs had failed to demonstrate irreparable harm because they only alleged financial harm, that plaintiffs failed to demonstrate the likelihood of success on the merits[12], and that they failed to establish that the potential harm to Sarah Farms outweighs the potential harm to the government and the Intervenors if the Rule is enjoined.  *See* Defendant's Ex. 1.  While the court order recognized that Congress passed the MREA, it did so in a footnote preceded by the caveat that the passage of the MREA was not outcome-determinative.[13]  *Id.*  Given the fact that the Court's Order clearly indicates that the Court adjudicated the motion for preliminary injunction on its merits, Plaintiff's claim that the passage of the MREA interfered with their lawsuit falls flat.  Their own voluntary dismissal of the complaints also belies their assertion today.  *See* Defendant's Ex. 2.

---

[11] In addition, Plaintiffs' assertion that Congress purposely took up the MREA when it did in order to undermine Sarah Farm's legal efforts in Texas lacks support.  Plaintiffs claim that Representative Lewis noted that that passage of the Act would likely deny Sarah Farms an opportunity to challenge the regulations in court. Compl. at 43.   In fact, according to the Congressional Record, Congressman  Lewis said, "That regulation is being challenged in court and it is supposed to be heard tomorrow.  So the opponents are choosing to bring the bill up today to undermine that opportunity for a family business to have an opportunity to expand their business."  March 28, 2006 Congressional Record at H1153.

[12] In so holding, the court essentially adopted the opinion of the Edaleen trial court.  That complaint was nearly identical to that of the Hettingas in the Northern District of Texas.  The Edaleen court found that not only were plaintiffs' claims not ripe for adjudication, but that they failed to meet any of the 4 elements of the test for granting preliminary injunction.

[13] The footnote states: "Although not outcome-determinative, the Court notes that Congress recently passed the Milk Regulatory Equity Act of 2005.  See 152 *Con. Rec.* S2120 (March 28, 2006) (statement of Speaker pro tempore Culberson) ('In the opinion of the Chair, two-thirds of those present have voted in the affirmative.').  As an initial matter, it appears that if the President signs this Act into law, Plaintiffs' request for injunctive relief may very well become a moot point."  <u>Johanns</u> Order at 4.

2.    <u>Nothing prohibits Congress from changing the law even if it will affect pending litigation</u>.

Over a century of jurisprudence has permitted Congress to amend laws as it desires, regardless of the impact on pending litigation.  Any claim by Plaintiff that it was harmed by the timing of the passage of the MREA must fail.  In examining the constitutionality of New York's gun laws in light of outcome-determinative federal legislation that was passed while litigation was pending, the Eastern District of New York recently reiterated that, "the fact that the Act affects a pending case is not conclusive reason for denying its effect.  *See Ex Parte McCardle*, 74 U.S. 506 (1889)."  *City of N.Y.  v. Beretta U.S.A. Corp.*, 401 F. Supp.2d 244, 290 (E.D.N.Y. 2005).  Legislation that changes the underlying law to be applied to a pending matter has generally been accepted by the United States Supreme Court as a fair exercise of the legislature's Article II powers.  In *Pa. v. Wheeling & Belmont Bridge Co*, 59 U.S. 421 (1855), the Supreme Court had held, based on existing state law, that a bridge did not comply with law and must be removed or renovated to meet state law requirements.  Congress then passed legislation validating the bridge as built.  *Id.* at 430.  When the Supreme Court was asked to enforce its initial order, it found that the intervening Act of Congress mooted its original holding and held that the action could no longer be maintained.  *Id.* at 431-32.

More recently, the Supreme Court addressed the issue of the validity of new legislation in *Robertson v. Seattle Audobon Soc'y*, 503 U.S. 429 (1992).  The *Robertson* court upheld a change to the Endangered Species Act through the Northwest Timber Compromise.  The Northwest Timber Compromise specifically referred to and impacted pending litigation.  The Supreme Court found that the Timber Compromise "compelled changes in law, not findings or results under old law", and therefore passed constitutional muster.  *Robertson*, 503 U.S. at 438.

Changes in legislation have also impacted midstream litigation involving the milk industry. When the Secretary followed (or so he thought) Congress' dictates in the late 1990's in response to the Federal Agriculture Improvement and Reform Act of 1996, a number of dairy farmer cooperatives filed multiple federal court litigation in an effort to enjoin the results of the Secretary's rulemaking. Congress intervened when it passed the 1999 Omnibus Appropriations Act (P.L. 106-113) and provided outcome determinative legislation that brought an end to the pending litigation.

The effect of the MREA was less direct than the new legislation in *Robertson* or *Beretta*. The MREA essentially codified a regulation, already promulgated by the Secretary of Agriculture. That regulation had already been upheld by the only other court to address it. *Edaleen v. Johanns*, Case No. 05-2442 (PLF) D.D.C. (December 29, 2005). The Court adjudicating the Hettingas' complaint with which the MREA allegedly interfered, specifically noted that the MREA was in no way outcome determinative and based its order on other independent factors. *See* Exhibit 1 to Defendant's Motion to Dismiss. Plaintiff's claim that the MREA impermissibly interfered with a right to challenge the Secretary's Rule fails to sustain a cause of action both on the facts and on the law.

## CONCLUSION

For all of the foregoing reasons, Amici respectfully request that this Court grant defendant's motion to dismiss.

Respectfully submitted,

/s/ Charles M. English, Jr.
Charles M. English, Jr.
D.C. Bar No.: 386572
Sara Pikofsky
D.C. Bar No.: 485948
Thelen Reid Brown Raysman & Steiner LLP

701 8th Street NW
Washington, DC  20001
Telephone:  202.508.4000

December 22, 2006                    *Attorneys for Amici Curiae*
                                    *United Dairymen of Arizona, et al.*

## <u>CERTIFICATE OF SERVICE</u>

On this 22 day of December, 2006, I hereby certify that I caused true and correct copies of the foregoing Motion of United Dairymen of Arizona, Shamrock Foods, Shamrock Farms, Parker Farms and Dairy Institute of California For Leave to File a Brief Amicus Curiae in Support of Defendant's Motion to Dismiss to be served by prepaid first class mail to the following parties.

Alfred W. Ricciardi
Hebert Schenk P.C.
4742 N. 24th Street
Suite 100
Phoenix, AZ  85016

John F. Cooney
Venable LLP
575 7th Street NW
Washington, DC  20004

Peter J. Phipps
United States Department of Justice
Civil Division, Federal Programs Branch
P. O. Box 883
Washington, DC  20044

_____
Sara R. Pikofsky