UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HEIN HETTINGA AND ELLEN HETTINGA,    )
d/b/a Sarah Farms, et al.,    )
    )
            Plaintiffs,    )
    )
    v.    )    Civil Action No.06-1637 (RJL)
    )
UNITED STATES OF AMERICA,    )
    )
            Defendant.    )

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
THE COMPLAINT PURSUANT TO RULE 12(B)(1) AND 12(b)(6)

ALFRED W. RICCIARDI
(Arizona Bar No. 009547)
Hebert Schenk P.C.
4742 N. 24th Street, Suite 100
Phoenix, Arizona 85016
(602) 248-8203

JOHN F. COONEY
(D.C. Bar No. 936336)
NANCY S. BRYSON
(D.C. Bar No. 913673)
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4812

February 6, 2007                    Counsel for Plaintiffs

# TABLE OF CONTENTS

Table of Contents ............................................................................................... i

Table of Authorities .......................................................................................... iii

Introduction........................................................................................................ 1

Factual Background Leading to Passage of the Unconstitutional Act ....................... 2

Congress Renders the Hettingas' Lawsuit Moot by Passing the Milk
Regulatory Equity Act in Violation of the Bill of Attainder Clause............................ 4

How the MREA Targets and Punishes the Hettingas and GH Dairy ......................... 5

Standard of Review ............................................................................................. 7

ARGUMENT....................................................................................................... 8

    I.      PLAINTIFFS HAVE PROPERLY PLEADED THAT SECTION 2(A) OF
           THE MREA IS AN UNCONSTITUTIONAL BILL OF ATTAINDER ......... 9

          A.    The Elements of a Bill of Attainder Claim.................................. 9

          B.    The Complaint Explicitly Alleges that the MREA Specifically
              Singles Plaintiffs Out for Legislative Punishment .............................. 10

          C.    The Complaint Alleges that the Law Provides No Judicial Process .... 13

          D.    The Complaint Properly Alleges that the Unique Burdens
              Imposed by the MREA Constitute Legislative Punishment ................ 14

              1.    The Complaint Alleges Economic Harm that Satisfies the
                    Historical Test...................................................................... 14

              2.    The Complaint Properly Alleges that the MREA
                    Constitutes Punishment under the Functional Test.................. 18

                    a.    The Governing Standard............................................. 18

                    b.    The Factual Inquiry Required by the Functional Test
                         Cannot Be Resolved at the Motion To Dismiss
                         Stage ........................................................................ 19

              3.    The Complaint Alleges Facts that Satisfy the Motivational Test ........ 23

II.    THE COMPLAINT PROPERLY ALLEGES THAT THE MREA DENIES
       PLAINTIFFS EQUAL PROTECTION OF THE LAWS ...............................24

       A.    The Standard To Be Applied ..............................................25

       B.    The Complaint Alleges that the MREA Denies Plaintiffs Equal
             Protection .......................................................................26

             1.    Discriminatory Effects of Subsection (N)...............................26

             2.    Discriminatory Effects of Subsection (N) on the Hettingas'
                   Right to Obtain Judicial Review .............................................27

             3.    Discriminatory Effects of Subsection (M) ...............................28

       C.    There is No Basis for Dismissing the Equal Protection Claim............29

III.   THE COMPLAINT STATES A VALID DUE PROCESS CLAIM ..............31

       A.    The Hettingas Have Protected Liberty and Property Interests.............32

       B.    Plaintiffs Were Deprived of Access to the Courts Without
             A Hearing........................................................................32

IV.    THE RULE 12(b)(1) ARGUMENTS SHOULD BE REJECTED ................34

       A.    Plaintiffs Have Alleged that They Suffered Injury-in-Fact ................34

       B.    The Facts Alleged in the Complaint Regarding Subsection (N) Satisfy
             the Redressability and Traceability Requirements of Article III .........36

             1.    The Governing Standard .......................................................36

             2.    The Harms Alleged ..............................................................37

       C.    Sovereign Immunity Does Not Apply to a Request for Equitable Relief
             from Unconstitutional Acts by the Government ................................40

       D.    Plaintiffs Need Not Exhaust Any Administrative Remedies
             Before Filing This Threshold Challenge to the Constitutionality
             of the MREA ...................................................................43

Conclusion....................................................................................45

## TABLE OF AUTHORITIES

### CASES

*Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 469 F.3d 129 (D.C. Cir. 2006)....................................................................................................................36

*Avocados Plus, Inc. v. Veneman*, 370 F.3d 1243 (D.C. Cir. 2004).........................................44

*BellSouth Corp. v. FCC*, 144 F.3d 58 (D.C. Cir. 1998), *cert. denied*, 526 U.S. 1086 (1999)..10

*BellSouth Corp. v. FCC*, 162 F.3d 678 (D.C. Cir. 1998) .......................................................10

*Bernheim v. Litt*, 79 F.3d 318 (2d Cir. 1996) ..........................................................................7

*Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ...........41

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)...............................................25

*Clark v. Library of Congress*, 750 F.2d 89 (D.C. Cir. 1984) .................................................41

*Conley v. Gibson*, 355 U.S. 41 (1957) ....................................................................................7

*Consol. Edison Co. v. Pataki*, 292 F.3d 338 (2d Cir. 2002)..................................................14

*Cummings v. Missouri*, 71 U.S. (4 Wall.) 277 (1866) ............................................................13

*Darby v. Cisneros*, 509 U.S. 137 (1993) ................................................................................44

*Department of Agriculture v. Moreno*, 413 U.S. 528 (1973) ..................................................25

*Dugan v. Rank*, 372 U.S. 609 (1963) .....................................................................................41

*Edaleen Diary, LLC v. Johanns*, 2006 WL 3069187 (D.C. Cir., Oct. 31, 2006) ....................27

*Ex parte Garland*, 71 U.S. (4 Wall.) 333 (1866) ..................................................................16

*Foretich v. United States*, 351 F.3d 1198 (D.C. Cir. 2003)...........................................*passim*

*Gilvin v. Fire*, 259 F 3d 749 (D.C. Cir. 2001) .........................................................................7

*Haase v. Sessions*, 835 F.2d 902 (D.C. Cir. 1987) ..................................................................8

*Herbert v. National Academy of Sciences*, 974 F.2d 192 (D.C. Cir. 1992) ..............................8

*Hettinga v. Johanns*, No. 5-06CV0052-C (N.D. Tex.) ..............................................................3

*Hillside Dairy, Inc. v. Lyons*, 539 U.S. 59 (2003) ...................................................................6

*Hillside Diary, Inc. v. Kawamura*, 317 F.Supp.2d 1194 (E.D. Cal. 2004) ..............................35

*Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003)....................7

*Hotel and Restaurant Employees Union, Local 25 v. Smith*, 846 F.2d 1499 (D.C. Cir. 1988) .8

*Kelley v. United States*, 69 F.3d 1503 (10th Cir. 1995) ..........................................................41

*Kingman Park Civic Ass'n v Williams*, 348 F.3d 1033 (D.C. Cir. 2003)...................................7

*Krieger v. Fadely,* 211 F.3d 134 (D.C. Cir. 2000)....................................................7

*Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682 (1949) ................................41

*Logan v. Department of Veterans Affairs,* 357 F.Supp.2d 149 (D.D.C. 2004) ........................8

*Louisville Gas & Elec. Co. v. Coleman,* 277 U.S. 32 (1928)................................................25

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992)...........................................................37

*Malone v. Bowdoin,* 369 U.S. 643 (1962) ........................................................................41

*Menkes v. Dep't of Homeland Security,* 402 F.Supp.2d 204 (D.D.C. 2005)............................8

*Nami v. Fauver,* 82 F.3d 63 (3rd Cir. 1996).......................................................................7

*Navegar, Inc. v. United States,* 192 F.3d 1050 (D.C. Cir. 1999)...........................................24

*Nixon v. Adm'r of Gen. Servs.,* 433 U.S. 425 (1977) ...........................................................12

*Panola Land Buyers Ass'n v. Shuman,* 762 F.2d 1550 (11th Cir. 1985)..................................40

*Phoenix Consulting, Inc. v. Republic of Angola,* 216 F.3d 36 (D.C. Cir. 2000) ........................8

*Robertson v. Seattle Audubon Soc'y,* 503 U.S. 429 (1992) ..................................................28

*Romer v. Evans,* 517 U.S. 620 (1996)...............................................................................25

*Selective Serv. Sys. v. Minnesota Pub. Interest Research Group,* 468 U.S. 841 (1984)............9

*Shays v. Federal Election Commission,* 414 F.3d 76 (D.C. Cir. 2005) ..................................36

*Swierkiewicz v. Sorema,* 534 U.S. 506 (2002).....................................................................7

*United States v. Brown,* 381 U.S. 437 (1965).....................................................................10

*United States v. Florida East Coast Ry.,* 410 U.S. 224 (1973) .............................................33

*United States v. James Daniel Good Real Property,* 510 U.S. 43 (1993)................................33

*United States v. Lovett,* 328 U.S. 303 (1946) ....................................................................16

*Village of Willowbrook v. Olech,* 528 U.S. 562 (2000) ........................................................25

*Warren v. District of Columbia,* 353 F.3d 36 (D.C. Cir. 2004)...............................................7

*Weaver v. United States,* 98 F.3d 518 20 (10th Cir. 1996) ..................................................43

*Zobel v. Williams,* 457 U.S. 55 (1982) ..............................................................................25

## CONSTITUTION AND STATUTES

*Constitutional Provisions:*

Bill of Attainder Clause, Article 1, § 9, cl.3 ...................................................................*passim*

Due Process Clause, Amend. V ...........................................................................................*passim*

Equal Protection Clause, Amend. V ....................................................................................*passim*

*Statutory Provisions:*

5 U.S.C. § 704.................................................................................................................32

Milk Regulatory Equity Act, Pub. L. No. 109-215 (2006)

       Section 2(a) ................................................................................................9

       Section 2(b) ..............................................................................................21

       Section 2(d) …………………………………………………………………44

7 U.S.C. § 601……....................................................................................................3

7 U.S.C. § 608c(5) ...........................................................................…5, 26

       Subsection (M), 7 U.S.C. § 608c(5)(M) ...........................…………………*passim*

       Subsection (N), 7 U.S.C. § 608c(5)(N) ............................................*passim*

7 U.S.C. § 608c(9) ...................................................................................39

7 U.S.C. § 608c(15)(A) .............................................................................43

28 U.S.C. § 1331..........................................................................................40

## REGULATIONS

7 C.F.R. § 1131.7 (2006)...........................................................................28

Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas: Order
Amending the Orders, 71 Fed. Reg. 9430 (Feb. 24, 2006) ......................................3

## OTHER AUTHORITIES

Cong. Rec. H1150 (March 28, 2006) ................................................................................. 35

Cong. Rec. H 1151 (March 28, 2006) ................................................................................ 35

Cong. Rec. H 1152 (March 28, 2006) ................................................................................ 35

Fed. R. Civ. P. 12(b)(1) ...................................................................................................... 8

Fed. R. Civ. P. 12(b)(6) ...................................................................................................... 7

The Federalist, No. 48 ....................................................................................................... 10

## Introduction

Hein Hettinga and Ellen Hettinga and their family partnership GH Dairy have been singled out by Congress with laser-like precision for unconstitutional legislative punishment and denied due process and equal protection of law. Congress's passage on March 28, 2006 of the Milk Regulatory Equity Act (the "MREA", Pub. L. No. 109-215, codified at 7 U.S.C. § 608c(5)(M)-(N)) marked the culmination of a years-long crusade by the largest companies in the dairy industry to impose Federal price controls on the Hettinga operations and thereby eliminate price competition. The Hettinga family's dairy operations were designed to operate with the highest level of managerial and economic efficiency so that customers could purchase the highest quality dairy products at the lowest possible prices. The Hettinga family's ability to operate their dairy businesses within the law, but outside both federal and state imposed price controls drove the industry to eliminate this entrepreneurial family as a factor in the marketplace.

