## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **HEIN HETTINGA AND ELLEN HETTINGA**<br>**d/b/a SARAH FARMS,**<br>**1140 U.S. Highway 84**<br>**Muleshoe, Texas 79347**<br><br>**and**<br><br>**GH Dairy d/b/a GH Processing**<br>**17094 Cucamonga Ave.**<br>**Corona, California 92880**<br><br>         **Plaintiffs,**<br><br>   **v.**<br><br>**UNITED STATES OF AMERICA,**<br><br>           **Defendant.** | **Case No.06-CV-1637 (RJL)** |

## FIRST AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Hein Hettinga and Ellen Hettinga, doing business under the trade name Sarah Farms, and GH Dairy, doing business as GH Processing ("GH Processing") (collectively "Plaintiffs"), seek declaratory and injunctive relief from application of certain unconstitutional provisions of the Milk Regulatory Equity Act ("MREA"), Public Law No. 109-215, codified at 7 U.S.C. §§ 608c(5)(M)-(N). The enactment of these provisions by Congress constitutes an impermissible legislative punishment of Plaintiffs, in violation of the Bill of Attainder Clause of the Constitution, and denies Plaintiffs both due process of law and equal protection of the law in violation of the Fifth Amendment.

## PARTIES

1. Plaintiffs Hein Hettinga and Ellen Hettinga are married individuals and residents of the State of Texas who own and operate a dairy business under the trade name Sarah Farms. The Sarah Farms operation is an integrated producer-handler that produces milk on

farms owned by the Hettingas and processes that raw milk into bottled milk and other dairy products for sale directly to consumers, milk dealers or retailers. The Hettingas have been operating under the trade name Sarah Farms as a producer-handler since approximately 1994. The Hettingas are also partners in a family partnership known as GH Dairy, in conjunction with their son Gerben Hettinga, whose ownership interest in the partnership is held by Gerben Hettinga as trustee for the Gerben Hettinga Revocable Trust. The Hettingas and their son are the only partners in this family partnership.

1.1 GH Dairy is a general partnership registered with the State of California. GH Dairy operates a plant that processes raw milk into bottled milk and other dairy products for sale directly to consumers, milk dealers, or retailers. This plant is located in Yuma, Arizona and operates under the trade name "GH Processing." GH Processing is not a producer-handler of milk, but rather purchases some of the milk it processes from other producers. GH Processing sells its milk and milk products exclusively into the State of California and has done so since its inception in 2003.

2. The defendant is the United States of America through the actions of Congress.

## NATURE OF THE LAWSUIT

3. Prior to April 2006, Sarah Farms had been exempt from the minimum pricing and pooling provisions of Federal Milk Marketing Orders adopted by the U.S. Department of Agriculture ("USDA") under the Agricultural Milk Marketing Agreements Act of 1937, 7 U.S.C. § 601 et seq. ("AMAA").

4. On March 28, 2006, Congress enacted the MREA, which was signed by the President on April 11, 2006. Section 2(a) of that statute amended the AMAA by adding 7 U.S.C. § 608c(5)(N) ("Subsection N") which singled out Plaintiffs for punishment and inflicted extraordinary injuries upon their ability to conduct their dairy businesses, by directly imposing upon them, through their Sarah Farms operation alone, out of all the producer-handlers of milk in the United States, mandatory price controls and a concomitant obligation to make prohibitively great monetary payments to their competitors in the production and

sale of fluid milk in the newly revised Arizona Federal Milk Marketing area. This statutory exaction has resulted in a substantial reduction in the revenues of plaintiffs' Sarah Farms' operation and enforced subsidization of their competitors, and has caused other harms to the Hettingas.

4.1  Section 2(a) also added a new 7 U.S.C. § 608c(5)(M) ("Subsection (M)") which directly imposed on GH Processing alone, out of all the handlers of milk in the United States, mandatory price controls on its interstate sales of milk into the State of California and a concomitant obligation to make prohibitively large monetary payments to its competitors in the production and sale of fluid milk in the same Arizona Federal Marketing Area. This statutory exaction has resulted in a substantial reduction in GH Processing's revenues and enforced subsidization of its competitors and has caused other harms to GH Processing and its family partners, including Plaintiffs.

5.    Floor statements during the debates on the MREA in the House of Representatives, as set forth in the Congressional Record, demonstrate that the MREA is a piece of special interest legislation intended to punish Hein and Ellen Hettinga for the manner in which they have lawfully operated their dairy businesses for more than a decade.

6.  The floor statements in the House also demonstrate that the MREA was passed in an effort to preclude Hein and Ellen Hettinga from effectively pursuing a lawsuit they had brought challenging a final rule issued by USDA in February 2006 that subjected Plaintiffs, through their Sarah Farms operation, and other producer-handlers similarly situated to Federal price controls. The MREA was adopted by the House of Representatives and cleared for signature by the President the night before the scheduled oral argument on Plaintiffs' motion for a preliminary injunction against the rule.

