## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HEIN HETTINGA AND ELLEN HETTINGA d/b/a SARAH FARMS,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Civil Action No. 06-1637 (RJL) |

## DEFENDANT'S RENEWED MOTION TO DISMISS PURSUANT TO RULE 12(b)(1) AND RULE 12(b)(6)

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, and the Court's Minute Order of November 13, 2009, defendant the United States of America respectfully moves this Court to dismiss plaintiffs' First Amended Complaint (Docket #13) for lack of subject matter jurisdiction and for failure to state a claim for relief.  Points and authorities supporting defendant's motion are presented in the attached Memorandum in Support of Defendant's Renewed Motion to Dismiss.

Dated: November 25, 2009

Respectfully submitted,

TONY WEST
Assistant Attorney General

JOHN R. GRIFFITHS
Assistant Branch Director

    /s/ *Peter J. Phipps*
PETER J. PHIPPS
Senior Counsel
United States Department of Justice

Civil Division, Federal Programs Branch
Tel: (202) 616-8482
Fax: (202) 616-8470
peter.phipps@usdoj.gov

<u>Mailing Address:</u>
Post Office Box 883
Washington, D.C.  20044

<u>Courier Address:</u>
20 Massachusetts Ave., N.W.
Washington, D.C.  20001

Attorneys for Defendant

2

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HEIN HETTINGA AND ELLEN HETTINGA d/b/a SARAH FARMS, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 06-1637 (RJL) |
| v. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S RENEWED MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . 2

    I.    The Federal Regulation of Milk. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    II.    Exceptions to the Pooling and Pricing Obligations. . . . . . . . . . . . . . . . . 3

    III.    The February 2006 Amendments to the Regulations for Order 131. . . . . . 4

    IV.    The Milk Regulatory Equity Act of 2006. . . . . . . . . . . . . . . . . . . . . . . . 6

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    I.    Plaintiff Sarah Farms' Action Must Be Dismissed Pursuant to Rule
        12(b)(1) for Lack of Subject Matter Jurisdiction. . . . . . . . . . . . . . . . . . . 8

        A.    Standard of Review for Rule 12(b)(1) Dismissal. . . . . . . . . . . . . 8

        B.    Sarah Farms Lacks Standing to Challenge Subsection (N). . . . . . . 9

    II.    Plaintiffs' Complaint Does Not State a Cognizable Claim for Relief. . . . . 10

        A.    Standard of Review for a Rule 12(b)(6) Motion to Dismiss. . . . . . 10

        B.    Section 2(a) of the MREA Is Not a Bill of Attainder. . . . . . . . . . . 11

            1.    Section 2(a) Does Not Satisfy the Specificity Element
                of a Bill-of-Attainder Violation. . . . . . . . . . . . . . . . . . . . 12

            2.    Section 2(a) of the MREA Does Not Inflict a
                Legislative Punishment. . . . . . . . . . . . . . . . . . . . . . . . . 14

                a.    Historical Analysis of Punishment. . . . . . . . . . . . . . 15

          b.     Functional Analysis of Punishment. . . . . . . . . . . . . 17

          c.     Motivational Analysis of Punishment. . . . . . . . . . . 18

     3.     Section 2(a) of the MREA Does Not Usurp the Judicial
         Function.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

  C.     The MREA Does Not Violate Equal Protection or Due
     Process.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# INTRODUCTION

Plaintiffs, Hein and Ellen Hettinga d/b/a Sarah Farms and GH Dairy d/b/a GH Processing, seek to have this Court strike down as unconstitutional two provisions of the Milk Regulatory Equity Act of 2006, Pub. L. No. 109-215, 120 Stat. 328 (Apr. 11, 2006) (the "MREA"). Plaintiffs' complaint targets section 2(a) of the MREA, specifically subsections (M) and (N). These subsections narrow the exceptions to pooling and pricing obligations that would otherwise apply to handlers of milk products. By closing these loopholes, the MREA ensures that the largest entities in the dairy industry are not exempted from regulation. Subsection (M) subjects a handler of milk products to federal pool payment obligations when that handler sells milk from a federally regulated geographic area into an area where milk sales are regulated at the state level. Similarly, subsection (N) applies a cap of three-million pounds of milk per month to the Arizona geographical region, thus ensuring that any handler whose production exceeds that limit is subject to the applicable federal pooling obligations. Plaintiffs, who were previously unregulated, complain that through these two subsections, the MREA violates the Bill of Attainder Clause, the Equal Protection Clause, and the Due Process Clause. Plaintiffs mistake valid regulatory statutes for constitutional infirmities. Their claims lack merit and should be dismissed.

1

## STATUTORY AND REGULATORY BACKGROUND

### I.     The Federal Regulation of Milk

Through the Agricultural Marketing Agreement Act of 1937 as amended, see

7 U.S.C. § 601 et seq. (the "AMAA"), Congress empowered the Secretary of Agriculture

to regulate persons who handle agricultural commodities, including milk products.  See

id. § 608c(1)-(2).  Congress authorized the regulation of such persons, known as

"handlers," through agricultural marketing orders to further several policy objectives,

including establishing and maintaining orderly marketing conditions for agricultural

commodities, see id. § 602(1), protecting consumers of agricultural commodities, see id.

