IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HEIN HETTINGA, ELLEN HETTINGA,
d/b/a SARAH FARMS, et al.,

          Plaintiffs,

   v.

UNITED STATES OF AMERICA,

          Defendant.

Civil Case No.: 06-1637 (RJL)

**MEMORANDUM OF AMICI CURIAE
IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS (RENEWED)**

Charles M. English, Jr.
D.C. Bar No.: 386572
Michael A. Hass
D.C. Bar. No.: 985620
Ober, Kaler, Grimes & Shriver
1401 H Street, NW; Suite 500
Washington, DC, 20005
Telephone:  202-408-8400
Facsimile:  202-408-0640

*Attorneys for Amici Curiae*
*United Dairymen of Arizona, et al.*

# TABLE OF CONTENTS

**Page**

BACKGROUND ................................................................................................................. 1

STANDARD OF REVIEW ................................................................................................ 4

DISCUSSION .................................................................................................................... 4

    **A.** Plaintiffs allege no facts supporting their claim that the MREA violates the equal
        protection element of the Fifth Amendment. ................................................................. 4

        1.  The MREA acts as an economic regulation........................................................... 4

        2.  Congress provided a rational basis for the MREA. ................................................ 5

        3.  Plausible reasons for the legislation abound in the Secretary of Agriculture's
            pronouncements in promulgating a Final Rule (the "Rule") that, in part, mirrors
            the MREA. ............................................................................................................ 6

        4.  Past regulations of the milk industry have met the rational basis test. ................... 7

        5.  Plaintiff fails to allege sufficient facts to withstand a motion to dismiss its equal
            protection claim. ................................................................................................... 8

        6.  Other entities are affected by the MREA.............................................................. 10

    **B.** The MREA is not a Bill of Attainder ........................................................................ 12

        1.  The MREA applies and can apply to multiple parties and does not satisfy the
            specificity element of a bill of attainder. .............................................................. 12

        2.  The MREA furthers the nonpunitive goals of the AMAA and is not punishment
            under the Bill of Attainder Clause of the U.S. Constitution. ................................. 14

    **C.** The MREA's passage in no way violated Due Process............................................. 17

CONCLUSION.................................................................................................................. 19

CERTIFICATE OF SERVICE ......................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Am. Commc'ns. Ass'n, CIO v. Douds*, 339 U.S. 382, 414 (1950) ................................ 13

*Bd. of Governors of Fed. Reserve Sys. v. Agnew*, 329 U.S. 441 (1947) ....................... 14

*Bellsouth Corp. v. FCC*, 162 F.3d 678, 686 (D.C. Cir. 1998) ..................................... 14

*\*Benson v. Schofield*, 236 F.2d 719, 720-21 (D.C. Cir. 1956) ..................................... 2

*City of N.Y.  v. Beretta U.S.A. Corp.*, 401 F. Supp.2d 244, 290 (E.D.N.Y. 2005)........................ 18

*\*City of New Orleans v. Dukes*, 427 U.S. 297 (1976) ............................................. 4, 5

*Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 462 F.3d 249, 253-55 (3d Cir. 2006) ................................................................................................ 2

*Communist Party of the U.S. v. Subversive Activities Control Bd.,* 367 U.S. 1, 88 (1961)...... 1, 16

*Conley v. Gibson*, 355 U.S. 41, 46-47 (1957)................................................... 4

*Dandridge v. Williams*, 397 U.S. 471, 485 (1970) ............................................ 9

*De Veau v. Braisted*, 363 U.S. 144, 160 (1960)............................................... 14

*Dent v. W. Va.*,  129 U.S. 114 (1889) ........................................................ 15

*\*FCC v. Beach Commc'ns Inc.*, 508 U.S. 307 (1993) ......................................... 5, 8, 9

*FCC v. National Citizens Comm. for Broad.*, 436 U.S. 775 (1978) ............................ 14

*Flemming v. Nestor*, 363 U.S. 603, 613-614 (1960)........................................... 14

*Foretich v. U.S.*, 351 F.3d 1198, 1218 (D.C. Cir. 2003)....................................... 15

*Hawker v. N.Y.*, 170 U.S. 189 (1898) ........................................................ 14

*Heller v. Doe*, 509 U.S. 312, 324 (1993) ..................................................... 9

*Interstate Natural Gas Co. v. So. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953)................... 10

*Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004) ....................................... 4

*Lamers Dairy Inc. v. U.S. Dep't of Agric.*, 379 F.3d 466 (7th Cir. 2004) ...................... 7

*Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993) ............ 10, 11

*Mitchell v. Yates*, 402 F.Supp.2d 222, 232 (D.D.C. 2005) ..................................................... 5

*\*Pa. v. Wheeling & Belmont Bridge Co.*, 59 U.S. 421 (1855) .................................................... 18

*Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429 (1992) ..................................................... 18

*SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662 (9th Cir. 2002).......................... 15, 16

*Selective Serv. Sys. v. Minn. Pub. Interest Research Group*, 468 U.S. 841, 853 (1984).............. 13

*\*Shamrock Foods Co. v. Veneman*, 146 F.3d 1177 (9th Cir. 1998) ............................................... 8

*U.S. Nat'l Bank of Or., Petitioner 92-484 v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993)........................................................................................................................... 13

*U.S. v. Rock Royal Co-op, Inc.*, 307 U.S. 533 (1939)................................................................ 12

