UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HEIN HETTINGA AND ELLEN HETTINGA d/b/a SARAH FARMS, AND GH DAIRY d/b/a GH PROCESSING,<br><br>     Plaintiffs,<br><br>  v.<br><br>UNITED STATES OF AMERICA,<br><br>     Defendant. | Civil Action No.: 06-1637 (RJL) |

**OPPOSITION TO DEFENDANT'S RENEWED MOTION TO DISMISS THE COMPLAINT PURSUANT TO RULE 12(b)(1) AND RULE 12(b)(6)**

ALFRED W. RICCIARDI
(Arizona Bar No. 009547)
Aiken Schenk Hawkins & Ricciardi P.C.
4742 N. 24th Street, Suite 100
Phoenix, Arizona  85016
(602) 248-8203

JOHN F. COONEY
(D.C. Bar No. 936336)
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4812

January 25, 2010       Counsel for Plaintiffs

# TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................1

Factual Background Leading to Passage of the Unconstitutional Act ......................................3

Congress Renders the Hettingas' Lawsuit Moot by Passing the Milk Regulatory Equity Act in Violation of the Bill of Attainder Clause. ...........................................................................4

How the MREA Targets and Punishes the Hettingas and GH Dairy ......................................5

STANDARD OF REVIEW ...........................................................................................7

ARGUMENT ..............................................................................................................10

I.    THE HETTINGAS' SARAH FARMS OPERATION HAS STANDING TO CHALLENGE SUBSECTION (N) OF THE MREA .............................................11

    A.    The Facts Alleged in the First Amended Complaint Regarding Subsection (N) Satisfy the Redressability and Traceability Requirements of Article III ........................11

II.    PLAINTIFFS HAVE PROPERLY PLED THAT SECTION 2(A) OF THE MREA IS AN UNCONSTITUTIONAL BILL OF ATTAINDER ...........................................16

    A.    The Elements of a Bill of Attainder Claim. .........................................................16

    B.    The First Amended Complaint Explicitly Alleges that the MREA Specifically Singles Plaintiffs Out for Legislative Punishment .........................................................17

    C.    The First Amended Complaint Properly Alleges that the Law Provides No Judicial Process. ...........................................................................................................20

    D.    The First Amended Complaint Properly Alleges that the Unique Burdens Imposed by the MREA Constitute Legislative Punishment. .........................................................21

    1.    The First Amended Complaint Alleges Economic Harm that Satisfies the Historical Test. ............................................................................................................22

    2.    The First Amended Complaint Properly Alleges that the MREA Constitutes Punishment Under the Functional Test. .........................................................................26

    3.    The First Amended Complaint Alleges Facts that Satisfy the Motivational Test. ..31

III.    THE FIRST AMENDED COMPLAINT PROPERLY ALLEGES THAT THE MREA DENIES PLAINTIFFS EQUAL PROTECTION OF THE LAWS. ......................33

    A.    The Standard To Be Applied....................................................................33

    B.    The First Amended Complaint Alleges that the MREA Denies Equal Protection. .34

    C.    There Is No Basis for Dismissing the Equal Protection Claim................................38

IV.    THE FIRST AMENDED COMPLAINT PLEADS A VALID DUE PROCESS CLAIM. ....................................................................................................................40

    A.    The Hettingas Have Protected Liberty and Property Interests................................40

    B.    Plaintiffs Were Deprived of Access to the Courts Without a Hearing. ...................41

CONCLUSION ......................................................................................................43

CERTIFICATE OF SERVICE..............................................................................44

# TABLE OF AUTHORITIES

## CASES

*Abigail Alliance for Better Access to Developmental Drugs v. von Estenbach*, 469 F.3d 129 (D.C. Cir. 2006) ..................................................................................................12

*ACORN v. United States*, ___F.Supp.2d___, 2009 WL 4743348 (E. D.N.Y. 2009) ........17, 23

*Bell Atlantic v. Twombly,* 550 U.S. 555 (2007) ..............................................................8

*BellSouth Corp. v. FCC*, 162 F.3d 678 (D.C. Cir. 1998) ("*BellSouth II*").....16, 17, 19, 22, 23, 24, 25, 26

*Bernheim v. Litt*, 79 F.3d 318 (2nd Cir. 1996)....................................................................9

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ...........................................33

*Conley v. Gibson*, 355 U.S. 41 (1957).................................................................................8

*Consolidated Edison Co. v. Pataki*, 292 F.3d 338 (2d Cir. 2002).............22, 23, 25, 26, 31, 32

*Cummings v. Missouri*, 71 U.S. 277 (1866) .......................................................................21, 24

*Department of Agriculture v. Moreno*, 413 U.S. 528 (1973) ................................................33

*Edaleen Dairy, LLC v. Johanns*, 467 F.3d 778 (D.C. Cir., 2006).........................................36

*Elgin v. United States*, 594 F. Supp. 2d 133 (D. Mass. 2009).......................................16, 20

*Erickson v. Pardus*, 551 U.S. 89, 93, (2007).......................................................................7

*Erickson*, 551 U.S. at 94, (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, (2007) ..7

*Ex parte Garland*, 71 U.S. (4 Wall.) 333 (1866).................................................................24

*Fleming v. Nestor*, 363 U.S. 603 (1960)..............................................................................10

*Foretich v. United States,* 351 F.3d 1198 (D.C. Cir. 2003)....11, 16, 17, 18, 19, 21, 22, 23, 24, 26, 27, 28, 29, 30, 31, 32

*Gilven v. Fire*, 259 F.3d 749 (D.C. Cir. 2001) ....................................................................8

*Haase v. Sessions*, 835 F.2d 902 (D.C. Cir. 1987)...............................................................8

*Herbert v. National Academy of Sciences*, 974 F.2d 192 (D.C. Cir. 1992) .............................8

*Hettinga v. Johanns*, Case Number 5-06CV0052-C, United States District Court for the Northern District of Texas, Lubbock Division.........................................................4, 13, 40

*Hillside Dairy, Inc. v. Lyons*, 539 U.S. 59 (2003) ...............................................................6

*Holy Land Foundation for Relief & Development v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003).....8

*Hotel and Restaurant Employees Union, Local 25 v. Smith*, 846 F.2d 1499 (D.C. Cir. 1988) ...... 8

*Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted)............40

*Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003) ......................8

*Krieger v. Fadely*, 211 F.3d 134 (D.C. Cir. 2000) ...............................................................8

*Logan v. Department of Veterans Affairs*, 357 F. Supp. 2d 149 (D.D.C. 2004) ......................7

*Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32 (1928) .................................................34

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)...........................................................12

*Marshall County Health Care Authority v. Shalala*, 988 F.2d 1221 (D.C. Cir. 1993) .......9, 10

*Menkes v. Department of Homeland Security*, 402 F. Supp.2d 204, 207 (D.D.C. 2005) .........7

*Nami v. Fauver*, 82 F.3d 63 (3rd Cir. 1996).........................................................................9

*Navegar, Inc. v. United States*, 192 F.3d 1050 (D.C. Cir. 1999) ..........................................32

*Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977).........................................................19, 26

*Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000) ......................7

*Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429 (1992) .....................................................36
*Romer* v. *Evans*, 517 U.S. 620 (1996)......................................................................................34
*Selective Serv. Sys. v. Minnesota Pub. Interest Research Group*, 468 U.S. 841 (1984).........16
*Shays v. Federal Election Commission*, 414 F.3d 76, 116 (D.C. Cir. 2005)...........................12
*Swierkiewicz v. Sonoma*, 534 U.S. 506 (2002)...........................................................................8
*United States v. Brown*, 381 U.S. 437 (1965) ...............................................................17, 19, 24
*United States v. Florida East Coast Ry.*, 410 U.S. 224 (1973) ................................................41
*United States v. James Daniel Good Real Property*, 510 U.S. 43 (1993).............................42
*United States v. Lovett*, 328 U.S. 303 (1946) ...........................................................................24
*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000)...........................................................33
*Warren v. District of Columbia*, 353 F.3d 36 (D.C. Cir. 2004) ...............................................8
*Zobel v. Williams*, 457 U.S. 55 (1982) ....................................................................................33

## STATUTES

5 U.S.C. § 704 ......................................................................................................................35, 40
7 C.F.R. § 1131.7 (2006).............................................................................................................6
7 U.S.C. § 608c(11)(D)..............................................................................................................19
7 U.S.C. § 608c(15) ...................................................................................................................40
7 U.S.C. § 608c(5)..................................................................................................................5, 35
7 U.S.C. § 608c(9)(B)................................................................................................................15
Milk Regulatory Equity Act (the "MREA", Pub. L. No. 109-215, codified at 7 U.S.C. §
   608c(5)(M)-(N)) ........................................................................................................................1

## OTHER AUTHORITIES

Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas; Order Amending the
   Orders, 71 Fed. Reg. 9430 (Feb. 24, 2006) .............................................................................3

## RULES

Fed.R.Civ.P. 12 ....................................................................................................................10, 11
Fed.R.Civ.P. 12(b)(6)..................................................................................................................8
Fed.R.Civ.P. 12(b)(1)..................................................................................................................7
Fed.R.Civ.P. 56 ..........................................................................................................................10
Rule 8(a)(2), Federal Rules of Civil Procedure..........................................................................7

## CONSTITUTIONAL PROVISIONS

Article I, § 9, cl. 3......................................................................................................................16
Article III ..............................................................................................................11, 16, 35, 41
Bill of Attainder Clause................................................................................................................2

## INTRODUCTION

Hein Hettinga and Ellen Hettinga and their family partnership GH Dairy have been singled out by Congress with laser-like precision for unconstitutional legislative punishment and denied due process and equal protection of law.

