UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HEIN HETTINGA AND ELLEN )
HETTINGA d/b/a SARAH FARMS, *et al.*, )
)
      Plaintiffs, )
)
v. ) Civil Action No. 06-1637 (RJL)
)
UNITED STATES OF AMERICA, )
)
      Defendant. )

## MEMORANDUM OPINION
(March 15, 2011) [#44]

Plaintiffs Hein and Ellen Hettinga d/b/a Sarah Farms ("plaintiffs"), bring this action against the United States ("defendant" or "Government") as a facial challenge to the constitutionality of two provisions of the Milk Regulatory Equity Act of 2005 ("MREA"), Pub. L. No. 109-215, 120 Stat. 328 (2006) (codified at 7 U.S.C. § 608c). They allege, in essence, that because they alone are subject to those provisions, MREA constitutes a bill of attainder and is also a violation of equal protection and due process. Now before the Court is the Government's Renewed Motion to Dismiss. After careful consideration of the relevant law, the pleadings and oral arguments of counsel, and the entire record, the Government's motion is GRANTED.

## BACKGROUND

Milk markets in the United States are regulated by the Secretary of Agriculture, who is authorized under the Agricultural Marketing Agreement Act of 1937 ("AMAA") to issue milk marketing orders that govern payments from milk processors and

1

distributors (known as "handlers") to dairy farmers (known as "producers") within certain geographic regions. 7 U.S.C. §§ 601 *et seq.*; *Hettinga v. United States*, 560 F.3d 498, 501 (D.C. Cir. 2009); *see also Edaleen Dairy LLC v. Johanns*, 467 F.3d 778, 779-780 (D.C. Cir. 2006). Because the price of raw milk depends on its ultimate use (e.g., high-value uses such as fluid milk vs. low-value uses such as butter and cheese processing), handlers pay money into a "producer settlement fund" at fixed prices based on intended use. *Edaleen Dairy*, 467 F.3d at 780. The fund is then redistributed to producers to ensure that producers receive a uniform "blend price" for raw milk based on quantity sold regardless of end use. *Id.*

Until recently, entities that both produced and distributed their own milk products, known as "producer-handlers," were exempt from the pricing and pooling requirements established by federal milk marketing orders. *See id.* at 780-82. Because producer-handlers did not have to pay into the pool, they had a competitive advantage over other milk handlers and could sell their milk at lower prices. *Id.* Similarly, the pricing and pooling requirements did not apply to handlers who sold milk in geographic areas that were not regulated by federal milk marketing orders, even if the handler itself was located in a federally-regulated area. First Amend. Compl. ("Compl.") ¶ 17.1 [Dkt. #16].

Plaintiffs operate a dairy business in Yuma, Arizona, under the trade name Sarah Farms. *Id.* ¶¶ 1, 11. Sarah Farms is an integrated producer-handler that processes and sells over three million pounds of its own farm-produced milk in the former Arizona-Las Vegas Milk Marketing Area, which is now known as the Arizona Marketing Area or "Order 131." *Id.* ¶¶ 1, 17; *see also* 7 C.F.R. pt. 1131. Plaintiffs allege that they are the

only producer-handler in Order 131 with monthly milk sales over three million pounds. Compl. ¶ 17.

Plaintiffs also own, with their son, a second, independent milk processing plant known as GH Dairy or GH Processing ("GH Dairy"). *Id.* ¶¶ 1, 17.1. GH Dairy, a handler located in Arizona, processes raw milk into bottled milk and milk products for sale exclusively in California. *Id.* ¶¶ 1.1, 17.1. Because California is not a federally regulated marketing area, GH Dairy was not subject to federal minimum price regulation prior to the passage of the MREA. *Id.* ¶ 17.1.