For more than a decade, the Hettingas have operated Sarah Farms, a "producer-handler" in Yuma, Arizona. As a producer-handler, the Hettingas produce milk on their own farms and bottle that milk for sale to consumers, milk dealers and retailers. Because they are totally independent businesses that do not rely on the protection of the government or the industry collective, producer-handlers have historically been exempt from federal price controls. In February 2006, the dairy industry persuaded the U.S. Department of Agriculture ("USDA") to adopt a rule that eliminated this exemption for Sarah Farms and other similarly situated producer-handlers. When the Hettingas challenged this rule in court, Congress responded by passing the MREA, which punishes the Hettingas by imposing direct statutory price controls on their family operations alone. The MREA also eliminated the Hettingas' ability to obtain judicial review of USDA's unlawful rule.

Congress was not content to punish the Hettingas solely by imposing mandatory price controls on their Sarah Farms operation. The MREA also imposed punitive price regulations on GH Processing, which is owned by the Hettingas' family partnership, GH Dairy. GH Processing operates a second, independent dairy processing plant in Yuma, Arizona that sells all of the milk it processes into California. Until the passage of the MREA, GH Processing was not subject to Federal price controls for these sales. The MREA singled it out for direct statutory price controls on its interstate sales into California.

In combination, the provisions of the MREA constitute impermissible legislative punishment of Plaintiffs, in violation of the Bill of Attainder Clause, and deny the Hettingas equal protection and due process of law in violation of the Fifth Amendment. Plaintiffs do not seek damages, but seek only declaratory and injunctive relief from application of these unconstitutional provisions of the MREA. The Complaint sufficiently pleads their claims for relief. The arguments raised by the government in its motion to dismiss ignore the legal standards applicable to motions under Rule 12(b). The government seeks to have this Court treat this case as if it were in the later stages of litigation, after the full exchange of discovery rather than one recently filed and in its infancy, and to decide these issues on the merits.

**Factual Background Leading to Passage of the Unconstitutional Act**

Before April 2006, all producer-handlers of milk in the United States, including the Hettingas' Sarah Farms operation, were exempt from federal price controls imposed by the federal milk marketing orders. From 1937 until 2006, USDA had never subjected producer-handlers to the price regulations applicable to handlers of milk that purchase some or all of their supply from other dairy farmers. In fact, USDA had concluded that its authorizing statute, the

Agricultural Marketing Agreement Act of 1937, 7 U.S.C. §§ 601 et seq. did not provide USDA legal authority to subject producer-handlers to price regulations.

In June 2002, some of the country's largest milk cooperatives and processors requested that USDA subject the Hettingas' Sarah Farms plant to the price regulations of the Arizona-Las Vegas Milk Marketing Order. On February 24, 2006, USDA adopted a Final Rule, effective April 1, 2006, that purported to subject producer-handlers in that area and in the Pacific Northwest Milk Marketing area to the pricing and pooling provisions of their respective Marketing Orders, if the producer-handler produced and sold more than 3,000,000 pounds per month of its own milk. Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas; Order Amending the Orders, 71 Fed. Reg. 9430 (Feb. 24, 2006). The net effect of the Rule would have been to eliminate price competition from the Hettingas in the Arizona-Las Vegas Milk Marketing area, by forcing the Hettingas to pay a substantial portion of their monthly revenues into a pool to subsidize their competitors in those markets.

On March 15, 2006, the Hettingas sued USDA to invalidate the Rule because: (1) USDA lacked statutory authority to impose price controls on producer-handlers who sell only milk that they produce from their own cows and do not purchase milk from other producers; (2) USDA had acted arbitrarily and capriciously by changing, without explanation, its prior legal interpretation that it lacked authority to eliminate the producer-handler exemption; and (3) USDA had otherwise acted arbitrarily and capriciously in eliminating the producer-handler exemption[1]

---

[1] *Hettinga v. Johanns*, No. 5-06CV0052-C (N.D. Tex., Lubbock Division).

**Congress Renders the Hettingas' Lawsuit Moot by Passing the Milk Regulatory Equity Act in Violation of the Bill of Attainder Clause.**

Oral argument on the Hettingas' motion for a preliminary injunction of the USDA Rule was scheduled for March 29, 2006. The scheduling of the hearing precipitated Congress to pass this targeted bill to squelch the Hettingas' legal challenge. On the evening of March 28, 2006, without benefit of any prior Committee hearing, the MREA was brought to the floor of the House on the Suspension Calendar. Its proponents moved to suspend the rules and pass the bill immediately, which required a super-majority vote of two-thirds. Following a short floor debate, the bill narrowly passed the House and was cleared for signature by the President.

During the House floor debate on the MREA, several Members stated that passage of the bill was intended to short circuit judicial consideration of the Hettingas' challenge to the legality of the USDA rule, which was scheduled to be heard the next morning. The passage of the MREA in fact had that effect. At the opening of oral argument, USDA's attorney handed the District Judge a copy of the Congressional Record in which the House had adopted the bill the previous evening. While noting that President Bush had not yet signed the bill, USDA argued that the MREA was highly likely to become law, because the President had never vetoed a bill. The government also noted that the MREA categorically subjected Sarah Farms to the pricing and pooling obligations of the AMAA, which would moot its challenge to the USDA rule and that the Congressional action was a conclusive reason why the Court should deny the motion for a preliminary injunction. The Court then denied injunctive relief, noting that the passage of the MREA had effectively mooted the Hettingas' legal challenge to the validity of the USDA rule. The President signed the MREA on April 11, 2006. The Texas litigation thereafter was voluntarily dismissed without prejudice.

**How the MREA Targets and Punishes the Hettingas and GH Dairy**

The MREA added new Subsections (M) and (N) to 7 U.S.C. § 608c(5), which singled out and punished Plaintiffs, not by name but through the specificity of its provisions, for their prior operation of Sarah Farms and GH Processing.

**Subsection (N).**  Subsection (N) imposes a direct statutory requirement that any producer-handler who sells more than 3,000,000 pounds of milk per month in the geographic area covered by the Arizona Milk Marketing Order must be subject to the minimum pricing and revenue pooling requirements of that Order.  The imposition of price controls on such producer-handlers (and Sarah Farms is the only such producer-handler) is absolute and does not depend upon the validity of the February 2006 USDA rule.  Even if USDA were to revert to its prior legal position that producer-handlers were exempt from minimum price regulations, a producer-handler in the Arizona Marketing area that sold more than 3,000,000 pounds per month nonetheless would be subject to those requirements by virtue of the MREA.  Subsection (N) thus makes one and only one producer-handler in the United States, the Hettingas, subject to a direct statutory command to comply with the pricing requirements of a Federal Milk Marketing Order.

Under Subsection (N), the Hettingas are required to make a prohibitive monthly payment into the Arizona milk marketing pool equal to the difference between the federal minimum price for milk bottled by handlers and the average price of all milk processed under the Arizona Marketing Order.  This monthly payment amounts to hundreds of thousands of dollars per month and comes directly from the revenues of the Hettingas' Sarah Farms operation, which is then distributed to their competitors..

**Subsection (M)**.  Subsection (M) of the MREA imposes a direct statutory obligation that if a handler's plant is located in a geographic area that is covered by a Federal Milk Marketing

Order, then unless certain exemptions apply, the pricing and pooling requirements of that Federal order apply to all sales made by that entity into a non-federally regulated State. The Hettingas sell milk into California through GH Processing, which is located within the boundaries of the Arizona Milk Marketing area.[2] Thus, passage of Subsection (M) subjected the Hettingas for the first time to the pricing and pooling requirements of the Arizona Milk Marketing Order for sales GH Processing makes into California. As far as is known, GH Processing is the only handler in the United States currently subjected to federal price regulations under Subsection (M).

Subsection (M) adversely affects Plaintiffs in two ways. First, GH Processing must pay the Federal minimum price for milk it processes and sells into California, which prior to passage of the Act it was not required to do. Second, this Subsection treats GH Processing differently from other plants that sell milk in California. It must pay the Federal minimum price in Arizona, while California handlers must pay only the price determined by California law, which varies but tends to be lower than the Federal minimum price.[3]

Individually and taken together, Subsections (M) and (N) of the MREA single out the plaintiffs by specific statutory commands for adverse treatment, by requiring them to pay hundreds of thousands of dollars per month to subsidize their competitors. (Complaint, ¶¶ 4, 47)

---

[2] Paragraphs 38-39 of the original Complaint erroneously referred to the sales into California as if they were made by the Hettingas' Sarah Farms operation. As noted, the sales into California are made by GH Processing. Accordingly, Plaintiffs have filed an Amended Complaint to differentiate clearly between the two Hettinga operations. The Amended Complaint retains the same structure and paragraph numbering as the original Complaint, as well as the same claims for relief. New paragraphs in the Amended Complaint are designated as subparagraphs (i.e. Paragraph 1.1).

[3] Under the Federal milk marketing orders, sellers of milk generally are not regulated according to the geographic area in which their plants are located but according to the federal Order, if any, that applies to the State in which they sell their milk. *See* 7 C.F.R. § 1131.7 (2006). Prior to the passage of the MREA, out-of-state entities that sold milk in California were not subject to federal price regulation, because the federal Order that previously had applied to California had been repealed. *See Hillside Dairy, Inc. v. Lyons*, 539 U.S. 59 (2003). Further, under the Commerce Clause, the State of California lacked authority to regulate interstate sales of milk.