## JURISDICTION AND VENUE

7.  This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337.  This action arises under the laws of the United States, specifically the Milk Regulatory Equity Act.  This action also arises under the Constitution of the United States,

specifically the Bill of Attainder Clause, Article I, § 9, cl.3, and the Due Process and Equal Protection Clauses of the Fifth Amendment.

8.  This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., in order to settle an actual controversy between plaintiffs and defendant United States of America involving the constitutionality of a federal law.

9.  Pursuant to 28 U.S.C. § 2202 and Rule 57 of the Federal Rules of Civil Procedure, this Court has authority to grant injunctive relief in addition to declaring the rights of the parties.

10.  Venue is proper in this Court because the United States of America is a defendant and resides in this district.  28 U.S.C. § 1391(e)(1).

10.1  The doctrine of sovereign immunity does not bar this lawsuit, which seeks only declaratory and injunctive relief, and not monetary damages, against an unconstitutional statute adopted by Congress.  Plaintiffs have alleged that the provisions of the MREA are unconstitutional under specific provisions of the Constitution.  Accordingly, sovereign immunity never attaches to these unconstitutional and *ultra vires* actions of the government.

10.2  Plaintiffs bring this suit as a facial challenge to the constitutionality of the MREA, and not as a challenge to the terms of any Federal Milk Marketing Order administered by USDA or to any action by USDA in carrying out its obligations under the MREA or in applying any such Order to Plaintiffs various business operations.  Accordingly, any administrative exhaustion requirement applicable to challenges to Milk Marketing Orders under 7 U.S.C § 608c(15)(A) is inapplicable to this case.

### BACKGROUND – THE HETTINGAS' BUSINESS OPERATIONS

11.  The Hettingas own and operate an integrated milk business in Yuma, Arizona that processes and markets milk directly and solely from their own farms and that does business under the trade name Sarah Farms.

12.  Sarah Farms is a family business owned and operated by Hein Hettinga and his wife, Ellen Hettinga.  Hein Hettinga named the business "Sarah Farms," after his daughter,

who works at the plant. To this day, the Hettingas alone own and control all aspects of the milk production and milk processing of their Sarah Farms operation.

13. Hein Hettinga, who began his career in the dairy industry as a first generation Dutch immigrant trimming cow hooves, has built a business that supplies good and wholesome milk, which is free from added growth hormones such as rBST, to retailers throughout the State of Arizona.

14. As an integrated business, the plaintiffs' Sarah Farms operation is a "producer-handler" of milk within the meaning of the AMAA and federal regulations. "Producer-handlers are dairy farmers who process milk from their own cows in their own plants and market their packaged fluid milk and other dairy products themselves." http://www.ams.usda.gov/dyfmos/mib/prod_hand_dscrp.pdf (June 6, 2005). See, e.g., 7 C.F.R. § 1131.10 (2005).

15. Because they are integrated operations producer-handlers, such as the Hettingas, bear the full risk of all aspects of the dairy business. For example, a producer-handler bears the risks of illness in the herd, mechanical failures in the processing plant or inability to run the plant at an efficient level of operation, and/or the inability to find customers for its production of milk or the failure of customers to pay. The Hettingas, like other producer-handlers, bear the entire cost of milk production and they are fully exposed to the risk of costs in excess of production.

16. In contrast, when the processing plant and milk production are not part of the same business entity, the handler of milk and the producer of milk are protected from the risks of the other entity's operations. The handler of milk faces no risks from higher milk production costs. For instance, if it costs the farmer selling milk to a handler more to produce milk than the minimum price mandated by Federal law, the handler must pay only the minimum price. Moreover, for the dairy farmer or producer of milk who has no plant of its own, the federal milk market blend price is a final price from the market and is not subject to adjustment based upon the efficiency or profitability of the processing plant.

17. Each month, the Hettingas, through Sarah Farms, process and sell in the former Arizona-Las Vegas Milk Marketing area (now known as the Arizona Marketing Area, and referred to alternatively as "Order 131", see 7 C.F.R. part 1131) more than 3,000,000 pounds of their own farm-produced milk. The Hettingas, through Sarah Farms, are the only producer-handlers that sell more than 3,000,000 pounds of their own milk per month in the Arizona Marketing area.

17.1 In addition to Sarah Farms, Hein and Ellen Hettinga own a one-half interest in a family partnership that operates a second, independent plant in Yuma, Arizona known as GH Processing. Their son, Gerben Hettinga, as the trustee of his revocable trust, owns the other one-half interest in the partnership that operates GH Processing. GH Processing operated as an unregulated "non-pool plant" from its inception until the passage of the MREA. GH Processing, while located in Arizona, sells all of the milk that it processes into California. As a handler that does not sell milk into a federally regulated marketing area, GH Processing was not subject to federal minimum price regulation until the passage of the MREA.