§ 602(2), as well as avoiding unreasonable fluctuations in supplies and prices by

maintaining an orderly supply of agricultural products throughout the seasons, see id.

§ 602(4).

With regard to milk, the AMAA authorizes the Secretary of Agriculture to

establish milk marketing orders to regulate different geographic regions of the country.

See id. §§ 608c(1), (5).  This authority includes the ability to guarantee dairy farmers

(referred to as "producers") a minimum uniform price for milk sold to handlers,

regardless of the milk's ultimate use.  Id. §§ 608c(5)(A)-(C).  Pursuant to the AMAA, the

Secretary of Agriculture has issued several milk marketing orders for many geographic

regions of the United States, including Order 131, which governs the Arizona geographic

region.  See, e.g., 7 C.F.R. §§ 1131.1 -.86 (providing regulations specific to Order 131).

On the handler side, a 'pool' or 'settlement fund' is created to take into account the

end use of milk purchased at the blend price.  See 7 C.F.R. § 1000.70 (providing for the

settlement fund).  Handlers pay into the settlement fund to the extent that the average end-

use value of their milk products exceeds the blend price.  See Lehigh Valley Farmers v.

Block, 829 F.2d 409, 412 (3d Cir. 1987); Schepps Dairy, Inc. v. Bergland, 628 F.2d 11,

15 (D.C. Cir. 1979); see, e.g., 7 C.F.R. § 1131.71 (providing for handler payments into

the settlement fund for Order 131).  Handlers whose average end-use value of their milk

products is below the blend price receive payments from the settlement fund.  See Lehigh

Valley, 829 F.2d at 412; Schepps Dairy, 628 F.2d at 15; see, e.g., 7 C.F.R. § 1131.72

(providing for payments to handlers from the settlement fund for Order 131).  The net

effect of these payments is that "each handler pays for his milk at the price he would have

paid had it been earmarked at the outset for the use to which it was ultimately put."

Lehigh Valley Coop. Farmers, Inc. v. United States, 370 U.S. 76, 81 (1962); see also

7 U.S.C. § 608c(5)(C) (requiring that "the total sums paid by each handler shall equal the

value of milk purchased by him at the prices fixed . . ."); Lamers Dairy Inc. v. USDA,

379 F.3d 466, 470 (7th Cir. 2004).

## II.     Exceptions to the Pooling and Pricing Obligations

         Before the MREA, there were two loopholes that would allow even the largest

handlers to avoid the pooling and pricing obligations.  First, when a handler located in a

federally regulated marketing order sold milk into an area subject to state regulation,

those sales were exempt from federal (and state) pool payment obligations.  Second,

where a handler's operations were so thoroughly integrated with the production side that

the entire business – from cow to consumer – did not rely on federal minimum price guarantees, it was exempt from the pooling and pricing obligations. See Edaleen Dairy, LLC v. Johanns, 467 F.3d 778, 780-81 (D.C. Cir. 2006). Historically, the entities qualifying for this so-called producer-handler exception were small family businesses, and their use of the exception did not disrupt orderly milk market conditions. See id.; Stew Leonard's v. Glickman, 199 F.R.D. 48, 50 (D. Conn. 2001). In recent years, however, the allure of the competitive advantage from the producer-handler exception (not having to make payments to the settlement fund) has motivated entities with large-scale dairy operations to exploit the exception. See Edaleen Dairy, 467 F.3d at 780-81.

## III.  The February 2006 Amendments to the Regulations for Order 131

In February 2006, the Secretary of Agriculture redefined the producer-handler exception for Order 131 so that large producer-handlers are no longer exempt from the Order's pooling and pricing requirements. See Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas; Order Amending the Orders, 71 Fed. Reg. 9430 (Feb. 24, 2006). Under the amended regulatory definition, handlers with in-area monthly milk distributions of over three-million pounds no longer qualify as exempt producer-handlers. See 71 Fed. Reg. at 9433, Part 3 (codified at 7 C.F.R. § 1131.10). As a result, large producer-handlers in Arizona are now subject to the same pooling and pricing requirements that apply to all handlers. See 71 Fed. Reg. at 9430.

Before implementing such a rule, USDA issued a proposed rule, heard testimony, and made findings regarding the need and appropriateness of amending the producer-

4

handler exception for Order 131.  See *Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas; Final Decision on Proposed Amendments to Marketing Agreement and to Orders*, 70 Fed. Reg. 74166-91 (Dec. 14, 2005).  As a result of that process, USDA concluded that contrary to the AMAA's goal of achieving orderly milk markets, an uncapped producer-handler exception in the Arizona region was contributing to significant market instability.  See 70 Fed. Reg. at 74185-86; see also id. at 74188 ("This decision finds that disorderly marketing conditions exist in the Pacific Northwest and the Arizona-Las Vegas marketing areas.").  In fact, on the evidence before it, USDA concluded that it would be justifiable to phase out the producer-handler exception at an even lower monthly milk volume – 150,000 pounds – one-twentieth of the current three-million pound monthly cap.  See 70 Fed. Reg. at 74186.