*United States v. Brown*, 381 U.S. 437, 446 (1965)................................................................. 17

*Waters v. Rumsfeld*, 320 F.3d 265, 268-69 (D.C. Cir. 2003)......................................................... 5

*Williamson v. Lee Optical*, 348 U.S. 483, 487-88 (1955)............................................................. 9

**Statutes**

152 Cong. Rec. 1150.............................................................................................................. 6

33 U.S.C. § 2737 ................................................................................................................. 15

7 C.F.R. § 1131.7(a).............................................................................................................. 13

7 U.S.C. § 608c ................................................................................................................. 2, 4

7 U.S.C. § 7253 .................................................................................................................... 2

7 U.S.C. §§ 601, *et seq*......................................................................................................... 1

71 Fed. Reg. 25495 (May 1, 2006) ........................................................................................ 11

71 Fed. Reg. 9430 .................................................................................................................. 3

Agriculture, Rural Development, Food and Drug Administration and Related Agencies Appropriations Act of 2000, Pub. L. No. 106-78, Title VII, § 760, 113 Stat. 1135 (1999) ....... 2

District of Columbia Appropriations Act of 2000, Pub. L. No. 106-113, Title I, Subtitle D, Ch. 1, § 143, 113 Stat. 1501 (1999)................................................................................................. 3

Federal Agriculture Improvement and Reform Act of 1996, Pub. L. No. 104-127, 110 Stat. 888 (1996)............................................................................................................................. 2

Food Security Act of 1985, Pub. L. No. 99-198, § 131-133, 99 Stat. 1354 (1985)...................... 2

Food, Conservation, and Energy Act of 2008, Pub. L. 110-246, Title I, § 1504, 122 Stat. 1561, 1721 (2008) (codified as amended in 7 U.S.C. § 608c(17)) ...................................................... 3

Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas; Final Decision on Proposed Amendments to Marketing Agreement and to Orders, 70 Fed. Reg. 74166........... 4, 7

Milk Regulatory Equity Act of 2005, Pub. L. No. 109-215, 120 Stat. 328 .................... 1, 5, 11, 17

## Other Authorities

Black's Law Dictionary 176 (8th ed. 1969)................................................................................. 11

Federal Milk Market Administrator's Office, Pacific Northwest and Arizona Federal Milk Orders, List of Plants and Handlers: (2006) Monthly, 5-6 ........................................................ 9

Amici Curiae United Dairymen of Arizona, Shamrock Foods, Shamrock Farms, Parker

Farms and Dairy Institute of California, by and through counsel submit the following in support

of Defendant's Motion to Dismiss (Renewed).  Amici Curiae are either producers or handlers in

the Arizona marketing order or a trade association of handlers in California who compete against

GH Dairy.  Amici support all of Defendant's arguments and offer additional arguments.

The complaint suffers from flawed assumptions.  The Milk Regulatory Equity Act of

2005, Pub. L. No. 109-215, 120 Stat. 328, ("MREA"), especially when read in its entirety, has

general application and affects business entities other than Sarah Farms and GH Dairy.  The

claim fails to account for how rule-making, whether by Congress or its delegates, can ever be

lawfully enacted.  Plaintiffs paint a scenario in their complaint where no economic regulation

could ever be lawful.  For instance, if the Internal Revenue Service identified a class of persons

that were not paying any taxes and Congress chose to modify the Internal Revenue Code so as to

capture the future taxes on the economics of those persons, the complaint would make such

standard lawmaking unlawful.  This position is contradicted by long-standing principles laid out

by the U.S. Supreme Court permitting, in order to protect the public welfare, legislation of

conduct "whether that conduct is found to be engaged in by many persons *or one by one.*"

*Communist Party of the U.S. v. Subversive Activities Control Bd.,* 367 U.S. 1, 88 (1961).

## BACKGROUND

The Milk Regulatory Equity Act amends The Agricultural Marketing Agreement Act of

1937 ("AMAA").  7 U.S.C. §§ 601, *et seq.*  Through the AMAA, Congress responded to

disruptions in agricultural commodity marketing during the Great Depression.  Among other

things, this disruption harmed farmers by causing a severe drop in milk prices, primarily through

competition for the more lucrative fluid milk market.  In passing the AMAA, Congress, through

the United States Department of Agriculture ("USDA" or "the Secretary"), initiated the federal

program for the regulation of minimum milk prices that milk processors, known as handlers, must pay to dairy farmers, known as producers, and it delegated to the Secretary of Agriculture the authority to set minimum milk prices nationwide.  7 U.S.C. § 608c.  *See generally Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 462 F.3d 249, 253-55 (3d Cir. 2006) (discussing history of and need for federal regulation of milk).

The AMAA and its related regulatory program aim to prevent over-supply, depressed prices and unstable milk marketing by honoring Congress's long-cherished, repeated conclusions that without such orders, dairy farmers would engage in destructive competition for the higher-end fluid milk market.  *Benson v. Schofield*, 236 F.2d 719, 720-21 (D.C. Cir. 1956) ("It is common knowledge that the production and marketing of milk are vital and the problems of the industry have long engaged the notice of the Congress, the state legislatures and the courts.").