Congress's passage on March 28, 2006 of the Milk Regulatory Equity Act (the "MREA", Pub. L. No. 109-215, codified at 7 U.S.C. § 608c(5)(M)-(N)) marked the culmination of a years-long crusade by the largest companies in the dairy industry to impose Federal price controls on the Hettinga operations and thereby eliminate price competition.  The Hettinga family's dairy operations were designed to operate with the highest level of managerial and economic efficiency so that customers could purchase the highest quality dairy products at the lowest possible prices.  The Hettinga family's ability to operate their dairy businesses within the law, but outside insistence upon operating its dairy businesses independently of both federal and state forced price controls, drove the industry to obtain passage of a statute to punish this entrepreneurial family and eliminate it as a factor in the marketplace.

For more than a decade, the Hettingas have operated Sarah Farms, a "producer-handler" in Yuma, Arizona.  As a producer-handler, the Hettingas produce milk on their own farms and bottle that milk for sale to consumers, milk dealers and retailers.  Because they are totally independent businesses that do not rely on the protection of the government or the industry collective, producer-handlers have historically been exempt from federal price controls.   In February 2006, the dairy industry persuaded the U.S. Department of Agriculture ("USDA") to adopt a rule to eliminate this exemption for Sarah Farms and other similarly situated producer-handlers.  When the Hettingas challenged this rule in court, the industry used its political and financial muscle to obtain passage of the MREA statute that punished the Hettingas by imposing

1

direct statutory price controls on their family operations alone.  The MREA also eliminated the Hettingas' ability to obtain judicial review of USDA's unlawful rule.

Congress was not content to punish the Hettingas solely by imposing mandatory price controls on their Sarah Farms operation.  The MREA also imposed punitive price regulations on GH Processing, which is owned by the Hettingas' family partnership, GH Dairy.  GH Processing operates a second, independent dairy processing plant in Yuma, Arizona that sells all of the milk it processes into California.  Until the passage of the MREA, GH Processing was not subject to Federal price controls for these sales and was not covered by the USDA rule.  The MREA singled it out for direct statutory price controls on its interstate sales into California as part of its imposition of targeted punishment to the Hettinga family.

In combination, the provisions of the MREA constitute impermissible legislative punishment of the plaintiffs, in violation of the Bill of Attainder Clause, and deny the Hettingas equal protection and due process of law, in violation of the Fifth Amendment.  Plaintiffs do not seek damages, but seek only declaratory and injunctive relief from application of these unconstitutional provisions of the MREA.  The First Amended Complaint properly pleads all elements of plaintiffs' claims for relief.  The arguments raised by the government in its renewed motion to dismiss ignore the legal standards applicable to motions under Rule 12(b).  Instead, the government seeks to have this Court ignore these binding standards and to prematurely decide these issues without a complete hearing on the merits.

**Factual Background Leading to Passage of the Unconstitutional Act**

Before April 2006, all producer-handlers of milk in the United States, including the Hettingas' Sarah Farms operation, were exempt from federal price controls imposed by the federal milk marketing orders. From 1937 until 2006, USDA had never subjected producer-handlers to the price regulations applicable to handlers of milk that purchase some or all of their supply from other dairy farmers. In fact, USDA had concluded that the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. §§ 601 et seq., did not provide USDA legal authority to subject producer-handlers to price regulations.

In June 2002, some of the country's largest milk cooperatives and processors requested that USDA subject the Hettingas' Sarah Farms plant to the price regulations of the Arizona-Las Vegas Milk Marketing Order. On February 24, 2006, USDA adopted a Final Rule, effective April 1, 2006, that purported to subject producer-handlers in that area and in the Pacific Northwest Milk Marketing area to the pricing and pooling provisions of their respective Marketing Orders, if the producer-handler produced and sold more than 3,000,000 pounds per month of its own milk. Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas; Order Amending the Orders, 71 Fed. Reg. 9430 (Feb. 24, 2006). The net effect of the Rule would have been to eliminate price competition from the Hettingas in the Arizona-Las Vegas Milk Marketing area, by forcing the Hettingas to pay a substantial portion of their monthly revenues into a pool to subsidize their competitors in those markets.

On March 15, 2006, the Hettingas sued USDA to invalidate the Rule because: (1) USDA lacked statutory authority to impose price controls on producer-handlers who sell only milk that they produce from their own cows and do not purchase milk from other producers; (2) USDA had acted arbitrarily and capriciously by changing, without explanation, its prior legal

interpretation that it lacked authority to eliminate the producer-handler exemption; and (3) USDA had otherwise acted arbitrarily and capriciously in enacting the Final Rule.[1]

### Congress Renders the Hettingas' Lawsuit Moot by Passing the Milk Regulatory Equity Act in Violation of the Bill of Attainder Clause.

Oral argument on the Hettingas' motion for a preliminary injunction of the USDA Final Rule was scheduled for March 29, 2006. The scheduling of the hearing precipitated Congress to pass this targeted bill to squelch the Hettingas' legal challenge. On the evening of March 28, 2006, without benefit of any prior Committee hearing, the MREA was brought to the floor of the House on the Suspension Calendar. Its proponents moved to suspend the rules and pass the bill immediately, which required a super-majority vote of two-thirds. Following a short floor debate, the bill narrowly passed the House and was cleared for signature by the President.

During the House floor debate on the MREA, several Members stated that passage of the bill was intended to short circuit judicial consideration of the Hettingas' challenge to the legality of the USDA rule, which was scheduled to be heard the next morning. The passage of the MREA in fact had that effect. At the opening of oral argument, USDA's attorney handed the District Judge a copy of the Congressional Record in which the House had adopted the bill the previous evening. While noting that then President Bush had not yet signed the bill, USDA argued that the MREA was highly likely to become law, because President Bush had never previously vetoed a bill. The government also noted that the MREA categorically subjected Sarah Farms to the pricing and pooling obligations of the AMAA, which would moot its challenge to the USDA rule, and that the Congressional action was a conclusive reason why the Court should deny the motion for a preliminary injunction. The Court then denied injunctive

---

[1] *Hettinga   v. Johanns*, Case Number 5-06CV0052-C, United States District Court for the Northern District of Texas, Lubbock Division.

relief, noting that the passage of the MREA had effectively mooted the Hettingas' legal challenge to the validity of the USDA rule. The President signed the MREA on April 11, 2006. The Texas litigation thereafter was voluntarily dismissed without prejudice.

**How the MREA Targets and Punishes the Hettingas and GH Dairy**

The MREA added new Subsections (M) and (N) to 7 U.S.C. § 608c(5). It singled out and punished plaintiffs, not by name but through the specificity of its provisions, for their prior operation of Sarah Farms and GH Processing:

**Subsection (N).** Subsection (N) imposes a direct statutory requirement that any producer-handler who sells more than 3,000,000 pounds of milk per month in the geographic area covered by the Arizona Milk Marketing Order must be subject to the minimum pricing and revenue pooling requirements of that Order. The imposition of price controls on such producer-handlers (and Sarah Farms is the only such producer-handler) is absolute and does not depend upon the validity of the February 2006 USDA rule. Even if USDA were to revert to its prior legal position that producer-handlers were exempt from minimum price regulations, a producer-handler in the Arizona Marketing area that sold more than 3,000,000 pounds per month nonetheless would be subject to those requirements by virtue of the MREA. Subsection (N) thus makes one and only one producer-handler in the United States, the Hettingas, subject to a direct statutory command to comply with the pricing requirements of a Federal Milk Marketing Order.

Under Subsection (N), the Hettingas are required to make a prohibitive monthly payment into the Arizona milk marketing pool equal to the difference between the federal minimum price for milk bottled by handlers and the average price of all milk processed under the Arizona Marketing Order. This monthly payment amounts to hundreds of thousands of dollars per month and comes directly from the revenues of the Hettingas' Sarah Farms operation. The money is then distributed to their competitors.

**Subsection (M)**. Subsection (M) of the MREA imposes a direct statutory obligation that if a handler's plant is located in a geographic area that is covered by a Federal Milk Marketing Order, then unless certain exemptions apply, the pricing and pooling requirements of that Federal order apply to all sales made by that entity into a non-federally regulated State. The Hettingas sell milk into California through GH Processing, which is located within the boundaries of the Arizona Milk Marketing area. Thus, passage of Subsection (M) subjected the Hettingas for the first time to the pricing and pooling requirements of the Arizona Milk Marketing Order for sales GH Processing makes into California. As far as is known, GH Processing is the only handler in the United States currently subjected to federal price regulations under Subsection (M).

Subsection (M) adversely affects the plaintiffs in two ways. First, GH Processing must pay the Federal minimum price for milk it processes and sells into California, which prior to passage of the Act it was not required to do. Second, this Subsection treats GH Processing differently from other plants that sell milk in California. GH Processing must pay the Federal minimum price in Arizona, while California handlers must pay only the price determined by California law, which varies but tends to be lower than the Federal minimum price.[2]

Individually and taken together, Subsections (M) and (N) of the MREA single out the plaintiffs by specific statutory commands for punishment, by requiring them to pay hundreds of thousands of dollars per month to subsidize their competitors. (Complaint, ¶¶ 4, 47).

------

[2] Under the Federal milk marketing orders, sellers of milk generally are not regulated according to the geographic area in which their plants are located but according to the Federal Order, if any, that applies to the State in which they sell their milk. *See* 7 C.F.R. § 1131.7 (2006). Prior to the passage of the MREA, out-of-state entities that sold milk in California were not subject to regulation on such sales, unless otherwise regulated by federal milk marketing orders. *See Hillside Dairy, Inc. v. Lyons,* 539 U.S. 59 (2003). Further, under the Commerce Clause, the State of California lacked authority to regulate interstate sales of milk.