According to plaintiffs, other dairy producers and processers, who were subject to the federal pricing and pooling requirements, had long sought to eliminate the producer-handler exemption to eliminate Sarah Farms as a source of competition. *Id.* ¶¶ 19, 21, 23. On February 24, 2006, the USDA adopted a Final Rule ("USDA Rule") that would have subjected producer-handlers operating in the Arizona-Las Vegas and Pacific Northwest Milk Marketing Areas to the pricing and pooling provisions of their respective marketing orders if they sold more than three million pounds per month of their own milk. *Id.* ¶ 24; *see also* 71 Fed. Reg. 9430 (Feb. 24, 2006). The USDA Rule was to go into effect on April 1, 2006.

On March 15, 2006, plaintiffs filed suit in the United States District Court for the Northern District of Texas challenging the legality of the USDA Rule and seeking a preliminary injunction. Compl. ¶¶ 25-26. Oral argument on the preliminary injunction was scheduled for March 29, 2006. *Id.* ¶ 26. On March 28, 2006, the House of Representatives passed MREA, which had passed in the Senate several months earlier.

3

*Id.* ¶¶ 26, 32. It was then sent to President Bush for his signature, and ultimately enacted on April 11, 2006. *Id.* ¶ 33; *see* Pub. L. No. 109-215, 120 Stat. 328 (2006). Ultimately, the District Court for the Northern District of Texas denied plaintiffs' motion for a preliminary injunction, and plaintiffs voluntarily dismissed the case. Compl. ¶¶ 45-46; *see also* Def.'s Renewed Mot. to Dismiss ("Def.'s Mot."), Exs. 1-2 [Dkt. #44].

At issue in this case are subsections M and N of Section 2(a) of MREA (now codified at 7 U.S.C. § 608c(5)(M)-(N)). With respect to the treatment afforded producer-handlers, these subsections of MREA were similar to the USDA Rule but narrower in scope. Like the USDA Rule, MREA's Subsection N subjects producer-handlers in the newly-revised Arizona Milk Marketing Area that sell more than three million pounds of milk per month to federal pricing and pooling requirements. Compl. ¶ 35. Unlike the USDA Rule, under MREA Nevada was removed from coverage by any federal milk marketing orders; MREA also did not cover the Pacific Northwest Milk Marketing Area. *Id.* ¶ 31. In addition, Subsection M of MREA imposed the federal pricing and pooling requirements on handlers who sold packaged milk in a state not covered by a federal milk marketing order, such as California. *Id.*

Plaintiffs now bring three constitutional challenges to MREA. First, they allege that Subsections M and N of MREA single them out for legislative punishment, thereby violating the Bill of Attainder Clause. *Id.* ¶¶ 41-52.5. Second, they claim that MREA foreclosed them from obtaining judicial review of the USDA's Rule in the Northern District of Texas, and is thus a violation of the Due Process Clause. *Id.* ¶ 60. Finally, plaintiffs claim that MREA denies them equal protection by "specifically singling them

4

out for adverse treatment that is extended to no other producer-handler in any other Milk Marketing area." *Id.* ¶ 65.

Plaintiffs filed their initial complaint on September 22, 2006. The defendant moved to dismiss for lack of subject matter jurisdiction or for failure to state a claim on December 6, 2006, and amici[1] filed a brief in support of that motion on January 3, 2007. An amended complaint was filed February 6, 2007.

After hearing oral argument on the motion on March 26, 2007, I dismissed the action for lack of subject matter jurisdiction on July 31, 2007, finding that plaintiffs failed to exhaust the administrative review process. *Hettinga v. United States*, 518 F. Supp. 2d 58 (D.D.C. 2007). On April 3, 2009, our Circuit Court reversed my decision, finding that plaintiffs' challenge was not to an order or attendant obligation, but instead to the determination of *which entities* would be subject to that order, and that exhaustion was not jurisdictionally required. *Hettinga*, 560 F.3d at 501. Because it was a constitutional challenge, which the agency lacked both the institutional competence to resolve as well as the authority to grant relief, our Circuit Court also found that exhaustion was not prudentially required. *Id.* at 506.

After remand, the Government renewed its motion to dismiss, arguing that the plaintiffs lacked standing as well as failed to state a claim. Again, amici filed a brief in

---

[1] Amici are United Dairymen of Arizona, Shamrock Foods, Shamrock Farms, Parker Farms, and the Dairy Institute of California, who are producers or handlers in the Arizona marketing order or a trade association of handlers in California who compete against GH Dairy. Amici Mem. 1 [Dkt. #45].

support of that motion. Oral argument was held on June 15, 2010, and the parties filed supplemental briefing on July 12, 2010.