## Standard of Review

In resolving a motion to dismiss under Fed. R. Civ. P. 12(b)(6)[4], the court must treat the complaint's factual allegations – including any mixed questions of law and fact – as true and draw all reasonable inferences in plaintiffs' favor. *See Warren v. District of Columbia*, 353 F.3d 36, 40 (D.C. Cir. 2004); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003). Plaintiffs need not plead all elements of their prima facie case, *see Swierkiewicz v. Sorema*, 534 U.S. 506, 511-14 (2002), or to "plead law or match facts to every element of a legal theory," *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000) (internal quotations and citation omitted). The court may dismiss a complaint for failure to state a claim only if "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.". *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003)(quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Gilvin v. Fire*, 259 F.3d 749, 756 (D.C. Cir. 2001).

The sole issue on a Rule 12(b)(6) motion is whether the facts pleaded would, if established, support a valid claim for relief. The facts alleged must be accepted as true; "[r]ecovery may seem remote and unlikely on the face of the pleading, but that is not the test for dismissal." *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir. 1996). The question before the Court is not whether plaintiffs will ultimately prevail, but whether they should be entitled to offer evidence in support of their claims. *See Nami v. Fauver*, 82 F.3d 63, 65 (3rd Cir. 1996).

---

[4] The government has moved to dismiss under Rules 12(b)(1) and 12(b)(6). The plaintiffs' responses are interrelated. To give the Court a context for the plaintiffs' claims and to properly convey why each of the government's arguments should be rejected, the Opposition first addresses the Rule 12(b)(6) arguments.

Under Fed. R. Civ. P. 12(b)(1), the court "must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiffs." *Logan v. Dep't of Veterans Affairs*, 357 F. Supp.2d 149, 153 (D.D.C. 2004) (citation omitted). Judicial review at this stage is limited to resolving "disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Menkes v. Department of Homeland Sec.*, 402 F. Supp.2d 204, 207 (D.D.C. 2005) (*quoting Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)). But the plaintiff is protected against an evidentiary attack by the defendant on his asserted theory. *Hotel and Restaurant Employees Union, Local 25 v. Smith*, 846 F.2d 1499, 1502-03 (D.C. Cir. 1988); *Haase v. Sessions*, 835 F.2d 902, 908 (D.C. Cir. 1987).

While the Court "may rule on disputed jurisdictional facts at any time, if they are inextricably intertwined with the merits of the case it should usually defer its jurisdictional decision until the merits are heard." *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 198 (D.C. Cir. 1992). If the court looks beyond the pleadings to decide jurisdictional issues, it must consider what procedural protections, such as the opportunity to conduct discovery and submit affidavits, "could be required to assure that a full airing of the facts pertinent to a decision on the jurisdictional question may be given to all parties." *Id*.

## ARGUMENT

The government and its supporting <u>amici</u> have ignored the relevant question whether the Complaint alleges sufficient facts that, if taken as true, would entitle Plaintiffs to relief.[5] Instead, the government seeks to have this Court reject the factual allegations in the Complaint and supplement the Complaint with its own facts and characterizations of Plaintiffs' theories of

---

[5] Plaintiffs have contemporaneously filed their First Amended Complaint, which clarifies the allegations contained in the Complaint and adds the Hettingas' family partnership, GH Dairy, as a party to this suit. Regardless, both the Complaint and First Amended Complaint meet the requirements to defeat the government's arguments under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

recovery. The government's proposed approach is inconsistent with the Court's obligation to draw all reasonable inferences in favor of Plaintiffs, as is required in resolving a Rule 12 motion. Further, the government has misstated the legal elements that will govern resolution of this lawsuit, by ignoring *Foretich v. United States*, 351 F.3d 1198 (D.C. Cir. 2003), and other Circuit precedent that define the elements of the claims.

The Complaint correctly states the elements of the causes of action and alleges facts that, if taken as true, sufficiently make out such claims. The case is in its infancy; discovery has not yet begun. The Court should ignore the government's premature merits arguments and deny the motion to dismiss.

This Court has subject matter jurisdiction to decide this case. The Complaint sets forth sufficient facts to establish all the elements of Article III standing. But if there were any doubt , Plaintiffs are entitled to conduct discovery and present affidavits to establish conclusively that they have been injured by the MREA and that a judicial order declaring the law unconstitutional would remedy those harms. Likewise, the government's arguments concerning sovereign immunity and failure to exhaust administrative remedies should be rejected.

## I. PLAINTIFFS HAVE PROPERLY PLEADED THAT SECTION 2(A) OF THE MREA IS AN UNCONSTITUTIONAL BILL OF ATTAINDER.

The Complaint properly alleges the elements of a bill of attainder claim, as defined in *Foretich v. United States*, 351 F.3d 1198 (D.C. Cir. 2003), and sets forth facts that, if taken as true as required under Rule 12(b)(6), would entitle Plaintiffs to relief.

### A.    The Elements of a Bill of Attainder Claim.

A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Selective Serv. Sys. v. Minnesota Pub. Interest Research Group*, 468 U.S. 841, 846-47 (1984). Article I, §

9, cl. 3 of the Constitution provides that "[n]o bill of attainder or ex post facto Law shall be passed." There are three elements of a bill of attainder claim: a statute that (1) applies with specificity to affected persons; (2) imposes punishment; and (3) without provision of the protections of a judicial trial. *See e.g., Foretich*, 351 F.3d at 1217; *BellSouth Corp. v. FCC*, 162 F.3d 678 (D.C. Cir. 1998) ("*BellSouth II*").

The Bill of Attainder Clause "was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply – trial by legislature." *United States v. Brown*, 381 U.S. 437, 442 (1965). The authors of the Federalist Papers sought to insulate the citizenry from an overzealous legislature acting out of passion. Thus "barriers had to be erected to ensure that the legislature would not overstep the bounds of *its* authority and perform the functions of the other departments. The Bill of Attainder Clause was regarded as such a barrier ." *Id.* at 443-44 (relying on *The Federalist*, No. 48).

The Complaint properly alleges the three required elements of a bill of attainder claim. The MREA singled out the Hettingas with specificity for adverse treatment (Complaint, ¶¶ 4, 48, 52, 52.1, 52.2); without a judicial determination of the facts (Complaint, ¶¶ 49, 56, 57); and the extreme burdens on Plaintiffs' ability to sell their milk in California and Arizona that were imposed by Subsections (M) and (N) constituted legislative punishment that penalized Plaintiffs for their past business activities (Complaint, ¶¶ 5, 6, 49, 50, 51, 52.1, 52.2, 57).

### B. The Complaint Explicitly Alleges that the MREA Specifically Singles Plaintiffs Out for Legislative Punishment.

The "specificity" element is satisfied if a statute singles out a person or class by name or applies to "easily ascertainable members of a group." *Foretich*, 351 F.3d at 1217. *See BellSouth*

- 10 -

*Corp. v. FCC*, 144 F.3d 58, 62 (D.C. Cir. 1998), *cert. denied*, 526 U.S. 1086 (1999) ("*BellSouth I*") ("not all bills of attainder expressly name their targets; some simply describe them.")

The Complaint alleges that while Subsection (N) is phrased in neutral terms, Hein and Ellen Hettinga are the only milk producer-handlers in the Arizona Milk Marketing area whose own farm production exceeds 3,000,000 pounds per month and thus are the only persons subject to adverse treatment under this provision. Complaint, ¶¶ 4, 27, 31, 37, 48, 52. Similarly, the Complaint alleges that while Subsection (M) is phrased in neutral terms, GH Processing, the plant operated by the Hettingas' family partnership GH Dairy, is the only known milk handler located in a federally regulated area that sells milk into the California market and does not qualify for an exemption from the application of the minimum price requirements of the federal order, and thus is the only known handler subject to the price controls imposed by Subsection (M). Complaint, ¶¶ 27, 31, 38, 39, 52, 52.2.

In particular, the Complaint alleges that the MREA "singles out plaintiffs for legislative punishment." Complaint, ¶ 55. It alleges that the application of Subsections (M) and (N) "depends upon such a narrow set of circumstances that it applies to no known cases" other than Plaintiffs, *Foretich*, 351 F.3d at 1217, and that the burdens and disabilities they impose apply to Plaintiffs and to no other persons. Complaint, ¶ 27, 31, 37, 49. The Complaint identifies several parts of the House floor debate in which Plaintiffs are identified as the targets of the legislation. Complaint, ¶¶ 40-44. Under the governing law, these allegations satisfy the specificity element.

The government asserts that the MREA does not satisfy the specificity element because it does not mention the persons singled out for adverse treatment "specifically by name" and otherwise "is open-ended in its application." (Gov't Mem. at 27-28). The case law, however, holds that a statute may constitute a bill of attainder if the class is "easily ascertainable." *See*

- 11 -

*Brown*, 381 U.S. at 448-49.[6]  For example, in *Foretich*, the court found that the law was a bill of

attainder even though Dr. Foretich was never named and its provisions nominally were open-

ended and would apply to anyone who in the future might fall into the same limited category:

> Although Congress stopped short of including the names "Foretich" and "Morgan"
> in the text of the statute, the applicability of the Act depends on such a narrow
> set of circumstances that it applies to no known cases other than the Morgan-
> Foretich custody dispute.

*Id.* at 1217.  To the extent that the government argues that Subsection (M) could conceivably

apply in the future to other milk handlers, it presents a merits-based defense whose resolution

must be reserved for the merits stage.

    The government claims that under *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977),

Congress may, if it has a rational purpose, create a "class of one," without violating the Bill of

Attainder Clause.  (Gov't Mem. at 28).  The "class of one" cases are compatible with the bill of

attainder doctrine, and the *Foretich* court took due account of *Nixon* in finding that there was a

bill of attainder.  *Foretich*, 351 F.3d at 1216-17.  The Bill of Attainder Clause prohibits Congress

from singling out a small group of persons for legislative punishment, which is not a "rational

purpose" within the meaning of the "class of one" cases.  The question whether the MREA

constitutes punishment, or is supported by a legitimate government interest, is an issue that must

be reserved for the merits stage.

---

[6] The amici claim that the Complaint does not satisfy the specificity requirement because the
MREA does not apply to Plaintiffs alone.  They assert that Subsection 2(b) of the Act, codified at
7 U.S.C. § 608c(11)(D), might apply to nine milk producers in Nevada, if they sell packaged
fluid milk into Arizona in competition with Plaintiffs.  (Amici Mem. at 15-16, 18).  This
argument is irrelevant.  Plaintiffs have challenged only the constitutionality of Subsections (M)
and (N), not the Nevada provision.  It also fails as a matter of law.  *See BellSouth I*, 144 F.3d at
63 (specificity requirement satisfied by a law that applied only to 20 named companies).  In any
event, this argument does not challenge the adequacy of the Complaint but attacks the claims on
their merits, an issue that cannot be resolved at this stage of the case.