## EFFORTS BY THE DAIRY INDUSTRY
## TO DESTROY PLAINTIFFS' DAIRY BUSINESSES

18. From the inception of their business and at all times relevant to this First Amended Complaint, the Hettingas through their Sarah Farms operation processed only their own milk and bore sole responsibility for the disposition of the milk produced on their farms through their Sarah Farms operation. Under the terms of the AMAA and prior USDA regulations, as producer-handlers, the Hettingas were exempt from the pricing and pooling requirements of the Federal Milk Marketing Order applicable to the area formerly known as the Arizona-Las Vegas Milk Marketing area.

19. The dairy producers and processors who were subject to the pricing and pooling requirements undertook a decade-long campaign seeking to subject the Hettingas to those requirements, and thereby eliminate the one source of competition they faced in the sale of

fluid milk to the public in that market. The largest members of the dairy industry in the United States and the largest dairy organizations in Arizona and California pursued a "dual strategy" of legislation and regulation against the Hettingas, "due to the unpredictability of the legislative route, and the slowness of the administrative route." "At Last! USDA Announces Long Awaited Producer-Handler Recommended Decision," United Dairymen, May 2005, at 6.

20. Over the years, the United States Department of Agriculture repeatedly rejected the efforts of large milk cooperatives and handlers to eliminate the producer-handler exemption and subject these entities to the pricing and pooling requirements. The Department consistently rejected these efforts even during periods when producer-handlers played a much more significant role in the market than they do today. In recent years, both the number of producer-handlers and the percentage of fluid milk that they sell have declined significantly.

21. In 1996, Congress directed the Secretary of Agriculture to undertake a major revision of the Federal Milk Marketing Orders through rulemaking. See the Federal Agricultural Improvement and Reform Act of 1996, 7 U.S.C. § 7253(a). In that rulemaking, two of the Hettingas' direct competitors requested that the Secretary of Agriculture abolish or severely limit the producer handler-exemption.

22. In the preamble to the proposed rule, the Secretary rejected the proposal to modify the producer-handler exemption for lack of legal authority.

> In the legislative actions taken by Congress to amend the AMAA since 1965, the legislation has consistently and specifically exempted producer-handlers from regulation. The 1996 Farm Bill, unlike previous legislation, did not amend the AMAA and was silent on continuing to preserve the exemption of producer-handlers from regulation. However, past legislative history is replete with the specific intent of Congress to exempt producer-handlers from regulation.

63 Fed. Reg. 4802, 4934-40 (Jan. 30, 1998). The Department reiterated its rejection of the request to eliminate the producer-handler exemption in the preamble to the final rule. 64 Fed. Reg. 16025, 16135 (April 2, 1999).

23. In June 2002, various parties, including the largest milk cooperative in the country, requested that the Department of Agriculture initiate a formal rulemaking to subject the Hettingas' Sarah Farms operation to the pricing and pooling requirements of the then Arizona-Las Vegas Milk Marketing Order. The Department initiated such a proceeding in September 2003, to consider whether to impose minimum pricing and pooling obligations on producer-handlers in two geographic areas -- the Arizona-Las Vegas (Order 131) and the Pacific Northwest areas (Order 124). At the rulemaking hearings, the largest milk processors and cooperatives joined in calling for imposition of such regulations, in order to increase the costs that the Hettingas and other producer-handlers faced in doing business.

24. Notwithstanding the limited authority granted to the USDA under the AMAA and the agency rules that for almost 70 years had exempted producer-handlers from the pricing and pooling provisions of Federal Milk Marketing Orders, on February 24, 2006, USDA adopted a Final Rule that purported to subject producer-handlers operating in the Arizona-Las Vegas and Pacific Northwest Milk Marketing areas to the pricing and pooling provisions of their respective Marketing Orders if the producer-handlers produced and sold more than 3,000,000 pounds per month of their own milk. Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas; Order Amending the Orders, 71 Fed. Reg. 9430 (Feb. 24, 2006). The Rule required covered producer-handlers in these two geographic areas to pay a substantial portion of their monthly revenues into a pool to subsidize their competitors in those markets. The net effect of the Rule was to eliminate competition from the Hettingas for large dairy interests operating in the then defined Arizona-Las Vegas Milk Marketing

8

area, by subjecting the Hettingas and the Hettingas alone to onerous payment obligations that would destroy their ability to operate their business. The Final Rule became effective on April 1, 2006.