In addition to these findings on the disruptive effects of an uncapped producer-handler exception, USDA concluded that a central rationale underlying the producer-handler exception no longer applied to the large producer-handlers.  A justification for exempting producer-handlers from the pooling and pricing requirements was that they bore the burden of disposing of their surplus milk – the milk that they could not sell as highly profitable fluid milk.  But that rationale ceases to exist for large producer-handlers who, by avoiding payments to the settlement fund, can price their milk so that it all sells as fluid milk.  See 70 Fed. Reg. at 74187.  Thus, USDA found that the competitive advantage from the producer-handler exception was so great that large producer-handlers could avoid the risks traditionally associated with producer-handler status.

IV.     **The Milk Regulatory Equity Act of 2006**

Enacted on April 11, 2006, the MREA amends and supplements the AMAA by limiting the two exceptions to the pooling and pricing obligations.  See Pub. L. No. 109-215, 120 Stat 328 (Apr. 11, 2006).  Those limits are contained in MREA, Section 2(a), subsections (M) and (N), which are now codified at 7 U.S.C. § 608c(5)(M)-(N).

Subsection (M) regulates the sale of fluid milk into geographic regions with state-law minimum prices for milk (such as California) by handlers located in regions covered by federally regulated milk marketing orders (such as Arizona).  In general, under subsection (M), milk handlers who import milk into a region governed by state minimum milk prices "shall be subject to all of the minimum and uniform price requirements of a Federal milk marketing order . . . applicable to the county in which the plant of the handler is located . . . ."  7 U.S.C. § 608c(5)(M)(i).  Thus, under subsection (M), handlers can no longer avoid the pooling and pricing obligations of their own federal marketing order (as well as those of the state into which the sales take place) by selling milk from a region that is federally regulated into a region that is regulated at the state level.  See id. § 608c(5)(M)(ii).

Subsection (N) regulates milk handlers in Order 131.  Under subsection (N), handlers (including producer-handlers) with a monthly disposition of over three-million pounds of Class I milk products from their own farms are subject to the minimum pooling and pricing requirements.  See 7 U.S.C. § 608c(5)(N).

## STATEMENT OF THE CASE

Plaintiffs Sarah Farms and GH Processing claim that subsections (M) and (N) of the MREA violate the Bill of Attainder Clause, the Equal Protection Clause, and the Due Process Clause of the Constitution.  Under the MREA, plaintiffs are presently subject to the pooling and pricing obligations for federally regulated milk handlers.  Before the enactment of subsection (M), plaintiff GH Processing avoided the federal (and state) pooling and pricing obligations because although GH Processing was located within Arizona, an area covered by federal Order 131, it sold its milk into California, a state-regulated area.  See Amended Compl. ¶¶ 1.1, 4.1 (Docket #13).  Similarly, before the enactment of subsection (N), plaintiff Sarah Farms relied on a limitless producer-handler exception to avoid the pooling and pricing obligations.  See id. ¶¶ 1, 3-4.  Due to the volume limit on the producer-handler exception imposed by subsection (N), whenever Sarah Farms exceeds monthly fluid milk dispositions of three-million pounds, it will be subject to the same pooling and pricing obligations as other regulated handlers in Order 131.  As explained below, the MREA is constitutional, and plaintiffs' case should be dismissed.

## PROCEDURAL HISTORY

This case is presently on remand from the D.C. Circuit.  In December 2006, defendant moved to dismiss plaintiffs' case on several grounds, including failure to exhaust administrative procedures.  See 7 U.S.C. § 608c(15)(A).  The Court dismissed plaintiffs' case for failure to exhaust the administrative process, a jurisdictional issue that

7

resolved the entire case.  See Hettinga v. United States, 518 F. Supp. 2d 58 (D.D.C. 2007).  By so doing, the Court did not address defendant's remaining challenges to plaintiffs' complaint.  See id.  On appeal, plaintiffs contested this Court's ruling and argued that their case was a facial challenge to the constitutionality of a statute for which exhaustion would not apply.  See Appellants' Final Opening Brief at 6, 8, 14 (July 22, 2008) in Hettinga v. United States, No. 07-5403 (D.C. Cir.).  The D.C. Circuit agreed with plaintiffs and remanded the case "for further proceedings on the Hettingas' complaint."  Hettinga v. United States, 560 F.3d 498, 506 (D.C. Cir. 2009).

Consistent with the D.C. Circuit's remand order and the Court's minute entry of November 13, 2009, defendant hereby renews its motion to dismiss plaintiffs' complaint for the remaining reasons set forth in defendant's original motion to dismiss.  See Def.'s Mot. to Dismiss at 18-20, 24-43 (Docket # 4); Def's Reply Mem. at 6-21 (Docket #22).