Congress acts routinely and aggressively to preserve the milk order system implemented by the Secretary under the AMAA, demonstrating its continued concern and legislative findings that milk, as an agricultural commodity, still requires special government intervention in order to "assure orderly marketing."  Since 1985, Congress has amended the AMAA dealing with milk marketing or directed specific action by the Secretary as to the milk order system at least four times in addition to the MREA .  7 U.S.C. §§ 608c and 7253; see Food Security Act of 1985, Pub. L. No. 99-198, § 131-133, 99 Stat. 1354 (1985); Federal Agriculture Improvement and Reform Act of 1996, Pub. L. No. 104-127, 110 Stat. 888 (1996); Agriculture, Rural Development, Food and Drug Administration and Related Agencies Appropriations Act of 2000, Pub. L. No. 106-78, Title VII, § 760, 113 Stat. 1135 (1999); District of Columbia Appropriations Act of 2000, Pub. L. No. 106-113, Title I, Subtitle D, Ch. 1, § 143, 113 Stat. 1501 (1999); Food,

Conservation, and Energy Act of 2008, Pub. L. 110-246, Title I, § 1504, 122 Stat. 1561, 1721 (2008) (codified as amended in 7 U.S.C. § 608c(17)).

Large producer-handlers, entities like Sarah Farms, that serve both as dairy farms and processing plants, while subject to the regulatory program, have been largely exempted from the pooling and pricing system described above largely out of administrative convenience.  Recent changes by the Secretary of Agriculture in the form of an Order published in the Federal Register on February 24, 2006, 71 Fed. Reg. 9430 (the "Rule"), and Congress, through the MREA, have ended that exemption for producer-handlers in the Western United States (which has the largest dairy farmers) that exceed a certain production level.  The Rule provides that any producer-handler in the Pacific-Northwest order or Arizona-Las Vegas order that produces, processes, and markets in the marketing area, more than 3 million pounds (approximately 330,000 gallons) of milk per month shall not be exempt from the pooling and pricing requirements. The MREA substantially mirrors the Rule with respect to producer-handlers in the Arizona-Las Vegas order. The MREA also requires certain handlers to be subject to federal order prices if they sell to other plants in states where handlers must pay uniform minimum prices for raw milk (e.g. Montana and California).  This places a handler such as GH Dairy, located in the marketing area of a federal order on the same regulatory footing as the fully regulated handlers shipping into a state such as Montana or California.  Both Congress, with respect to the MREA, and the Secretary, with respect to the Rule, based their decisions on the desire to maintain a stable marketplace for the purchase and sale of milk.

Sarah Farms and GH Dairy, through their challenge to the MREA, wish to upset the long-standing policy of Congress and the regulatory program.  Sarah Farms is a large-scale commercial producer-handler, larger than many of its regulated processor competitors and its

dairy farmer counterparts.   Milk in the Pacific Northwest and Arizona-Las Vegas Marketing

Areas; Final Decision on Proposed Amendments to Marketing Agreement and to Orders, 70 Fed.

Reg. 74166, 74173 and 74182 (Dec 14, 2005).  The AMAA seeks to ensure that the benefits of

the fluid market will be shared by all dairy farmers through pooling.  Exemptions from pricing

and pooling defeat uniformity.  Uniform treatment for both the processors using the milk and the

dairy farmers producing the milk is the fundamental statutory requirement, resulting in account

adjustments so as to achieve uniform payments as to all handlers, including producers acting as

handlers.  7 U.S.C. § 608c(5)(C).  Increased contributions to the equalization pool enhances and

equalizes dairy farmers' minimum prices.  For operators of fluid milk plants, or handlers, the

requirement that all handlers, regardless of whether they are handlers or producer-handlers,

participate in the equalization pool, results in a more level playing field.

## STANDARD OF REVIEW

Courts must grant motions to dismiss when "it appears beyond doubt that the plaintiff can

prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*,

355 U.S. 41, 46-47 (1957). In evaluating a motion to dismiss, the court need not accept

inferences drawn by plaintiffs if those inferences are not supported by the facts in the complaint,

nor must the court accept as true any factual allegations that contradict matters subject to judicial

notice. *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004).

## DISCUSSION

**A.    Plaintiffs allege no facts supporting their claim that the MREA violates the
equal protection element of the Fifth Amendment.**

1.    The MREA acts as an economic regulation.

Economic regulations are entitled only to rational basis review.  *City of New Orleans v.*

*Dukes*, 427 U.S. 297 (1976) (applying rational basis to an ordinance that prohibited certain

pushcart vendors from plying their wares in New Orleans' Vieux Carre).  Rational basis grants

the legislature wide latitude in implementing the rules and regulations it believes necessary for

effective governance.  *Id.* at 303.  When addressing equal protection challenges, courts

consistently posit that "the judiciary may not sit as a superlegislature to judge the wisdom or

desirability of legislative policy determinations made in areas that neither affect fundamental

rights nor proceed along suspect lines."  *Id.*; *FCC v. Beach Commc'ns Inc.*, 508 U.S. 307, 313

(1993) (holding that equal protection embodied in either 14th Amendment or 5th Amendment "is

not a license for courts to judge the wisdom, fairness, or logic of legislative choices.")  Because

the MREA affects neither fundamental rights nor distinguishes treatment based on suspect class,

this Court must apply the rational basis test in determining whether the MREA violates equal

protection.  In fact, the preamble to the MREA itself provides that rational basis stating that it is

an act, "to ensure regulatory equity between and among all dairy farmers and handlers for sales

of packaged fluid milk in federally regulated marketing areas and into certain non-federally

regulated milk marketing areas from federally regulated areas, and for other purposes."  *Milk*

*Regulatory Equity Act of 2005,* Pub. L. No.109-215, 120 Stat. 328. PL 109-215 (April 11, 2006).