**STANDARD OF REVIEW**

A plaintiff's complaint need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to survive a motion to dismiss. Rule 8(a)(2), <u>Federal Rules of Civil Procedure</u>,. A complaint must give the defendants notice of the claims and the grounds upon which they rest, but "[s]pecific facts are not necessary." *Erickson v. Pardus*, 551 U.S. 89, 93, (2007). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson*, 551 U.S. at 94, (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, (2007)) (other citations omitted). A court may not grant a motion to dismiss for failure to state a claim "even if it strikes a savvy judge that ... recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556, (internal quotation marks and citation omitted). "So long as the pleadings suggest a 'plausible' scenario to 'sho[w]' that the pleader is entitled to relief,' a court may not dismiss." *Twombly*, 550 U.S. at 557.

Under Rule 12(b)(1), <u>Federal Rules of Civil Procedure</u>, the court "must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiffs." *Logan v. Department of Veterans Affairs*, 357 F. Supp. 2d 149, 153 (D.D.C. 2004) (citations omitted). Judicial review at this stage is limited to resolving "disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Menkes v. Department of Homeland Security*, 402 F. Supp.2d 204, 207 (D.D.C. 2005) (*quoting Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)). The plaintiff is protected against an evidentiary attack by the defendant on his asserted theory. *Hotel and Restaurant Employees Union, Local 25 v. Smith*, 846 F.2d 1499, 1502-03 (D.C. Cir. 1988); *Haase v. Sessions*, 835 F.2d 902, 908 (D.C. Cir. 1987).

While this Court "may rule on disputed jurisdictional facts at any time, if they are inextricably intertwined with the merits of the case it should usually defer its jurisdictional decision until the merits are heard." *Herbert v. National Academy of Sciences*, 974 F.2d 192, 198 (D.C. Cir. 1992). If a court looks beyond the pleadings to decide jurisdictional issues, it must consider what procedural protections, such as the opportunity to conduct discovery and submit affidavits, "could be required to assure that a full airing of the facts pertinent to a decision on the jurisdictional question may be given to all parties." *Id.*

In resolving a motion to dismiss under Rule 12(b)(6), Federal Rules of Civil Procedure, this Court must treat the complaint's factual allegations – including any mixed questions of law and fact – as true and draw all reasonable inferences in plaintiffs' favor. *See Warren v. District of Columbia*, 353 F.3d 36, 40 (D.C. Cir. 2004); *Holy Land Foundation for Relief & Development v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003). Plaintiffs need not plead all elements of their prima facie case, *see Swierkiewicz v. Sonoma*, 534 U.S. 506, 511-514 (2002), or "plead law or match facts to every element of a legal theory," *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000) (internal quotations and citation omitted). This Court may dismiss a complaint for failure to state a claim only if "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)); *Gilven v. Fire*, 259 F.3d 749, 756 (D.C. Cir. 2001). In *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), the Supreme Court noted that, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to

raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." 550 U.S. at 555 (2007) (internal quotations and citations omitted).

The sole issue on a Rule 12(b)(6 motion is whether the facts pleaded would, if established, support a valid claim for relief. The facts alleged must be accepted as true; "[r]ecovery may seem remote and unlikely on the face of the pleading, but that is not the test for dismissal." *Bernheim v. Litt*, 79 F.3d 318, 321 (2nd Cir. 1996). The question before this Court is not whether plaintiffs will ultimately prevail, but whether they should be entitled to offer evidence in support of their claims. *See Nami v. Fauver,* 82 F.3d 63, 65 (3rd Cir. 1996).

The amici urge this Court to decide this motion by reference to matters and evidence clearly outside of the four corners of the First Amended Complaint. Specifically, they refer the Court to reports of the Arizona Federal Milk Marketing Order Administrator to argue that the subsection (N) of the MREA applies to processors other than the Hettingas. (Amici Memorandum at 10, n.3.) For support, they cite to *Marshall County Health Care Authority v. Shalala*, 988 F.2d 1221 (D.C. Cir. 1993), and argue that "matters of public record may be examined on 12(b)(6) review." Their reliance, however, is patently misplaced.

In *Marshall Cty.*, plaintiffs challenged agency action as arbitrary and capricious under the Administrative Procedure Act ("APA"). The district court dismissed the case on a motion to dismiss brought under Rule 12(b)(6), and in doing so, relied in part of statements made by the agency in the *Federal Register*. The plaintiffs appealed, arguing that the district court erred in looking outside the four corners of the Complaint, which would normally be permitted only on a motion for summary judgment under Rule 56. In that procedural setting, the Court of Appeals determined that the district court, sitting as an appellate tribunal, could look beyond the face of

the complaint to resolve pure issues of law. *Marshall Cty.*, 988 F.2d at 1226. The court reasoned that in an APA case, the legal issues in a motion under Rule 12(b)(6) and a motion under Rule 56 are the same since, "the entire case on review is a question of law and only a question of law." *Id.*

The situation is markedly different here. Most obviously, the Hettingas are not challenging agency action under the APA. This case involves, as the Court of Appeals held, a direct challenge to the passage of the MREA by Congress. It alleges that the actions of Congress in passing the MREA violated the Hettingas' constitutional rights, including the constitutional prohibition against bills of attainder. As the Supreme Court stated, each bill of attainder case is **factually** independent and "turns on its own highly particularized context." *Flemming v. Nestor*, 363 U.S. 603, 616 (1960). That is, the issues presented are not merely issues of law, but factually intensive examinations different from a case on APA review.

Accordingly, the amici's suggestion that this Court can look beyond the face of the First Amended Complaint to resolve the instant motion to dismiss is not supported by the standard of review applicable to Rule 12 motions or by the Court of Appeals' reasoning in *Marshall Cty.*

## ARGUMENT

The government and its supporting *amici* have ignored the relevant question whether the First Amended Complaint alleges sufficient facts that, if taken as true, would entitle plaintiffs to relief. Instead, the government seeks to have this Court reject the factual allegations in the First Amended Complaint and supplement that Complaint with its own facts and characterizations of the plaintiffs' theories of recovery. The government's proposed approach is inconsistent with the Court's obligation to draw all reasonable inferences in favor of plaintiffs, as is required in resolving a Rule 12 motion. Further, the government has misstated the legal elements that will

govern resolution of this lawsuit, by ignoring *Foretich v. United States,* 351 F.3d 1198 (D.C. Cir. 2003) , and other Circuit precedent that define the elements of the claims.

The First Amended Complaint correctly states the elements of the causes of action and alleges facts that, if taken as true, sufficiently make out such claims. The case is still in its infancy, even though it has been appealed and remanded by the United States Court of Appeals for the District of Columbia Circuit. For the reasons explained herein, this Court should ignore the government's premature merits arguments and deny the motion to dismiss.

This Court has subject matter jurisdiction to decide this case. The Complaint sets forth sufficient facts to establish all the elements of Article III standing. But if there were any doubt, plaintiffs are entitled to conduct discovery and present affidavits to establish conclusively that they have been injured by the MREA and that a judicial order declaring the law unconstitutional would remedy those harms.

## I.   THE HETTINGAS' SARAH FARMS OPERATION HAS STANDING TO CHALLENGE SUBSECTION (N) OF THE MREA.[3]

### A.   The Facts Alleged in the First Amended Complaint Regarding Subsection (N) Satisfy the Redressability and Traceability Requirements of Article III.

The government mischaracterizes the allegations of the First Amended Complaint concerning the harms alleged under Subsection (N) and the relief sought, by erroneously claiming that plaintiffs seek a declaration that they are not properly classified as a producer-handler. On that faulty basis, it argues that this injury is not traceable to the MREA and is not redressable, because that treatment is independently established by the USDA rule. (Gov't Mem.

---

[3] The government claims that the Hettingas' Sarah Farms operation does not have Article III standing to challenge the constitutionality of Subsection (N) of the MREA. The government does not, however, challenge their standing for the claims asserted by the Hettingas' GH Dairy d/b/a GH Processing operation that Subsection (M) is unconstitutional.

at 9). This argument fails on its face in light of the actual language of the First Amended Complaint.

(1) **The Governing Standard.** To have standing under Article III, a plaintiff's injury must be causally related to the challenged government action, and the relief requested must, if granted, remedy the harm suffered. *Shays v. Federal Election Commission*, 414 F.3d 76, 116 (D.C. Cir. 2005). The stage of the proceeding determines the predicate evidence needed to establish standing. "At the motion to dismiss stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Abigail Alliance for Better Access to Developmental Drugs v. von Estenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006). Further, the relationship of the plaintiff to the challenged action is significant. When a plaintiff who is the object of government action challenges its legality, the showing needed to establish standing is minimal, and resolution of the issue is reserved for the merits stage of the case.

> [T]he nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. <u>If he is [the object of the government action], there is ordinarily little question that the action or inaction has caused him injury</u>, and that a judgment preventing or requiring the action will redress it.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (emphasis added). Here, the Hettingas' Sarah Farms plant is the clear object of Subsection (N).

(2) **The Harms Alleged.** The First Amended Complaint specifically alleges how the Hettingas were directly harmed by enactment of Subsection (N) and shows how those injuries would be redressed by a declaratory judgment and an injunction invalidating that provision.

They challenge Subsection (N) of the MREA passed by Congress and seek relief from its adverse effects; they do not challenge the USDA rule imposing price regulation on several similarly situated producer handlers.

The government's argument is erroneous on the face of the First Amended Complaint, which seeks only a declaration and an injunction that Subsection (N) is unconstitutional. Subsection (N) imposes independent harms on the Hettingas that can be eliminated by the invalidation of the MREA. Further, the government's claim is fundamentally inconsistent with the position it previously took in the Johanns litigation. There, it successfully argued that the Hettingas' challenge to the USDA rule should be denied because they were now directly regulated by Subsection (N) of the MREA and not by the USDA rule. The doctrine of judicial estoppel prevents the government from changing positions here and trying to entrap Plaintiffs in this Catch-22.