## ANALYSIS

### 1. 12(b)(1): Standing

The Government argues that the plaintiffs lack standing to challenge Subsection N of MREA, which applies to Sarah Farms, because separate USDA regulations impose the same three million pound monthly cap on the producer-handler exception. Def.'s Mot. 9. The standing requirement, which derives from Article III's limitation on "federal courts to adjudicate actual 'cases' and 'controversies,'" *Allen v. Wright*, 468 U.S. 737, 750 (1984), is characterized as containing three elements: injury-in-fact, traceability, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). According to the Government, plaintiffs cannot show that their injury is traceable to MREA, as the USDA Rule, which contains the same three million pound cap on the producer-handler exception, preceded the statute's passage. Further, the plaintiffs cannot demonstrate redressability, because even if Subsection N of MREA were declared invalid, plaintiffs would still be subject to the three million pound cap under the USDA Rule.[2] Plaintiffs would only get relief if they were successfully able to challenge the regulations, which the government maintains is too speculative to support constitutional standing. *Lujan*,

---

[2] Traceability and redressability are "two facets of a single causation requirement . . . To the extent there is a difference, it is that the former examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the latter examines the causal connection between the alleged injury and the judicial relief requested." *Allen*, 468 U.S. at 753 n.19 (internal quotation omitted).

504 U.S. at 561 (redressability is met if it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision") (internal quotations omitted).

Unfortunately for the defendants, however, I am not persuaded by their arguments. *Lujan* addressed the standing of environmental groups seeking to invalidate joint Commerce and Interior Department regulations that regulated *third parties*, whereas in this case the plaintiffs are directly subject to the government action at issue—the passage of MREA. *Lujan*, 504 U.S. at 558, 562. As the Supreme Court in *Lujan* noted, if "the plaintiff is himself an object of the action (or foregone action) at issue," then "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Id.* at 561-62. Moreover, plaintiffs should not be forbidden from making a bill of attainder challenge to a statute that directly affects them simply because agency-promulgated regulations impose identical restraints. Accordingly, I will proceed to the Government's 12(b)(6) argument.

## 2. 12(b)(6): Failure to State a Claim

A court may dismiss all or part of a complaint that "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss made pursuant to Rule 12(b)(6), a complaint must have "facial plausibility," or in other words, it must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that "pleads facts that are merely consistent with a

defendant's liability [] stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotations omitted).

In evaluating a Rule 12(b)(6) motion, the Court must construe the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) (internal quotations omitted). But, the Court "need not accept inferences drawn by plaintiff[] if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Indeed, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 129 S. Ct. at 1950. Although the factual allegations need not be detailed, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and alterations omitted). Factual allegations, even though assumed to be true, must still "be enough to raise a right to relief above the speculative level." *Id.*

### a. Bill of Attainder

Congress is constitutionally prohibited from passing bills of attainder. U.S. Const. art. 1, § 9, cl. 3 ("No Bill of Attainder or ex post facto Law shall be passed."). Our Circuit Court has described a bill of attainder as "'a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the

8

protections of a judicial trial.'" *Foretich v. United States*, 351 F.3d 1198, 1216 (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977)). Thus, "a law is prohibited under the bill of attainder clause 'if it (1) applies with specificity, and (2) imposes punishment.'" *Id.* at 1217 (quoting *BellSouth Corp. v. FCC ("BellSouth II")*, 162 F.3d 678, 683 (D.C. Cir. 1998)). Both the specificity and the punishment prongs must be met before a law can constitute a bill of attainder. *Selective Serv. Sys. v. Minn. Pub. Interest Grp.*, 468 U.S. 841, 851 (1984); *see also Nixon*, 433 U.S. at 472-484 (finding that even though statute affected only a "legitimate class of one," it did not constitute punishment and therefore was not a bill of attainder).