Finally, the government asserts that the Complaint does not satisfy the specificity requirement because the Hettingas may avoid its effects by changing their conduct. (Gov't Mem. at 26-27). This is a merits-based argument that cannot be considered at the motion to dismiss stage. Under the case law, it is properly considered as part of the analysis whether the MREA constitutes punishment under the "historical" test. <u>See</u> Section I.D.1 below. The short answer is that the government's argument fails because Plaintiffs cannot now avoid the effects of the MREA, given the prohibitory nature of the punishment. Whether they are legislatively restrained from engaging in the prohibited conduct or "choose" not to perform this conduct because of the crushing economic consequences, the Hettingas cannot now undo their past lawful activities for which Congress meted out punishment through the MREA at the behest of their competitors.

## C. The Complaint Alleges that the Law Provides No Judicial Process.

The Complaint properly alleges that the MREA denies the Hettingas judicial process before imposing onerous penalties. (Complaint ¶¶ 40, 45, 46, 49). No judicial determination of the facts occurred here. In particular, by imposing a direct statutory obligation on the Hettingas that they be subject to the pricing and pooling requirements of the Arizona Order, Subsection (N) stripped Plaintiffs of the right provided by the AMAA and Administrative Procedure Act to seek review by an Article III court of the validity of the February 2006 USDA rule.

The government argues that the MREA is not a bill of attainder because the law does not preclude Plaintiffs from challenging it in court. (Gov't Mem. at 38). But, this claim is not supported by the sole case on which the government relies, *Cummings v. Missouri*, 71 U.S. 277 (1866). The law held in *Cummings* to constitute a bill of attainder did not contain a clause explicitly barring judicial review, nor did the law invalidated in *Foretich*. The issue in a bill of

attainder case is whether Congress deprived the target of judicial process by passing the

underlying law, not whether the offending law may be challenged in court.

### D.    The Complaint Properly Alleges that the Unique Burdens Imposed by the MREA Constitute Legislative Punishment.

In determining whether a statute imposes punishment, the Supreme Court considers:

(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes; and (3) whether the legislative record evinces a congressional intent to punish.

*Selective Service System*, 468 U.S. at 852 (citations and internal quotations omitted).  Each of

these criteria is applied "as an independent – though not necessarily decisive – indicator of

punitiveness"; of the three, the functional test, determining whether a law serves nonpunitive

legislative purposes, is the most important. *Foretich*, 351 F.3d at 1218.  The Complaint alleges

that Plaintiffs suffered "punishment" under all three branches of the *Selective Service System* test.

The harsh economic injury alleged by the Plaintiffs, which is now occurring and will be

experienced in perpetuity solely as punishment for past lawful operation of their business,

constitutes "punishment" within the meaning of the Bill of Attainder Clause.  *See Consolidated

Edison Co. v. Pataki*, 292 F.3d 338 (2d Cir. 2002).

### 1.  The Complaint Alleges Economic Harm that Satisfies the Historical Test.

Historically, bills of attainder have been recognized as laws that impose deprivations and

disabilities that are disproportionately severe and inappropriate to the non-punitive ends

allegedly served by the statute.  *Foretich*, 351 F.3d at 1219.  The class of punishments found to

constitute bills of attainder includes laws that impose economic burdens and deprivations.

*Foretich*, 351 F.3d at 1220, citing *BellSouth II*, 162 F.3d at 683.  For example, in *Consolidated

Edison*, the Second Circuit held that a statute forbidding a utility from recouping from customers

certain costs that it had incurred, although cast as a piece of economic regulatory legislation, was a bill of attainder. 292 F.3d at 345. In addition, statutes that erect "legislative bars to participation by individuals or groups in specific employments or professions" have historically been found to be bills of attainder. *See Selective Serv. Sys.*, 468 U.S. at 852; *BellSouth II*, 162 F.3d at 685. Thus, a law that imposes significant economic harms upon a small group of persons may qualify as a bill of attainder under the historical test.

The Complaint alleges that the MREA imposes economic burdens and deprivations on Plaintiffs that fall within the class of economic harms found to satisfy the "historical" test. The MREA punishes Plaintiffs for their past lawful operation of their dairy businesses and has had severe, adverse effects on their ability to operate their businesses, by forcing them to make prohibitively expensive monthly monetary payments, which are then distributed to their competitors. Complaint, ¶ 4, 47, 50, 56.

The government claims that the MREA does not fall within the historical meaning of punishment because it "does not contain any legislative censure or public reprimand of plaintiffs." (Gov't Mem. at 30). However, *Foretich* held that such a "brand of infamy or disloyalty" is not a required element of a bill of attainder claim, but is an aggravating factor that makes such a law "particularly susceptible to invalidation." 351 F.3d at 1219.[7]

Further, the government asserts that a law does not satisfy the punishment element "where there is a possibility that a statute will not impose adverse consequences on an entity" and that the Hettingas can avoid the impact of Subsection (N) by reducing their milk production

---

[7] *See also United States v. Brown*, 381 U.S. 437, 438 n.1 (1965) (law invalidated as a bill of attainder where its text merely set out a prohibition against certain persons holding office in a labor union, without expressly reprimanding them for their past conduct).

below the 3,000,000 pound threshold limit established by that provision. (Gov't Mem. at 29-30). Its argument fails for several reasons.

First, the government made a similar argument in *Foretich*, based on the same passages in *BellSouth II* and *Selective Service System* cited here. *See* Joint Brief for Appellees United States of America et al. in No. 02-5224 at 25. The D.C. Circuit rejected that argument and reiterated its finding in *BellSouth II*, that "the definition of punishment 'has expanded to include legislative bars to participation by individuals or groups in specific employments or professions.'" *Foretich*, 351 F.3d at 1220, quoting *Bell South II*, 162 F.3d at 685, and *Selective Serv. Sys.*, 468 U.S. at 852.

The type of burden or disability imposed on Plaintiffs -- a severe economic punishment that substantially harms their ability to continue practicing their profession -- is covered by the historical test, as defined in *Foretich*, *BellSouth II*, and prior Supreme Court decisions.[8] The sole question for decision is whether the severity of the burdens to which Plaintiffs have been subjected, when weighed against the alleged nonpunitive purpose suggested by the government, makes the MREA an unconstitutional bill of attainder. As demonstrated in the next section, this question must be resolved under the functional test for punishment, and only at the merits stage of the case when the parties can present the facts they have assembled on this issue.

Second, the government misapplies the hypothetical example raised by the court in *BellSouth II*, that a law would not constitute a bill of attainder if it "perpetually leave[s] open the possibility" that an entity could continue to manufacture its products by adopting pollution control techniques required by an environmental law of general applicability. (Gov't Mem. at

---

[8] *See United States v. Brown*, 381 U.S. 437 (1965); *United States v. Lovett*, 328 U.S. 303 (1946); *Ex parte Garland*, 71 U.S. (4 Wall.) 333 (1866); *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277 (1866).

29), quoting *BellSouth II*, 162 F.3d at 685. Taking the allegations of the Complaint as true, the hypothetical is irrelevant here. Under the MREA, there is no condition Plaintiffs can satisfy to avoid the punitive restriction imposed on them. Subsection (N) requires the Hettingas to scale back the sales from Sarah Farms to a level (less than 3,000,000 pounds per month) that is not economically viable. Subsection (M) imposes a significant cost penalty on sales into California that is not borne by GH Processing's competitors. These provisions thus constitute de facto prohibitions on Plaintiffs' ability to continue pursuit of their profession.

Congress imposed these disabilities on Plaintiffs based on their past lawful economic activity (engaging in price competition in conformance with the existing law). Plaintiffs cannot now alter their past behavior so as to remove or avoid the restrictions that Congress has inflicted on them. The situation thus is similar to *Consolidated Edison*, where the New York legislature imposed severe economic penalties based on its prior lawful operation of its nuclear plant. As in *Consolidated Edison*, the harm that the Hettingas have suffered and will continue to suffer , is punishment for past conduct. Further, as that decision shows, a statute may constitute an unconstitutional bill of attainder if it imposes harsh economic punishment, even if it does not drive an entity completely out of business. *See Consol. Edison*, 292 F.3d at 345.

Accordingly, the government is simply wrong as a matter of law in asserting that the allegations of the Complaint do not satisfy the historical test, because "there is a possibility that [the MREA] will not impose adverse consequences" upon Plaintiffs. (Gov't Mem. at 29). The only way Plaintiffs can avoid these punitive restrictions is if they scale back their operations to a small dairy selling only in Arizona, which in itself would constitute an extreme form of punishment. Under the government's theory, the four cases in which the Supreme Court has invalidated laws as bills of attainder were wrongly decided, because in each case the plaintiff

could avoid the "punishment" imposed by law if he decided to surrender his employment or "chose" not to practice his profession. There, as here, whatever the plaintiff chose to do in the future, he would suffer the restrictive punishment that Congress imposed upon him.

### 2. The Complaint Properly Alleges that the MREA Constitutes Punishment under the Functional Test.

**(a) The Governing Standard.** Under the "functional" test, the court "must consider whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further non-punitive legislative purposes.'" *Foretich*, 351 F.3d at 1220, quoting *Nixon*, 433 U.S. at 475-76. The court must ensure that the statute serves a nonpunitive legislative purpose in order to prevent "Congress from circumventing the clause by cooking up newfangled ways to punish disfavored individuals or groups." *BellSouth I*, 144 F.3d at 65.

Courts conduct this inquiry "by examining both the purported ends of contested legislation and the means employed to achieve those ends." *Foretich*, 351 F.3d at 1221. Where a significant imbalance exists between the magnitude of the burden imposed and a purported nonpunitive purpose, the law cannot reasonably be said to further nonpunitive purposes and is an unconstitutional bill of attainder. *Id.* at 1221-22, citing *Consol. Edison*, 292 F.3d at 354 (a statute is an unconstitutional bill of attainder where "the legislature piled on a burden that was obviously disproportionate to the harm caused.")

The Complaint expressly alleges that the MREA does not "further any non-punitive legislative purpose." Complaint, ¶¶ 50, 52.4, 57. It alleges that Congress through the MREA sought to punish Plaintiffs for their past lawful operation of their businesses. Complaint, ¶ 56; *see id.* ¶¶ 4, 47. The Complaint further alleges that Plaintiffs are directly subjected to a statutory prohibition and a requirement to make prohibitive payments, under statutes that on their face provide no protective measures for them. The selectivity of the statute cannot be explained

- 18 -

without resort to inferences of punitive purposes, because the Hettingas' businesses are the only

known dairy businesses singled out for the restrictions imposed by Subsections (M) and (N). *See*

*Foretich*, 351 F.3d at 1224 (finding that the law's extreme narrowness rendered "simply

implausible" the asserted nonpunitive purposes). Any assertion of a nonpunitive purpose is

undermined by the fact that Congress did not apply the same standard in other similar cases. *Id.*

at 1223-24. Finally, the Complaint identifies a less burdensome alternative that was available to

the government – to allow Plaintiffs' business to be regulated under rules of general applicability,

as its Arizona producer-handler operation at Sarah Farms and its California sales from GH

Processing were until the MREA was enacted.