25. On March 15, 2006, the Hettingas filed a lawsuit in the United States District Court for the Northern District of Texas, Lubbock Division, challenging the legality of the Final Rule. Hettinga v. Johanns, Case Number 5-06CV0052-C. They sought a declaration that the Final Rule was invalid on the grounds that: (1) the Department of Agriculture lacked statutory authority under the AMAA to impose minimum pricing and pooling obligations on producer-handlers who sell only milk that they produce from their own cows and do not purchase milk from other producers; (2) the Department had acted arbitrarily and capriciously by changing, without explanation, its prior interpretation of the applicable statutes under which the agency had concluded in 1998-1999 that it lacked authority to eliminate the producer-handler exemption for businesses such as their Sarah Farms operation; and (3) the Department had acted arbitrarily and capriciously by finding that a de minimis economic effect (allegedly two to four cents per hundredweight of milk, or approximately one-half of one percent of the sales price) justified subjecting producer-handlers to the pricing and pooling controls, on the ground that this slight economic effect created "disorderly marketing conditions" within the meaning of the AMAA.

## ENACTMENT OF THE MREA

26. Oral argument on Hettingas' motion for a preliminary injunction in the Johanns lawsuit was scheduled for March 29, 2006. The scheduling of this hearing prompted immediate action by Congress to preempt judicial review of Hettingas' legal challenge to the Department of Agriculture rule. On the evening of March 28, 2006, the House of Representatives passed the legislation whose constitutionality is challenged in this lawsuit and cleared it for signature by the President.

27. The MREA, as adopted, contained provisions that singled out and punished the Hettingas in two respects. First, Subsection (N) of the law directly mandated that the pricing

and pooling requirements of the Arizona-Las Vegas Milk Marketing Order must be applied to any producer-handler that sold more than 3,000,000 pounds of fluid milk per month in that area. There was only one producer-handler in the Arizona-Las Vegas marketing area that sold in excess of 3,000,000 pounds per month – the Hettingas' Sarah Farms operation. Second, Subsection (M) of the law directly imposed the pricing and pooling requirements of the federal milk marketing orders on all sales into the California market (which otherwise was not subject to Federal pricing and pooling regulations) by any handler not otherwise required to pay federal minimum prices. Again, there was only one current handler in the Arizona-Las Vegas Milk Marketing area, indeed as far as is known only one handler in the nation, that satisfied this criterion -- the GH Processing plant owned by the Hettingas' family partnership.

28. The passage of the MREA was the culmination of a prolonged legislative effort led by members of the Arizona and California Congressional delegations. From the outset of that effort, Hein and Ellen Hettinga and their dairy businesses were specifically targeted for punishment.

29. In the Senate, the legislative effort to adopt the MREA was led by Senator Kyl of Arizona. Starting in the 107th Congress, Senator Kyl introduced legislation to impose a limit on the amount of bottled milk that a producer-handler could sell in the then defined Arizona-Las Vegas milk marketing area without becoming subject to the pricing and pooling requirements of the applicable Milk Marketing Order. From the outset, this limitation on the size that a producer-handler could obtain was directed specifically at the Hettingas and their Sarah Farms operation. The enactment of this provision would directly benefit Sarah Farms' major competitors.

30. In the House of Representatives, the legislative effort to adopt the MREA was led by Representative Nunes of California, whose District included Tulare County, the single-largest milk producing county in the United States. Beginning in 2003, Congressman Nunes introduced in successive Congresses the House version of the MREA. While nominally

broad in scope, the bill targeted for adverse treatment the milk processing operations of the GH Processing plant owned by the Hettingas' family partnership. The bill attracted substantial opposition because it was overtly discriminatory. For example, Representative Baca of California opposed the proposal to eliminate the producer-handler exemption "for a single dairy operator," plaintiff Hein Hettinga. He objected that "Sarah Farms, who operates dairies and bottling plants in the Chino Basin in Southern Arizona was being singled out unfairly" and that any legislation which would "financially penalize one dairyman can only be described as discriminatory." Official Website of Representative Baca, "Congressman Baca Fights for California Agriculture," www.house.gov/baca/legislation-agriculture.html (last visited February 1, 2007).