## ARGUMENT

## I.   Plaintiff Sarah Farms' Action Must Be Dismissed Pursuant to Rule 12(b)(1) for Lack of Subject Matter Jurisdiction.

### A.   Standard of Review for Rule 12(b)(1) Dismissal

Federal Rule of Civil Procedure 12(b)(1) allows for a preliminary challenge to a court's subject matter jurisdiction over an action.  Because federal courts are courts of limited jurisdiction, it is presumed that a plaintiff's action lies outside of that jurisdiction.  See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  For that reason, a plaintiff bears the burden of establishing jurisdiction, which includes proving

the elements of Article III standing (an injury-in-fact, traceability, and redressability).

See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  A court's standing

inquiry is "especially rigorous when reaching the merits of the dispute would force [the

court] to decide whether an action taken by one of the other two branches of the Federal

Government was unconstitutional."  Raines v. Byrd, 521 U.S. 811, 819-20 (1997).  Where

a plaintiff does not establish standing for a claim, a court must dismiss that claim for lack

of subject matter jurisdiction.  See Valley Forge Christian Coll. v. Americans United for

Separation of Church and State, Inc., 454 U.S. 464, 475-76 (1982) ("Those who do not

possess Article III standing may not litigate as suitors in the courts of the United States.").

**B.     Sarah Farms Lacks Standing to Challenge Subsection (N).**

Plaintiff Sarah Farms does not have Article III standing to challenge the

constitutionality of subsection (N).  This is so because the USDA regulations, *which*

*Sarah Farms does not challenge in this litigation*, independently impose a three-million

pound monthly output cap on the producer-handler exception, see 71 Fed. Reg. at 9433,

Part 3 (codified at 7 C.F.R. § 1131.10) (excluding handlers with a monthly distribution of

over three-million pounds from the definition of "producer-handler").  Due to that

independent basis in regulation for the cap on the producer-handler exception, Sarah

Farms' challenges to the constitutionality of subsection (N) fail the fairly traceable and

redressability elements of standing.

To prove the traceability requirement, plaintiffs must demonstrate a "fairly

traceable" causal connection between the alleged injury and the challenged action, and the

9

injury must not result from another independent action not before the court.  See Lujan, 504 U.S. at 560.  Yet here, Sarah Farms' alleged injury (the three-million pound monthly cap on the producer-handler exception) would also result from the preexisting USDA regulations.  See 71 Fed. Reg. at 9433, Part 3 (codified at 7 C.F.R. § 1131.10).  For that reason, Sarah Farms cannot fairly trace its injuries back to only subsection (N), and consequently, it lacks standing.

Nor is Sarah Farms' injury redressable.  Redressability requires that a plaintiff demonstrate that the requested relief would likely redress the alleged injury.  See Lujan, 504 U.S. at 560-61.  Here, even if subsection (N) were declared a nullity, Sarah Farms would still be subject to the three-million pound monthly cap on the producer-handler exception, again due to the USDA regulations.  See 71 Fed. Reg. at 9433, Part 3 (codified at 7 C.F.R. § 1131.10).

In sum, due to the independent force of the USDA regulations, Sarah Farms cannot satisfy the traceability and redressability elements of Article III standing.

## II.     Plaintiffs' Complaint Does Not State a Cognizable Claim for Relief.

Plaintiffs attack the MREA on several constitutional grounds.  But even taking plaintiffs' factual allegations as true, plaintiffs fail to state a claim upon which relief can be granted.

### A.     Standard of Review for a Rule 12(b)(6) Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides a mechanism for testing the legal sufficiency of the factual allegations in a plaintiff's complaint.  See Davis v.

Monroe County Bd. of Educ., 526 U.S. 629, 633 (1999).  Dismissal for failure to state a

claim is appropriate where a plaintiff's complaint does not set forth claims that are

plausible on their face.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Under

the plausibility standard, the plaintiff must present "more than a sheer possibility that a

defendant has acted unlawfully."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  And

the complaint will fail if it does not contain "more than labels and conclusions."  Twombly,

550 U.S. at 555.  Similarly, "a formulaic recitation of the elements of a cause of action will not

do."  Id.; see also Kowal v. MCI Commc'ns Corp., Inc., 16 F.3d 1271, 1275 (D.C. Cir.

1994) (explaining that Rule 12(b)(6) pleading standard applies only to factual allegations

and does not apply to "legal conclusions cast in the form of factual allegations").

**B.      Section 2(a) of the MREA Is Not a Bill of Attainder.**

Section 2(a) of the MREA, which contains subsections (M) and (N), is not a bill of

attainder.  The Supreme Court has described the "key features" of a bill of attainder as

being "a law that legislatively determines guilt and inflicts punishment upon an

identifiable individual without the provision of the protections of a judicial trial."  Nixon

v. Adm'r of Gen. Servs., 433 U.S. 425, 468 (1977); see also Houston v. Williams,

547 F.3d 1357, 1364 (11th Cir. 2008); SeaRiver Mar. Fin. Holdings, Inc. v. Mineta,

309 F.3d 662, 668-69 (9th Cir. 2002).  Section 2(a) does not satisfy any of those elements.

It does not target a sufficiently specific person or group, let alone plaintiffs.  It does not

inflict a punishment.  Nor does it legislatively determine plaintiffs' guilt.  Nor does it

deny plaintiffs the provisions of a judicial trial.  Rather, section 2(a) is a legitimate form

11

of economic regulation in furtherance of orderly and stable milk markets by treating

plaintiffs the same as other handlers.