> 2.     Congress provided a rational basis for the MREA.

In determining whether a provision comports with equal protection principles, the courts

determine whether a plausible reason for Congressional action exists.  *Beach Commc'ns*., 508

U.S. at 313-14 ("Where there are 'plausible reasons' for Congress' action, 'our inquiry is at an

end.'").  Congress is not required to provide reasons for enacting statutes; in applying rational

basis, courts may discern any plausible reason for the legislation.  *Beach Commc'ns,* 508 U.S. at

315.  *See also Waters v. Rumsfeld*, 320 F.3d 265, 268-69 (D.C. Cir. 2003); *Mitchell v. Yates*, 402

F.Supp.2d 222, 232 (D.D.C. 2005).  Congress provided a plausible, valid reason for enacting the

MREA.

During the floor session prior to the MREA's passage in the House, a number of Congressmen commented on the purposes of the MREA. Representative Cardoza perhaps summed it up best with his statement that "the foundation of this legislation is that all dairy organizations should be governed by the same rules. One group should not have an unfair competitive advantage over another. The Milk Regulatory Equity Act ensures production and price of milk is fair and equitable." 152 Cong. Rec.1150, 1152 (March 28, 2006).

Representative Goodlatte also endorsed that reasoning, explaining that "the Secretary of Agriculture protects dairy producers from predatory pricing by setting a minimum price that must be paid by processors who distribute fluid milk within a Federal Milk Marketing Order Area." *Id.* at 1150. With respect to the need for the provision codified in section (M),[1] Representative Goodlatte added that "[b]ecause of this loophole, milk produced in Arizona and sold in California is not subject to any minimum pricing regulations. This creates an unfair advantage for out-of-state fluid milk processors." *Id.* Rep. Goodlatte also commented that the current practice of an Arizona plant selling to California without paying either the California or Federal minimum price "is disrupting the marketplace and undermining the goal of fairness that the regulatory system should encourage." *Id.* at 1151. Plaintiffs offer no reason why Congress's stated reasons do not provide a rational explanation for the MREA.

    3.    <u>Plausible reasons for the legislation abound in the Secretary of Agriculture's pronouncements in promulgating a Final Rule (the "Rule") that, in part, mirrors the MREA.</u>

The Secretary provided extensive explanations for the Rule's necessity. In the Rule's findings, the Secretary acknowledges explicitly that the combination of the changing retail landscape and the growth of certain producer-handlers has resulted in a situation where the large

---

[1] Section (M) requires that certain handlers (for instance GH Dairy) be subject to federal order prices if they sell to other plants in states where handlers must pay minimum prices for raw milk.

producer-handlers are not bearing the burden of their own surplus milk.  *Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas*, 70 Fed. Reg. 74166 (Dec 14, 2005).  Shifts in marketing conditions or market structure lead to disorderly marketing, evidenced by lower blend prices paid to dairy farmers shipping to regulated handlers.  *Id.* at 74,186.  The producer-handlers are significantly larger in these two orders and while they are solely responsible for their production and processing facilities, they are not assuming the entire burden of balancing their production with their fluid milk requirements.  *Id.*  The Secretary therefore found "that the burden of balancing has been essentially shifted to the market's pooled participants."  *Id.* at 74,187.  Like the Rule, the MREA aims to even out that burden among all milk processors.  Based on the AMAA's purpose, this goal is clearly rational.

        4.     <u>Past regulations of the milk industry have met the rational basis test</u>.

In *Lamers Dairy Inc. v. U.S. Dep't of Agric.*, 379 F.3d 466 (7th Cir. 2004), Lamers challenged the Secretary's order permitting cheese manufacturers to opt out from regulated Class III pricing under certain circumstances.  Lamers alleged that the order violated equal protection because it, as a Class I handler, could never opt out of the regulations.  The Court held that the Secretary's order did not offend equal protection.  In so holding, the *Lamers* court recognized that "The Secretary also is charged with establishing and maintaining orderly marketing conditions so as to ensure an orderly flow of supply and thereby prevent unreasonably fluctuating prices.  In order to achieve these legitimate marketing objectives, it is *conceivably rational* for the Secretary to treat Class I and Class III handlers differently with respect to pooling requirements."  *Lamers*, 379 F.3d at 473 (emphasis added).

5.       <u>Plaintiff fails to allege sufficient facts to withstand a motion to dismiss its equal protection claim</u>.

Because courts grant a strong presumption of validity to statutes imposing economic regulations, "those attacking the rationality of a legislative classification have the burden 'to negative every conceivable basis which might support it.'"  *Beach Commc'ns*., 508 U.S. at 314, 315.  Plaintiffs fail completely to allege any facts that would undermine the MREA's rationality and therefore cannot withstand the government's motion to dismiss.