Subsection (N) punishes the Hettingas and denies them rights that are available to every other dairy farm or dairy plant affected by Federal milk marketing order regulations. As long as the statute remains in effect, the Hettingas' Sarah Farms plant must be subjected to the minimum price and revenue pooling provisions of the Arizona Order. Subsection (N) eliminated the Hettingas' ability to seek to alter the regulatory status of Sarah Farms through administrative means; eliminated the discretion USDA otherwise would have to modify how it regulates Sarah Farms; and effectively eliminated the Hettingas' ability to seek review of the 2006 USDA rule, which departed from 70 years of precedent concerning regulation of entities like Sarah Farms.

Subsection (N) requires that all producer-handler plants in Arizona whose monthly sales exceed 3,000,000 pounds of fluid milk -- of which there is only one, Sarah Farms -- must be subjected to federal minimum price requirements. Neither the MREA nor the AMAA mandates

the imposition of minimum price requirements on any other milk processing plant, of any size, in any other part of the country.

With the exception of the producer-handler part of the Arizona order, all other Federal Orders in the country are subject to revision by USDA upon a finding that market conditions have changed or that continuation of the current regulations would be inequitable or cause market distortions. *See* 7 U.S.C. § 608(c)(5). All other handlers except the Hettingas may petition USDA for changes in the terms of marketing orders that could exempt them from regulation or change the terms under which they are regulated. Subsection (N) denies the Hettingas these rights, because it categorically mandates that their Sarah Farms plant must be subject to the price regulations if it operates at a level greater than 3,000,000 pounds per month, which it continuously does and has done for many years.

The ability to seek a change in the applicable threshold level for regulation of producer-handlers in the Arizona marketing area is a critical right. The level, if any, at which regulation is appropriate, is highly debatable and may change with market conditions. Subsection (N) precludes the Hettingas from pursuing these avenues to obtain different regulatory treatment. The Hettingas alone are subject to a statutory requirement for price controls at a 3,000,000 pound level, a threshold that is now frozen in time and in place by passage of the MREA.

Subsection (N) also deprives the Hettingas of one of the basic procedural protections afforded by the AMAA: an effective voice in the conditions under which they are regulated. In every other case in which USDA seeks to change the terms of a marketing order, the AMAA requires it to conduct a referendum and obtain a two-thirds affirmative vote of the covered producers. 7 U.S.C. § 608c(9)(B). The MREA denies the Hettingas the basic democratic right afforded all other producers to vote on the terms by which they are regulated and to seek to

persuade their fellow producers to change the marketing order in a manner that would change the conditions under which they are regulated.

Subsection (N) further deprives the Hettingas, alone among the entities covered by the February 2006 USDA rule, of the rights they otherwise would have had to seek further review of the conditions it imposed.  The producer-handlers in the Pacific Northwest continued to enjoy the rights provided by the AMAA to (1) petition USDA to amend the marketing order to modify or eliminate the minimum price regulation; or (2) pursue the AMAA's administrative and legal processes to challenge the legality of the USDA rule.   Subsection (N) eliminated only the Hettingas' ability to seek relief.

A declaration that Subsection (N) is unconstitutional would restore all the rights that the law stripped from plaintiffs.  The Hettingas would then be able to pursue all the administrative and judicial avenues for relief that are available to all other persons affected by federal milk marketing orders.  As the action of the United States District Court for the Northern District of Texas demonstrated, the Hettingas were denied the effective ability to pursue their rights by the passage of the MREA.  This denial of rights and mandatory imposition of regulations constitute independent forms of harm that are directly traceable to Subsection (N) and that would be conclusively redressed if the requested declaration and injunction against that provision were issued.

The Hettingas are entitled to seek justice in some Federal district court from the unconstitutional and inequitable conditions to which they alone are subjected.  Having once successfully closed the Hettingas off from challenging the USDA rule by passing the MREA and mooting their legal claim in the Northern District of Texas, the government cannot now argue

that the existence of the USDA rule forecloses their ability to challenge the MREA here.  In sum, the factual allegations in the First Amended Complaint conclusively demonstrate that the Hettingas satisfy all Article III standing requirements.

## II.  PLAINTIFFS HAVE PROPERLY PLED THAT SECTION 2(A) OF THE MREA IS AN UNCONSTITUTIONAL BILL OF ATTAINDER

The First Amended Complaint properly alleges the elements of a bill of attainder claim, as defined in *Foretich v. United States*, 351 F.3d 1198 (D.C. Cir. 2003), and sets forth facts that, if taken as true as required under Rule 12(b)(6),  entitle plaintiffs to relief.

### A.    The Elements of a Bill of Attainder Claim.

A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Selective Serv. Sys. v. Minnesota Pub. Interest Research Group*, 468 U.S. 841, 846-47 (1984).  Article I, § 9, cl. 3 of the Constitution provides that "[n]o bill of attainder or ex post facto Law shall be passed."  There are three elements of a bill of attainder claim:  a statute that (1) applies with specificity to affected persons; (2) imposes punishment; and (3) without provision of the protections of a judicial trial.  *See e.g., Foretich*, 351 F.3d at 1217; *BellSouth Corp. v. FCC*, 162 F.3d 678 (D.C. Cir. 1998) ("*BellSouth II*"); *Elgin v. U.S.* 594 F. Supp. 2d 133, 138 (D. Mass. 2009), *ACORN v. United States,* ___F.Supp.2d___, 2009 WL 4743348 (E.D.N.Y. 2009).  A statute "need not fit all three factors to be considered a bill of attainder; rather, those factors are the evidence that is weighed together in resolving a bill of attainder claim." *Consolidated Edison Co. of New York v. Pataki*, 292 F.3d 338, 350 (2d Cir. 2002) (citing *Nixon v. Administrator of General Services*, 433 U.S. 425, 473-78 (1977)).

The Bill of Attainder Clause "was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of separation of powers, a general

safeguard against legislative exercise of the judicial function, or more simply – trial by legislature." *United States v. Brown*, 381 U.S. 437, 442 (1965). The Founders sought to insulate the citizenry from an overzealous legislature acting out of passion. Thus, "barriers had to be erected to ensure that the legislature would not overstep the bounds of *its* authority and perform the functions of the other departments. The Bill of Attainder Clause was regarded as such a barrier." *Id.* at 443-44 (relying on *The Federalist*, No. 48).

The First Amended Complaint properly alleges the three elements of a bill of attainder claim. The MREA singled out the Hettingas with specificity for adverse treatment (Complaint, ¶¶ 4, 48, 52, 52.1, 52.2); without a judicial determination of the facts (Complaint, ¶¶ 49, 56, 57); and the extreme burdens on plaintiffs' ability to sell their milk in California and Arizona that were imposed by Subsections (M) and (N) constituted legislative punishment that penalized plaintiffs for their past business activities (Complaint, ¶¶ 5, 6, 49, 50, 51, 52.1, 52.2, 57).

**B.** **The First Amended Complaint Explicitly Alleges that the MREA Specifically Singles Plaintiffs Out for Legislative Punishment.**

The "specificity" element is satisfied if a statute singles out a person or class by name or applies to "easily ascertainable members of a group." *Foretich*, 351 F.3d at 1217. *See BellSouth Corp. v. FCC*, 144 F.3d 58, 62 (D.C. Cir. 1998), *cert. denied*, 526 U.S. 1086 (1999) ("*Bell South I*") ("not all bills of attainder expressly name their targets; some simply describe them.")

The First Amended Complaint alleges that while Subsection (N) is phrased in neutral terms, Hein and Ellen Hettinga are the only milk producer-handlers in the Arizona-Las Vegas Milk Marketing area whose own farm production exceeds 3,000,000 pounds per month and thus are the only persons subject to adverse treatment under this provision. Complaint, ¶¶ 4, 27, 31,

37, 48, 52.  Similarly, the Complaint alleges that while Subsection (M) is phrased in neutral terms, GH Processing, the plant operated by the Hettingas' family partnership GH Dairy, is the only known milk handler located in a federally regulated area that sells milk into the California market and does not qualify for an exemption from the application of the minimum price requirements of the federal order.  It thus is the only handler subject to the price controls imposed by Subsection (M).  Complaint, ¶¶ 27, 31, 38, 39, 52, 52.2.

In particular, the Complaint alleges that the MREA "singles out plaintiffs for legislative punishment."  Complaint, ¶ 55.  It alleges that the application of Subsections (M) and (N) "depends upon such a narrow set of circumstances that it applies to no known cases" other than plaintiffs, *Foretich*, 351 F.3d at 1217, and that the burdens and disabilities they impose apply to plaintiffs and to no other persons.  Complaint, ¶ 27, 31, 37, 49.  The Complaint identifies several parts of the House floor debate in which plaintiffs are identified as the targets of the legislation.  Complaint, ¶¶ 40-44.  Under the governing law, these allegations are sufficient to satisfy the specificity element.

The government asserts that the MREA does not satisfy the specificity element because it does not mention the persons singled out for adverse treatment specifically by name and otherwise is open-ended in its application.  (Gov't Mem. at 17-18).  The case law, however, holds that a statute may constitute a bill of attainder if the class is "easily ascertainable."  *See Brown*, 381 U.S. at 448-49.[4]  For example, in *Foretich*, the court found that the law was a bill of

---

[4] The Amici claim that the First Amended Complaint does not satisfy the specificity requirement because the MREA does not apply to plaintiffs alone.  They assert that Subsection 2(b) of the Act, codified at 7 U.S.C. § 608c(11)(D), might apply to nine milk producers in Nevada, if they sell packaged fluid milk into Arizona in competition with Plaintiffs.  (Amici Mem. at 15-16, 18).  This argument is irrelevant.  Plaintiffs have challenged only the constitutionality of Subsections (M) and (N), not the Nevada provision.  It also fails as a matter of law.  *See BellSouth I*, 144 F.3d

attainder even though Dr. Foretich was never named and its provisions nominally were open-ended and would apply to anyone who in the future might fall into the same limited category:

> Although Congress stopped short of including the names "Foretich" and "Morgan" in the text of the statute, the applicability of the Act depends on such a narrow set of circumstances that it applies to no known cases other than the Morgan-Foretich custody dispute.