The Government argues that plaintiffs' claim that MREA violates the Bill of Attainder Clause must be dismissed because they have failed to allege either that the act targets them specifically, or that it constitutes legislative punishment. Unfortunately for the plaintiffs, for the following reasons, I agree.

Plaintiffs have failed to allege that MREA targets them specifically. "The element of specificity may be satisfied if the statute singles out a person or class by name or applies to 'easily ascertainable members of a group.'" *Foretich*, 351 F.3d at 1217 (quoting *United States v. Lovett*, 328 U.S. 303, 315 (1946)); *see also BellSouth II*, 162 F.3d at 683. For example, the specificity prong is met when statutes reference an individual by name or by "a combination of facts [that] is so exceedingly narrow and unlikely to coincide that the affected persons are [] 'easily ascertainable.'" *Foretich*, 351 F.3d at 1217. The specificity prong may also be satisfied when an individual is "described in terms of conduct which, because it is *past* conduct, operates only as a

designation of particular persons." *Communist Party of the United States v. Subversive Activities Control Bd.*, 367 U.S. 1, 86 (1961) (emphasis added); *see also Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 413 (1950).

In *American Communications*, the Supreme Court upheld a statute that barred individuals from becoming labor organization leaders unless they signed an affidavit renouncing Communist beliefs and party membership. 339 U.S. at 413-14. The Supreme Court distinguished earlier bill of attainder cases that struck down "proscription[s] of certain occupations to a group classified according to belief and loyalty," because unlike in those cases, in *American Communications*, past Communist beliefs or party membership were not a bar to serving as a labor leader. *Id.* at 413. Those who so desired were "free to serve as union officers if at any time [those individuals] renounce the allegiances which constituted a bar to signing the affidavit in the past." *Id.* at 414.

Similarly, the universe of who may, or may not, be regulated under MREA is open-ended, since it not only fails to name plaintiffs (or any other party) as individuals, but moreover, the subset of producer-handlers regulated by MREA is entirely independent of past conduct. By its terms, the challenged subsections of MREA apply to two groups: (1) Subsection M covers producers located in federally regulated milk marketing area distributing milk to areas that are not subject to a federal milk marketing order; and (2) Subsection N covers handlers whose monthly distribution of milk from the handler's own farm exceeds three million pounds. 7 U.S.C. § 608c(5)(M)-(N). These classes of milk handlers or producer-handlers are not delineated in such an "exceedingly narrow" fashion such that they refer to an "easily ascertainable" group, nor are they based

on past conduct in any way. As in *American Communications*, plaintiffs are free to change their conduct to no longer be subject to the statute. Thus, even assuming that plaintiffs are the only entity *currently* covered by MREA, as they allege, the statute does not meet the specificity prong and therefore cannot constitute a bill of attainder. Because the first prong is not met, the Court need not even reach the question of whether the law constitutes legislative punishment.

### b. Equal Protection

MREA is an economic regulation that is entitled to rational basis review. *See, e.g., City of New Orleans v. Dukes*, 427 U.S. 297 (1976). "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns*, 508 U.S. 307, 313 (1993). The government need not even articulate its reasons at the time the statute is enacted, and as such, "the burden is upon the challenging party to negative any reasonably conceivable state of facts that could provide a rational basis for the classification." *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001) (internal quotations omitted). Where a *plausible* reason for congressional action exists, judicial review must end. *Beach Commc'ns*, 508 U.S. at 313-14.

The Government contends that it has a legitimate interest in ensuring the orderly function of milk markets. Def.'s Mot. 22. Courts have consistently recognized this interest as legitimate. *See, e.g., Nebbia v. New York*, 291 U.S. 502, 529-37 (1934);

*Lamers Dairy, Inc. v. U.S. Dep't of Agric.*, 379 F.3d 466, 473 (7th Cir. 2004); *Shamrock Farms Co. v. Veneman*, 146 F.3d 1177, 1183 (9th Cir. 1998). MREA, according to the Government, is a rational means of achieving that aim, because it closes loopholes in the AMAA that would otherwise allow producers exporting fluid milk to non-federally regulated regions or producer-handlers to gain significant competitive advantages over rivals and disrupt milk markets. Def.'s Mot. 22. Specifically, Subsection M prevents handlers located in federally regulated regions who export milk to non-federally regulated regions from gaining competitive advantages over rivals both in their federally regulated region as well as in the state-regulated region. *Id.* Similarly, Subsection N prevents large producer-handlers operating in federally regulated regions from disrupting milk market conditions by undercutting other handlers with non-regulated sales. *Id.* at 21-22.