**(b) The Factual Inquiry Required by the Functional Test Cannot Be Resolved at
the Motion to Dismiss Stage.** The government claims that the MREA does not punish Plaintiffs

because the law "is a constitutionally permissible economic regulation" that serves legitimate

purposes. (Gov't Mem. at 31). It does not allege that the Complaint fails to allege facts

sufficient to state a claim under the functional test. Rather, the government seeks to have the

Court jump directly to resolution of the merits of the claim.

The D.C. Circuit has established the following rule for determining at the merits stage

whether a statute constitutes a bill of attainder:

> The law is clear that if there exists an extraordinary imbalance between the burden
> imposed and the alleged nonpunitive purpose, and if the legislative means do not appear
> rationally to further that alleged purpose, then the statute in question does not escape
> unconstitutionality merely because the Government can assert purposes that superficially
> appear to be nonpunitive.

*Foretich*, 351 F.3d at 1223.  The final point is critical.  A law may be held to constitute a bill of attainder even though the government might be able to articulate a purportedly legitimate purpose "that superficially appears to be nonpunitive."[9]

Under the test established in *Foretich*, the issues presented under the "functional" test cannot be resolved on a motion to dismiss, once it has been determined that Plaintiffs have set forth a <u>prima facie</u> case, as they have here.  Resolution of this issue requires balancing the severity of the burden imposed by the law relative to its "purported nonpunitive benefits," in order to determine whether "a grave balance or disproportion between the burden and the purported nonpunitive purpose suggests punitiveness."  *Foretich*, 351 F.3d at 1225.  This is true even if the government can suggest that "the statute bears some minimal relation to nonpunitive ends."  *Id.*  This type of balancing may be performed only at the merits stage of the case, not at the motion to dismiss stage.

*Foretich* explicitly rejects the government's argument that the claim should be dismissed, because it has asserted that the MREA "constitutes permissible economic regulation in furtherance of the non-punitive purpose of promoting orderly milk markets and further regulatory equity."  (Gov't Mem. at 31).  "The law is clear that . . . the statute in question does not escape unconstitutionality merely because the Government can assert purposes that superficially appear to be nonpunitive."  351 F.3d at 1223.

---

[9] *Accord, Consol. Edison*, 292 F.3d at 350, quoting *Nixon*, 432 U.S. at 482:

> Where a statute establishing a punishment declares and imposes that punishment on an identifiable party, however, the Bill of Attainder Clauses undermine the usual solicitude we have for [punishment of wrongdoing].  In such cases, we look beyond simply a rational relationship of the statute to a legitimate purpose for "less burdensome alternatives by which [the] legislature . . . could have achieved its legitimate nonpunitive objectives."

Here, the Complaint alleges that the MREA has three parts, each of which is punitive in its own right and which, taken together, create an extraordinary imbalance of harms specific to Plaintiffs that overwhelm any alleged non-punitive purpose.

(1) Subsection (N) subjects the Hettingas' Sarah Farms plant, alone of all the producer-handlers of milk in the United States, to an explicit statutory command that it must be regulated in a specific manner for all sales of milk in the Arizona market.  The effect of the specific and unique regulatory treatment dictated by the MREA is that the Hettingas are required to make prohibitive financial payments to their competitors for all their sales.  Accordingly, the Hettingas are punished twice.  First, they are forced to make payments to the USDA revenue pool, and they receive no return benefit.  Second, the money paid into the revenue pool is distributed to their direct competitors.

(2) Subsection (M) imposes upon GH Processing alone of all handlers of milk in the United States, to an explicit statutory command that it  must be subject to the minimum price requirements of the Arizona Milk Marketing Order for all sales of bottled milk into the California market.  Typically, milk handlers are regulated by virtue of the fact that they sell milk into a federally regulated area.  The location of a handler's plant, absent actual sales into a federal milk marketing area, is not a basis for imposing regulation.  As to GH Processing, the MREA imposes price control regulation premised solely on the location of its plant, rather than the place where its sales occur.  Simultaneously, other entities selling milk into the California market from Nevada have been granted a regulatory exemption from this requirement by Section 2(b) of the MREA and are not subject to such Federal minimum price controls.  The effect is that GH Processing is required to make prohibitive financial payments to the federal revenue pool for

all milk sold in California, and the money paid by GH Processing is shared only by Arizona dairies.

Congress passed the MREA on the night before the Hettingas were to argue their judicial challenge to the legality of the USDA rule. The intent and effect of this action was to moot that case by subjecting the Hettingas, and them alone, to the mandatory statutory requirements set forth in Subsection (N), that codified and superseded the USDA rule. The effect of this codification is that the Hettingas cannot change their status by requesting an amendment or revision through USDA or pursue administrative and judicial remedies. The Hettingas are subject to a perpetual rule, which can only be changed by Congress. All other marketing orders are subject to modification, amendment, or termination. All other market participants except the Hettingas are entitled to the constitutional and procedural protection of the legal process.

At the merits stage, the government can try to show, based on a factual record, whether its alleged "non-punitive purpose of promoting orderly milk markets and furthering regulatory equity" (Gov't Mem. at 31) can survive, given the "grave imbalance or disproportion" between that alleged purpose and the enormous burden it imposes on Plaintiffs (*Foretich*, 351 F.3d at 1222); the MREA's lack of protective provisions; the extreme selectivity of the law and its midnight passage, which both indicate punitiveness; the availability of less burdensome alternatives; and Section 2(b)'s contradiction of the purported rationale for Subsection (M) by allowing other handlers in Nevada to sell milk into California without being subjected to Federal minimum price controls. But that is an issue for another day. At this stage, the Complaint alleges facts that, if taken as true, would satisfy the functional test.

### 3. The Complaint Alleges Facts that Satisfy the Motivational Test.

"The final test of legislative punishment is 'strictly a motivational one: inquiring whether the legislative record evinces a congressional intent to punish.'" *Foretich*, 351 F.3d at 1225 (internal citation omitted). Courts conduct this inquiry "by reference to legislative history, the context or timing of the legislation, or specific aspects of the text or structure of the disputed legislation." *Foretich*, 351 F.3d at 1225 (emphasis added).

A formal legislative announcement of moral blameworthiness or punishment is not necessary to make a law an unconstitutional bill of attainder. "All that is necessary is that the legislative process and the law it produces indicate a congressional purpose to behave like a court and to censure or condemn." *Id*. at 1226. Evidence of punitive intent in the legislative record is directly relevant, both in its own right and to confirm other evidence of Congressional intent to punish. *Consol. Edison*, 292 F.3d at 354-55.

The Complaint expressly alleges that the MREA embodied "a Congressional intent to punish" the Hettingas for the manner in which they had lawfully operated their businesses. It sets forth specific aspects of the text and the structure of the legislation to support that allegation. Complaint, ¶ 51; *see id.* ¶¶ 5, 6, 56, 57. The Complaint also asserts that the context or timing of the legislation – its passage on the night before the Hettingas were to argue a preliminary injunction motion against the USDA rule – further demonstrates a Congressional intent to punish them. Complaint, ¶¶ 6, 26, 40, 49, 50, 56. It specifically identifies several passages in the House floor debate that confirm on their face the allegation that Congress singled out the Hettingas for punishment. Complaint, ¶¶ 40-45. As there were no Committee Hearings or Reports on the bill in either body and no floor debate on the MREA in the Senate, the statements in the House floor

debate are the best evidence of Congressional intent. Thus, the Complaint sets forth facts

sufficient to satisfy the motivational test at this stage of the case. *See Warren*, 353 F.3d at 40.

In response, the government asserts that to show intent to punish, the legislative record

must include statements from both houses of Congress. (Gov't Mem. at 32). It cites no authority

to support this claim. The isolated phrase the government quotes from *Navegar, Inc. v. United*

*States*, 192 F.3d 1050 (D.C. Cir. 1999), does not stand for the proposition for which it is cited.

(Gov't Mem. at 32-33). This passage states that merely naming a party in floor debates, with no

hint of disapproval or condemnation, is insufficient on the merits to demonstrate a legislative

intent to punish. *Id*. at 1067.

The government quotes at great length statements by proponents of the MREA on the

House floor, presumably to suggest that the Court should dismiss based on the sheer quantity of

those statements. (Gov't Mem. at 33-37). However, the D.C. Circuit has ruled that Congress

cannot paper over its intent to punish by filling the record in this fashion with speeches that are

"conveniently self-serving." *Foretich*, 351 F.3d at 1226. In any event, the government cannot

defeat a bill of attainder claim by simply asserting "purposes that superficially appear to be

nonpunitive." *Id.* at 1223.

In sum, the Complaint alleges facts which, if taken as true, establish that Congress

adopted the MREA with intent to punish Plaintiffs. It sets forth a valid bill of attainder claim.

## II.     THE COMPLAINT PROPERLY ALLEGES THAT THE MREA DENIES PLAINTIFFS EQUAL PROTECTION OF THE LAWS.

The Complaint properly alleges that the MREA denies Plaintiffs equal protection of the

law by invidiously creating two classes of milk handlers. One class has a panoply of procedural

and substantive rights concerning how they are regulated under the Federal Milk Marketing

Orders, as administered by the USDA under the AMAA. This class includes all other entities in

the milk business. The second class enjoys none of these procedural and substantive rights, but is directly regulated by the terms of the MREA. As far as can be determined, the Hettingas and GH Processing are the only member of this class. The Complaint further alleges that there is no rational basis for this discriminatory treatment of Plaintiffs.

### A. The Standard To Be Applied.

To satisfy the Equal Protection Clause, a statutory classification "must be rationally related to a legitimate governmental purpose." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985). "A classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational" is unconstitutional. *Id., citing Zobel v. Williams*, 457 U.S. 55, 61-63 (1982); *Dep't of Agric. v. Moreno*, 413 U.S. 528, 535 (1973). A statute that creates a "class of one" violates the Equal Protection Clause if there is no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Whether a statute that differentiates between two classes of economic entities is supported by a rational basis presents a question that must be decided at the merits stage, rather than on a motion to dismiss. As the Supreme Court stated in *Romer* v. *Evans*, 517 U.S. 620, 632-633 (1996), in overturning a statutory classification under the rational basis branch of the Equal Protection Clause:

> [E]ven in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained . . . By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law.

Moreover, "discriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provisions." *Id.* at 633, *quoting Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 37-38 (1928).

- 25 -

**B. The Complaint Alleges that the MREA Denies Equal Protection.**

The Complaint states a valid claim for relief under the Equal Protection Clause. It alleges that three aspects of the MREA discriminate against Plaintiffs and single them out for adverse treatment not imposed on others. Complaint, ¶¶ 47-52, 52.5 65, 65.1, 65.2. It also alleges that these three classifications are unrelated to any legitimate government purposes and that taken collectively, they deny Plaintiffs equal protection. Complaint ¶¶ 50-52, 57, 65.