31. In the fall of 2005, after USDA had published its proposed regulation to amend the Arizona-Las Vegas and Pacific Northwest Orders to subject producer-handlers in those two areas to the pricing and pooling requirements if they sold more than 3,000,000 pounds of milk per month, the proponents of the MREA revised the bill. To address the concerns of Arizona dairy interests, the revised bill (S. 2120) imposed the 3,000,000 pound limitation only in the Arizona-Las Vegas Milk Marketing area. Similarly situated producer-handlers in the Pacific Northwest area were not covered by the bill, even though producer-handlers in both areas were covered by the proposed regulation. The scope of the bill thus was narrowed to target the Hettingas exclusively. Further, to address the concerns of California dairy interests, the revised bill included a provision that imposed the minimum Federal pricing and pooling provisions of its local Federal Milk Marketing Order on any handler that sold packaged milk in a State, such as California, that was not covered by a Federal Milk Marketing Order. This provision again targeted the Hettingas and imposed severe financial consequences upon all sales of milk by GH Processing into California by forcing them to pay the Federal minimum price, for all milk it purchased in Arizona, which is higher than the prices that its California competitors pay for their milk. Another provision of the MREA, Section 2(b), explicitly removed Nevada from the coverage of any Federal Milk Marketing

Order. The effect of this provision was to allow eight handlers of milk in Nevada, including some operations that are larger than GH Processing, to sell their milk into California without being subject to either Federal or State of California minimum price controls. These two provisions thus placed GH Processing at a significant competitive disadvantage for its sales into California.

32. On December 16, 2005, the MREA as revised passed the Senate by unanimous consent, without having been the subject of a Committee hearing or floor debate.

33. On March 28, 2006, the evening before the Johanns lawsuit was to be argued in Texas, the MREA was brought before the House of Representatives on the Suspension Calendar, without benefit of a prior Committee hearing. When objection was made to its consideration, the proponents moved to suspend the rules and pass the bill over the objections. This procedure required a super-majority vote of two-thirds to suspend the rules and pass the measure. Following a short floor debate, the bill narrowly passed the House and was cleared for action by the President.

34. As enacted, Section 2(a) of the MREA amended the AMAA, 7 U.S.C. § 608c(5), by adding, inter alia, new Subsections (M) and (N). They provide:

(M) Minimum Milk Prices for Handlers.—

(i) Application of minimum price requirements.-- Notwithstanding any other provision of this section, a milk handler described in clause (ii) shall be subject to all of the minimum and uniform price requirements of a Federal milk marketing order issued pursuant to this section applicable to the county in which the plant of the handler is located, at Federal order class prices, if the handler has packaged fluid milk product route dispositions, or sales of packaged fluid milk products to other plants, in a marketing area located in a State that requires handlers to pay minimum prices for raw milk purchases.

(ii) Covered milk handlers.—

Except as provided in clause (iv), clause (i) applies to a handler of Class I milk products (including a producer-handler or producer operating as a handler) that—

(I) operates a plant that is located within the boundaries of a Federal order milk marketing area (as those boundaries are in effect as of the date of the enactment of

this subparagraph);

(II) has packaged fluid milk product route dispositions, or sales of packaged fluid milk products to other plants, in a milk marketing area located in a State that requires handlers to pay minimum prices for raw milk purchases; and

(III) is not otherwise obligated by a Federal milk marketing order, or a regulated milk pricing plan operated by a State, to pay minimum class prices for the raw milk that is used for such dispositions or sales.

(iii) Obligation to pay minimum class prices.--For purposes of clause (ii)(III), the Secretary may not consider a handler of Class I milk products to be obligated by a Federal milk marketing order to pay minimum class prices for raw milk unless the handler operates the plant as a fully regulated fluid milk distributing plant under a Federal milk marketing order.

(iv) Certain handlers exempted.--Clause (i) does not apply to--

(I) a handler (otherwise described in clause (ii)) that operates a nonpool plant (as defined in section 1000.8(e) of title 7, Code of Federal Regulations, as in effect on the date of the enactment of this subparagraph);

(II) a producer-handler (otherwise described in clause (ii)) for any month during which the producer-handler has route dispositions, and sales to other plants, of packaged fluid milk products equaling less than 3,000,000 pounds of milk; or

(III) a handler (otherwise described in clause (ii)) for any month during which--

> (aa) less than 25 percent of the total quantity of fluid milk products physically received at the plant of the handler (excluding concentrated milk received from another plant by agreement for other than Class I use) is disposed of as route disposition or is transferred in the form of packaged fluid milk products to other plants; or
>
> (bb) less than 25 percent in aggregate of the route disposition or transfers are in a marketing area or areas located in one or more States that require handlers to pay minimum prices for raw milk purchases.

(N) Exemption for Certain Milk Handlers.--Notwithstanding any other provision of this section, no handler with distribution of Class I milk products in the marketing area described in Order No. 131 shall be exempt during any month from any minimum price requirement established by the Secretary under this subsection if the total distribution of Class I products during the preceding month of any such handler's own farm production exceeds 3,000,000 pounds.