1.     **Section 2(a) Does Not Satisfy the Specificity Element of a
       Bill-of-Attainder Violation.**

Subsections (M) and (N) of the MREA do not satisfy the specificity element of the

bill of attainder analysis.  Under Supreme Court jurisprudence, the specificity element is

not satisfied when either of two conditions is met: (i) the legislation is open-ended in its

applicability; or (ii) the legislation governs conditions within a person's control, as

opposed to immutable characteristics.  See Nixon, 433 U.S. at 471-72; Communist Party

of the United States. v. Subversive Activities Control Bd., 367 U.S. 1, 86 (1961); Am.

Commc'ns Ass'n, C.I.O. v. Douds, 339 U.S. 382, 414 (1950).  Both of those conditions

exist here – subsections (M) and (N) are open-ended (other entities meeting the

conditions would be subject to their terms), and they do not regulate based on conditions

beyond plaintiffs' present control, such as past conduct (plaintiffs can change their

business practices to avoid regulation).

At the outset, it would be of no legal significance even if subsections (M) and (N)

presently applied only to plaintiffs because subsections (M) and (N) are open-ended in

their applicability.  The Supreme Court's Nixon decision makes clear this point of law.

There, the Supreme Court considered and rejected the argument that the specificity prong

could be satisfied when a statute presently applies only to one person or entity.  Nixon

433 U.S. at 471-72; see also Communist Party, 367 U.S. at 88.  In so doing, the Court

explained that although the statute at issue, the Presidential Recordings and Materials Preservation Act, applied at that time only to President Nixon's files, the statute was open-ended and would apply to the files of future presidents, and for that reason, it was not a bill of attainder.  Nixon 433 U.S. at 472; see also United States v. Brown, 381 U.S. 437, 461 (1965) (explaining that rules of general applicability do not constitute bills of attainder).  The same is true of subsections (M) and (N); they can apply to an unlimited number of additional handlers who would sell from federally regulated areas into state-regulated areas or who would have monthly route dispositions of over three-million pounds of milk.  Due to that open-ended nature, the MREA, like the statute at issue in Nixon, is not a bill of attainder.  See Kerr-McGee Chem. Corp. v. Edgar, 837 F. Supp. 927, 936 (N.D. Ill. 1993) (explaining that legislation that "could potentially operate on other entities" was not a bill of attainder "even if as it now stands the Act operates only upon [plaintiff]"); see also Cathy's Tap, Inc. v. Vill. of Mapleton, 65 F. Supp. 2d 874, 881-82 (C.D. Ill. 1999).

Next, subsections (M) and (N) are not bills of attainder because they do not impose penalties by name or based on an irreversible characteristic (such as past conduct).  See Communist Party, 367 U.S. at 86 (explaining that the Subversive Activities Control Act is not a bill of attainder because "it attaches not to specified organizations but to described activities in which an organization may or may not engage").  More practically still, Sarah Farms could avoid the volume limit imposed by subsection (N) entirely by lowering its monthly fluid milk output.  See Am. Commc'ns Ass'n, 339 U.S. at 414 (1950) (holding

13

that the law at issue was not a bill of attainder because the persons subject to it could by "voluntary alteration" avoid its effect); WMX Techs., Inc. v. Gasconade County, Mo., 105 F.3d 1195, 1202 (8th Cir. 1997); Recreational Devs. of Phoenix, Inc. v. City of Phoenix, 83 F. Supp. 2d 1072, 1098 (D. Ariz. 1999) (holding that local ordinance prohibiting certain adult businesses was not a bill of attainder since the ordinance "does not mention Plaintiffs by name, nor does it limit its application to Plaintiffs or deny them the opportunity to conform their conduct to the new ordinance").

In sum, subsections (M) and (N) do not meet the specificity element for a bill of attainder because they are of general applicability and do not apply to a closed set of persons, either by name or based on an immutable characteristic.  Rather, section 2(a) is a permissible regulation of prospective economic conduct.

### 2. Section 2(a) of the MREA Does Not Inflict a Legislative Punishment.

In evaluating whether legislation constitutes a punishment for bill-of-attainder purposes, courts have considered three factors: whether the legislation fits into the historical definition of a punishment (the historical test); whether the legislation acts like a punishment (the functional test); and whether the legislation was motivated by punitive interests (the motivational test).  See Selective Serv. Sys. v. Minn. Pub. Interest Research Group, 468 U.S. 841, 852 (1984); Foretich v. United States, 351 F.3d 1198, 1218 (D.C. Cir. 2003).  Section 2(a) does not satisfy any of those tests, and therefore it is not a legislative punishment.  Instead, it is regulatory legislation of an economic market.