The Ninth Circuit has addressed a challenge to the constitutionality of a California law governing milk production and sale.  *Shamrock Foods Co. v. Veneman*, 146 F.3d 1177 (9th Cir. 1998).  Shamrock alleged that California's milk-related laws violated due process and equal protection.  Applying rational basis, the court explained that "[b]ecause California's interests in enacting the milk laws and regulations are legitimate, Shamrock must allege facts in the complaint to show that those laws and regulations are arbitrary or not rationally related to the state's goals in order to withstand the state's motion to dismiss."  *Shamrock Foods*, 146 F.3d at 1183.  The Court concluded that, "[t]here is nothing in the complaint that so much as suggests that the milk laws are either arbitrary or unrelated to the state's efforts to ensure a plentiful supply of healthy milk for its citizens.  It is insufficient to assert that the milk laws establish discriminatory classifications; the complaint must allege facts to demonstrate that the classifications are arbitrary or that they are not rationally related to legitimate state interests."  *Id.*

The Ninth Circuit's reasoning affirming dismissal of the case applies equally to Plaintiffs' complaint in the instant case.  The complaint alleges that Plaintiffs have been unfairly singled out, but the rationale behind the unfairness is nothing more than the fact that Plaintiffs

perceive themselves to be the only entities affected by the legislation.[2]  As the *Shamrock Foods* court held, alleged discriminatory classifications do not suffice to overcome rational basis.  *Id.* Despite Plaintiffs' wishes, the equal protection doctrine does not require that every entity be treated completely equally.  *Dandridge v. Williams*, 397 U.S. 471, 485 (1970) (a classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality.)  "The law need not be in every respect logically consistent with its aims to be constitutional.  It is enough that there is an evil at hand for correction and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson v. Lee Optical*, 348 U.S. 483, 487-88 (1955).  Congress believed that the exclusion of some handlers from the regulated milk marketing system resulted in the "evil" of an imbalanced, unstable market and has devised a method by which to correct this "evil."  Rational basis requires only that the court determine whether there is a plausible basis for the legislation and nothing more.  *Heller v. Doe*, 509 U.S. 312, 324 (1993) ("A statutory classification fails rational-basis review only when it 'rests on grounds wholly irrelevant to the achievement of the State's objective.'").  Courts do not focus on whether all entities that "should" or "could" be included are regulated by the legislation.  *Beach Commc'ns. Inc.*, 508 U.S. at 315-16 (explaining that "Defining the class of persons subject to a regulatory requirement—much like classifying governmental beneficiaries—'inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.'").  No part of equal protection doctrine focuses on the number of entities affected by the legislation.  This Court should dismiss the third claim for failure to state a claim.

---

[2] Even if this alleged fact were relevant to the rational basis inquiry, Plaintiffs are not the only entities affected.  *See* section A.6, *infra*.

6.      Other entities are affected by the MREA.

Despite Plaintiffs' insistence that it is the only entity affected by the MREA's three million pound-per-month limit on producer-handlers, Plaintiffs were *not* the only producer-handler the MREA affected.  Aurora Dairy operated as a producer-handler on the Arizona Order at the same time Plaintiffs' entities did.  *See* Federal Milk Market Administrator's Office, Pacific Northwest and Arizona Federal Milk Orders, List of Plants and Handlers: (2006) Monthly, 5-6, *available at* http://www.fmmaseattle.com/plantlist/HandlerList_2006.pdf. [3]  Both Plaintiffs and Aurora Dairy were producer-handlers from January through the end of March 2006 after which the Final Rule took effect.  Plaintiffs became fully regulated under the Arizona Order beginning in April, and Aurora Dairy was a producer-handler for another month before becoming partially regulated once the MREA became law.  Aurora Dairy continues to operate as a producer-handler under other federal milk marketing orders without the 3 million pound restriction.  *See id.* at 3. The only reasonably inference to be drawn from this set of facts is that Aurora sells less than 3 million pounds of milk in Arizona, but more than 3 million pounds of milk total as that is the only distinction between the MREA and the rule as they affected Arizona.  Regardless, though, of the ultimate path either entity took, Plaintiffs are plainly wrong that they were the only affected producer-handler when the Final Rule or the MREA took effect.

In addition to subjecting producer-handlers with distribution of over three million pounds per month and federal order based handlers with sales into certain State Orders to the same pricing and pooling regulations as other milk handlers, the MREA changes the rules for fluid milk processors located in Clark County, Nevada.  Pursuant to the terms of the MREA, the

---

[3] This is the Market Administrator's monthly record of plants and handlers in these milk orders.  In this Circuit "matters of public record" may be examined on 12(b)(6) review.  *See Marshall Cty. Health Care Auth. v. Shalala*, 1226 (D.C. Cir. 1993), 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993) (*citing Interstate Natural Gas Co. v. So. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953) (holding that "records and reports of administrative bodies" may be examined on 12(b)(6) review)).

Secretary of Agriculture amended all milk marketing orders.  MREA § (O); 71 Fed. Reg. 25495

(May 1, 2006):  "The Milk Regulatory Equity Act of 2005 specifically amends section 608c(11)

of the AMAA by removing the following: 'The price of milk paid by a handler at a plant

operating in Clark County, Nevada shall not be subject to any order under this section.'  This

removal of the Clark County exemption results in handlers located in Clark County, Nevada,

now being subject to Federal order minimum prices for their route sales in a Federal order

marketing area."  71 Fed. Reg. 25496.[4]  Thus the MREA operates to bring into the federal

pricing and pooling system both Sarah Farms, GH Dairy and any handlers in the Clark County,

Nevada area selling packaged fluid milk into Arizona in competition with Sarah Farms, neither

of which were previously subject to the minimum pricing and pooling provisions of the Order.