*Id.* at 1217. To the extent that the government argues that Subsection (M) could conceivably apply in the future to other milk handlers, it presents a merits-based defense whose resolution must be reserved for the merits stage.

The government also claims that under *Nixon,* 433 U.S. 425 (1977), Congress may create a "class of one," without violating the Bill of Attainder Clause. (Gov't Mem. at 12). The "class of one" cases are compatible with the bill of attainder doctrine, and the *Foretich* court took due account of *Nixon* in finding that there was a bill of attainder. *Foretich,* 351 F.3d at 1216-17. The Bill of Attainder Clause prohibits Congress from singling out a small group of persons for legislative punishment, which is not a "rational purpose" within the meaning of the "class of one" cases. The question whether the MREA constitutes punishment, or is supported by a legitimate government interest, is an issue that must be reserved for the merits stage.

Finally, the government asserts that the Complaint does not satisfy the specificity requirement because the Hettingas may avoid its effects by changing their conduct. (Gov't Mem. at 13). This is a merits-based argument that cannot be considered at the motion to dismiss stage. Under the case law, it is properly considered as part of the analysis whether the MREA constitutes punishment under the "historical" test. The short answer is that the government's

---

at 63 (specificity requirement satisfied by a law that applied only to 20 named companies). In any event, this argument does not challenge the adequacy of the Complaint but attacks the claims

argument fails because plaintiffs cannot now avoid the effects of the MREA, given the prohibitory nature of the punishment. Whether they are legislatively restrained from engaging in the prohibited conduct or "choose" not to perform this conduct because of the crushing economic consequences that Congress imposed, the Hettingas cannot now undo their past lawful activities for which Congress meted out punishment through the MREA at the behest of their competitors. *See Elgin v. United States, 594 F.Supp.2d 133, 138 (D. Mass. 2009) (past conduct leaves no opportunity to correct "status").* Likewise, the government has offered no reason to treat the Hettingas operations any differently from other operations subject to the general provisions of the AMAA.

In addition, the amici argue that the reach of Subsection (N) is broader than the Hettingas allege. The amici purport to rely on information outside the four corners of the pleading at issue, reports of the market administrator for the Arizona milk marketing area to suggest that the MREA imposes regulation on another entity, Aurora Dairy. As explained above, this type of evidence that reaches beyond the face of the Hettingas' complaint is improper. But in any event, it does nothing to change the facts pled by the Hettingas that they were the intended target of the Act. As explained below, the legislative history of the MREA demonstrates that the Hettingas were the target of the MREA. If the provisions did reach other operations, a point which the Complaint does not establish and the Hettingas do not concede, that would not alter the demonstrated unconstitutional intent of the MREA.

**C.    The First Amended Complaint Properly Alleges that the Law Provides No Judicial Process.**

---

on their merits. That issue cannot be raised, let alone resolved at this stage of the case.

The Complaint properly alleges that the MREA denies the Hettingas judicial process before imposing onerous penalties. (Complaint ¶¶ 40, 45, 46, 49). No judicial determination of the facts occurred here. In particular, by imposing a direct statutory obligation on the Hettingas that they be subject to the pricing and pooling requirements of the Arizona Order, Subsection (N) stripped plaintiffs of the right provided by the AMAA and Administrative Procedure Act to seek review by an Article III court regarding the legal validity of the February 2006 USDA rule.

The government argues that the MREA is not a bill of attainder because the law does not preclude plaintiffs from challenging it in court. (Gov't Mem. at 20). But this claim is not supported by the sole case on which the government relies, *Cummings v. Missouri*, 71 U.S. 277 (1866). The law held in *Cummings* to constitute a bill of attainder did not contain a clause explicitly barring judicial review, nor did the law invalidated in *Foretich*. The issue in a bill of attainder case is whether Congress deprived the target of judicial process by passing the underlying law, not whether the offending law may be challenged in court. Here, the MREA imposes regulation on the Hettingas' operations without any opportunity to challenge the regulations, as evidenced by the mandatory nature of the Act's provisions. Through the MREA, Congress has deprived the Hettingas of the procedural safeguards applicable to all other milk marketing order amendments, including promulgation following a formal rulemaking, a producer referendum, and an opportunity to seek modification or exemption of the provisions. *See* 7 U.S.C. § 608c(3), (9), (15).

## D.   The First Amended Complaint Properly Alleges that the Unique Burdens Imposed by the MREA Constitute Legislative Punishment.

In determining whether a statute imposes punishment, the Supreme Court considers:

(1)   whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further

nonpunitive legislative purposes; and (3) whether the legislative record evinces a congressional intent to punish.

*Selective Service System*, 468 U.S. at 852 (citations and internal quotations omitted). Each of these criteria is applied "as an independent – though not necessarily decisive – indicator of punitiveness"; of the three, the functional test, determining whether a law serves nonpunitive legislative purposes, is the most important. *Foretich*, 351 F.3d at 1218. The Complaint alleges that plaintiffs suffered "punishment" under all three branches of the *Selective Service System* test. The economic injury alleged by the plaintiffs, which is now occurring and will be experienced in perpetuity solely as punishment for past lawful operation of their business, constitutes "punishment" within the meaning of the Bill of Attainder Clause. *See Consolidated Edison Co. v. Pataki*, 292 F.3d 338 (2d Cir. 2002).

1.   **The First Amended Complaint Alleges Economic Harm that Satisfies the Historical Test.**

Historically, bills of attainder have been recognized as laws that impose deprivations and disabilities that are disproportionately severe and inappropriate to the non-punitive ends allegedly served by the statute. *Foretich*, 351 F.3d at 1219. The class of punishments found to constitute bills of attainder includes laws that impose economic burdens and deprivations. *Foretich*, 351 F.3d at 1220, citing *BellSouth II*, 162 F.3d at 683. For example, in *Consolidated Edison*, the Second Circuit held that a statute forbidding a utility from recouping from customers certain costs that it had incurred, although cast as a piece of economic regulatory legislation, was a bill of attainder. 292 F.3d at 345. In addition, statutes that erect "legislative bars to participation by individuals or groups in specific employments or professions" have historically been found to be bills of attainder. *Selective Service System*, 468 U.S. at 852. *See BellSouth II*, 162 F.3d at 685. For example, late last year, the United States District Court for the Eastern

District of New York held that a statute prohibiting one organization from applying for federal grant funding constituted a bill of attainder. *ACORN v. United States*, ___ F. Supp. 2d ___, 2009 WL 4743348 (E.D.N.Y. 2009).   Thus, a law that imposes significant economic harm upon a small group of persons may qualify as a bill of attainder under the historical test.

The First Amended Complaint alleges that the MREA imposes economic burdens and deprivations on plaintiffs that fall within the class of economic harms found to satisfy the historical test.   The MREA punishes plaintiffs for their past lawful operation as a producer-handler.   The law has had severe, adverse effects on their ability to operate their businesses, by forcing them to make prohibitively expensive monetary payments, which are then distributed to their competitors.   Complaint, ¶ 4, 47, 50, 56.

The government claims that the MREA does not fall within the historical meaning of punishment because it "does not contain any legislative censure or public reprimand." (Gov't Mem. at 15).   However, *Foretich* held that such a "brand of infamy or disloyalty" is not a required element of a bill of attainder claim, but is an aggravating factor that makes such a law "particularly susceptible to invalidation." 351 F.3d at 1219.[5]   The case law clearly establishes that monetary harm is sufficient to state such a claim.

Further, the government asserts that a law does not satisfy the punishment element "where there is a possibility that a statute will not impose adverse consequences on an entity" and that the Hettingas can avoid the impact of Subsection (N) by reducing their milk production below the 3,000,000 pound threshold limit established by that provision. (Gov't Mem. at 16).   Its argument fails for several reasons.

First, the government made a similar argument in *Foretich*, based on the same passages in *BellSouth II* and *Selective Service System* cited here.  *See* Joint Brief for Appellees United States of America et al. in No. 02-5224 at 25.  The D.C. Circuit rejected that argument and reiterated its finding in *BellSouth II*, that "the definition of punishment 'has expanded to include legislative bars to participation by individuals or groups in specific employments or professions.'"  *Foretich*, 351 F.3d at 1220, quoting *Bell South II*, 162 F.3d at 685, and *Selective Service System*, 468 U.S. at 852.

The type of burden or disability imposed on plaintiffs -- a severe economic punishment that substantially harms their ability to continue practicing their profession -- is covered by the historical test, as defined in *Foretich*, *BellSouth II*, and prior Supreme Court decisions.[6]  The sole question for decision is whether the severity of the burdens to which Plaintiffs have been subjected, when weighed against the alleged nonpunitive purpose suggested by the government, makes the MREA an unconstitutional bill of attainder.  As demonstrated in the next section, this question must be resolved under the functional test for punishment -- and only at the merits stage of the case, when the parties can present the facts they have assembled on this issue.

Second, the government misapplies the hypothetical example raised by the court in *BellSouth II*, that a law would not constitute a bill of attainder if it "perpetually leave[s] open the possibility" that an entity could continue to manufacture its products by adopting pollution control techniques required by an environmental law of general applicability.  (Gov't Mem. at

---

[5] *See also United States v. Brown*, 381 U.S. 437, 438 n.1 (1965) (law invalidated as a bill of attainder where its text merely set out a prohibition against certain persons holding office in a labor union, without expressly reprimanding them for their past conduct).

[6] *See United States v. Brown*, 381 U.S. 437 (1965); *United States v. Lovett*, 328 U.S. 303 (1946); *Ex parte Garland*, 71 U.S. (4 Wall.) 333 (1866); *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277 (1866).