Plaintiffs claim that MREA violates the Equal Protection Clause by classifying producer-handlers into two groups: (1) those subject to direct pricing and pooling requirements under MREA (*i.e.*, plaintiffs); and (2) those subject to the pricing and pooling requirements by the USDA Rule as promulgated under the AMAA. Compl. ¶¶ 65-65.2; Pls.' Opp'n 38 [Dkt. #47]. According to plaintiffs, this classification twice denies them equal protection: first, because they are the only producer-handler subject to direct pricing and pooling requirements, and second, because unlike their counterparts— who are subjected to the same pricing and pooling requirements but under the USDA

Rule and not MREA—plaintiffs were denied the ability to challenge the USDA Rule through the procedures set forth by the AMAA.³ I disagree.

Even assuming that the classifications plaintiffs allege exist, plaintiffs have wholly failed to allege in their complaint why MREA is, in their view, arbitrary or not rationally related to the government's interest in maintaining orderly milk markets. *See, e.g.*, *Shamrock Farms*, 146 F.3d at 1183. Though they may consider it *unfair*, for the reasons discussed above, mere disparity in treatment is not sufficient to state an equal protection violation. Indeed, "the legislature must be allowed leeway to approach a perceived problem incrementally." *Beach Commc'ns*, 508 U.S. at 316 (citing *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483 (1955)). Thus, "[t]he law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson*, 348 U.S. at 487-88. Because plaintiffs have not demonstrated that MREA is irrational or arbitrary in any way, their equal protection claim must also be dismissed.

### c. Due Process

Finally, the plaintiffs maintain that MREA violates their procedural rights under the Due Process Clause because it forecloses their ability to obtain federal review of the

---

³ It is worth noting that plaintiffs' challenge to the USDA Final Rule was based on the argument that the rule exceeded the Secretary's authority under the statute, because the Secretary had, on prior occasions, repeatedly declined to regulate producer-handlers because he found a clear Congressional intent to exempt producer-handlers from such regulation. *See* Compl. ¶¶ 22-23. By contrast, however, MREA's passage unequivocally demonstrates a clear Congressional intent to close the loophole for producer-handlers of a certain size and subject them to the same regulation as other handlers.

USDA's decision to implement the Final Rule in the *Hettinga v. Johanns* litigation. Specifically, the Complaint alleges that: MREA was passed in the House the night before oral argument on the plaintiffs' motion for a preliminary injunction; an attorney for the government brought the passage of MREA to the Court's attention at the hearing; and plaintiffs' preliminary injunction was denied.

The Government contends, however, that this claim must be dismissed not only because plaintiffs fail to allege a protected liberty or property interest, but also because they have failed to allege that MREA deprives them of the ability to challenge USDA regulations. Indeed, as the Government points out, though plaintiffs' motion for a preliminary injunction was denied, plaintiffs' administrative challenge to the USDA Rule never reached a final decision on the merits because plaintiffs voluntarily dismissed their suit. *See* Def.'s Mot. Ex. 2. Though plaintiffs make conclusory allegations in the complaint that MREA denied them the opportunity to seek judicial review, the factual content they plead is insufficient to allow the Court to reasonably infer a due process violation as required by *Iqbal*. 129 S. Ct. at 1949. Accordingly, the Government's motion must be GRANTED as to plaintiff's due process claim.

## CONCLUSION

For all the foregoing reasons, the defendant's Motion to Dismiss is GRANTED. An appropriate order will accompany this memorandum opinion.

_____
RICHARD J. LEON
United States District Judge