The discriminatory treatment imposed by the MREA is apparent on the face of the statute. Subsections (M) and (N) focus on the Hettingas and their family partnership, and with laser-like precision impose unique restrictions on several parts of their family businesses. The House debates confirm that the MREA was intended to apply to the Hettingas and to force changes in their operations. Complaint, ¶¶ 5-6, 40-45.

**1. Discriminatory Effects of Subsection (N).** Subsection (N) directly subjects the Hettingas to the pricing and pooling requirements of the Arizona Milk Marketing Order for milk that they produce and sell. No other entity in the country that sells only its own produced milk is subject to such a specific statutory price control requirement. All other entities are regulated by the USDA under the general provisions of the AMAA. Before they may be subject to price controls, all other producer-handlers have a right to notice and an opportunity for an administrative hearing, at which they may present evidence concerning whether and how they should be regulated, pursuant to the AMAA's substantive standards. Each entity also has the right to petition USDA to abolish or modify its Milk Marketing Order, 7 U.S.C. § 608c(5), and a right to judicial review of the government's final decision by an Article III court, 5 U.S.C. § 704.

The Hettingas' Sarah Farms plant, by contrast, is regulated directly by the MREA. They received none of the procedural and substantive protections that all other entities enjoy. They

- 26 -

were not permitted judicial review of the substance of the government's decision to regulate

them. And the Hettingas cannot meaningfully petition USDA to exclude them from the Arizona

Order, because such an act would require adoption of a new statute.

The discrimination that the Hettingas have suffered is illustrated by the disparate

treatment afforded the producer-handlers in the Pacific Northwest Milk Marketing area who

were regulated by the February 2006 rule. The MREA did not impose direct statutory regulation

on these entities; they retain the full rights of a regulated entity under the AMAA. The MREA

discriminates against the Hettingas because it took away from them alone, and not others

similarly situated, the procedural and substantive rights that they previously enjoyed concerning

the terms under which they would be regulated.

**2. The Discriminatory Effects of Subsection (N) on the Hettingas' Right To Obtain
Judicial Review.** By codifying the result of the USDA rule as applicable to them, Subsection

(N) denied the Hettingas alone, out of all producer-handlers covered by the rule, the right to seek

judicial review of the government's decision to impose price controls on their Sarah Farms plant.

This discrimination is apparent by comparing their treatment with that of the Pacific Northwest

producer-handlers. One of those entities is pursuing its statutory right under the AMAA to seek

review of the USDA rule, which ultimately will be resolved by an Article III court.[10] The

Hettingas, however, have been denied the opportunity for judicial review because the

requirement that they be price controlled is imposed directly by statute.

_____

[10] There is a dispute whether the Pacific Northwest producer-handler may in the first instance
challenge the price controls in court or must first exhaust an administrative remedy provided by
Section 15(A) of the AMAA, 7 U.S.C. § 608c(15)(A). (Gov't Mem. at 23). *See Edaleen Dairy,
LLC v. Johanns*, 2006 WL 3069187 (D.C. Cir., Oct. 31, 2006). For the equal protection analysis,
the critical fact is the other entities had a right to judicial review under the AMAA process. The
MREA stripped the Hettingas of that right.

- 27 -

The amici note that the principle of separation of powers is not violated if Congress changes the underlying law in a manner that happens to resolve an issue pending before a court. Amici Mem. at 24. *See Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429 (1992). The Hettingas do not make a *Robertson*-type argument, but this point shows why Subsection (N) is unconstitutional by emphasizing what Congress did not do in the MREA. Congress did not amend the AMAA to establish a new law generally applicable to the milk industry as a whole. Instead, the night before the Hettingas were to argue a judicial challenge to the USDA rule, Congress changed the law applicable to the Sarah Farms plant and the Hettingas alone. It is this specifically focused change in the law applicable to them alone that violates the Equal Protection Clause.

**3. Discriminatory Effects of Subsection (M).** Subsection (M) discriminates against the Hettingas in a different way, by specifically subjecting their sales of milk into California through their family partnership's GH Processing plant to Federal minimum price controls, while not imposing such requirements on other similarly situated entities.

Subsection (M) changes, for this specific purpose, the longstanding principle that whether federal milk marketing regulations apply is predicated on the sale of milk into a federal milk marketing area, and not simply on the geographic location of the handler's plant. *See* 7 C.F.R. 1131.7 (2006). Subsection (M) provides that a plant physically located in a federally regulated area is subject to federal price controls if it sells milk in a non-federally regulated market. As far as is known, this provision applies to the operations of GH Processing and no other entity. The legislative history expressly shows that this provision was intended to close a "regulatory loophole" allegedly being exploited by Plaintiffs – selling milk from a federal milk marketing

area into a state-regulated area without payments to the revenue pool in either the federal milk marketing area or the state.

Subsection (M) adversely affects the Hettingas by (a) requiring GH Processing to pay the Federal minimum price for milk it purchases and sells into California, which is higher than the price it otherwise would have to pay; and (b) by requiring it to pay the Federal minimum price in Arizona, while California handlers must pay only the price determined by California law. The California minimum price varies from month-to-month, but it tends to be significantly less than the Federal minimum price. The Complaint properly alleges that this unique, discriminatory treatment imposed on Plaintiffs violates the Equal Protection Clause.

At the same time, Section 2(b) of the MREA exempted handlers in Nevada from federal regulation. Thanks to Section 2(b), these non-federally regulated Nevada handlers are now allowed to sell their milk into California without being subject to either federal or California price regulation. This aspect of the MREA clearly demonstrates the intentional discriminatory effect of Subsection (M) on the Hettingas through GH Processing. It also demonstrates the absence of any rational basis for a statute that limits their ability to compete in the California market on the one hand while opening the door to non-price controlled competition from many other entities with the other hand.

### C. There Is No Basis for Dismissing the Equal Protection Claim.

The Complaint appropriately alleges an equal protection claim, by identifying several discriminatory classifications and alleging that these differences in treatment are not supported by a rational basis. In response, the government argues that the claim should be dismissed because, as a result of the February 2006 USDA rule, the Hettingas allegedly are no longer a producer-handler and thus cannot claim discrimination if they are treated differently from other

- 29 -

producer-handlers. (Govt. Mem. at 39). This argument, which applies only to Subsection (N), is based on a misconception of Plaintiffs' equal protection claim.

The February 2006 USDA rule changed the regulatory treatment of producer-handlers in the Pacific Northwest and Arizona Milk Marketing areas, by subjecting entities with production in excess of 3,000,000 pounds per month to federal price controls. That rule is being challenged by the one Pacific Northwest producer-handler under the procedural and substantive provisions of the AMAA. After passage of the MREA, the Hettingas' Sarah Farms plant is no longer regulated by the USDA rule, but is regulated by the MREA, which categorically requires that they must be subject to federal price controls. The discrimination of which the Hettingas complain in their equal protection challenge to Subsection (N) is the difference in treatment imposed on them by the MREA compared to the treatment under the AMAA of similarly-situated entities.

The government and amici also assert that there is a rational basis for the differences in classification and treatment of Plaintiffs imposed by the MREA. (Gov't Mem. at 39-40; Amici Mem. at 8-13). Their claim that "subsections (M) and (N) survive rational basis review" is a merits-based argument that may not be resolved by the Court at the motion to dismiss stage. (Gov't Mem. at 39). The government correctly notes that if this discriminatory provision were to be reviewed at the merits stages under the rational basis standard of review, that standard would be deferential to the government. At this stage of the case, however, even assuming the MREA would be reviewed under the rational basis test on the merits, there is no basis to dismiss this claim. Plaintiffs have set forth a proper equal protection claim and are entitled to assemble and present the evidence in support of their claim. There is no provision of law, and the government has not cited one, that allows a court automatically to dismiss a rational basis equal protection

claim at the outset. Such a theory would read rational basis claims out of the Equal Protection Clause. This is certainly not the law.

As the Supreme Court squarely concluded in *Romer*, plaintiffs have the right to present a rational basis claim to the Court on its merits, and the Court has an obligation to give careful consideration to these "discriminations of an unusual character . . . to determine whether they are obnoxious to constitutional provisions." 517 U.S. at 633. Further, even the cases on which the government relies that arose from the district courts show that resolution of the equal protection claims occurred at the merits stage, not the motion to dismiss stage.

The government has also misstated the analysis that will apply at the merits stage. The inquiry is not whether Congress made a rational choice between regulating milk to maintain orderly markets and promote regulatory equity, or having unregulated milk markets. (Gov't Mem. at 40). The real question is whether Congress had a rational basis for displacing the AMAA and adopting a special statute that imposed several overtly discriminatory provisions directly against the Hettingas, and doing so on the night before they were to argue a judicial challenge to their treatment under the regulatory statute of general applicability. The obvious inference is that Congress was concerned that the current AMAA framework and the judicial proceeding would not produce the outcome that dairy lobbyists wanted. The Hettingas are entitled to present their evidence to the Court to show that there was no rational basis for the discriminatory treatment imposed by the MREA, other than the exercise of brute political power to produce a result.

### III.    THE COMPLAINT STATES A VALID DUE PROCESS CLAIM.

A procedural due process claim has two components. The first is whether there exists a liberty or property interest which has been interfered with by the government; the second

examines whether the procedures attendant upon that deprivation were constitutionally sufficient. The Complaint properly states a claim that the MREA violates Plaintiffs' procedural rights under the Due Process Clause by foreclosing their ability to obtain effective judicial review of the government action that determines how they may operate their business.

### A.     The Hettingas Have Protected Liberty and Property Interests.

As the Supreme Court held in the cases cited in the bill of attainder section, individuals such as Plaintiffs have a constitutionally protected interest in practicing their profession or occupation. See cases cited at p. 16, n. 8. Further, under the system established by the AMAA and USDA implementing rules, milk handlers and producer-handlers who are adversely affected by government decisions or regulations have a right to judicial review of these determinations. 7 U.S.C. § 608c(15), 5 U.S.C. § 704. The Complaint alleges that the Hettingas were exercising their rights to challenge the USDA's February 2006 rule under the AMAA scheme when Congress passed the MREA, imposing statutory requirements directly upon them and mooting the pending *Johanns* litigation.

As set forth in the Complaint, the MREA denies the Hettingas their rights to engage in their profession and their property interests previously protected by the AMAA, by directly imposing the specific statutory terms under which their business must be conducted.

### B.  Plaintiffs Were Deprived of Access to the Courts Without a Hearing.

Once the plaintiff has demonstrated the existence of a protected liberty or property interest, the inquiry turns to whether the party has alleged that it was not afforded the process it was due. The Complaint properly alleges this element.