35.    Subsection (N) has the effect of directly imposing pricing and pooling requirements on any producer-handler in the Arizona-Las Vegas Milk Marketing area that satisfies the 3,000,000 pounds per month criterion.  A covered producer-handler's obligation

to comply with the price controls and make the payments into the pool for distribution to its competitors is absolute and does not depend upon the validity of the February 24, 2006 Department of Agriculture rule or the rationality of the factual findings underlying that rule. That is, even if USDA were to revert to its 1998-1999 interpretation that the law precluded elimination of the producer-handler exemption or if it were to find that the facts did not show the existence of disruptive marketing conditions in this area, a producer-handler in the newly revised Arizona Milk Marketing area that produced more than 3,000,000 pounds of fluid milk per month still would be expressly subject to the pricing and pooling requirements of that Order.

36. Subsection (N) applies to only one Milk Marketing area, the new Arizona area. It does not apply the disqualification from the exemption to any producer-handlers in the Pacific Northwest Milk Marketing area, even though that area and those producer-handlers were covered by the Department of Agriculture rule that the Hettingas were challenging in the Johanns case.

37. There is only one producer-handler in the Arizona-Las Vegas Milk Marketing area – "Order No. 131" -- that distributes more than 3,000,000 pounds per month of fluid milk (known under the AMAA regulatory scheme as "Class I products"). That producer-handler is the Sarah Farms operation owned by the Hettingas. Thus, the effect of Subsection (N) is to make one and only one producer-handler – Sarah Farms – ineligible for the exemption that otherwise would apply. In this manner, the MREA singles out the Hettingas and makes them the only producer-handler operation in the United States that is subject to a direct statutory command that they must be subject to the pricing and pooling requirements of the local Federal Milk Marketing Order.

38. Similarly, Subsection (M)(i) provides that the pricing and pooling requirements of its local Federal Milk Marketing Order shall apply to a handler that sells fluid milk in packaged form "in a marketing area located in a State that requires handlers to pay minimum prices for raw milk purchases." One such State is California, in which milk prices are not governed by Federal Milk Marketing Orders. Rather, California is governed by the Gonsalves Milk Pooling Act of 1967, enacted under a separate State statute. During the course of the 1996-1999 revision of the Federal Milk Marketing Orders (see ¶ 21), California declined to join the federal milk marketing system. See 7 U.S.C. § 7253(a)(2).

39. Subsection (M) thus subjects the Hettingas' family partnership, through GH Processing, to the pricing and pooling requirements of the new Arizona Milk Marketing Order, and its onerous payment obligations, for any sales of milk that GH Processing makes to California purchasers.

40. Statements made in the course of the floor debate in the House confirm that Subsection (N) was intended to short circuit judicial consideration of Hettingas' challenge to the Department of Agriculture rule, which was scheduled to be heard the next morning, and to impose a mandatory statutory requirement that plaintiffs must be subject to the pricing and pooling provisions of the AMAA. The net effect of this provision was a statutory directive that plaintiffs must make large payments from their revenues to subsidize their competitors in the Arizona Milk Marketing area.

41. For example, during the course of the debate, members specifically stated that the Act was written to target "the Yuma handler" or the "plant in Yuma." Congressional Record H1151 (March 28, 2006) (comments of Rep. Collin Peterson).

15

42.   Thereafter, Rep. Obey had an exchange with Rep. Goodlatte, in which Congressman Obey suggested that the Act was a special bill for a select few interests in the dairy industry and that the Act targeted and punished the Hettingas for lawfully operating their dairy businesses plant outside of the federal pricing and pooling regulations. Id. at H1151, H1152.

43. In a later exchange between Rep. Lewis and Rep. Nunes, plaintiff Hein Hettinga was specifically identified as the target of the Act. Congressman Lewis further noted that passage of the Act would likely deny the Hettingas an opportunity to challenge the Secretary's recently enacted regulations in court. Id. at H1153.

44.   The floor debate also demonstrates that the Act was intended to punish the Hettingas for their interest in GH Processing for allegedly "exploiting a loophole" in federal Milk Marketing regulations. Id. at H1152 (comments of Rep. Cardoza), H1153 (comments of Rep. Gutknecht).

45.   The passage of the MREA had the effect intended by its proponents when they pushed to obtain passage of the measure prior to the scheduled preliminary injunction hearing in the Johanns lawsuit in the Northern District of Texas.  At the opening of oral argument the next morning, counsel for the Department of Agriculture handed the judge a copy of the pages of the Congressional Record in which the House had adopted the bill the previous evening.  While noting that the President had not yet signed the measure, counsel nonetheless argued that since President Bush had (to that point) never vetoed a bill during his tenure in office, the MREA was highly likely to become law; that it conclusively subjected the Hettingas' Sarah Farms operation to the pricing and pooling obligations of the AMAA; and that this development constituted a conclusive reason why the court should deny the motion for a preliminary injunction.

16

46. In its decision denying the motion for a preliminary injunction, the District Court noted that the passage of the Act effectively mooted Hettingas' legal challenge to the validity of the Department of Agriculture rule. The case thereafter was voluntarily dismissed without prejudice.