### a.   Historical Analysis of Punishment

The MREA does not constitute a bill of attainder under the historical analysis of punishment for three reasons: (i) the MREA is a classic economic regulation since it governs actions, not persons; (ii) plaintiffs have the ability to avoid the effects of the MREA by altering their business operations; and (iii) the MREA does not condemn plaintiffs or subject them to a public reprimand.

First, the MREA is economic legislation, not punishment.  As the Supreme Court explained, "Forbidden legislative punishment is not involved merely because the Act imposes burdensome consequences." Nixon, 433 U.S. at 472.  The historical sense of punishment has also been distinguished from that of regulation by the following hypothetical:

> For example, it would be patently absurd, we think, for an inorganic chemical manufacturing company to argue that because it must comply with environmental laws specific to that industry, Congress has "punished" it in violation of the bill of attainder clause.  Leaving aside the nonpunitive purpose of such laws, it is clear that the environmental laws perpetually leave open the possibility that the company may still manufacture lawful products by simply employing the appropriate pollution control techniques or devices.

BellSouth Corp. v. Fed. Commc'ns Comm'n, 162 F.3d 678, 685 (D.C. Cir. 1998).  As this example underscores, congressional regulation of an industry – even through strict compliance laws – is not within the historical meaning of a bill of attainder. Consequently, because section 2(a) works to regulate the milk industry in the Arizona region, as well as milk sales into non-federally regulated regions, it is a regulation and not

a punishment.

Second, where there is a possibility that a statute will not impose adverse consequences on an entity, then that statute does not satisfy the punishment element.  See Selective Serv. Sys., 468 U.S. at 853 (holding that a statute that leaves open "perpetually the possibility" that its effect can be avoided does not fall within the historical definition of punishment).  As the Supreme Court explained in upholding legislation that terminated social security benefits for deported aliens against a bill-of-attainder challenge:

> Where the source of legislative concern can be thought to be the ***activity or status*** from which the individual is barred, the disqualification is not punishment even though it may bear harshly upon one affected.  The contrary is the case where the statute in question is evidently aimed at the person or class of persons disqualified.

Fleming v. Nestor, 363 U.S. 603, 614 (1960) (emphasis added).  Consistent with the Supreme Court's conclusion that legislation which focuses on conduct or status and not on persons specifically is not punishment, section 2(a) focuses on actions and not on persons *qua* persons.  For instance, as explained above, the impact of subsection (N) can be avoided by any handler simply by not selling over three-million pounds of fluid milk a month.  In short, section 2(a) regulates conduct, and it does not satisfy the historical definition of punishment.

Finally, where legislation does not censure or condemn a person, that legislation is not within the historical definition of punishment for bill-of-attainder purposes.  See United States v. Brown, 381 U.S. 437, 453-54 (1965); Foretich, 351 F.3d at 1220 ("While the prohibition against bills of attainder has evolved far beyond the original context of

capital sentences, it continues to focus on legislative enactments that 'set a note of infamy' on the persons to whom the statute applies." (quoting <u>Brown</u>, 381 U.S. at 453-54.)).  Section 2(a) does not contain any legislative censure or public reprimand, and so again, it falls outside of the historical meaning of legislative punishment.

### b.    Functional Analysis of Punishment

Subsections (M) and (N) of the MREA do not function as a punishment, but rather as economic pooling regulations, common in the milk industry since the 1930s.  The MREA works to ensure orderly marketing conditions and to promote regulatory equity.  Because Congress may legitimately act to further those purposes, the MREA constitutes valid economic regulation and not a punishment.  <u>See</u> <u>SeaRiver</u>, 309 F.3d at 674 ("[E]ven if the Act singles out an individual on the basis of irreversible past conduct, if it furthers a non-punitive legislative purpose, it is not a bill of attainder."); <u>see also</u> <u>N. Am. Co. v. Sec. & Exch. Comm'n</u>, 327 U.S. 686, 706 (1946) ("Once it is established that the evil concerns or affects commerce in more states than one, Congress may act."); <u>SBC Commc'ns, Inc. v. Fed. Commc'ns Comm'n</u>, 154 F.3d 226, 243 (5th Cir. 1998) (concluding that ensuring fair competition is a non-punitive purpose).

By narrowing the exceptions to the pooling and pricing obligations, the MREA eliminates a means by which some handlers could obtain a competitive advantage at the expense of regulated handlers (who still have to make pool payments) and other producers (who receive a lower guaranteed blend price).  Subsection (M) ensures that handlers who sell milk from federally regulated regions into state-regulated regions are

responsible for the federal pool payments.  See 70 Fed. Reg. 74166, 74187.  Similarly,

subsection (N) addresses disruptive marketing conditions in Order 131, wherein the

exploitation of the producer-handler exception reduced the blend price to dairy farmers in

Arizona, causing them a significant loss of revenue.  See Fed. Reg. 74166, 74186.  In

sum, by eliminating or capping the loopholes, the MREA furthers the legitimate, non-

punitive objectives of promoting market stability and furthering regulatory equity.