The MREA, read in its entirety, has far-reaching consequences intended to:

> ensure regulatory equity between and among all dairy farmers and
> handlers for sales of packaged fluid milk in federally regulated
> milk marketing areas and into certain non-federally regulated milk
> marketing areas from federally regulated areas. . .

Preamble to *Milk Regulatory Equity Act of 2005,* Pub. L. No.109-215, 120 Stat. 328. PL 109-215

(April 11, 2006).

Prior to the MREA, both Sarah Farms and Las Vegas-based processors were exempt from

federal order pricing and pooling for any sales in Arizona.  The MREA simply reverses that

course of action as to at least those entities.[5]  Plaintiffs' claims of unequal treatment clearly lack

---

[4] Because it is in the Federal Register, the Court may take judicial notice of this fact as "public record."  *See Marshall Cty. Health Care Auth.*, 988 F.2d at 1226 n.6 ("statements in the Federal Register can be examined on 12(b)(6) review").

[5] It is relevant that to the best of Amici's knowledge, information and belief, the federal regulatory treatment of as many as 9 handlers (other than Sarah Farms and GH Dairy) was altered by the MREA.  And as discussed by the Government in its Motion to Dismiss, Sarah Farms' regulatory treatment actually remained the same under the April 1 implemented Final Rule and the May 1 implemented MREA.  It is simply untrue that Sarah Farms and GH Dairy were singled out in any way by this legislation.

support in both the MREA and the implementing regulations, and the Court should therefore

dismiss their equal protection claim.

**B.      The MREA is not a Bill of Attainder**

Economic regulation of future business conduct that may be avoided by altering the

course of business activity and that is or may be applicable to a number of non-named entities

cannot and does not constitute a bill of attainder.  The MREA is a classic example of legislation

that is not a bill of attainder for each of the foregoing reasons. A bill of attainder is a special

legislative action inflicting punishment upon a person.  Black's Law Dictionary 176 (8th ed.

1969).  There is no moral approbation or taint to subjecting fluid milk processors like, but not

limited to, Sarah Farms and GH Dairy, to the economic pricing and pooling provisions of a

federal milk marketing order in months after enactment of the MREA. Sarah Farms and GH

Dairy may avoid regulation under this provision by altering their business conduct.  The MREA,

taken as a whole, can and does alter the regulatory treatment of other fluid milk processors.

Taken to its logical conclusion, Plaintiffs' complaint would undercut, if not eliminate, the federal

milk order system entirely.  If regulating Plaintiffs and others under the MREA is an unlawful

bill of attainder, then the AMAA must inevitably also be unlawful because it also applies in

Arizona (and other orders) to a limited number of entities subject to business regulation of future

conduct.  But the United States Supreme Court, together with all of the other courts that have

reviewed this program over the 70 plus years of its existence have found precisely otherwise.

*See U.S. v. Rock Royal Co-op, Inc.*, 307 U.S. 533 (1939) (and its numerous progeny).

1.      <u>The MREA applies and can apply to multiple parties and does not satisfy
the specificity element of a bill of attainder</u>.

Plaintiffs would have this Court parse the MREA in order to assert (as opposed to prove)

that it was singled out by the MREA.  First, and most obviously, Plaintiffs are not named

anywhere in the MREA.  Second, as discussed in the equal protection argument above, Plaintiffs

cannot assert that the MREA affects only them because Section (b) clearly results in the same

rules for minimum pricing and pooling regulation applying to Las Vegas, Nevada (Clark County)

based plants that sell packaged, fluid milk into Arizona.[6]  For motion to dismiss purposes, we are

limited to that universe of known regulated entities under the Arizona order as a result of the

MREA.  But the universe of who may become or who may avoid regulation under the Arizona

order under this provision is non-specific and not immutable.  *See Selective Serv. Sys. v. Minn.

Pub. Interest Research Group*, 468 U.S. 841, 853 (1984) ("A statute that leaves open perpetually

the possibility of qualifying for aid does not fall within the historical meaning of forbidden

legislative punishment."); *Am. Commc'ns. Ass'n, CIO v. Douds*, 339 U.S. 382, 414 (1950)

(holding that "there is no one who may not . . . become eligible to sign the affidavit.  We cannot

conclude that this section is a bill of attainder.").

Plaintiffs could alter their business activity such that they no longer fit the administrative

definition of a producer-handler (e.g. purchase raw milk from other sources or simply fail to

provide the Secretary's local federal agent (known as the Market Administrator) with the

required information to maintain producer-handler status) or by out selling milk into California.

Sarah Farms could reduce its milk marketings to under 3 million pounds in a given month.

Plaintiffs could sell all of their milk in Mexico or non-federally regulated Nevada (thus not

meeting the definition of an Arizona federal order plant under 7 C.F.R. § 1131.7(a)).  In each of

these cases, neither the Final Rule nor the MREA would subject Plaintiffs; instead, Plaintiffs

would either be regulated under different provisions of the pre-2006 Arizona order (if it gave up

---

[6] In analyzing the MREA, the court must look to the statute as a whole, not simply to one part as Plaintiff suggests. *U.S. Nat'l Bank of Or., Petitioner 92-484 v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (holding that "over and over we have stressed that 'in expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'")

its producer-handler status) or simply not be regulated at all.  The MREA regulates future conduct and is thus not a bill of attainder.  *Flemming v. Nestor*, 363 U.S. 603, 613-614 (1960) (upholding termination of Social Security benefits of deported aliens as not constituting punishment for past conduct).