15-16), quoting *BellSouth II*, 162 F.3d at 685. Taking the allegations of the Complaint as true, the hypothetical is irrelevant here. Under the MREA, there is no condition plaintiffs can satisfy to avoid the punitive restriction imposed on them. Subsection (N) requires the Hettingas to scale back the sales from Sarah Farms to a level (less than 3,000,000 pounds per month) that is not economically viable or to pay the mandated assessments. Subsection (M) imposes similar significant cost penalties on sales into California that are not borne by GH Processing's competitors. These provisions thus constitute <u>de facto</u> prohibitions on plaintiffs' continuing to pursue their chosen profession.

Congress imposed these disabilities on plaintiffs based on their past lawful economic activity (engaging in price competition in conformance with the existing law). Plaintiffs cannot now alter their past behavior so as to remove or avoid the restrictions that Congress has inflicted on them. The situation thus is similar to *Consolidated Edison*, where the New York legislature imposed severe economic penalties on a company based on its prior lawful operation of its nuclear plant. As in *Consolidated Edison*, the harm that the Hettingas have suffered, and will continue to suffer, is punishment for past conduct. Further, as that decision shows, a statute may constitute an unconstitutional bill of attainder if it imposes harsh economic punishment, even if it does not drive an entity completely out of business. *See Consolidated Edison*, 292 F.3d at 345.

Accordingly, the government is simply wrong as a matter of law in asserting that the allegations of the Complaint do not satisfy the historical test, because "there is a possibility that [the MREA] will not impose adverse consequences" upon plaintiffs. (Gov't Mem. at 16). The only way plaintiffs can avoid these punitive restrictions is if they scale back their operations to a small dairy selling only in Arizona, which in itself would constitute an extreme form of punishment. Under the government's theory, the four cases in which the Supreme Court has

invalidated laws as bills of attainder were wrongly decided, because in each case the plaintiff could avoid the "punishment" imposed by law if he decided to surrender his employment or "chose" not to practice his profession. There, as here, whatever the plaintiff chose to do in the future, he would suffer the restrictive punishment that Congress imposed upon him.

**2.     The First Amended Complaint Properly Alleges that the MREA Constitutes Punishment Under the Functional Test.**

**(a)     The Governing Standard.**  Under the "functional" test, the court "must consider whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further non-punitive legislative purposes.'" *Foretich*, 351 F.3d at 1220, quoting *Nixon*, 433 U.S. at 475-76.  The court must ensure that the statute serves a nonpunitive legislative purpose in order to prevent "Congress from circumventing the clause by cooking up newfangled ways to punish disfavored individuals or groups." *BellSouth I*, 144 F.3d at 65.

Courts conduct this inquiry "by examining both the purported ends of contested legislation and the means employed to achieve those ends." *Foretich*, 351 F.3d at 1221.  Where a significant imbalance exists between the magnitude of the burden imposed and a purported nonpunitive purpose, the law cannot reasonably be said to further nonpunitive purposes and is an unconstitutional bill of attainder. *Id.* at 1221-22, citing *Consolidated Edison*, 292 F.3d at 354 (a statute is an unconstitutional bill of attainder where "the legislature piled on a burden that was obviously disproportionate to the harm caused.")

The Complaint expressly alleges that the MREA does not "further any non-punitive legislative purpose." Complaint, ¶¶ 50, 52.4, 57.  It alleges that Congress through the MREA sought to punish plaintiffs for their past lawful operation of their businesses. Complaint, ¶ 56; *see id.* ¶¶ 4, 47.  The Complaint further alleges that plaintiffs are directly subjected to a statutory

prohibition and a requirement to make prohibitive payments, under statutes that on their face provide no protective measures for them. The selectivity of the statute cannot be explained without resort to inferences of punitive purposes, because the Hettingas' businesses were clearly singled out for the restrictions imposed by Subsections (M) and (N). *See Foretich*, 351 F.3d at 1224 (finding that the law's extreme narrowness rendered "simply implausible" the asserted nonpunitive purposes). Any assertion of a nonpunitive purpose is undermined by the fact that Congress did not apply the same standard in all other similar cases. *Id.* at 1223-24. Finally, the Complaint identifies a less burdensome alternative that was available to the government – to allow plaintiffs' business to be regulated under rules of general applicability, as its Arizona producer-handler operation at Sarah Farms and its California sales from GH Processing were until the MREA was enacted.

**(b)     The Factual Inquiry Required by the Functional Test Cannot Be Resolved at the Motion to Dismiss Stage.** The government claims that the MREA does not punish plaintiffs because "[s]ubsections (M) and (N) of the MREA do not function as punishment, but rather as economic [milk] pooling regulations." (Gov't Mem. at 17). It does not allege that the Complaint fails to allege facts sufficient to state a claim under the functional test. Rather, the government seeks to have the Court jump directly to resolution of the merits of the claim.

The D.C. Circuit has established the following rule for determining at the merits stage whether a statute constitutes a bill of attainder:

> The law is clear that if there exists an extraordinary imbalance between the burden imposed and the alleged nonpunitive purpose, and if the legislative means do not appear rationally to further that alleged purpose, then the statute in question does not escape unconstitutionality merely because the Government can assert purposes that superficially appear to be nonpunitive.

*Foretich*, 351 F.3d at 1223. The final point is critical. A law may be held to constitute a bill of attainder even though the government might be able to articulate a purportedly legitimate purpose "that superficially appears to be nonpunitive."[7]

Under the test established in *Foretich*, the issues presented under the "functional" test cannot be resolved on a motion to dismiss, once it has been determined that Plaintiffs have set forth a <u>prima facie</u> case, as they have here. Resolution of this issue requires balancing the severity of the burden imposed by the law relative to its "purported nonpunitive benefits," in order to determine whether "a grave balance or disproportion between the burden and the purported nonpunitive purpose suggests punitiveness." *Foretich*, 351 F.3d at 1225. This is true even if the government can suggest that "the statute bears some minimal relation to nonpunitive ends." *Id.* This type of balancing may be performed only at the merits stage of the case, not at the motion to dismiss stage.

*Foretich* explicitly rejects the government's argument that the claim should be dismissed, because it has asserted that the MREA constitutes permissible economic regulation. "The law is clear that . . . the statute in question does not escape unconstitutionality merely because the Government can assert purposes that superficially appear to be nonpunitive." *Foretich*, 351 F.3d at 1223.

---

[7]  *Accord, Consol. Edison,* 292 F.3d at 350, quoting *Nixon*, 432 U.S. at 482:

> Where a statute establishing a punishment declares and imposes that punishment on an identifiable party, however, the Bill of Attainder Clauses undermine the usual solicitude we have for [punishment of wrongdoing]. In such cases, we look beyond simply a rational relationship of the statute to a legitimate purpose for "less burdensome alternatives by which [the] legislature...could have achieved its legitimate nonpunitive objectives."

Here, the Complaint alleges that the MREA has three parts, each of which is punitive in its own right and which, taken together, create an extraordinary imbalance of harms specific to Plaintiffs that overwhelm any alleged non-punitive purpose.

(1)     Subsection (N) subjects the Hettingas' Sarah Farms plant, alone of all the producer-handlers of milk in the United States, to an explicit statutory command that they must be regulated in a specific manner for all sales of milk in the Arizona market.  The effect of the specific and unique regulatory treatment dictated by the MREA is that the Hettingas are required to make prohibitive financial payments to their competitors for all their sales.  Accordingly, the Hettingas are punished twice.  First, they are forced to make payments to the USDA revenue pool, and they receive no return benefit.  Second, the money paid into the revenue pool is distributed to their direct competitors.

(2)     Subsection (M) imposes upon GH Processing, alone of all handlers of milk in the United States, an explicit statutory command that it must be subject to the minimum price requirements of the Arizona Milk Marketing Order for all sales of bottled milk into the California market.  Typically, milk handlers are regulated by virtue of the fact that they sell milk into a federally regulated area.  The location of a handler's plant, absent actual sales into a federal milk marketing area, is not a basis for imposing regulation.  As to GH Processing, the MREA imposes price control regulation premised solely on the location of its plant, rather than the place where its sales occur.  The effect is that GH Processing is required to make prohibitive financial payments to the federal revenue pool for all milk sold in California, and the money paid by GH Processing is shared only by Arizona dairies.

(3) Simultaneously, other, larger entities selling milk into the California market from Nevada have been granted a regulatory pass by Section 2(b) of the MREA and are not subject to such Federal minimum price controls.

Congress passed the MREA on the night before the Hettingas were to argue their judicial challenge to the legality of the USDA rule.  The intent and effect of this action was to moot that case by directly subjecting the Hettingas to a mandatory set of statutory requirements set forth in Subsection (N), that codified and superseded the USDA rule for them alone.  The effect of this codification is that the Hettingas cannot change their status by requesting an amendment or revision through USDA or pursue administrative and judicial remedies.  The Hettingas are subject to a perpetual rule, which can only be changed by Congress.  All other marketing orders are subject to modification, amendment, or termination.  All other market participants except the Hettingas are entitled to the constitutional and procedural protection of the legal process.

At the merits stage, the government can try to show, based on a factual record, whether its alleged "non-punitive objectives of promoting market stability and furthering regulatory equity" (Gov't Mem. at 18) can survive, given the "grave imbalance or disproportion" between that alleged purpose and the enormous burden it imposes on Plaintiffs (*Foretich*, 351 F.3d at 1222); the MREA's lack of protective provisions; the extreme selectivity of the law and its midnight passage, which both indicate punitiveness; the availability of less burdensome alternatives; and Section 2(b)'s contradiction of the government's purported rationale for Subsection (M) by allowing other handlers in Nevada to sell milk into California without being subjected to Federal minimum price controls.  But that is an evidentiary based argument for another day when the merits are at issue.  At this stage, the Complaint alleged facts that, if taken as true, satisfy the functional test.