The AMAA establishes an adjudicatory proceeding for the determination of the highly fact-specific questions whether and under what conditions a Federal Milk Marketing Order

should be created or amended. These decisions are required to be made by USDA on the record, based on admission of evidence concerning the factual issues whether disorderly marketing conditions exist and need to be addressed, and under due process procedures that protect the rights of those affected. Thereafter, adversely affected parties have the right to appeal the agency decision to federal court for review. *See United States v. Florida East Coast Ry.*, 410 U.S. 224, 245 (1973).

The Complaint alleges that the MREA deprived Plaintiffs of their right to the procedural due process guarantees associated with that adjudicatory process, and the opportunity, under principles of judicial review of administrative decisions, to show on the factual record that the USDA regulatory decision was erroneous and should be overturned. The Complaint further identifies floor statements in the House debate, which demonstrate that the MREA was intended to short-circuit the ongoing review of the agency action by an Article III court, and further shows that the MREA did in fact have the intended effect of defeating the effort to obtain judicial review. Complaint, ¶¶ 6, 40, 43, 45, 46. While the government suggests that the MREA bore no relationship to the district court's decision (Gov't Mem. at 43), it cannot and does not deny that its lawyer brought the overnight passage of the legislation to the Court's attention and argued that this event justified denial of the motion for a preliminary injunction. It also cannot deny that the court relied on this ground in denying Plaintiffs' request. Complaint, ¶¶ 45, 46.

In sum, the MREA denied the Hettingas their pre-existing right to a due process hearing at which they would have had the opportunity to show that the new USDA rules which imposed price regulations on Sarah Farms was unlawful. It thereby violated the Due Process Clause. *See United States v. James Daniel Good Real Property*, 510 U.S. 43, 47-48 (1993). Similarly, the MREA denies the procedural protections of the AMAA prospectively to both of the Hettingas'

dairy businesses because they are effectively foreclosed from petitioning USDA for any modification to the terms of the marketing order that could alter their regulatory status.

The government has presented no rationale at all for denying the Plaintiffs their pre-existing due process rights under the AMAA. Instead, it submits a merits-based argument that any due process claim should be reviewed under a "rational basis" standard and that the MREA satisfies that test because it "is a rational means of achieving legitimate governmental interest." (Gov't Mem. at 43). Accordingly, the government has provided no basis for concluding at this stage that the Complaint does not properly state a due process claim.

## IV.  THE RULE 12(b)(1) ARGUMENTS SHOULD BE REJECTED.

The government also raised a series of preliminary jurisdictional arguments under Rule 12(b)(1) that are plainly defective under established law. These jurisdictional arguments ignore the allegations of the Complaint, misread and misapply Subsection (M), and assert doctrines that are inapplicable to these claims. The Complaint properly alleges that Plaintiffs have Article III standing, that they have suffered injury-in-fact under both Subsection (M) and (N), and that those injuries are redressable. The doctrine of sovereign immunity does not bar this suit for declaratory and injunctive relief against an unconstitutional statute, and there is no requirement that Plaintiffs pursue a USDA administrative remedy before they may seek judicial relief from these unconstitutional provisions. In sum, the Complaint sets forth facts sufficient to demonstrate that the Court has subject matter jurisdiction.

### A.  Plaintiffs Have Alleged that They Suffered Injury-In-Fact.

The government claims that the Complaint failed to allege injury-in-fact from Subsection (M) because Plaintiffs allegedly never asserted that they engage "in the inter-region milk sales

regulated by subsection (M)" into California. (Gov't Mem. at 17). [11] This argument ignores the language of the Complaint.

Paragraph 17.1 of the Complaint explicitly alleges that, GH Processing, the plant owned by the Hettingas' family partnership, sells its bottled milk exclusively into California. [12] This point is reinforced by the House floor debate, which the government quotes at length and in which many Members stated that the provision imposing price controls on interstate sales into California was intended to target "the Yuma handler" or the "plant in Yuma," the location of the Hettingas' GH Processing plant. Complaint, ¶ 41; *see* Cong. Rec. H1150 (Rep. Goodlatte), H 1151 (Rep. Peterson), H 1152 (Reps. Cardoza and Costa). Subsection (M) was carefully designed to apply only to the sales made by GH Processing plant into California.

Prior to adoption of Subsection (M), the interstate sales from the Hettingas' GH Processing plant into California were exempt from both Federal minimum price regulations and the California milk marketing order. The Yuma plant had, since its inception, sold its bottled milk into California and did not sell any milk in the Arizona marketing area. The California price provisions did not apply to the Hettingas' by virtue of the Commerce Clause. *See Hillside Dairy, Inc. v. Kawamura*, 317 F.Supp.2d 1194, 1197-98 (E.D. Cal. 2004). Likewise, because GH Processing sold no milk into a federally milk marketing area, federal regulations did not apply, either.

Subsection (M) imposed Federal price regulations on any handler (a) located within a geographic area covered by a Federal Order; (b) that sells packaged fluid milk (bottled milk) into

---

[11] The motion does not challenge the Hettingas' showing of injury-in-fact from the application of Subsection (N) to their Sarah Farms plant.
[12] The Plaintiffs' original Complaint also alleged that the Hettingas "suppl[y] good and wholesome milk, which is free from added growth hormones such as rBST, to retailers throughout the State of Arizona <u>and in California</u>." Comp. ¶ 13 (emphasis added).

- 35 -

a State that operates its own marketing order that requires payment of minimum prices; and (c) is not otherwise obliged to pay minimum prices for the milk it processes. This section imposed federal minimum price regulations on Hettinga's GH Processing plant for the first time. It thereby harmed Plaintiffs by requiring them to pay the higher minimum prices required by the Federal Order for milk they purchase. Thus, the Complaint adequately demonstrates that the Plaintiffs have suffered a distinct and palpable injury-in-fact from the operation of Subsection (M). *See Shays v. Fed. Election Comm'n*, 414 F.3d 76, 125 (D.C. Cir. 2005).

### B. The Facts Alleged in the Complaint Regarding Subsection (N) of the MREA Satisfy the Redressability and Traceability Requirements of Article III.

The government mischaracterizes the allegations of the Complaint concerning the harms alleged under Subsection (N) and the relief sought, by erroneously claiming that Plaintiffs seek a declaration that they are not properly classified as a producer-handler. On that faulty basis, it argues that this injury is not traceable to the MREA and is not redressable, because that treatment is independently established by the USDA rule. (Gov't Mem. at 18-19). This argument fails on its face in light of the actual language of the Complaint.

**(1) The Governing Standard.** To have standing under Article III, the plaintiff's injury must be causally related to the challenged government action, and the relief requested must, if granted, remedy the harm suffered. *Id.* at 116. The stage of the proceeding determines the predicate evidence needed to establish standing. "At the motion to dismiss stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006). Further, the relationship of the plaintiff to the challenged action is significant. When a plaintiff who is the object of government action challenges its legality, the

showing needed to establish standing is minimal, and resolution of the issue is reserved for the merits stage of the case.

> [T]he nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is [the object of the government action], there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (parentheticals in original).  Here, the Hettingas' Sarah Farms plant is the clear object of Subsection (N).

**(2) The Harms Alleged**.  The Complaint specifically alleges how the Hettingas were directly harmed by enactment of Subsection (N) and shows how those injuries would be redressed by an declaratory judgment and an injunction invalidating that provision.   They challenge Subsection (N) of the MREA passed by Congress and seek relief from its adverse effects; they do not here challenge the February 2006 USDA rule imposing price regulation on several similarly situated producer handlers.

The government's argument is erroneous on the face of the Complaint, which seeks only a declaration and an injunction that Subsection (N) is unconstitutional.  Subsection (N) imposes independent harms on the Hettingas  that can be eliminated by the invalidation of the MREA. Further, the government's claim is fundamentally inconsistent with the position it previously took in the *Johanns* litigation, where it successfully argued that the Hettingas' challenge to the USDA rule should be denied because they were now directly regulated by Subsection (N) of the MREA and not by the USDA rule.   The doctrine of judicial estoppel prevents the government from changing positions here and trying to entrap Plaintiffs in this Catch-22.

Subsection (N) punishes the Hettingas and denies them rights that are available to every other dairy farm or dairy plant affected by federal milk marketing order regulations.  As long as

the statute remains in effect, the Hettingas' Sarah Farms plant must be subjected to the minimum price and revenue pooling provisions of the Arizona Order. Subsection (N) eliminated the Hettingas' ability to seek to alter the regulatory status of Sarah Farms through administrative means; eliminated the discretion USDA otherwise would have to modify how it regulates Sarah Farms; and effectively eliminated the Hettingas' ability to seek review of the new USDA rule, which departed from 70 years of precedent concerning regulation of entities like Sarah Farms.

Subsection (N) <u>requires</u> that all producer-handler plants in Arizona whose monthly sales exceed 3,000,000 pounds of fluid milk -- of which there is only one, Sarah Farms -- <u>must</u> be subjected to federal minimum price requirements. Neither the MREA nor the AMAA mandates the imposition of minimum price requirements on any other milk processing plant, of any size, in any other part of the country.

With the exception of the producer-handler part of the Arizona order, all other Federal Orders in the country are subject to revision by USDA upon a finding that market conditions have changed or that continuation of the current regulations would be inequitable or cause market distortions. All other handlers except the Hettingas may petition USDA for changes in the terms of marketing orders that could exempt them from regulation or change the terms under which they are regulated. Subsection (N) denies the Hettingas these rights, because it categorically mandates that their Sarah Farms plant <u>must</u> be subject to the price regulations if it operates at a level greater than 3,000,000 pounds per month, which it continuously does and has done for many years.

The ability to seek a change in the applicable threshold level for regulation of producer-handlers in the Arizona marketing area is a critical right. The level, if any, at which regulation is appropriate is highly debatable and may change with market conditions. Subsection (N)

precludes the Hettingas from pursuing these avenues to obtain different regulatory treatment. They and they alone are subject to a statutory requirement for price controls at a 3,000,000 pound level, a threshold that is now frozen in time and in place by passage of the MREA.

Subsection (N) also deprived the Hettingas of one of the basic procedural protections afforded by the AMAA, an effective voice in the conditions under which they are regulated. In every other case in which USDA seeks to change the terms of a marketing order, the AMAA requires it to conduct a referendum and obtain a two-thirds affirmative vote of the covered producers. 7 U.S.C. § 608c(9)(B). The MREA denied the Hettingas the basic democratic right afforded all other producers to vote on the terms by which they are regulated and to seek to persuade their fellow producers to change the marketing order in a manner that would change the conditions under which they are regulated.