47. The MREA punishes the Hettingas alone, by requiring them to make prohibitive monthly payments into newly created Arizona Milk Marketing Pool equal to the difference between the federal minimum Class I milk price, which is the price applicable to raw milk processed for bottling, and the average price of all milk processed under the Arizona Marketing Order. This monthly payment amounts to hundreds of thousands of dollars per month and comes directly from the revenues of the Hettingas' Sarah Farms operation. Through the pooling mechanism, this monthly payment is then distributed to the Hettingas' direct competitors. These impositions threaten to compel them either to limit the amount of milk they sell through Sarah Farms into the Arizona milk market or drastically alter their producer-handler economic model.

48. The MREA applies with specificity to the Hettingas and singles them out for legislative punishment. Subsection (N) of the MREA addresses only the Arizona-Las Vegas Milk Marketing area and does not apply to any other marketing area. While the Hettingas are not identified by name in the text of the MREA, their identity as the target of the Congressional action is easily ascertainable. The Congressional debates and the rulemaking record compiled by the Department of Agriculture establish that there is only one producer-handler in the Arizona-Las Vegas market that produces more than 3,000,000 pounds per month of its own milk – Sarah Farms.

49. The MREA imposes legislative punishment on the Hettingas. The statute's infliction of large mandatory payments and the mandatory subsidization of the Hettingas' main competitors, without any countervailing benefit, and the short-circuiting of their attempt to obtain judicial review of the Department of Agriculture rule constitute legislative punishment for their prior activities in operating their dairy.

17

50.  The punishments imposed by the MREA have had severe adverse effects upon the Hettingas, including the irretrievable loss of customers, loss of income, change in business structure, and/or substantial loss of business assets.  These losses are irreparable. Enactment of the MREA also defeated their ability to obtain judicial review of the Department of Agriculture rule.  These burdens do not further any non-punitive legislative purpose.

51.  The legislative history of the MREA shows a Congressional intent to punish the Hettingas.

52.  No other producer-handler operation in the country has been subjected to the type of mandatory statutory penalties that Congress imposed upon the Hettingas through the MREA.

52.1   The MREA also imposes legislative punishment on the Hettingas' family partnership through subsection (M) by punishing them and them alone for selling packaged fluid milk into California from GH Processing.  Subsection (M) requires GH Processing to pay the federal minimum price for such sales, and these payments are, as with those made by the Hettingas' producer-handler operation, Sarah Farms, distributed to the competitors of GH Processing through the Arizona milk marketing pool.  These pooled payments are distributed to Arizona dairy farmers for sales into California.  Accordingly, California dairy farmers receive no direct benefit from the regulation of GH Processing.  Furthermore, while milk processors regulated under the California state laws pay a California minimum price, GH Processing must pay the federal minimum price applicable to Arizona, which tends to be higher than the California minimum prices.

52.2  Subsection (M) of the MREA applies with specificity to the Hettingas through their family partnership that owns GH Processing plant and singles them out for legislative punishment.  While GH Processing and the Hettingas are not identified by name in the text of the MREA, their identity as the target of the Congressional action is easily ascertainable. The Congressional debates and the records of the Department of Agriculture establish that

18

there is only one handler in the country that is obligated to make payments under subsection (M) – GH Processing.

52.3  Subsection (M) changes the historical operation of the Federal Milk Marketing Orders for only GH Processing.  While other handlers of milk are subjected to regulation only when they sell milk into a federal milk marketing area, Subsection (M) imposes minimum price regulations based not on the location where the milk is sold, but instead based solely on the location of the GH Processing plant.  Even though GH Processing sells no milk into a federally regulated marketing area, the MREA imposes federal pricing regulations on the plant.

52.4  The punishments imposed by Subsection (M) have had severe adverse effects upon GH Processing, including the irretrievable loss of customers, loss of income, change in business structure, and/or substantial loss of business assets.  These losses are irreparable.  These burdens do not further any non-punitive legislative purpose, especially in light of the fact that at the same time the MREA imposes federal price regulation on GH Processing, Section 2(b) of the Act  (codified at 7 U.S.C. § 608c(11)(D)) removes the entire State of Nevada from the purview of the federal milk marketing orders.  Essentially, these Nevada provisions permit any handler located in Nevada to sell milk into California without being required to pay either a federal minimum price or the California minimum price.

52.5  The Nevada provision provides to Nevada milk handlers the ability to sell milk into the State of California without being subjected to the minimum price controls of any Federal or State milk marketing order.  Thus, the MREA on the one hand imposes punitive provisions on GH Processing by subjecting it to minimum Federal price controls for its interstate sales into California while on the other hand exempting interstate sales by Nevada handlers into California from all minimum price controls.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (BILL OF ATTAINDER)

53.   Plaintiffs repeat and incorporate all previous allegations of this First Amended Complaint.

54.   Article I, § 9, cl. 3 of the Constitution provides that "[n]o bill of attainder or ex post facto law shall be passed."