### c.   Motivational Analysis of Punishment

As the Supreme Court has observed, the search for punitive legislative motives is

often wrought with peril:

> We observe initially that ***only the clearest proof*** could suffice to establish
> the unconstitutionality of a statute on such a ground [i.e., punitive design].
> Judicial inquiries into Congressional motives are at best a hazardous matter,
> and when that inquiry seeks to go beyond objective manifestations it
> becomes a dubious affair indeed.  Moreover, the presumption of
> constitutionality with which this enactment, like any other, comes to us
> forbids us lightly to choose that reading of the statute's setting which will
> invalidate it over that which will save it.

Fleming, 363 U.S. at 617 (emphasis added); see also Selective Serv. Sys., 468 U.S. at 856

n.15 (requiring "unmistakable evidence of punitive intent" by Congress before a statute

may be invalidated on attainder grounds (quoting Fleming, 363 U.S. at 619)).

Here however, the text of the MREA does not express any intention of punishing

plaintiffs.  See Pub. L. No. 109-215, 120 Stat 328, 328  (Apr. 11, 2006) (expressing the

purpose of ensuring regulatory equity).  Moreover, there were no committee reports or

floor speeches in the Senate.  The only other source of legislative history – floor debates

in the House of Representatives – could, by itself, hardly suffice to establish such

"clearest proof."  See Navegar, Inc. v. United States, 192 F.3d 1050, 1067 (D.C. Cir.

1999) (concluding that although appellants "are repeatedly named in the floor debates . . .

[t]hese allegations fall well short of the type of evidence required to show a legislative

intent to punish").

Nor do the floor statements in the House evidence any legislative intent to punish.

Rather the floor statements indicate that the MREA was enacted to promote orderly milk

markets and to ensure regulatory equity by closing loopholes.  See 152 Cong. Rec.

H1149, H1152 (daily ed. Mar. 28, 2006) (statement of Rep. Goodlatte) (explaining that

"[t]his is not about punishing individuals.  It is about ensuring a level playing field for

competition."); id. at 1154 (statement of Rep. Nunes) ("This has national implications to

let producer-handlers game the system.  This is about gaming the system."); see also

152 Cong. Rec. H1149, H1150-51 (daily ed. Mar. 28, 2006) (statement of Rep.

Goodlatte); id. at H1152 (statement of Rep. Cardoza); id. at H1152 (statement of Rep.

Schmidt); id. at H1153 (statement of Rep. Gutknect); id. at H1152-53 (statement of Rep.

Costa).  None of these floor statements contain any evidence – let alone the "clearest

proof" – of a legislative intent to punish.  To the contrary, they evidence a concern for

regulatory equity and a desire to close loopholes that disrupt orderly milk markets, which

again confirms that section 2(a) is not a bill of attainder.  See Houston, 547 F.3d at 1364

(denying a bill of attainder challenge where the policy furthered a non-punitive goal and

where "no intent to punish [could] be established from the record").

### 3.    Section 2(a) of the MREA Does Not Usurp the Judicial Function.

As its third element, the bill of attainder prohibition prevents legislatures from usurping judicial functions in two ways:  by making a legislative determination of guilt or by denying judicial recourse.  See Nixon, 433 U.S. at 468; Brown, 381 U.S. at 454 n. 29; Lovett, 328 U.S. at 322-23 (Frankfurter, J., concurring); Cummings v. Missouri, 71 U.S. 277, 323 (1866); see generally SeaRiver, 309 F.3d at 668 ("The Bill of Attainder Clause implements the doctrine of separation of powers"); Siegel v. Lyng, 851 F.2d 412, 416 (D.C. Cir. 1988) (explaining the separation of powers rationale for bill of attainder prohibition).  Neither of those is present here.

First, the MREA makes no legislative determination of guilt because it does not determine that plaintiffs possess certain characteristics at issue.  The MREA does not identify GH Processing as selling milk from a federally regulated region into a state-regulated area.  Nor does it find that Sarah Farms had monthly distributions of more than three-million pounds of fluid milk.  Similarly, the MREA does not indicate that plaintiffs are guilty or liable for some past offense.  Nor is there any link between the present regulation and plaintiffs' past practices.  Thus, the MREA does not legislatively determine guilt.

Second, section 2(a) is not a bill of attainder because it does not deny plaintiffs the ability to seek judicial recourse.  See Cummings, 71 U.S. at 323 ("A bill of attainder is a legislative act which inflicts punishment without a judicial trial.").  Nothing in section 2(a) prevents plaintiffs from having recourse to the judiciary.