Amici agree with the Government's argument regarding the specificity element for these additional reasons.  The MREA establishes an open-ended set of fluid milk processors whose future regulatory status can change (more federally regulated, less federally regulated, or not federally regulated) based upon many fluid circumstances.

2. <u>The MREA furthers the nonpunitive goals of the AMAA and is not punishment under the Bill of Attainder Clause of the U.S. Constitution.</u>

Though the MREA's alleged impacts on Plaintiffs do not amount to an actual line of business restriction, as opposed to limited economic regulation, lines of business restrictions have been found routinely by the United States Supreme Court to be lawful without ever suggesting that they can constitute punishment, or constitute a potential unlawful bill of attainder.  *See, e.g.*, *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775 (1978) (upholding ban for cross ownership of broadcast licensee and newspaper in the same market); *Bd. of Governors of Fed. Reserve Sys. v. Agnew*, 329 U.S. 441 (1947) (upholding rule preventing employees of securities firms from simultaneously working for Federal Reserve System banks).  In *Bellsouth Corp. v. FCC*, 162 F.3d 678, 686 (D.C. Cir. 1998), this Circuit found that the Telecommunications Act of 1996 was not a bill of attainder, upholding for the second time the Act's constitutionality, despite repeated challenges that the Bell Operating Companies were singled out by name for business restrictions: "burdensome regulation simply cannot be equated with punishment." *Id.* at 687 (*citing De Veau v. Braisted*, 363 U.S. 144, 160 (1960) and *Hawker v. N.Y.*, 170 U.S. 189 (1898)).

Without conceding that the MREA might impose "burdensome" regulation, Amici note that Plaintiffs do not and cannot allege more than burdensome regulation as the basis for their complaint.  Congress, the Secretary, and the courts have routinely and regularly found that federal milk order regulation remains necessary both to protect dairy farmers and consumers, and in order to maintain a fresh and wholesome supply of milk for the United States.  *See generally* Background Section, *supra*.  Thus, maintaining the system through appropriate regulation of entities that might otherwise disrupt it is a "reasonable means" of ensuring the program's survival.  *Dent v. W. Va.*, 129 U.S. 114 (1889) (upholding educational and certification requirements for those practicing medicine).

*SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662 (9th Cir. 2002) stands out; the Court upheld pollution control legislation that barred vessels from the Prince William Sound, Alaska, if after March 23, 1989, the vessel had released more than one million gallons of oil in the marine environment.  The "Exxon-Valdez" case is relevant on its facts.[7]  In mid-1990, Congress passed and the President on August 18 signed the Oil Pollution Act.  Among other terms, the Oil Pollution Act contained a provision banning from the navigable waters of the Prince William Sound, Alaska, any tank vessel that had spilled more than 1,000,000 gallons of oil into the marine environment after March 22, 1989.  33 U.S.C. § 2737.  The Exxon Valdez oil spill occurred on March 23, 1989.  The *SeaRiver* court found the requisite specificity element, notwithstanding the open future nature of the regulation, because of the specific date of March 22 chosen by Congress—clearly past conduct.  *SeaRiver*, 309 F.3d at 670-673.   Nonetheless, the

---

[7]       *See also*, *Foretich v. U.S.*, 351 F.3d 1198, 1218 (D.C. Cir. 2003) (finding an unlawful bill of attainder in Congressional action singling out specific persons, making judicial judgments in legislation and otherwise casting moral and invidious approbation on specific individuals)  The notorious, 20-year long *Foretich* saga only proves that when facts are uniquely bad enough (legislation named for person benefited at expense of ex-husband, legislative "findings" contrary to court decisions on the merits, moral judgments that affected fundamental rights regarding child-rearing and visitation, and impacts on future jobs as a result of moral findings of fact due to alleged past conduct), a court may find an unlawful bill of attainder.  Nothing Plaintiffs have or could plead in this matter would even be in the same universe as the facts in *Foretich*.

court concluded that the Oil Pollution Act did *not* inflict punishment on SeaRiver because it did not meet the historical meaning of legislative punishment, it furthered non-punitive legislative purposes, it lacked clear legislative intent to punish, and Sea River could not prove that there were less burdensome alternatives.  Along the same lines, the MREA functions to revise the AMAA and thus is economic regulation, restoring equitable treatment to the Western United States.  Thus, the MREA has a non-punitive, rational purpose.

Only the clearest proof suffices to establish a statute as an unconstitutional bill of attainder. *Communist Party of U.S. v. Subversive Activities Control Bd.*, 367 U.S. 1, 83 (1961). Unlike SeaRiver, Plaintiffs have no way of showing that future regulation is based upon its past conduct.  The Exxon Valdez court found legitimate regulatory goals and, despite the legislation's appearance of regulating past conduct, Congressional focus on prospective risks to overcome any indicia of punishment—the key being that under the functional test and with the "clear evidence" rule applicable, *any* non-punitive reason for the legislation suffices to defeat a bill of attainder claim.  This is because, much like the equal protection analysis, discussed above, the court may rely on any legitimate concern that Congress may have had. *SeaRiver*, 309 F.3d at 675.  And the fact that Congress even knew (assuming that it did) that the legislation would impose additional costs on Plaintiffs (assuming that the Final Rule had not already imposed it), "does not translate into a suggestion that Congress's intent was to punish" rather than to further the equitable regulatory goals of the AMAA.  *Id.* at 674.