### 3.     The First Amended Complaint Alleges Facts that Satisfy the Motivational Test.

"The final test of legislative punishment is 'strictly a motivational one:  inquiring whether the legislative record evinces a congressional intent to punish.'" *Foretich*, 351 F.3d at 1225 (internal citation omitted).  Courts conduct this inquiry "by reference to legislative history, the context or timing of the legislation, or specific aspects of the text or structure of the disputed legislation." *Foretich*, 351 F.3d at 1225 (emphasis added).

A formal legislative announcement of moral blameworthiness or punishment is not necessary to make a law an unconstitutional bill of attainder.  "All that is necessary is that the legislative process and the law it produces indicate a congressional purpose to behave like a court and to censure or condemn." *Id.* at 1226.  Evidence of punitive intent in the legislative record is directly relevant, both in its own right and to confirm other evidence of Congressional intent to punish. *Consolidated Edison*, 292 F.3d at 354-55.

The Complaint expressly alleges that the MREA embodied "a Congressional intent to punish" the Hettingas for the manner in which they had lawfully operated their business.  It sets forth specific aspects of the text and the structure of the legislation to support that allegation. Complaint, ¶ 50; *see id.* ¶¶ 5, 6, 56, 57.  The Complaint also asserts that the context or timing of the legislation – its passage on the night before the Hettingas were to argue a preliminary injunction motion against the USDA rule – further demonstrates a Congressional intent to punish them.  Complaint, ¶¶ 6, 26, 40, 49, 50, 56.  It specifically identifies several passages in the House floor debate that confirm on their face the allegation that Congress singled out the Hettingas for punishment.  Complaint, ¶¶ 40-45.  As there were no Committee Hearings or Reports on the bill in either body and no floor debate on the MREA in the Senate, the statements in the House floor debate are the best evidence of Congressional intent.  Thus, the Complaint sets forth facts

31

sufficient to satisfy the motivational test at the motion to dismiss stage. *See Warren*, 353 F.3d at 40.

In response, the government asserts that to show intent to punish, the legislative record must include statements from both houses of Congress. (Gov't Mem. at 18-19). It cites no authority to support this claim. The isolated phrase the government quotes from *Navegar, Inc. v. United States*, 192 F.3d 1050 (D.C. Cir. 1999), does not stand for the proposition for which it is cited. (Gov't Mem. at 19). This passage states that merely naming a party in floor debates, with no hint of disapproval or condemnation, is insufficient at the merits stage to demonstrate a legislative intent to punish. *Id.* at 1067.

The government quotes statements by proponents of the MREA on the House floor, presumably to suggest that the Court should dismiss based on the sheer quantity of those statements. (Gov't Mem. at 19). However, the D.C. Circuit has ruled that Congress cannot paper over its intent to punish by filling the record in this fashion with speeches that are "conveniently self-serving." *Foretich*, 351 F.3d at 1226. In any event, the government cannot defeat a bill of attainder claim by simply asserting "purposes that superficially appear to be nonpunitive." *Id.* at 1223. Rather, as the Second Circuit Stated in *Consolidated Edison*, "the stated intent of at least some legislators—most notably one of the floor managers of the legislation—to punish ConEd reinforces our independent conclusion that a substantial portion of the legislation cannot be justified by any purpose but punishment." *Consolidated Edison*, 292 F.2d at 355.

In sum, the Complaint alleges facts which, if taken as true, establish that Congress adopted the MREA with intent to punish plaintiffs. They have pled a valid bill of attainder claim

which defeats the attempts by the government to dismiss that claim under Rule 12(b)(6), Federal Rules of Civil Procedure.

## III.   THE FIRST AMENDED COMPLAINT PROPERLY ALLEGES THAT THE MREA DENIES PLAINTIFFS EQUAL PROTECTION OF THE LAWS.

The Complaint properly alleges that the MREA denies Plaintiffs equal protection of the law by invidiously creating two classes of milk handlers.  One class has a panoply of procedural and substantive rights concerning how they are regulated under the Federal Milk Marketing Orders, as administered by the USDA under the AMAA.  This class includes all other entities in the milk business.  The second class enjoys none of these procedural and substantive rights, but is directly regulated by the terms of the MREA.  As far as can be determined, the Hettingas and GH Processing are the only members of this class.  The Complaint further alleges that there is no rational basis for this discriminatory treatment of Plaintiffs.

### A.   The Standard To Be Applied.

To satisfy the Equal Protection Clause, a statutory classification "must be rationally related to a legitimate governmental purpose." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985).  "A classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational" is unconstitutional. *Id., citing Zobel v. Williams*, 457 U.S. 55, 61-63 (1982); *Department of Agriculture v. Moreno*, 413 U.S. 528, 535 (1973).  A statute that creates a "class of one" violates the Equal Protection Clause if there is no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Whether a statute that differentiates between two classes of economic entities is supported by a rational basis presents a question that must be decided at the merits stage, rather than on a motion to dismiss.  As the Supreme Court stated in *Romer* v. *Evans*, 517 U.S. 620,

632-633 (1996), in overturning a statutory classification under the rational basis branch of the Equal Protection Clause:

> [E]ven in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained . . . By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law.

Moreover, "discriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provisions." *Id.* at 633, *quoting Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 37-38 (1928).

## B.   The First Amended Complaint Alleges that the MREA Denies Equal Protection.

The Complaint states a valid claim for relief under the Equal Protection Clause.  It alleges that three aspects of the MREA discriminate against plaintiffs and single them out for adverse treatment not imposed on others.  Complaint, ¶¶ 47-52, 65.  It also alleges that these three classifications are unrelated to any legitimate government purposes and that taken collectively, they deny Plaintiffs equal protection.  Complaint ¶¶ 50-52, 57, 65.

The discriminatory treatment imposed by the MREA is apparent on the face of the statute.  Subsections (M) and (N) focus on the Hettingas and their family partnership, and with laser-like precision impose unique restrictions on several parts of their family business.  The House debates confirm that the MREA is intended to apply to the Hettingas and to force changes in their operations.  Complaint, ¶¶ 5-6, 40-45.

### 1.   Discriminatory Effects of Subsection (N).

The First Amended Complaint alleges that Subsection (N) directly subjects the Hettingas to the pricing and pooling requirements of the Arizona Milk Marketing Order for milk that they produce and sell.  No other

entity in the country that sells only its own produced milk is subject to such a specific statutory price control requirement. All other entities are regulated by the USDA under the general provisions of the AMAA. Before they may be subject to price controls, all other producer-handlers have a right to notice and an opportunity for an administrative hearing, at which they may present evidence concerning whether and how they should be regulated, pursuant to the AMAA's substantive standards. Each entity also has the right to petition USDA to abolish or modify its Milk Marketing Order, 7 U.S.C. § 608c(5), and a right to judicial review of the government's final decision by an Article III court, 5 U.S.C. § 704.

The Hettingas' Sarah Farms plant, by contrast, is regulated directly by the MREA. They received none of the procedural and substantive protections that all other entities enjoy. They were not permitted judicial review of the substance of the government's decision to regulate them. And the Hettingas cannot meaningfully petition USDA to exclude them from the Arizona Order, because such an act would require adoption of another statute.

The discrimination that the Hettingas have suffered is illustrated by the disparate treatment afforded the producer-handlers in the Pacific Northwest Milk Marketing area who were regulated by the February 2006 rule. The MREA did not impose direct statutory regulation on these entities; they retain the full rights of a regulated entity under the AMAA. The MREA discriminates against the Hettingas because it took away from them alone, and not others similarly situated, the procedural and substantive rights that they previously enjoyed concerning the terms under which they would be regulated.

**2.      Discriminatory Effects of Subsection (N) on the Hettingas' Right to Obtain Judicial Review.**  By codifying the result of the USDA rule as applicable to them, Subsection (N) denied the Hettingas alone, out of all covered producer-handlers, the right to seek

judicial review of the government's decision to impose price controls on their Sarah Farms plant. This discrimination is apparent by comparing their treatment with that of the Pacific Northwest producer-handlers. One of those entities sought review of the USDA rule, apparently electing to end its efforts when it was obligated to exhaust administrative remedies.[8]   The Hettingas, however, have been denied the opportunity for judicial review because the requirement that they be price controlled is imposed directly by statute.

The *Amici* note that the principle of separation of powers is not violated if Congress changes the underlying law in a manner that happens to resolve an issue pending before a court. (*Amici* Mem. at 18.)   *See Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429 (1992).   The Hettingas do not make a *Robertson*-type argument, but this observation shows why Subsection (N) is unconstitutional by emphasizing what Congress did not do in the MREA.   Congress did not amend the AMAA to establish a new law generally applicable to the milk industry as a whole.   Instead, the night before the Hettingas were to argue a judicial challenge to the USDA rule, Congress changed the law applicable to the Sarah Farms plant and the Hettingas alone.   It is this specifically focused change in the law applicable to them alone which violates the Equal Protection Clause.

    **3.**    **Discriminatory Effects of Subsection (M).**    Subsection (M) discriminates against the Hettingas in a different way, by specifically subjecting their sales of milk into California through their family partnership's GH Processing plant to Federal minimum price controls, while not imposing such requirements on other similarly situated entities.

---

[8] *See Edaleen Dairy, LLC v. Johanns*, 467 F.3d 778 (D.C. Cir., 2006).   For the equal protection analysis, the critical fact is the other entities had a right to judicial review under the AMAA process.   The MREA stripped the Hettingas of that right.

Subsection (M) changes, for this specific purpose, the longstanding principle that whether federal milk marketing regulations apply is predicated on the sale of milk into a federal milk marketing area, and not simply on the geographic location of the handler's plant. *See* 7 C.F.R. 1131.7. Subsection (M) provides that a plant physically located in a federally regulated area is subject to federal price controls if it sells milk in a non-federally regulated market. As far as is known, this provision applies to the operations of GH Processing and no other entity. The legislative history expressly shows states that this provision was intended to close a "regulatory loophole" allegedly being exploited by Plaintiffs – selling milk from a federal milk marketing area into a state-regulated area without payments to the revenue pool in either the federal milk marketing area or the state.