Subsection (N) further deprived the Hettingas, alone among the entities covered by the February 2006 USDA rule, of the rights they otherwise would have had to seek further review of the conditions it imposed. The producer-handlers in the Pacific Northwest continued to enjoy the rights provided by the AMAA to (1) petition USDA to amend the marketing order to modify or eliminate the minimum price regulation; or (2) pursue the AMAA's administrative and legal processes to challenge the legality of the USDA rule. Subsection (N) eliminated only the Hettingas' ability to seek relief.

A declaration that Subsection (N) is unconstitutional would restore all the rights that it stripped from Plaintiffs. The Hettingas then would be able to pursue all the administrative and judicial avenues for relief that are available to all other persons affected by federal milk marketing orders. As the action of the Northern District of Texas demonstrated, the Hettingas were denied the effective ability to pursue their rights by the passage of the MREA. This denial

of rights and mandatory imposition of regulations constitute independent forms of harm that are directly traceable to Subsection (N) and that would be conclusively redressed if the requested declaration and injunction against that provision are issued.

The Hettingas are entitled to seek justice somewhere from the unconstitutional and inequitable conditions to which they alone are subjected. Having once successfully closed the Hettingas off from challenging the USDA rule by passing the MREA and mooting their claim, the government cannot now argue that the existence of the USDA rule forecloses their ability to challenge the MREA here.

In sum, the factual allegations in the Complaint conclusively demonstrate that the Hettingas satisfy all Article III standing requirements.

### C. Sovereign Immunity Does Not Apply to a Request for Equitable Relief from Unconstitutional Acts by the Government.

The government alleges that the Complaint should be dismissed because it allegedly fails "to identify a valid waiver of sovereign immunity." (Gov't Mem. at 21). This argument apparently addresses the format of the jurisdictional allegations rather than their substance. The gravamen of the Complaint, explicitly stated throughout, is that Congress, in passing the MREA, violated the Bill of Attainder Clause and the Equal Protection and Due Process components of the Fifth Amendment. The relief requested is equitable in nature and seeks a declaration that the statute is unconstitutional. The Court has subject matter jurisdiction over such federal questions under 28 U.S.C. § 1331. Further, the Complaint tracks the jurisdictional allegations in *Foretich*.

The starting point for "analyzing the use of any sovereign immunity defense" is the question "whether the doctrine applies at all." *Panola Land Buyers Ass'n v. Shuman*, 762 F.2d 1550, 1551 (11th Cir. 1985). Where the complaint seeks only declaratory and injunctive relief against a constitutional violation, and not money damages, sovereign immunity never attaches.

*See e.g., Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690 (1949). "Significantly, the doctrine of sovereign immunity is not always applicable to suits filed against federal entities or officials. In particular, one of the well-established exceptions to the doctrine limits its application in declaratory and/or injunctive suits against federal entities or officials seeking to enjoin the enforcement of an unconstitutional statute." *Kelley v. United States*, 69 F.3d 1503, 1507 (10th Cir. 1995). In such cases, a waiver is not required (and need not be pleaded) because "there is no sovereign immunity to waive -- it never attached in the first place." *Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996). Here, the Hettingas do not seek monetary damages, only declaratory and injunctive relief from the unconstitutional provisions of the MREA.

Circuit precedent clearly establishes that the Court has subject matter jurisdiction to consider a threshold challenge that actions by the Legislative Branch are unconstitutional. For example, in *Clark v. Library of Congress*, 750 F.2d 89 (D.C. Cir. 1984), a former employee brought suit against the Library of Congress, alleging that it violated his First Amendment and committed employment discrimination, and sought compensatory and punitive damages, as well as an injunction, correction of his records and reinstatement. The Library is part of the Legislative Branch, and the government defended the case on sovereign immunity grounds, but the court of appeals rejected this challenge to the claims for non-monetary relief.

> Clark's claims for non-monetary, specific relief are not barred by sovereign Immunity. It is well-established that sovereign immunity does not bar suits for Specific relief against government officials where the challenged actions of officials are alleged to be unconstitutional or beyond statutory authority. *See Dugan v. Rank*, 372 U.S. 609, 621-23 (1963); *Malone v. Bowdoin*, 369 U.S. 643,646-48(1962); *Larson* [337 U.S. at 698-91]. Thus, sovereign immunity presents no obstacle to Clark's claims for non-monetary relief.

- 41 -

*Id.* at 102.  The court held that, on remand, "specific non-monetary relief in the form of an injunction, correction of records or reinstatement may be available against both the Library and the Librarian but relief in the form of damages is barred by sovereign immunity." *Id.* at 105-05.

Similarly, in *Foretich*, a case involving a similar threshold challenge to the constitutionality of an act of Congress on bill of attainder and Fifth Amendment grounds, the court of appeals granted declaratory and injunctive relief that the statute was unconstitutional. Although the court discussed jurisdictional issues at length, it never suggested that the doctrine of sovereign immunity barred review of a suit challenging the constitutionality of a statute on the two grounds that also are alleged here. *Foretich*, 351 F.3d at 1209-16.  The constitutional defects alleged in the Complaint are similar to those involved in *Foretich* – Congress allegedly imposed legislative punishment without a judicial trial and denied the target his Fifth Amendment rights.  The relief requested was the same – declaratory and injunctive relief against unconstitutional actions by Congress, not money damages.  Indeed, in the Brief the United States filed with the D.C. Circuit in *Foretich*, where bill of attainder and procedural due process claims were presented, the government's Statement of Jurisdiction conceded that the court of appeals had jurisdiction and represented that "District Court jurisdiction was based on 28 U.S.C. § 1331 and the Fifth Amendment to the Constitution." Joint Br. for Appellees in No. 02-5224 at 1.

If the government's position were the law, then Congress could violate the Constitution with impunity, and federal courts would lack jurisdiction to force Congress to honor the limitations established by the Constitution. This obviously cannot be the law.  None of the cases

cited by the government involved suits seeking solely equitable relief for constitutional wrongs; most were suits for monetary damages.[13]

Accordingly, the three constitutional provisions and Section 1331 provide this Court with subject matter jurisdiction; no waiver of immunity need be shown or pleaded.

### D. Plaintiffs Need Not Exhaust Any Administrative Remedies Before Filing This Threshold Challenge to the Constitutionality of the MREA.

The government alleges that before Plaintiffs may file a threshold challenge to the constitutionality of the MREA in court, they must first file a petition for administrative review by USDA under Section 15(A) of the AMAA. (Gov't Mem. at 23). This argument fails on the plain language of the statute and is irrational, because USDA lacks the authority to declare an act of Congress unconstitutional, which is the remedy Plaintiffs seek. This claim is another manifestation of the government's failure to recognize that Plaintiffs challenge the very enactment of MREA, and not the USDA's rule promulgated under the AMAA.

Section 15(A) of the AMAA provides an avenue whereby the Secretary's milk marketing orders can be challenged in certain contexts.

> (A) Any handler subject to an order may file a written petition with the Secretary of Agriculture, stating that any such order or any provision of any such order or any obligation imposed in connection therewith is not in accordance with law and pray[s] for a modification thereof or to be exempted therefrom. . . .

7 U.S.C. § 608c(15)(A). The Complaint does not seek "review of the Secretary's milk marketing order" within the meaning of Section 15(A). Plaintiffs do not challenge the Arizona "order or any provision of . . . such order or any obligation imposed in connection therewith." Rather, Plaintiffs bring a threshold challenge to the constitutionality of the MREA, passed by Congress

---

[13] The one case cited by the government for its claim that a waiver of sovereign immunity must be asserted in the Complaint (Gov't Mem. at 21) involved "a challenge to [an] underlying benefits decision" that was explicitly prohibited by law. *Weaver v. United States,* 98 F.3d 518, 519-20 (10th Cir. 1996).

independent of any action by the USDA. Plaintiffs do not challenge the manner in which USDA actually has applied the Order to them, pursuant to the statutory mandates of the MREA. The Complaint does not allege that USDA has failed to act "in accordance with law"; rather, it presents a threshold challenge to the law that directed USDA to act. Thus, Section 15(A) is inapplicable.

The government's argument is irrational because USDA lacks the authority to declare the MREA unconstitutional. The agency is required to carry out the MREA until a court tells it to stop. This Court would not benefit from having an administrative record assembled, because there is no administrative action to be reviewed on this facial constitutional challenge. Similarly, the agency has no expertise to apply to the narrow issues whether the MREA is a bill of attainder or whether its passage denied Plaintiffs equal protection and due process.

As the Supreme Court has stated, any requirement of administrative exhaustion must be absolutely clear. *Darby v. Cisneros,* 509 U.S. 137, 154 (1993). Where a statute does not clearly premise access to the federal courts on an administrative exhaustion requirement, then pursuit of that path, even if available, is non-jurisdictional and a matter of discretion for the court. *See Avocados Plus Inc. v. Veneman*, 370 F.3d 1243 (D.C. Cir. 2004). Under the plain language of the AMAA, Section 15(A) does not apply to this challenge to the MREA.[14] Even if the Court had discretion to direct Plaintiffs to follow that course, it would be inappropriate to do so,

---

[14] Amici argue that exhaustion is required because "In response to the MREA, the Secretary could have terminated the Arizona-Las Vegas Order, essentially rendering the MREA toothless with respect to Sarah Farms." (Amici Mem. at 7). But the MREA contains a mandatory requirement that USDA impose price regulations on the Hettingas' Sarah Farms plant. In this instance, Congress specifically removed any discretion from the Secretary, and mandated that the provisions of the MREA were to take effect as written within 15 days of enactment. MREA Section 2(d). Since all authority of the Secretary flows from Congress, not applying the MREA to the Hettingas would violate Congressional directive.

because recourse to the USDA process would be futile and would add nothing to the Court's analysis of the constitutional issues.

### Conclusion

The Motion to Dismiss under Rule 12(b)(1) and 12(b)(6) should be denied.

Respectfully submitted,

*Alfred W. Ricciardi* by JFC

ALFRED W. RICCIARDI
(Arizona Bar No. 009547)
Hebert Schenk P.C.
4742 N. 24th Street, Suite 100
Phoenix, Arizona 85016
(602) 248-8203

*John F. Cooney*

JOHN F. COONEY
(D.C. Bar No. 936336)
NANCY S. BRYSON
(D.C. Bar No. 913673)
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4812

February 6, 2007                    Counsel for Plaintiffs

- 45 -

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **HEIN HETTINGA AND ELLEN HETTINGA, et al.,** ) ) ) ) | |
| **Plaintiffs,** ) | |
| v.    ) | Civil Action No.06-1637 (RJL) |
| ) | |
| **UNITED STATES OF AMERICA,** ) ) | |
| **Defendant.** ) | |

**ORDER**

Upon consideration of Defendant's Motion to Dismiss Pursuant to Rule 12(b)(1) and 12(b)(6), and the Opposition thereto, it is hereby Ordered that the Motion to Dismiss is denied.

So ordered this _____ day of _____ 2007.

_____
Richard J. Leon
United States District Judge