55.   Section 2(a) of the MREA constitutes an unconstitutional Bill of Attainder, because it singles out plaintiffs for legislative punishment.

56.   The Act severely punishes the Plaintiffs for their past lawful operation of Sarah Farms and GH Processing outside of federal milk pooling and pricing regulations.  It also denied the Hettingas the right to seek judicial resolution of its challenge to USDA's regulation that purported to subject their Sarah Farms operation to the pricing and pooling provisions of the AMAA.

57.   The Act summarily punishes plaintiffs pursuant to legislative findings and without a judicial determination.  The burdens imposed by the statute constitute legislative punishment and do not further any non-punitive legislative purpose.  The legislative history of the MREA demonstrates a Congressional intent to punish plaintiffs.  Section 2(a) of the Act therefore constitutes an unconstitutional Bill of Attainder.

## SECOND CLAIM FOR RELIEF

### (DENIAL OF DUE PROCESS)

58.   Plaintiffs repeat and incorporate all previous allegations of this First Amended Complaint.

59.   The Fifth Amendment of the Constitution entitles plaintiffs to due process of law.

60.   Section 2(a) of the MREA denied the Hettingas' due process of law by foreclosing their ability to obtain effective judicial review of the Department of Agriculture's Final Rule in the <u>Johanns</u> litigation in the United States District Court for the Northern District of Texas.

61.   Section 2(a) of the MREA also denied plaintiffs due process of law by imposing mandatory statutory punishment upon the operation of their businesses.

62.   Section 2(a) of the MREA therefore violates the Due Process Clause of the Fifth Amendment.

**THIRD CLAIM FOR RELIEF**

**(DENIAL OF EQUAL PROTECTION)**

63.   Plaintiffs repeat and incorporate all previous allegations of this First Amended Complaint.

64.   The Fifth Amendment of the Constitution entitles plaintiffs to equal protection of the law.

65.   Section 2(a) of the MREA denies the Hettingas the equal protection of the laws by specifically singling them out for adverse treatment that is extended to no other producer-handler in any other Milk Marketing area.  The statute denies the Hettingas equal protection by imposing on them direct price controls and obligations to make pool payments   that Congress has not imposed on any other producer-handler in the newly revised Arizona Milk Marketing area or on producer-handlers in any other Milk Marketing area in the country.

65.1.   Sections 2(a) and 2(b) of the MREA also deny the Hettingas' family partnership GH Processing equal protection of the laws by imposing Federal minimum price controls and an obligation to make pool payments on sales of milk into the California market that Congress has not imposed on any other handler in the nation, while simultaneously

exempting Nevada handlers who sell milk into California from all Federal and State minimum price controls.

65.2.    Further, the MREA denied the Hettingas equal protection of the laws by denying them, alone out of all the producer-handlers that were subjected to regulation under the Department of Agriculture's Final Rule, the ability to challenge that Rule in federal court.

66.    Section 2(a) of the MREA therefore violates the Equal Protection component of the Due Process Clause of the Fifth Amendment.

WHEREFORE, plaintiffs Hein and Ellen Hettinga d/b/a Sarah Farms and GH Dairy d/b/a/ GH Processing request the following relief:

1.    For a declaration that the Section 2(a) of the Act is unconstitutional, insofar as it purports to enact new Subsections (M) and (N) of Section 608c(5) of the AMAA.

2.    For an Order permanently enjoining the application of Subsections (M) and (N) of Section 608c(5) of the AMAA to GH Processing and to plaintiffs' Sarah Farms operation.

3.    For a declaration that Section 2(a) of the MREA constitutes an unconstitutional Bill of Attainder.

4.    For a declaration that Section 2(a) of the MREA violates plaintiffs' constitutional right to due process of law.

5.    For a declaration that Section 2(a) of the MREA violates plaintiffs' constitutional right to equal protection of the laws.

6.    For an Order awarding plaintiffs all of their costs and attorney's fees in prosecuting this action, and for such other and further relief as this Court deems just and appropriate under the circumstances.

Respectfully submitted,

/s/ Alfred W. Ricciardi
ALFRED W. RICCIARDI
(Arizona Bar No. 009547)
Hebert Schenk P.C.
4742 N. 24th Street, Suite 100
Phoenix, Arizona 85016
(602) 248-8203

/s/ John F. Cooney
JOHN F. COONEY
(D.C. Bar No. 936336)
NANCY S. BRYSON
(D.C. Bar No. 913673)
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 34-4812

February 6, 2007                    Counsel for Plaintiffs