**C.     The MREA Does Not Violate Equal Protection or Due Process.**

Plaintiffs' remaining equal protection and due challenges to subsections (M) and (N) are evaluated under rational basis review, which they easily pass.  See generally FCC v. Beach Comm'ns, Inc., 508 U.S. 307, 313 (1993) ("In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."); Lamers Dairy Inc. v. USDA, 379 F.3d 466, 476 (7th Cir. 2004) ("In cases involving economic and social regulation, so long and distinctions are conceivably rational, the recourse of a disadvantaged entity lies in the democratic process.").  Under rationality review, the statute at issue will be "accorded a strong presumption of validity," Heller v. Doe, 509 U.S. 312, 319 (1993), and it will be upheld if "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose."  Id. at 320.

Subsections (M) and (N) seek to further the governmental interests of maintaining orderly milk marketing and of promoting regulatory equity.  See Pub. L. No. 109-215, 120 Stat 328, 328  (Apr. 11, 2006).  Courts have consistently recognized the legitimacy of these interests.  See, e.g., Nebbia v. New York, 291 U.S. 502, 521, 537-38 (1934) (denying equal protection and due process challenges to milk pricing regulations which were legitimate exercises of governmental power); Shamrock Farms Co. v. Veneman, 146 F.3d 1177, 1183 (9th Cir. 1998) (holding that the government has a legitimate

interest in maintaining "a stable and plentiful supply of wholesome milk"); Country
Classic Dairies, Inc. v. Montana, 847 F.2d 593, 596 (9th Cir. 1988) (holding that the
health and stabilization of the milk market are legitimate governmental interests).  Put
simply, both subsections serve the legitimate government interests in maintaining orderly
milk marketing conditions and promoting regulatory equity because unregulated milk
distribution disrupts stable and orderly milk marketing.

Next, subsections (M) and (N) are rational means of achieving these legitimate
governmental interests.

Subsection (M) promotes orderly markets and regulatory equity by applying the
pooling and pricing obligations to handlers who export fluid milk into non-federally
regulated regions.  Without the pooling and pricing obligations those handlers could
avoid making pool payments under either a federal or a state regulatory system, and thus
they would have a competitive advantage over their regulated rivals in two regions – their
own federal marketing order and the state-regulated region into which they sell milk.  See
70 Fed. Reg. at 74187.  By preventing such exportation of milk without the corresponding
pool payment obligation, subsection (M) promotes regulatory equity and orderly markets.

Subsection (N) also works to achieve orderly milk markets and regulatory equity.
By requiring handlers in Order 131 with monthly milk distributions of over three-million
pounds to make pool payments, subsection (N) eliminates the producer-handler exception
for large handlers.  As explained above, when large handlers are exempted from the
pooling requirements of Order 131, they have a significant competitive advantage over

other handlers, and their non-regulated sales dramatically reduce the blend price for dairy farmers in Arizona.  See 70 Fed. Reg. at 74186.  To prevent such destabilizing effects on the milk market, subsection (N) no longer permits these large handlers to be exempt from pool payments.  For that reason, subsection (N) is a rational means of promoting an orderly and stable milk market in Order 131.

In sum, regardless of plaintiffs' precise complaints about subsections (M) and (N), e.g., whether those subsections allegedly impose a statutory punishment or whether they allegedly bar plaintiffs from challenging USDA regulations, those subsections are fully constitutional because they are rational means of achieving the legitimate government interests.[1]  Put another way, plaintiffs cannot meet their burden of establishing that subsections (M) and (N) are irrational in every reasonably conceivable instance.  See Hotel & Motel Ass'n of Oakland v. City of Oakland, 344 F.3d 959, 971 (9th Cir. 2003) ("To bring a successful facial challenge outside the context of the First Amendment, 'the challenger must establish that no set of circumstances exists under which the [statute] would be valid.'" (quoting United States v. Salerno, 481 U.S. 739, 745 (1987) (alteration in original))).  Thus, subsections (M) and (N) survive rational basis review, and plaintiffs do not state a claim under the Due Process Clause or the Equal Protection Clause.

---

[1] Plaintiffs' claims fail for other reasons as well.  Nothing in subsections (M) or (N) precludes plaintiffs from challenging USDA regulations; plaintiffs have simply chosen not to do so here.  Nor do subsections (M) and (N) legally bar plaintiffs' litigation in the Northern District of Texas.  Plaintiffs had already lost a preliminary injunction motion before the MREA was enacted.  See Hettinga v. Johanns, No. 06-cv-00052, slip. op., (N.D. Tex. Mar. 30, 2006) (copy at Ex. 1).  Moreover, it was plaintiffs – not the Court or the MREA – that voluntarily dismissed that litigation.  Id. (stipulation of dismissal) (May 22, 2006) (copy at Ex. 2).

## CONCLUSION

For the foregoing reasons, the Court should dismiss this action.

Dated: November 25, 2009                Respectfully submitted,

                                       TONY WEST
Assistant Attorney General

JOHN R. GRIFFITHS
Assistant Branch Director

    /s/ *Peter J. Phipps*
PETER J. PHIPPS
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 616-8482
Fax: (202) 616-8470
peter.phipps@usdoj.gov

Mailing Address:
Post Office Box 883
Washington, D.C.  20044

Courier Address:
20 Massachusetts Ave., N.W.
Washington, D.C.  20001

Attorneys for Defendant