The facts and history of the Exxon Valdez are far more suggestive of a bill of attainder than Plaintiffs can possibly muster.  If that provision of the Oil Pollution Act does not operate as an unlawful bill of attainder, Plaintiffs far weaker claim against the MREA must perforce fail. "By banning bills of attainder, the Framers of the Constitution sought to guard against such

dangers by limiting legislatures *to the task of rule-making*." *United States v. Brown*, 381 U.S. 437, 446 (1965) (emphasis added).  In passing the MREA and in USDA's implementation of it, that is precisely what the U.S. government did—general, lawful rule-making.

> ### C.     The MREA's passage in no way violated Due Process.

Sarah Farms contends that "Section 2(a) of the MREA denied Plaintiffs due process of law by foreclosing their ability to obtain effective judicial review of the Department of Agriculture's Final Rule in the <u>Johanns</u> litigation in the United States District Court for the Northern District of Texas."  Complaint at 60.  Sarah Farms seems to base this contention on two pieces of information: first that counsel for the government notified the court of the passage of the MREA prior to oral argument on the *Johanns* matter; and second, that "in its decision denying the motion for a preliminary injunction, the District Court noted that the passage of the Act effectively mooted plaintiffs' legal challenge to the validity of the Department of Agriculture rule."  Comp. at 45-46.

The assertion regarding the court's considering the MREA's passage fails to tell the whole story.  The *Johanns* court denied the Hettinga's request for preliminary injunction on the merits finding that plaintiffs had failed to demonstrate irreparable harm because they only alleged financial harm, that plaintiffs failed to demonstrate the likelihood of success on the merits, and that they failed to establish that the potential harm to Sarah Farms outweighs the potential harm to the government and the Intervenors if the Rule was enjoined.  *See* Defendant's Ex. 1.  While the court order recognized that Congress passed the MREA, it did so in a footnote preceded by the caveat that the MREA's passage was not outcome-determinative.  *Id.*  Given that the Court's Order clearly indicates that the Court adjudicated the motion for preliminary injunction on its merits, the claim that the MREA's passage interfered with the lawsuit falls flat. The complaints' voluntary dismissal also belies their assertion today.  *See* Defendant's Ex. 2.

Over a century of jurisprudence has permitted Congress to amend laws as it desires, regardless of the impact on pending litigation.  Any claim by Plaintiffs that they were harmed by the timing of the MREA's passage must fail.  In examining the constitutionality of New York's gun laws in light of outcome-determinative federal legislation that was passed while litigation was pending, the Eastern District of New York recently reiterated that, "the fact that the Act affects a pending case is not conclusive reason for denying its effect."  *City of N.Y.  v. Beretta U.S.A. Corp.*, 401 F. Supp.2d 244, 290 (E.D.N.Y. 2005) (*citing Ex Parte McCardle*, 74 U.S. 506 (1889)).  Legislation that changes the underlying law to be applied to a pending matter has generally been accepted by the United States Supreme Court as a fair exercise of the legislature's Article II powers.  In *Pennsylvania v. Wheeling & Belmont Bridge Co*, 59 U.S. 421 (1855), the Supreme Court had held, based on existing state law, that a bridge did not comply with law and must be removed or renovated to meet state law requirements.  Congress then passed legislation validating the bridge as built.  *Id.* at 430.  When the Supreme Court was asked to enforce its initial order, it found that the intervening Act of Congress mooted its original holding and held that the action could no longer be maintained.  *Id.* at 431-32.

More recently, the Supreme Court addressed the issue of the validity of new legislation in *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429 (1992).  The *Robertson* court upheld a change to the Endangered Species Act through the Northwest Timber Compromise.  The Northwest Timber Compromise specifically referred to and impacted pending litigation.  The Supreme Court found that the Timber Compromise "compelled changes in law, not findings or results under old law", and therefore passed constitutional muster.  *Robertson*, 503 U.S. at 438.

Plaintiffs' claim that the MREA impermissibly interfered with a right to challenge the Secretary's Rule fails to sustain a cause of action both on the facts and on the law.

## CONCLUSION

For all of the foregoing reasons, Amici respectfully request that this Court grant defendant's motion to dismiss.

Respectfully submitted,

/s/ Charles M. English, Jr._____
Charles M. English, Jr.
D.C. Bar No.: 386572
Michael A. Hass
D.C. Bar. No.: 985620
Ober, Kaler, Grimes & Shriver
1401 H Street, NW; Suite 500
Washington, DC, 20005
Telephone:  202-408-8400
Facsimile:  202-408-0640

November 25, 2009                    *Attorneys for Amici Curiae*
                                     *United Dairymen of Arizona, et al.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2009, I electronically transmitted this

Memorandum In Support of Defendant's Motion to Dismiss with the Clerk's Office using the

CM/CF System for filing and transmittal of a Notice of Electronic Filing to the following

CM/CF registrants:

Alfred W. Ricciardi
Hebert Schenk P.C.
4742 North 24th Street
Suite 100
Phoenix, AZ 85016

John F. Cooney
Venable LLP
575 7th Street, NW
Washington, DC 20004

Peter J. Phipps
United States Department of Justice
Civil Division, Federal Programs Branch
P. O. Box 883
Washington, DC 20044

/s/ Michael A. Hass_____
Michael A. Hass