Subsection (M) adversely affects the Hettingas by (a) requiring GH Processing to pay the Federal minimum price for milk it purchases and sells into California, which is higher than the price it otherwise would have to pay; and (b) by requiring it to pay the Federal minimum price in Arizona, while California handlers must pay only the price determined by California law. The California minimum price varies from month-to-month, but it tends to be significantly less than the Federal minimum price. The Complaint properly alleges that this unique, discriminatory treatment imposed on Plaintiffs violates the Equal Protection Clause.

At the same time, Section 2(b) of the MREA exempted handlers in Nevada from federal regulation. Thanks to Section 2(b), these non-federal regulated Nevada handlers are now allowed to sell their milk into California without being subject to either federal or California price regulation. This aspect of the MREA clearly demonstrates the intentional discriminatory effect of Subsection (M) on the Hettingas through GH Processing. It also demonstrates the absence of any rational basis for a statute that limits their ability to compete in the California

37

market with one hand while opening the door to non-price controlled competition from many other entities with the other hand.

### C.   There Is No Basis for Dismissing the Equal Protection Claim.

The First Amended Complaint appropriately alleges an equal protection claim, by identifying several discriminatory classifications and alleging that these differences in treatment are not supported by a rational basis.   In response, the government argues that the claim should be dismissed because, as a result of the February 2006 USDA rule, the Hettingas allegedly are no longer a producer-handler and thus cannot claim discrimination if they are treated differently from other producer-handlers.   (Govt. Mem. at 39).   This argument, which applies only to Subsection (N), is based on a misconception of Plaintiffs' equal protection claim.

The February 2006 USDA rule changed the regulatory treatment of producer-handlers in the Pacific Northwest and Arizona Milk Marketing areas, by subjecting entities with production in excess of 3,000,000 pounds per month to federal price controls.   That rule was challenged by one Pacific Northwest producer-handler under the procedural and substantive provisions of the AMAA.   After passage of the MREA, the Hettingas' Sarah Farms plant is no longer regulated by the USDA rule, but is directly regulated by the MREA, which categorically requires that they must be subject to federal price controls.   The discrimination of which the Hettingas complain in their equal protection challenge to Subsection (N) is the difference in treatment imposed on them by the MREA compared to the treatment under the AMAA of similarly-situated entities.

The government and *amici* also assert that there is a rational basis for the differences in classification and treatment of Plaintiffs imposed by the MREA.   (Gov't Mem. at 21-23; *Amici* Mem. at 4-12, 17-18).   Their claim that subsections (M) and (N) survive rational basis review is a merits-based argument that may not be resolved by this Court at the motion to dismiss stage.

The government correctly notes that if this discriminatory provision were to be reviewed at the merits stages under the rational basis standard of review, that standard would be deferential to the government.  At this stage of the case, however, even assuming the MREA would be reviewed under the rational basis test on the merits, there is no basis to dismiss this claim. Plaintiffs have set forth a proper equal protection claim and are entitled to assemble and present the evidence in support of their claim.  There is no provision of law, and the government has not cited one, that allows a court to automatically dismiss a rational basis equal protection claim at the outset.  Such a theory would read rational basis claims out of the Equal Protection Clause. This is certainly not the law.

As the Supreme Court squarely concluded in *Romer v. Evans*, 517 U.S. 620 (1996), Plaintiffs have the right to present a rational basis claim to the Court on its merits, and the Court has an obligation to give careful consideration to these "discriminations of an unusual character . . . to determine whether they are obnoxious to constitutional provisions."  517 U.S. at 633. Further, even the cases on which the government relies that arose from the district courts show that resolution of the equal protection claims occurred at the merits stage, not the motion to dismiss stage.

The government also has misstated the analysis that will apply at the merits stage.  The inquiry is not whether Congress made a rational choice between regulating milk to maintain orderly markets and promote regulatory equity, or having unregulated milk markets.  The real question is whether Congress had a rational basis for displacing the AMAA and adopting a special statute that imposed several overtly discriminatory provisions directly against the Hettingas, and did so on the night before they were to argue a judicial challenge to their treatment under the regulatory statute of general applicability.  The obvious inference is that

Congress was concerned that the current AMAA framework and the judicial proceeding would not produce the outcome that the dairy lobbyists for "big dairy" wanted. The Hettingas are entitled to present evidence to the Court to show that there was no rational basis for the discriminatory treatment imposed by the MREA, other than the exercise of brute political power to produce an unconstitutional result.

## IV.   THE FIRST AMENDED COMPLAINT PLEADS A VALID DUE PROCESS CLAIM.

A procedural due process claim has two components: "the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted). The Complaint properly states a claim that the MREA violates Plaintiffs' procedural rights under the Due Process Clause by foreclosing their ability to obtain effective judicial review of the government action that determines how they may operate their business.

### A.   The Hettingas Have Protected Liberty and Property Interests.

As the Supreme Court held in the cases cited in the bill of attainder section of this Opposition, individuals such as Plaintiffs have a constitutionally protected interest in practicing their profession or occupation. *See* cases cited at p. 21. Further, under the system established by the AMAA and USDA implementing rules, milk handlers and producer-handlers who are adversely affected by government decisions or regulations have a right to judicial review of these determinations. 7 U.S.C. § 608c(15); 5 U.S.C. § 704. The Complaint alleges that the Hettingas were exercising their rights to challenge the USDA's February 2006 rule under the AMAA scheme when Congress passed the MREA, imposing statutory requirements directly upon them and mooting the pending *Johanns* litigation.

As set forth in the Complaint, the MREA denies the Hettingas their rights to engage in their profession and their property interests previously protected by the AMAA, by directly imposing the specific statutory terms under which their business must be conducted.

### B.      Plaintiffs Were Deprived of Access to the Courts Without a Hearing.

Once the plaintiff has demonstrated the existence of a protected liberty or property interest, the inquiry turns to whether the party has alleged that it was not afforded the process it was due. The Complaint properly alleges that element.

The AMAA establishes an adjudicatory proceeding for the determination of the highly fact-specific questions whether and under what conditions a Federal Milk Marketing Order should be created or amended. These decisions are required to be made by USDA on the record, based on admission of evidence concerning the factual issues whether disorderly marketing conditions exist and need to be addressed, and under due process procedures that protect the rights of those affected. Thereafter, adversely affected parties have the right to appeal the agency decision to federal court for review. *See United States v. Florida East Coast Ry.*, 410 U.S. 224, 245 (1973).

The Complaint alleges that the MREA deprived Plaintiffs of their right to the procedural due process guarantees associated with that adjudicatory process, and the opportunity, under principles of judicial review of administrative decisions, to show on the factual record that the USDA regulatory decision was erroneous and should be overturned. The Complaint further identifies floor statements in the House debate which demonstrate that the MREA was intended to short-circuit the ongoing review of the agency action by an Article III court and further shows that the MREA did in fact have the intended effect of defeating the effort to obtain judicial review. Complaint, ¶¶ 6, 40, 43, 45, 46. It its memorandum, the government gives short-shrift

to the Hettingas' case challenging the USDA Final Rule that immediately preceded the adoption of the MREA.  Gov't Mem. at 23, n.1.  It cannot and does not deny that its lawyer brought the overnight passage of the legislation to the court's attention and argued that this event justified denial of the motion for a preliminary injunction.  It also cannot deny that the court relied on this ground in denying Plaintiffs' request.  Complaint, ¶¶ 45, 46.  The silence from the government on the effects of the MREA on the Hettingas' right to judicial review under the APA is deafening.

In sum, the MREA denied the Hettingas their pre-existing right to a due process hearing at which they would have had the opportunity to show that the new USDA rules which imposed price regulations on Sarah Farms was unlawful.  It thereby violated the Due Process Clause.  *See United States v. James Daniel Good Real Property*, 510 U.S. 43, 47-48 (1993).  Similarly, the MREA denies the procedural protections of the AMAA prospectively to both of the Hettingas' dairy businesses because they are effectively foreclosed from petitioning USDA for any modification to the terms of the marketing order that could alter their regulatory status.

The government has presented no rationale at all for denying plaintiffs their pre-existing due process rights under the AMAA.  Instead, it submits a merits-based argument that any due process claim should be reviewed under a "rational basis" standard and that the MREA satisfies that test because "subsections (M) and (N) are rational means of achieving . . . legitimate governmental interests."  (Gov't Mem. at 22).  Accordingly, the government has provided no proper basis for concluding at this stage that the Complaint does not properly state a due process claim.

## CONCLUSION

For the foregoing reasons, the Renewed Motion to Dismiss filed by the government under

Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure should be denied.

Respectfully submitted,

/Alfred W. Ricciardi

_____

ALFRED W. RICCIARDI
(Arizona Bar No. 009547)
Aiken Schenk Hawkins & Ricciardi P.C.
4742 N. 24th Street, Suite 100
Phoenix, Arizona 85016
(602) 248-8203

JOHN F. COONEY
(D.C. Bar No. 936336)
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4812

Counsel for Plaintiffs
Hein Hettinga and Ellen Hettinga d/b/a Sarah
Farms and GH Dairy d/b/a GH Processing

January 25, 2010

## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2010, I electronically transmitted Opposition to Defendant's Renewed Motion to Dismiss the Complaint Pursuant to Rule 12(b)(1) and Rule 12(b)(6) Pursuant to Rule 12(b)(1) and Rule 12(b)(6) with the Clerk's Office using CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

> Peter J. Phipps
> United States Department of Justice
> Civil Division, Federal programs Branch
> 20 Massachusetts Avenue, N.W.
> Washington, D.C. 20001
> Attorneys for Defendant

_____/s/ John F. Cooney____
John F. Cooney

¶

44